IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

STEVEN LISS,                          )
                                      )
        PLAINTIFF,                    )
                                      )
      -vs-                            ) Case No.: 3:19-CV-00810
                                      )
TMS INTERNATIONAL, INC.,              )
                                      )
        DEFENDANT.                    )
_____   )
                                      )
TMS INTERNATIONAL, INC.,              )
                                      )
        THIRD-PARTY PLAINTIFF,        )
                                      )
V.                                    )
                                      )
SUPREME TRUCKING &                    )
EXCAVATING, LLC and UNITED            )
SCRAP METAL, INC.,                    )
                                      )
        THIRD-PARTY DEFENDANTS.)

DEPOSITION VIA ZOOM OF ANGELA LEVITAN, PH.D.
TAKEN ON BEHALF OF THE PLAINTIFF
ON JUNE 22, 2021

*Reported by*
*Rachelle Zigrang*
*Missouri CCR Number 608*
*Illinois CSR Number 084-004014*

# *Bi-State Reporting, Inc.*
1204 Seasons Drive
Godfrey, IL  62035
Missouri (314)805-6578        Illinois (618)466-2039

**EXHIBIT A**

```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF ILLINOIS
2

3    STEVEN LISS,                )
                                 )
4         PLAINTIFF,             )
                                 )
5         -vs-                   )  Case No.: 3:19-CV-00810
                                 )
6    TMS INTERNATIONAL, INC.,    )
                                 )
7         DEFENDANT.             )
     _____)
8                                )
     TMS INTERNATIONAL, INC.,    )
9                                )
          THIRD-PARTY PLAINTIFF, )
10                               )
     V.                          )
11                               )
     SUPREME TRUCKING &          )
12   EXCAVATING, LLC and UNITED  )
     SCRAP METAL, INC.,          )
13                               )
          THIRD-PARTY DEFENDANTS.)
14

15                A P P E A R A N C E S

16

17   FOR THE PLAINTIFF
     (VIA ZOOM)
18
     DARR LAW OFFICES
19   307 Henry Street, Suite 406
     Alton, IL  62002
20   By:  Lanny Darr, Atty

21   FOR THE DEFENDANT-TMS
     (VIA ZOOM)
22
     LEWIS BRISBOIS BISGAARD & SMITH, LLP
23   550 West Adams Street, Suite 300
     Chicago, IL  60661
24   By:  Siobhan M. Murphy, Atty
          Abigail C. Horvat, Atty
25
```

2

1  **FOR THE DEFENDANT-UNITED SCRAP METAL**
   (VIA ZOOM)

2

3  CHILDRESS AHLEIM CARY
   1010 Market Street, Suite 500
   St. Louis, MO  63101

4  By:  Mark Hennelly, Atty

5

6  **FOR THE DEFENDANT-SUPREME TRUCKING**
   (VIA ZOOM)

7  BROWN & JAMES, P.C.
   525 W. Main Street, Suite 200

8  Belleville, IL  62220-1547
   By:  Denise Baker-Seal, Atty

9

10                    -o0o-

11

12                    -o0o-

13              **E X H I B I T S**

14

   **PLAINTIFF'S**
15 **EXHIBIT      DESCRIPTION                    PAGE**

16  1          Curriculum Vitae                    5
    2          Report                             67

17

18                    -o0o-

19

20                **I N D E X**

21                                              **PAGE**

Direct Examination by Mr. Darr              5
22 Cross-Examination by Ms. Baker-Seal       114
   Cross-Examination by Mr. Hennelly         122
23 Redirect Examination by Mr. Darr          122

24

25

3

1          It is stipulated and agreed, by and between

2     counsel for Plaintiff and counsel for Defendant, that

3     the discovery deposition via Zoom of Angela Levitan,

4     Ph.D. may be taken, by and on behalf of Plaintiff,

5     pursuant to the Federal Rules of Civil Procedure and

6     all applicable court rules pertaining to depositions,

7     on June 22, 2021, between the hours of eight o'clock

8     in the forenoon and six o'clock in the afternoon of

9     that day, before Rachelle Zigrang, IL-CSR, MO-CCR, in

10    a certain cause now pending in the United States

11    District Court Southern District of Illinois, wherein

12    Steven Liss is Plaintiff and TMS International, Inc.

13    is Defendant; on behalf of the Plaintiff, and that the

14    issuance of Notice and Dedimus is waived, and that

15    this deposition may be taken with the same force and

16    effect as if all statutory requirements had been

17    complied with.

18          It is further stipulated and agreed that any

19    and all objections to all or any part of this

20    deposition are hereby reserved and may be raised on

21    the trial of this cause, except as to the form of the

22    question, and that the signature of the deponent is

23    not waived.

24                         -o0o-

25

1       **ANGELA LEVITAN, PH.D.,**

2   via Zoom, of lawful age, being first duly sworn to

3   tell the truth, the whole truth, and nothing but the

4   truth, deposes and says on behalf of the Plaintiff.

5                    **DIRECT EXAMINATION**

6   BY MR. DARR

7       Q    Good morning.  Can you, please, state your

8   name?

9       A    Good morning.  Angela Levitan.

10      Q    Okay.  And what is your occupation or your

11  profession?

12      A    I am a human factors engineer and

13  biomechanist.

14           (The Court Reporter marked Plaintiff's

15  Exhibit 1.)

16      Q    And I noticed on your CV that there was --

17  that you previously had the last name DiDomenico.  Did

18  I pronounce that close to correct?

19      A    Close enough and yes.  That was my maiden

20  name.

21      Q    Okay.  So when I see DiDomenico on the CV

22  then that's also you.  Correct?

23      A    Yes.

24      Q    All right.  And I have a 7 page what I would

25  consider a CV which starts off with background and

1    goes into your educational background and a bunch of

2    publications and then another 11 page report.

3              Is that your understanding as to the

4    documentation that you have produced relative to your

5    testimony in this case?

6         A    Yes.

7         Q    Okay.  Did you have or do you have a case

8    list or a list of cases in which you've been a

9    disclosed witness in the past four to five years?

10        A    I do but not with me.

11        Q    Okay.  Would that be something you could

12   give to Siobhan or Abbi or something and they can get

13   that to us?

14        A    Yes.

15        Q    Okay.  Other than what's on your CV as far

16   as your educational background can you describe for me

17   your professional work as it relates to the field of

18   human factors or biomechanics?

19        A    Are you referring to my current work or

20   experience?

21        Q    Yeah, your experience.  And that was

22   intentionally a broad question in hopes that you would

23   run with it.

24             So just kind of tell me what you have done

25   outside of the field of education relative to human

1    factors or biomechanics on a professional level.

2        A    So after receiving my doctoral I became a

3    research scientist at the Center for Physical

4    Ergonomics within the Liberty Mutual Research

5    Institute for Safety, and as a research scientist I

6    performed experiments on human subjects and research

7    investigating causal factors of injuries and accidents

8    not solely related to but primarily related to

9    incidents related to falling and gravity.

10            Upon completion of my employment with them I

11   transitioned to a job I'm in now which is a forensic

12   engineer for ARCCA, Incorporated.

13            (There was a discussion off the record.)

14        A    Shall I try to continue?

15        Q    (By Mr. Darr) Yeah.  Well, I think you're up

16   to your current employment.  So let me kind of unpack

17   a little bit of what you just told me.  Okay?

18            And you were cutting out, and I couldn't

19   make out the name of the institute that you worked at

20   initially after receiving your degrees.

21        A    I worked for the Center for Physical

22   Ergonomics within the Liberty Mutual Research

23   Institute for Safety.

24        Q    And when we talk about Liberty Mutual when

25   you reference Liberty Mutual that's the insurance

1   company.  Correct?

2        A    Yes.

3        Q    Okay.  And how long did you work there?

4        A    Just shy of ten years.

5        Q    And were you working on specific claims

6   relative to issues that arose on Liberty Mutual

7   policies or did you just do general research?

8        A    I worked on research projects that were not

9   related to specific claims.  We were a separate

10  research institute that although funded by the Liberty

11  Mutual group was not directly related to the claims

12  department.  We did determine some of our general

13  focus based on areas in which injuries tended to occur

14  so in a general sense.  The claims from Liberty Mutual

15  and other incidents that occur around the country and

16  are reported by others did help us determine general

17  areas that we might want to focus on, but none of my

18  research was specific to any one claim or any set of

19  specific claims.

20       Q    When you were employed by Liberty Mutual did

21  you give expert testimony?

22       A    No, I did not.

23       Q    Okay.  And where was the Liberty Mutual

24  Research Institute located?

25       A    Hopkinton, Massachusetts.

1    Q    And after working there ten years you went

2    to your current place of employment?

3    A    Yes.

4    Q    And do you pronounce it ARCCA?

5    A    Yes.

6    Q    And how long have you worked at ARCCA?

7    A    I just had my eighth year anniversary.

8    Q    And for the record ARCCA is an acronym which

9    is A-R-C-C-A.

10          I'm sorry?

11    A    Go ahead.  I'm sorry.  Ask your question.

12    Q    Sure.

13          What does the ARCCA stand for?  What are the

14    initials?

15    A    It's my understanding that the name of the

16    company is ARCCA, Incorporated, that originally the

17    letters may have been chosen to represent family

18    members of the owner; but the name of our company is

19    ARCCA, Incorporated.

20    Q    Okay.  So for all practical purposes as of

21    today they don't really stand for any-- they don't

22    have any abbreviation or acronym use?

23    A    Correct.

24    Q    Okay.  And that's in Penns Park,

25    Pennsylvania?

1      A     That is where my office is located and our

2    headquarters.

3      Q     Okay.  And what is ARCCA?

4      A     ARCCA is an engineering firm that provides

5    consultant services, performs research and development

6    and provides litigation support.

7      Q     Okay.  How many people are employed at ARCCA

8    that do biomechanical work or expert witness work?

9      A     I'm sorry.  That's more than one question.

10           Could you specify, please?

11     Q     Sure.

12           Are there some people in ARCCA who just do

13    research and others who do expert witness testimony?

14     A     There are experts.  There are people who

15    support us who do not testify.  There may be some

16    people who only do research, but at this moment I

17    don't know everybody's roles.  So I couldn't identify

18    anybody specifically.

19     Q     Okay.  But have you given expert testimony

20    since you have been employed at ARCCA?

21     A     Yes.

22     Q     In how many different cases have you

23    testified in as an expert or been retained in I should

24    say?

25     A     Well, I have been retained I'm going to

1    approximate 300 to 500 times.  I have only provided

2    testimony in possibly two to three dozen cases.

3        Q    When you say testimony are you including

4    deposition testimony or are you also including trial

5    testimony?

6        A    I'm including both deposition and trial

7    testimony in that number.

8        Q    Okay.  And who is your clientele at ARCCA in

9    the sense of who hires you to perform -- to provide

10   expert consultation whether it be testimony or just

11   consulting in litigated cases?

12       A    For our general engineering consultancy it

13   can be anybody from a company or an attorney or a

14   claims adjuster.

15       Q    Okay.  Do you primarily work for the defense

16   in such situations?

17       A    I do work for both plaintiff and defense.

18       Q    Do you know your breakdown of whether

19   percentage for plaintiff verse defense?

20       A    I don't keep specific track of that, and it

21   would change slightly over time.

22       Q    Well, your testimony list that you are going

23   to provide us would that give us an indication as to

24   whether you were retained by the plaintiff or defense?

25       A    It should indicate that I have testified for

```
1    both sides.  I don't know if the proportion is

2    indicative of the overall retainment for my services

3    in litigation support.

4         Q    Well, on that list do you know what the

5    breakdown is plaintiff to defense?

6         A    No.

7         Q    Do you know if it tends to tilt one way or

8    the other?

9         A    I don't recall at this time the testimony

10   breakdown.  Generally speaking I do more defense work

11   than plaintiff work.

12        Q    Have you ever testified in a case in

13   Illinois?

14        A    I believe so, but I would have to check my

15   testimony list to make sure.

16        Q    Okay.  Does the testimony list tell us what

17   venue the cases you testified in were located?

18        A    I believe it does.  I don't keep it.  My

19   project manager does, but I believe that it does

20   indicate at least a general location.

21        Q    And are there other specialists at ARCCA or

22   other experts at ARCCA other than biomechanists?

23        A    Yes.

24        Q    What other specialties does ARCCA provide

25   testimony in?
```

1        A     I'm sure I'm not going to get all the

2    specialties, but generally speaking we cover anything

3    that has to do with engineering.  Some of our larger

4    areas are motor vehicle accident reconstructionists,

5    mechanical engineers, structural engineers.

6        Q     Okay.  What professional licenses do you

7    hold?

8        A     I don't have a license, but I'm a certified

9    professional ergonomist which is the certification

10   available for what I do.

11       Q     Okay.  And who issues that certification?

12       A     BCPE, Board of Certification for

13   Professional Ergonomics.

14       Q     And how long have you held that

15   certification?

16       A     It's a two-step process; and I believe that

17   the first step was around 2005; and although off the

18   top of my head I don't recall specifically, I think

19   the full certified professional ergonomist was 2007 or

20   thereabouts.

21       Q     Okay.  And what is the importance of having

22   a certification in ergonomics?  I mean is there

23   anything you can and cannot do in the absence of a

24   certification?

25       A     I'm not necessarily aware of anything in

1    particular that you can or can't do because you have

2    the certification.  The certification does provide in

3    my opinion a means of expressing the quantity and

4    quality of the education and training that an

5    ergonomist or human factors engineer has.

6         Q    How do you go about becoming a certified

7    ergonomist?  I'm probably mispronouncing that but go

8    ahead.

9         A    You are correct.

10          The process when I became a certified

11   professional ergonomist generally entailed a certain

12   amount of education, a certain amount of training and

13   experience.  That got me to the first level.  Then to

14   become a full-certified professional ergonomist there

15   was another amount of experience in the field that I

16   had to have; and finally there was an examination that

17   I had to take and pass; and to continue with that

18   certification every five years I have to reapply with

19   proof that I am continuing my training, my experiences

20   and working in the field to get recertified.

21        Q    Do you hold any type of engineering license

22   or certification?  I mean I assume arguably ergonomics

23   would be related to that but as a professional

24   engineer or anything?

25        A    No.  As I said earlier, I'm not a

1    professional engineer because the professional

2    engineering designation although it has different

3    subcategories for engineering none of them cover the

4    human factors aspect, the human factors or ergonomics

5    aspect and thus is not directly related to my training

6    and experience.

7        Q    Okay.  And you are not certified as a

8    reconstructionist?

9        A    I'm not certified as a motor vehicle

10   reconstructionist, no.

11       Q    Okay.  Or any type of accident

12   reconstructionist?

13       A    I'm not.  Although, I'm not aware of any

14   certification necessary to do reconstructions of the

15   kinds of incidents that I look at that have to do with

16   people and personal injuries outside of motor vehicle

17   accidents.

18       Q    Can you kind of ferret out for me the

19   difference between biomechanics, human factors and

20   ergonomics?  Is there a distinction that can be

21   clearly drawn between those three areas?

22       A    Generally human factors and ergonomics are

23   synonomous.  Historically speaking, ergonomics has

24   tended to be used more in office settings or in

25   designing, you know, equipment or work stations in an

1    ergonomic fashion; but really human factors and

2    ergonomics are synonomous.

3            As far as the distinction between human

4    factors and biomechanics, human factors is the

5    scientific discipline that looks at the interaction of

6    people and the tasks they're performing and the

7    environment in which they're performing it in.

8    Biomechanics is part of that where it's the

9    application of the principals of physics to the human

10   body, looking at the movements of the body while it's

11   performing a task, the forces it's producing and the

12   effects of forces during tasks that are being produced

13   on the person.  So there is obviously a large overlap,

14   but they are not exactly the same as human factors

15   will look at more than just the movement of forces.

16   It can also encompass looking at other senses and

17   other ways that people interact with their

18   environment.

19       Q    And I may have asked this before but have

20   you given any testimony whether it be in deposition or

21   trial situation that was outside the field of

22   biomechanics or human factors?

23       A    Well, as part of my testimony in human

24   factors and biomechanics that also encompasses some

25   aspects of safety.  So I wouldn't consider that

1    necessarily outside of that expertise, but I just

2    wanted to clarify that that is also part of what I

3    have been qualified to talk about in testimony.

4        Q    Okay.  When you say qualified do you mean

5    qualified by a court or by your own parameters or what

6    do you mean?

7        A    I believe as being offered as an expert in

8    human factors and safety during a trial and being

9    accepted as being able to testify on those topics.

10       Q    Has your testimony ever been disallowed or

11   not allowed by any court?

12       A    Not to my knowledge.

13       Q    Okay.  Do you track such things?

14       A    Beyond being in the courtroom and being

15   allowed to continue testimony, no.

16       Q    Okay.  In particular like are you familiar

17   with the Daubert standard or have you ever been

18   challenged on a Daubert basis that you're aware of?

19       A    I am aware of the Daubert challenge, and I

20   distinctly remember at least one on a federal case

21   that I testified for, and we had the hearing, and I

22   was able to testify.

23       Q    Okay.  Do you remember where that hearing

24   was held?

25       A    I don't specifically know.

1    Q    I mean did you travel to that courthouse for

2  testimony?

3    A    Yes.

4    Q    Okay.  But you don't remember where you

5  traveled to?

6    A    No.  I think it may have been New York State

7  Federal Court, but I'm not 100 percent sure.

8    Q    But do you consider yourself an expert in

9  the field of work site safety?

10    A    There are occasions where I opine on

11  workplace safety issues, yes.

12    Q    Okay.  Is that what you are doing here

13  today?

14    A    The analysis today is focusing more on the

15  human factors aspects related to the kinematics of the

16  events.  Although, it's almost impossible in my mind

17  to talk about human factors of an event that looks at

18  how a person interacts with their environment without

19  also keeping in mind that there is the safety aspects

20  and where some of the principals come from to try to

21  reduce injuries which in my mind is part of safety.

22    Q    But tell me what your background or

23  experience is relative to safety or safety compliance

24  or whatever you believe makes you an expert in that

25  field?

1      A     My master's degree in industrial and systems

2  engineering and doctoral degree in industrial and

3  systems engineering were the primary original training

4  that I received in the area because it was a human

5  factors and biomechanical program within the

6  industrial and systems engineering program at Virginia

7  Tech.  I was exposed to all aspects of industrial

8  settings and workplaces.  So I also took many courses

9  that had to do with safety.

10          During the master's program one thing that

11  Virginia Tech offered was they called it a safety

12  certificate.  Because it was a graduate program they

13  can't really call it a minor, but I received that

14  safety certificate because of the extra classes and

15  training that I undertook.  And as I continued then

16  after my formal education my training and experience

17  continued working as a research scientist who was

18  motivated partially by injuries that were occurring at

19  the workplace.  Although, my research wasn't only

20  about workplace settings it did encompass that which

21  gave me the opportunity to learn even more about

22  workplace environments, safety regulations and

23  standards that were applicable to my areas and how the

24  work that's being done on sites can be causative

25  factors of injuries.

1              Then I have continued my experience now at

2    ARCCA by providing litigation support in, you know,

3    different cases that have occurred on work sites.

4         Q    So the safety certification you referenced

5    would that have been during your master's that you

6    received in 1999?

7         A    Yes.

8         Q    Do you consider yourself to be an expert in

9    OSHA regulations or OSHA compliance?

10        A    I have opined on applicable OSHA regulations

11   depending on the area.  OSHA covers a lot of different

12   environments.  I don't necessarily claim to be an

13   expert in everything that OSHA covers but in the areas

14   of my expertise, yes.

15        Q    So what OSHA regulations do you consider to

16   be within your expertise?

17        A    I wouldn't be able to list all the OSHA

18   regulations.  I generally work in the Federal Industry

19   1910 regulations and the Construction 1926 regulations

20   that OSHA has put forth.

21        Q    Okay.  When was the last time you attended

22   an OSHA instructional course?

23        A    I'm actually in the process right now of

24   recertifying some of my OSHA certifications.

25        Q    Maybe I misunderstood you earlier.

1                    What OSHA certifications do you have?

2          A      Currently I have -- I believe I have the

3     OSHA 10 General Industry, the OSHA 30-hour

4     Construction Certification, Fall Protection.  I'm

5     sorry.  The specific names would be on my CV.  So

6     these aren't specific, but I have a competent person

7     certification.

8          Q      Well, you would agree with me that it is

9     important for employers to comply with OSHA

10    regulations.  Correct?

11         A      Yes.

12         Q      Okay.  And you would agree with me generally

13    that OSHA regulations would be applicable to the TMS

14    Granite City location?

15         A      Yes.

16         Q      And that the OSHA regulations and

17    requirements are important for any employer to

18    consider when determining whether a safe work site

19    exist?

20         A      If the work site falls under the OSHA

21    environments that they're covering, yes, I agree that

22    the employers should be considering those regulations

23    that are put forth by OSHA.

24         Q      And you would agree with me that all

25    employers are required to provide a safe work site for

1   their employees.  Correct?

2      A    Again, yes, under the umbrella of the

3   employers that OSHA is covering I agree.

4      Q    Well, that would be -- OSHA would cover the

5   TMS work site in Granite City, Illinois.  Correct?

6      A    I would have no reason to believe it would

7   not.

8      Q    And the OSHA regulations are there just not

9   only to provide -- I mean to protect the employees on

10   the work site but also other people coming onto the

11   work site.  Is that correct?

12      MR. HENNELLY:  Object to the form.

13      A    Well, by creating a work environment that is

14   safe for the employees then you are also providing a

15   safer environment for any other person who is invited

16   to be at that site.

17      Q    (By Mr. Darr) And you would agree with me

18   that the flood water that existed on the Granite City

19   TMS site on February 7, 2019, was a hazard to both TMS

20   employees and the third parties on the Granite City

21   property?

22      A    No.

23      Q    You don't believe that the flood water was a

24   hazard?

25      A    Not necessarily.

1      Q      Can you tell me why?

2      A      Well, it is a broad question; but there is

3   no indication based on specifics of this incident that

4   we are talking about today that there was a

5   requirement for anybody to actually interact with the

6   flood waters.

7      Q      Okay.  Well, if they were required to

8   interact with the flood waters, would it constitute a

9   hazard?

10     A      I think that that is too broad of a question

11  for me to answer.

12     Q      Why is it too broad?

13     A      There is a lot --

14     Q      I'm sorry.  Go ahead.

15     A      There are a lot of different ways to

16  interact with water that's on the ground; and in this

17  situation, you know, we have people potentially

18  interacting with their vehicles or with their own

19  bodies.

20     Q      Okay.  So was Steve Liss -- well, let me

21  back up a little bit.

22            Did TMS employees were they required to

23  navigate around the flood water on February 7, 2019?

24     A      Can you, please, specify what you mean by

25  navigate around?

1      Q     Avoid it.  Take steps to avoid it.

2      A     Depending on what tasks they were going to

3  perform it is definitely possible that they would have

4  to take steps to avoid the flood water.

5      Q     Would you agree with -- well, would you

6  agree with me that the flood water that existed on

7  February 7 was a potential hazard?

8      A     Depending on the task that was going to be

9  performed it potentially could be a hazard.

10     Q     Okay.  Could it cause physical injury?

11          MS. MURPHPY:  I'm going to object to the

12  form of the question.  It's too incredibly broad and

13  an incomplete hypothetical.

14     Q     (By Mr. Darr) Go ahead, ma'am.  Can you

15  answer my question?

16     A     It is too -- there is not enough specifics

17  for me to answer that question.

18     Q     Well, you would agree with me that Steve

19  Liss was injured while he was trying to navigate flood

20  water?

21     A     Based on his testimony that is my

22  understanding is that he walked through an area that

23  had water in it where he could not see below the

24  water.

25     Q     Okay.  And as a result he became injured?

24

1          A       It's my understanding he did become injured.

2     I am not going to agree that the water in itself was

3     the causative factor.

4          Q       Okay.  But my question was:

5                  He was injured while he was attempting to

6     navigate flood water.  You don't agree with that

7     statement?

8          A       Based on his testimony he was in the process

9     of navigating an area that was covered with water,

10    yes.

11         Q       Okay.  And the reason he was in the flood

12    waters was because he was trying to access the office

13    of TMS.  You would agree?

14         A       Based on his testimony he had left the

15    office and was returning to his vehicle.

16         Q       Okay.  You would agree with me that an

17    employee has an obligation to remediate any known

18    hazard on its work site?

19         A       Yes.

20         Q       And it must remediate any hazardous

21    condition promptly?

22         A       Reasonable promptness is expected, yes.

23         Q       Okay.  And if it cannot prevent employees or

24    third parties from coming in contact with a known

25    hazard to barricade it or block it off.  Would that be

1   accurate?

2      A   Well, there is a safety hierarchy; and

3   barricading or guarding is one of the steps within

4   that safety hierarchy if you can't eliminate the

5   hazard, yes.

6      Q   Okay.  If you can't eliminate it, then you

7   have to guard against it or barricade against it.

8   Correct?

9      A   It is one of the things that you can do,

10   yes.

11      Q   Okay.  What other things could one do as an

12   employer if they have a known hazard?

13      A   Well, if you can't engineer it out and

14   eliminate it, we already talked about you could guard

15   against it.  There are other things you could do like

16   warning or using administrative controls if there is a

17   way that that is feasible.  And I believe training is

18   also on the safety hierarchy.

19      Q   You would agree that a hazard in a walkway

20   that is not properly warned against is a dangerous

21   work site?

22      MS. MURPHPY:  Form of the question; assumes

23   facts not in evidence.

24      A   If there is -- I'm sorry.

25      Can you repeat the question?

1     Q     (By Mr. Darr) Sure.

2           If you have a hazard in a walkway, that's a

3     dangerous condition?

4     A     If there is an established walkway that has

5     a hazard, then it can be a dangerous condition.

6     Q     Well, would there be any circumstances in

7     which it would not be a dangerous condition?

8           MS. MURPHPY:  Form of the question.

9     A     I can't begin to evaluate every single

10    possibility to see if there are any situations where a

11    hazard does or does not create a dangerous condition

12    just because it is such a broad question.

13    Q     (By Mr. Darr) Can you give me a couple of

14    examples that would be relevant where you could have a

15    hazard in a dedicated walkway --

16          MS. MURPHPY:  Form of the question.

17    Q     (By Mr. Darr) -- and it would not result in

18    a dangerous situation?

19          MS. MURPHPY:  Form of the question; assumes

20    facts not in evidence.

21    A     Not at this time.  Generally speaking, as I

22    mentioned, if there is an established intended walkway

23    that has a hazardous condition, it generally is then

24    considered a dangerous condition.

25    Q     (By Mr. Darr) On February 7, 2019, did

1  anyone else have authority to correct safety

2  violations on its property other than TMS employees?

3          MS. MURPHPY:  Form of the question.

4      A    Based on my review of the materials I'm not

5  aware of any other entity that would be in charge of

6  that site besides TMS.

7      Q    (By Mr. Darr) Okay.  So all of your review

8  of materials in this case indicated that TMS was the

9  only one with authority to correct safety violations

10  on February 7, 2019?

11          MS. MURPHPY:  Form of the question.

12      A    Well, it's my opinion that TMS was operating

13  that site and would be responsible for any violations

14  directly related to the site environment.

15      Q    (By Mr. Darr) And if there is a hazard in a

16  known or dedicated walkway, the employer or whoever is

17  controlling the property, has an obligation to provide

18  alternative pathways.  You would agree?

19          MS. MURPHPY:  Form of the question.

20      A    I'm sorry.  Could you repeat the question?

21      Q    (By Mr. Darr) Sure.

22          If there is a known hazard in a dedicated

23  walkway, that entity controlling the work site has a

24  duty to provide an alternative walkway or pathway.

25  Correct?

1    A    Well, if there is --

2         MS. MURPHPY:  Form of the question.

3    A    -- a known and established walkway that does

4    have a hazard, then as we talked about earlier

5    guarding against would be one of the possibilities;

6    and having then alternative means of accessing the

7    area would be necessary.

8    Q    (By Mr. Darr) Okay.  And that's a

9    requirement of whoever controls the property.

10   Correct?

11        MS. MURPHPY:  Form of the question.

12   A    Well, the entity that controls the property

13   would be responsible for providing the intended

14   walkways.

15   Q    (By Mr. Darr) And those walkways have to be

16   free of hazards?

17   A    Yes.

18   Q    And it's your opinion that flood water on an

19   intended walkway is not a hazard?

20   A    It's my opinion that it could potentially be

21   a hazard or disguising something else that's going on

22   with the walkway underneath if it is obstructing view.

23   Q    Was the flood water that existed on

24   February 7, 2019, that obstructed intended walkways a

25   hazard relative to the TMS property?

1          MS. MURPHPY:  Form of the question; assumes
2    facts not in evidence.
3      A    Based on my review of the materials the
4    intended walkways to enter the office building weren't
5    flooded.
6      Q    (By Mr. Darr) Tell me where you believe that
7    the intended walkway was on February 7, 2019, from --
8    and when I say intended walkway I mean the intended
9    walkways from the area of the scales to the office?
10         MS. MURPHPY:  Form of the question; assumes
11   facts not in evidence.
12     A    Well, given my understanding that the scales
13   were flooded, there would be no reason for anybody to
14   be on the scales.  This was indicated by the --
15   partially by the cone that was placed before the
16   scales.  So there -- it was not necessary to have an
17   intended walkway from the scales itself because there
18   should not have been anybody at the scales.
19     Q    I think you are misunderstanding my
20   question.
21         There was an intended walkway that went from
22   the scales to the office before February 7, 2019.
23   Correct?
24     A    Well, it's my understanding that when the
25   truck drivers were using the scales that it is

1    necessary after they are on the scales to be able to

2    get to the office.

3        Q    Right.  And there is an intended walkway

4    that they take from the scales to that office door.

5    You would agree?

6        A    Well, based on the materials I reviewed

7    there wasn't anything actually marked from the actual

8    scales to the office door past the catwalk.

9        Q    Okay.  So that walkway was it covered with

10   flood water on February 7, 2019?

11       A    It's my understanding that that area that

12   would have been traversed by truck drivers using the

13   scales was covered with water because the scales were

14   covered with water.

15       Q    Okay.  And the area between the catwalk and

16   the scales was covered in water on February 7, 2019.

17   Correct?

18       A    I believe so, yes.

19       Q    Okay.  And the area underneath the catwalk

20   was covered in flood water.  Correct?

21       A    Yes.

22       Q    If someone was trying to walk from the

23   scales to the office on February 7, 2019, would the

24   flood water be considered a hazard?

25       A    Again, as I answered earlier, based on the

1    fact that the scales were flooded, that TMS closed the

2    scales and placed the cone at the beginning of the

3    scales to prevent the truck drivers from bringing

4    vehicles onto the scales so there would be no reason

5    for anybody to be there, thus, no hazard because no

6    walkway would have been used.

7         Q    My question is -- well, you think that since

8    the flood water was obscuring the pathway that it

9    wasn't a hazard because no one should be using it

10   anyway?

11        A    I think that at the time of the incident

12   that the trucks weren't allowed on the scales and,

13   thus, the truck drivers would not have been accessing

14   the office from the scales and then forced to walk

15   through the flood waters on the scales.

16        Q    But my question was:

17             If someone was attempting to walk from the

18   scales to the office on February 7, 2019, the flood

19   water would constitute a hazard.  Correct?

20             MS. MURPHPY:  Form of the question.

21        A    Again, as I mentioned earlier, the flood

22   waters could potentially be a hazard but there was no

23   reason for anybody to be on the scales at the time of

24   this subject incident.

25        Q    (By Mr. Darr) Well, but my question is:

1              If they were attempting to walk for whatever

2    reason from the scales to the office, was that flood

3    water a hazard?

4        A    Again still, potentially flood waters can be

5    a hazard, not necessarily a hazard; but it's not a

6    hazardous condition for an individual walking if they

7    are not supposed to be there.  In that case they have

8    made a choice to be in an area that they shouldn't

9    have been in because the scales were closed.

10       Q    Okay.  Under what circumstances would the

11   flood water not constitute a hazard?

12       A    Well, first the flood water would have to be

13   covering an intended constructive walkway.

14       Q    Okay.  Would anything else have to be

15   present or not present before it could be ruled to not

16   be a hazard?

17       A    I think every situation is different.  It

18   has to be analyzed based on the details.  We're using

19   the term flood water, for instance, without any

20   specificity as to what that definition is.  So to

21   assess a situation to determine whether water on an

22   intended walkway is hazardous I think that you need to

23   have more details in regards to the situation to do a

24   proper analysis.

25       Q    Well, I'm talking about the water that

1    existed on February 7, 2019.  Do you need to know

2    what -- what information do you need to know more to

3    determine whether or not it was a hazard?

4            MS. MURPHPY:  Form of the question.

5        A    Well, it's my opinion that the flood waters

6    that were present on the day of the subject incident

7    were covering the scales and under the catwalk that in

8    my opinion was not a constructed intended walkway.

9    So, therefore, those flood waters should not have been

10   hazardous because there shouldn't have been anybody

11   traversing that area.

12       Q    (By Mr. Darr) Would the depth of the water

13   be necessary for you to know to determine whether or

14   not it's a hazard?

15       A    Generally speaking if we are assessing water

16   in a walkway, the amount of water would be a piece of

17   information that would be useful to know.

18       Q    Can there be unintended water whether it be

19   flood water, rainwater or any other type of water that

20   is not a hazard if it's in a walkway?

21       A    There are definitely many different amounts

22   of water that could be on a walkway.  So every

23   situation would have to be analyzed to determine if

24   the existence of the water was actually creating a

25   hazardous condition.

1    Q    So you can have some water on a walkway that

2  may not be a hazard to workers; is that correct?

3    A    Yes.

4    Q    Okay.  And when we talk about a walkway what

5  is the definition of a walkway?

6    A    Well, walkways are, you know, constructed

7  for pedestrian travel usually sidewalks, sometimes

8  sections of parking lots, stairs, floors.

9    Q    Well, is there a difference between a

10  walkway and then an intended walkway?

11    A    Well, there is definitely differences as to

12  the fact that there are areas that people walk that

13  aren't necessarily going to be constructed walkways

14  that are going to fall under some of the standards and

15  guidelines that are out regarding walkway safety.

16    Q    Would anywhere where an employee walks be

17  considered a walkway?

18    A    Everywhere an employee walks is not

19  necessarily a walkway.

20    Q    Why is that?

21    A    Well, again, my definition of walkway based

22  on national walkway safety is going to be a

23  constructed walkway with the intended purpose of

24  having pedestrian travel.  There are going to be a

25  number of settings that can be, for instance, outdoors

1    or, you know, out in industrial settings that although

2    they are not the intended walkway there may be a

3    reason whether they should be there or not that an

4    employee may walk in different areas.  It doesn't

5    necessarily mean it was an intended walkway.

6         Q    Well, was there a dedicated walkway or path

7    from the scales to the office in this location?

8         A    In my review of the materials for the, as I

9    mentioned earlier, for the truck drivers getting out

10   of their vehicles when they're actually on the scales

11   it's my understanding that they would walk from their

12   vehicles to the office door.  Other than that during

13   the normal operation of the scales there were walkways

14   constructed around the building.

15        Q    I'm talking about between the scales and the

16   office.  There is not a dedicated pathway or walkway.

17   They just generally walk from the scales to the

18   office.  Correct?

19        A    Correct.  Given the environment and the rail

20   there isn't -- it's an outdoor setting.  There -- it's

21   my understanding there isn't a specific delineated

22   path.

23        Q    Okay.  So there was just a general area that

24   truck drivers could walk from the scales to the office

25   performing their routine tasks.  Correct?

1      A      Well, given the normal operation of the

2  scales and truck drivers getting out of their vehicles

3  while the truck is on the scales there was an

4  unobstructed path that could lead from the trucks to

5  the office door without going under the catwalk.

6      Q      Right.  But what I'm just saying is before

7  February 7, 2019, there is just a general open space

8  that truck drivers could use to walk from their truck

9  on the scales to the office?

10     A      Generally, yes.

11     Q      Okay.  And on February 7, 2019, that general

12 area was underwater.  Correct?

13     A      Not the entire section.

14     Q      Okay.  What section was not underwater?

15     A      It's my understanding that the waters did

16 not go all the way up to the office door or the stairs

17 to the office door.

18     Q      So how far from the stairs leading to the

19 office door was the water not covering?

20     A      I don't know specifically that amount or a

21 measurement, but based on the photographs that I

22 reviewed from that day there was a clear path from the

23 office door to the stairs to the walkway at the bottom

24 of the stairs and around the building.  It's the flood

25 waters were on the scales.

```
 1        Q     Right.

 2              But I'm trying to figure out between the

 3    scales and the stairs leading into the office how much

 4    dry area was there?

 5        A     I don't know a specific measurement.

 6        Q     Okay.  But you would agree with me the

 7    majority of that area between the scales and the

 8    stairs was underwater?

 9        A     It is my understanding that the scales were

10    underwater.

11        Q     And that most of the distance between the

12    scales and the stairs was underwater?

13        A     I don't know the measurements you know and

14    where -- where your referencing like the edge of the

15    scales to the door.  So I don't have a specific

16    answer.

17        Q     Okay.

18              MS. MURPHPY:   Relevance.

19        Q     (By Mr. Darr) Do you have an understanding

20    as to if there was a dry path between the scales and

21    the stairs?

22        A     It's my understanding that the scales were

23    flooded so there would be no specific dry path from a

24    vehicle that was actually on the scales to the office

25    which is my understanding one of the reasons why the
```

1    scales were actually closed.

2        Q    What was the range of depths of the water

3    that existed on TMS's property on February 7, 2019?

4        A    I don't know that specifically.

5        Q    Do you have any measurements as to the

6    depths of water at any locations on the TMS property?

7        A    I recall reading some testimony from

8    different people who tried to approximate some water

9    depths in different areas, but other than that it

10   would just be based on photographs which don't provide

11   in this case specific water depths.

12       Q    Well, what's your understanding as to the

13   approximation that other witnesses made as to the

14   water depth?

15       A    I don't know that any of the testimony was

16   specific to water depth for the overall site.  I do

17   recall specifically somebody said a certain area was

18   the depth of their finger.  I believe somebody else

19   may have approximated a certain depth at two or three

20   inches, but I don't have anything more specific at

21   this point except based on the photographs and the

22   fact that there were areas that were dry ranging to

23   areas primarily the scales that were covered with

24   water.

25       Q    Do any of your opinions rest upon an

1    understanding or assumption as to the depth of water?

2             MS. MURPHPY:  Form of the question.

3        A    The specific depth of water wasn't necessary

4    for me to formulate my opinions.

5        Q    (By Mr. Darr) You would agree that the

6    flooding that is depicted in the various photographs

7    that you reviewed was a reoccurring condition for the

8    Granite City property?

9        A    That is my understanding.

10       Q    Okay.  And was TMS under an obligation to

11   have a plan in place to deal with this flood water?

12       A    That wasn't part of the scope of my analysis

13   for this case.

14       Q    So you didn't consider whether or not this

15   work site had a plan available to it to institute

16   under flood conditions?

17       A    Part of my analysis for this case was not

18   looking specifically at the safety policies or work

19   site safety beyond what was related to my opinions.

20       Q    Okay.  So you have no opinions as to whether

21   TMS should have had a plan in place to deal with flood

22   conditions on its scales?

23       A    Well, I don't have any opinion besides the

24   fact that based on testimony when the scales flooded

25   the scales had to close and TMS put out a cone to

1      indicate that the scales were closed.

2          Q      I'm sorry.  You cut out.

3                 Did you say they put out a red cone?

4          A      They put out a cone to indicate that the

5      scales were closed and that the truck drivers could

6      not continue onto the scales.

7          Q      Other than that do you have any

8      understanding as to any plan or approach that TMS used

9      when flood waters were present?

10         A      Only that which was included in the

11     testimony that was really beyond the scope of my

12     analysis for this case.

13         Q      Okay.  So you don't have an opinion as to

14     whether TMS should have had a more thorough plan than

15     placement of a cone?

16         A      That wasn't part of my scope so, no, I do

17     not have an opinion on that subtopic.

18         Q      Okay.  And did they have a plan in place,

19     anything in addition to placing the cone near the stop

20     sign when the scales were flooded?

21                MS. MURPHPY:  Form of the question.

22         A      Again, based on my review of the materials I

23     recall that there was some testimony regarding

24     identifying that the scales were closed to different

25     entities.

1    Q    (By Mr. Darr) Okay.  When you say

2    identifying that the scales were closed to certain

3    entities do you mean contacting them and saying, hey,

4    our scales are closed, don't send your drivers?

5    A    I believe there was some testimony about

6    sending out e-mails to certain parties.

7    Q    Do you think they should have been doing

8    that?

9    A    Again, analyzing the appropriateness of

10   their response is beyond the scope of my analysis for

11   this case.

12   Q    Okay.  So you didn't consider whether they

13   should or should not have been warning Steve Liss's

14   employer or broker that the scales were closed?

15           MR. HENNELLY:  Object to the form.

16           MS. MURPHPY:  Join.

17   Q    (By Mr. Darr) Go ahead.

18   A    It's my opinion that the relevancy to what I

19   was asked to look at involved what Mr. Liss would have

20   observed for himself when he got to the site as

21   opposed to if he had known ahead of time and not gone

22   to the site at all.

23   Q    Have you ever given testimony wherein you

24   opined that a work site should have a plan in place to

25   deal with reoccurring known hazards?

1        A     I can't specifically recall at this time.

2        Q     Okay.  You would agree with me though that's

3    not an unreasonable position to take.  Correct?

4              MS. MURPHPY:  Form of the question and

5    incomplete hypothetical as to what a reasonable

6    position may be.

7        A     Can you repeat the question, please?

8              MR. DARR:  Why don't we have the court

9    reporter read it back.

10             (The reporter read back last two questions.)

11             MS. MURPHPY:  Same objection.

12       A     So it's my opinion generally speaking that

13   if a hazard has been identified that an evaluation and

14   some plan or action should be put in place if it has

15   been identified as an actual hazard.

16       Q     (By Mr. Darr) Okay.  So if there is an

17   identified hazard, there should be a plan in place to

18   deal with it.  Correct?

19       A     Yes.

20       Q     And that's just a safe practice.  Correct?

21       A     Yes.  If a hazard has actually been

22   identified, it is good practice to address it.

23       Q     Okay.  And if you don't address a known

24   hazard, that's an unsafe practice?

25       A     It's not good practice to ignore identified

1    hazards.

2        Q    And that's because it's unsafe?

3        A    Generally speaking hazards can create unsafe

4    conditions, yes.

5        Q    Okay.  Can you tell me all the visual cues

6    that were available to Steve Liss on 2007 or I'm

7    sorry.

8            Can you, please, identify for me all the

9    visual cues that were available to Steve Liss on

10   February 7, 2019, that the scales were closed?

11       A    Well, as Mr. Liss approached the facility it

12   started with the fact that he would have been aware

13   that it had been raining.  It was rainy and wet.  As

14   he entered the facility he admitted that he saw the

15   water at the facility, that he saw the areas were

16   covered with water.  This in itself based on his

17   experience should have provided him a visual cue that

18   the scales were closed.  In addition, when he talked

19   about the cone that was placed in between where he

20   entered with his truck and the scales that would have

21   provided a visual cue that he could not continue

22   driving his truck onto the scales, again, giving him a

23   cue that the scales were closed.  The lack of other

24   trucks on the scales would also provided some cue that

25   the scales weren't operational.

1          MS. MURPHPY:  If it is a good time for a

2     very brief break, I would appreciate it.

3          MR. DARR:  Well, let me.  Give me just a

4     couple minutes here.  Then we will take a break.

5          Q     (By Mr. Darr) First of all, you don't know

6     what the depth of the water was when Steve Liss was

7     looking at it when he pulled up to the cone.  Correct?

8     When I say depth of the water I mean depth of the

9     water at the scales.

10         A     I don't specifically know the depth except

11    that the scales were submerged.

12         Q     Okay.  Your understanding was that they were

13    completely submerged or they were floating?

14         A     It's my understanding that the surface

15    was -- that the area was covered with water.

16         Q     Okay.  So that the scale was not visible

17    above the surface of the water?

18         A     That is my understanding.

19         Q     Okay.  And that was a visual cue that they

20    weren't accepting scrap?

21         A     The flooded water near the scales would be a

22    visual cue that the scales would not be operational.

23         Q     Would that have been a visual cue that they

24    were not accepting scrap?

25         A     Given my understanding that the trucks would

1   have to be weighed on the scales, then it would be my

2   understanding that, yes, if the trucks can't be

3   weighed then they can't accept the scrap because it

4   has to be weighed.

5          If there are alternate means for them to

6   accept scrap, it wasn't part of the materials I

7   reviewed or my understanding.

8      Q    You don't have any idea whether Steve knew

9   if there was alternative means to accept his scrap

10  delivery?

11     A    There is no indication that there would be

12  alternative means.  Given his several years that he

13  had been a truck driver and years that he had been

14  going to TMS, it would be my opinion that he

15  understood the protocol for delivering scrap to TMS.

16     Q    You don't have any understanding as to what

17  his background was though in delivering cargo as a

18  truck driver.  Correct?

19     A    My understanding of his history is the time

20  that he worked for TMS and the fact that he was a

21  truck driver prior to that, but specifics regarding

22  exactly what he had done throughout his career I don't

23  have.

24     Q    Okay.  Well, he never worked for TMS.  You

25  would agree?

1       A      I'm sorry.  Supreme.  I apologize.

2       Q      And what his training was and whether he

3  normally delivered scrap or any of that is not

4  something you have looked at in this case?

5       A      Beyond what was in the testimony, no.

6              MR. DARR:  Do you guys want to take a break

7  here?

8              THE WITNESS:  Yes, please.

9              MR. DARR:  Okay.  How long do you guys want?

10              MS. MURPHPY:  It's not that long to walk

11  down the hall.  So maybe five minutes.  Anyone else

12  want more?

13              THE WITNESS:  I want to get a glass of water

14  if that's okay.

15              MS. HORVAT:  Can we call it ten?

16              MR. DARR:  I don't care.  Whatever.  However

17  long you guys want.

18              MR. HENNELLY:  Yes.  Let's do ten.

19              (There was a brief recess.)

20       Q      (By Mr. Darr) I want to talk a little bit

21  more and continue on with the visual cues that were

22  available to Steve Liss.

23              Were there any visual cues that told him not

24  to exit his vehicle?

25       A      There was nothing specific beyond what I

1   talked about that would indicate that he couldn't get

2   out of the vehicle.

3       Q    Well, do you have any criticism of him

4   leaving his vehicle?

5       A    I don't believe that it was necessary.

6       Q    Why do you believe it was not necessary for

7   him to leave his vehicle?

8       A    I believe there were alternative ways

9   including using the phone that he had to call his

10  dispatcher or to try to call TMS to confirm the

11  information that the scales were closed which was my

12  understanding of why he went to the office in the

13  first place.

14      Q    Was there a phone number in visual sight

15  from where he was at for the TMS office?

16      A    I don't know specifically that there was

17  given his location in his truck, but he should have

18  had the contact for his dispatcher, and given that he

19  is familiar with the TMS site it's possible that he

20  could have had the phone number for them also.

21      Q    Well, you understand that he delivers to

22  other sites other than TMS?

23      A    Yes.

24      Q    Okay.  And you don't have any expertise into

25  trucking or dispatch or anything along those lines.

1    Do you agree?

2        A    Correct.  I'm not opining on anything to do

3    with the trucking aspect for this case.

4        Q    Or what is accepted practice for a

5    commercial truck driver?

6            MS. MURPHPY:  Form of the question.

7        A    I'm not opining on that.  I am answering the

8    question that there are or were alternatives for him

9    as opposed to getting out of his vehicle where he did.

10       Q    (By Mr. Darr) Tell me what you think he

11   should have done when he drove up to the red cone?

12       A    Again, I don't know that I have an opinion

13   as to exactly what he should have done.  I do have

14   opinions that there were alternate things that he

15   could have done and opinions about some of the choices

16   as to what he did.

17       Q    So are your opinions of just to what he

18   could have done as opposed to what he should have

19   done?

20       A    I'm sorry.  Could you rephrase that

21   question, please?

22       Q    I thought your statement was that your

23   opinions go to what he could have done as opposed to

24   what he should have done.

25            So you don't have an opinion -- in other

1    words, you don't have an opinion as to what he should

2    have done when he approached the red cone?

3        A    I don't have an expert opinion as to what --

4    as a trucking expert what he should have done, but

5    when he pulled up to the cone I do understand there

6    were different alternatives that he could have done

7    and have opinions as to the fact that some of the

8    other alternatives would have led him to likely behave

9    differently and thus not led to the subject incident.

10       Q    Well, what in your background gives you the

11   ability to opine as to what he could have done any

12   differently than the rest of us can talk about what he

13   could have done?

14       A    Well, the options for him as far as when he

15   gets up to the scales are the options that he had had

16   based on the testimony and the materials reviewed.

17   Again I'm not opining that -- although I don't think

18   that getting out of his vehicle was necessarily the

19   best option, I'm not opining that he couldn't get out

20   of his vehicle; but when we take it to the next step

21   of what he did after his vehicle, after getting out of

22   the vehicle, that's where I believe that my expertise

23   really comes into play; and I'm not opining what he

24   should have done from the vehicle; but he did have

25   other options when he drove up.

1      Q    Is it your opinion that whatever options

2  Steve Liss had available to him were obvious to him?

3      A    It is my opinion that at least some of them

4  should you have been obvious to him, yes.

5      Q    Okay.  Just as you believe they would have

6  been obvious to anybody in Steve's position?

7      A    Well, I think given his experience as a

8  truck driver and his experience at the TMS site and

9  his experience as a human being that he could observe

10  the water on the scales, for example, just like

11  anybody else, that that was obvious.  He testified

12  that he saw the cone.  In fact, he stopped his truck

13  because he saw the cone; and that correctly told him

14  that he couldn't proceed by pulling -- he couldn't

15  proceed to pull the truck onto the scales.  This is

16  just based on his testimony.

17      Q    Well, but what I'm trying to figure out is:

18            You believe that the options that Steve Liss

19  did not avail himself to were options that were

20  available or obvious to everybody.  Is that correct?

21      A    That question is broad.  If we are

22  specifying just at the time that he pulls up to the

23  cone and he stops his truck and he's just determining

24  whether he should get out of the truck or not, I

25  believe that based on his experience he should have

1    been aware that one option was to call his dispatcher.

2    When people have questions usually they call their

3    employer.   And I believe that was part of the training

4    that he received that he could call his employer or

5    dispatch, and obviously another option that he used

6    was to get out of the truck.   And I believe that based

7    on his testimony he was also aware that, although he

8    didn't choose to, he could have located his truck on

9    another part of the site before he got out.

10        Q    Okay.   But you're not here giving opinions

11    based upon what a truck driver should do.   You are

12    here giving opinions as to what the general public

13    should do.   Correct?

14             MS. MURPHPY:   Form of the question.

15        A    I'm not giving an opinion on whether he

16    should or should not have gotten out of the truck

17    based on a trucking expertise as I mentioned earlier.

18        Q    (By Mr. Darr) Right.   And you don't have any

19    trucking expertise.   Correct?

20        A    Correct.

21        Q    Okay.   So what Steve Liss should have done

22    under those circumstances are the same things you

23    think I would do under those same circumstances.

24    Correct?

25        A    No.

1    Q    Okay.  Well, tell me the difference.

2    A    Well, although I'm not a trucking expert, I

3  am -- I feel that my expertise allows me to understand

4  that people do build mental constructs based on their

5  experience; and the fact that Steven Liss has been a

6  truck driver for I believe 11 years and had been

7  working for Supreme and delivering to TMS I believe

8  for about eight years on and off that he has more

9  familiarity with how these types of settings are and

10 what they represent to a truck driver which would be

11 slightly different because he has that familiarity

12 over you and I, for instance, as lay people.

13    Q    Well, you agree with me that he had never

14 been there under flood conditions.  Correct?

15    A    I believe that was his testimony.

16    Q    Well, that's correct.  I mean that's a fact;

17 isn't it?

18    A    Based on his testimony, yes, I believe he

19 said he hadn't been there when it had been flooded and

20 closed before.

21    Q    Well, how many times had Steve Liss been

22 present on that site before February 7, 2019?

23    A    I don't know if he specifically stated how

24 many times.

25    Q    Well, doesn't TMS keep records of how many

1   times he had been there?

2        A    I'm not aware of or recall any specific

3   number if it was within the materials that I reviewed.

4   I don't recall it at this time.

5        Q    Based on your opinions today how many times

6   had Steve been there?  What's your assumption?

7        A    I didn't make an assumption as to a specific

8   quantity.

9        Q    Well, do you think he had been there more

10  than ten times?

11       A    Again, I didn't.  I don't recall there being

12  a specific quantity listed in the materials that I

13  reviewed.

14       Q    Okay.  Well, based upon -- your opinions

15  today here are not based -- would be the same whether

16  he had been there one other time or whether he had

17  been there a hundred other times.  Would that be

18  correct?

19       A    Well, it's my opinion that this is based on

20  his experience as a truck driver not necessarily his

21  specific experience with the flooded condition at TMS.

22       Q    Had he ever been faced with flood conditions

23  on scales at any location in his truck driving

24  experience?

25       A    I don't recall if he specifically mentioned

1    that in his testimony.

2         Q    Okay.  And, in fact, wasn't what Steve did

3    consistent with what he had done at other locations

4    when he had questions about how to deliver his load?

5         A    I don't recall specifics at this time as to

6    that testimony.  If you would like to show me a

7    section, I'd be able to comment on it.

8         Q    Well, I mean wouldn't that be relevant to

9    know as to whether or not he acted consistent with how

10   he had always inquired about when he had questions

11   about how to deliver his load?

12        A    Again, based on the scope of my analysis, I

13   wasn't opining on whether or not he should have gotten

14   out of the vehicle to begin with.

15        Q    I understand.

16             Your opinion deals with the pathway that

17   Steve took to go to the office.  Would that be

18   accurate?

19        A    Correct.

20        Q    And you believe that Steve did not exercise

21   common sense when he selected his pathway to go to the

22   office.  Correct?

23        A    I believe that he made unsafe choices in his

24   walking path to the office, yes.

25        Q    Okay.  And you believe that those choices

1    should have been obvious to him?

2        A    I'm sorry.  Can you restate that?

3        Q    Sure.

4            The alternative to the choices he made in

5    walking under the catwalk should have been obvious to

6    him?

7        A    Yes.

8        Q    Okay.  And they would have been as obvious

9    to anybody coming onto that property whether they were

10   delivering scrap or they were an Amazon driver or a

11   pizza delivery man?

12       A    I think that seeing flood waters and not

13   navigating through them, yes, should apply to non

14   truck drivers also.

15       Q    Do you think in this case it would have been

16   reasonable for TMS to anticipate that drivers would

17   seek alternative paths to the office when attempting

18   to avoid the flood waters?

19       A    I think that TMS provided a path to the

20   office around the building, and it's my understanding

21   that that pathway would have not required walking

22   through flood waters.

23       Q    But my question was:

24           Should TMS have anticipated that drivers

25   would seek alternative paths when attempting to avoid

1    flood waters?

2             MS. MURPHPY:  Asked and answered.

3             MR. DARR:  No, it hasn't.

4        Q    (By Mr. Darr) Could you, please, answer.

5        A    I believe that it's reasonable that TMS

6    would expect people not to walk through the flood

7    waters.

8        Q    And, therefore, it would also be reasonable

9    for TMS to anticipate that the drivers would seek

10   alternative means to access the office?

11       A    As opposed to walking through flood waters

12   to get there, yes.

13       Q    Okay.  Well, not only -- or even just

14   avoiding areas of deep water?

15            MS. MURPHPY:  Form of the question.

16       A    I don't understand your distinction of the

17   two questions.  Could you, please, rephrase?

18       Q    (By Mr. Darr) Sure.

19            Was it reasonable that the drivers would

20   attempt a path that had the least amount of flood

21   water?

22       A    It's reasonable that the truck drivers would

23   try to avoid the flood waters if at all possible, and

24   given my understanding that would have been possible.

25       Q    Was an alternative path for the truck

1    drivers designated by TMS?

2         A    Could you be more specific?

3         Q    Sure.

4              Did TMS take any steps to designate an

5    alternative path to its office that avoided flood

6    waters?

7         A    There was a walkway around the building that

8    allowed access to the office without going through the

9    flood waters that was there all the time whether the

10   scales were flooded or not.

11        Q    But my question is:

12             On February 7th did TMS take any steps to

13   direct foot traffic to the alternative path which

14   required them to navigate the building?

15             MS. MURPHPY:  Form of the question.

16        A    Given that the scales were flooded the

17   walkway around the building to get to the office

18   connected the parking area.  It's my understanding as

19   I said that that was there all the time.  Since the

20   scales were closed and the cone was placed it's my

21   opinion nothing additional was needed, but I don't

22   recall from the materials that anything else specific

23   was indicated on the site more than usual regarding

24   where the walkway was around the building.

25        Q    (By Mr. Darr) Okay.  So we agree that there

1    was no signage that would direct Steve to walk around

2    the building to access the office?

3        A    No more than is normally there.

4        Q    Ma'am, I'm just trying to figure out was

5    there any signage that you are aware of that would

6    direct Steve Liss to walk completely around the

7    building to access the office?

8        A    Not any additional signage on that day.

9        Q    Was there any signage that would indicate

10   for him to walk around the building when trying to

11   access the office?

12       A    It's not my recollection that there was any

13   specific signage, but there are other cues that there

14   is a walkway and that that was a dry area that he

15   could have traversed.

16       Q    Okay.  So there was no signage?  Can we just

17   agree on that?

18       A    There is no specific signage going all

19   around the building that I recall, no.

20       Q    And do you have any reason -- well, let me

21   ask you this.

22            Are you assuming that the drivers would

23   understand the scales were closed simply by the

24   placement of the cone near a stop sign?

25       A    It's my understanding that if an obstruction

1    like a cone is placed in front of the scales such that

2    the truck cannot continue onto the scales, that that

3    would indicate that the scales are closed.

4         Q    To who?  Who would that be indicated to?

5         A    I believe anybody trying to enter the area.

6    In this case it would be the truck drivers.

7         Q    Okay.  But you think that would also be true

8    of the general public?

9         A    Well, I think generally speaking that most

10   people do have a mental construct that if there is a

11   cone in front of an area, that means that you are not

12   supposed to drive your vehicle into that space or that

13   area.

14        Q    Okay.  But when you say mental construct

15   what does that mean?

16        A    It means based on our experiences, our life

17   experiences of encountering other similar situations.

18        Q    Okay.  Well, if the cone tells you not to

19   drive your truck any further, does that also mean that

20   the scales are closed?

21        A    In conjunction with the scales being sub --

22   with the water, flood waters over the scales, I

23   believe that would be a couple of good visual cues to

24   indicate that the scales are not operational at that

25   point.

1    Q    Okay.  Would that also be an adequate visual

2    cue not to attempt to walk in the office?

3    A    I don't believe that the water, the presence

4    of the water or the cone necessarily precludes someone

5    from entering the office.

6    Q    Okay.  So you don't have any criticism of

7    Steve trying to go into the office to ask further

8    instructions or directions; do you?

9    A    As I indicated earlier, although he had

10   alternatives that may have been a better choice, I'm

11   not opining on the fact that he should have gotten out

12   of the truck at all to begin with.

13   Q    But when we say getting out of the truck but

14   I'm talking about getting out of the truck and

15   attempting to go to the office to discuss his load.

16   A    Correct.  That is my -- I'm not providing an

17   opinion to say that he could not have gotten out of

18   the truck to inquire with the office even though there

19   were other alternatives that possibly would have been

20   safer.

21   Q    So you think it was reasonable for him to

22   try and talk to the office.  You just take exception

23   with the path he chose.  Would that be correct?

24   A    Well, generally speaking as I said, I think

25   that there were other options that may have been

1    safer; but if his decision was to inquire with the

2    office in and of itself, I don't have an opinion as to

3    the fact that he shouldn't have done that.

4         Q    Okay.  So I was correct?  You don't have any

5    criticism of him attempting to inquire of the office?

6    You just take exception with his path?

7         A    Based on the materials I reviewed, it seems

8    that there are other occasions where truck drivers

9    have come into the office to inquire about operations.

10   So I don't necessarily take issue that that's what he

11   decided.  Although, as I said I think that there were

12   other safer means.

13        Q    Okay.  And by other safer means you mean

14   calling?

15        A    That would be the primary.  Other means is

16   when you see the flooded area is to not get out of

17   your vehicle.

18        Q    Did he receive any verbal cue or

19   instructions from TMS employees while he was on their

20   property?

21        A    I don't believe so.

22        Q    Okay.  Is there any reason they could not

23   have had an employee out there to instruct drivers

24   what to do?

25        A    I mean there is no reason necessarily that I

1    know of that they couldn't.  It doesn't mean that they

2    needed to.

3         Q    What makes you say that there is no reason

4    they needed to?

5         A    Well, again, they had -- in my opinion they

6    had the cues that the scales were closed.  They

7    have -- the truck drivers have the ability to follow

8    up in other ways to make phone calls or in this case

9    even get out and ask in the office that there are

10   other ways for them to get the information that they

11   need, and I don't feel that it's necessary.  Although

12   they could have had it, I don't believe it's

13   necessary.

14        Q    Do you agree with me that having someone

15   standing out there to say we're closed, we're not

16   accepting loads, leave the facility would have been a

17   safer practice?

18        A    Not necessarily.

19        Q    Okay.  Do you agree that if they would have

20   had someone out there instructing Steve Liss that he

21   could not deliver his load and there was no need to

22   access the office, that his injury would not have

23   occurred?

24        A    Assuming that if somebody said something to

25   him which then he decided not to get out of his truck,

1    then, of course, the incident wouldn't have occurred.

2        Q    Okay.  But, in fact, they weren't able to

3    accept his load, correct, and he was going back to

4    leave with his load; is that correct?

5        A    That would be my assumption given the fact

6    that the scales were closed, but I don't know for

7    certain that he would have necessarily left.  We

8    didn't get to that point since he had the incident.

9        Q    Well, what did they tell him when he went

10   into the office?

11       A    It's my understanding that they told him

12   they weren't accepting loads and the scales were

13   closed.

14       Q    Right.  So then he would have to deliver his

15   scrap either somewhere else or take it back to United

16   Scrap's yard.  Isn't that his two options?

17       A    Generally speaking, yes, those would be his

18   two main options.

19       Q    Okay.  And assuming that that was the

20   options that he wasn't going to leave it there on

21   their property, they could have had a guy out there

22   just directing everybody to leave.  Correct?

23       A    Again, it's possible that they could; but

24   considering there weren't appointments, you're talking

25   about having somebody standing out there; and I don't

1    know how often trucks would have been coming by.  It's

2    not necessarily a reasonable solution.

3        Q    You would agree with me they could have

4    barricaded the gate?  When I mean barricaded they

5    could have closed the gate.

6        A    It is possible they could have closed the

7    gate, but based on the information that I reviewed the

8    whole site does not shut down.  So I'm not sure that

9    that would have been the best means, but it is

10   possible they could have closed the gate for the truck

11   deliveries.

12       Q    Right.

13            There wasn't any dedicated gate for truck

14   deliveries.  Correct?

15       A    It is my understanding that the gate was,

16   the eastern gate was the primary gate for the truck

17   deliveries to get to the scales.

18       Q    Would you agree with me that if they would

19   have closed that gate, that would have been the best

20   visual cue that they were not accepting deliveries?

21       A    I don't necessarily agree that it would have

22   been the best suggesting that the others were

23   insufficient, but it would have been a cue that the

24   site was closed for truck deliveries.

25       Q    And doesn't the sign on that gate that's

1    closed provide them with a telephone number to call?

2        A    I do believe there is signage at the front

3    that does provide a number for TMS.

4        Q    Okay.  And there is no telephone number for

5    TMS posted beyond that gate.  Correct?

6        A    I don't believe that there is.

7        Q    Okay.  So the best indicator to give them a

8    number to call would be by having that east gate

9    closed so they would know not to come in and there was

10   a number there they could call?

11       A    Again, I don't think that that is

12   necessarily the best or had to have been done.  Again,

13   the truck drivers should have access to their

14   dispatcher.  They don't necessarily need the TMS

15   number.

16       Q    Okay.  But they would have had it.  You

17   would agree?  They could have either called their

18   dispatch at that point or they could have called the

19   TMS office had the gate been closed?

20       A    Yes.

21       Q    And we agree that if the gate had been

22   closed, the chances of this injury happening is not

23   likely?

24       A    If he had not gotten his vehicle onto the

25   site, then this subject incident wouldn't have

 1    happened.

 2             (The Court Reporter marked Plaintiff's

 3    Exhibit 2.)

 4        Q    Do you have a copy of your report in front

 5    of you?

 6        A    I do.

 7        Q    Okay.  Can you look at page 6?  Well,

 8    let's -- first, let's look at page 5.

 9             There is a photograph on page 5, and that

10    stop sign is where you believe that Steve Liss stopped

11    his vehicle?

12        A    That's my understanding based on his

13    testimony.

14        Q    Okay.  And then over to the far right side

15    are the scales.  Correct?

16        A    Yes.

17        Q    And it's your impression that he can see the

18    scales from where he is parked at that stop sign?

19        A    It's my opinion that he can see the water

20    pooling and the flooded water, that by his

21    understanding of the site he could ascertain that that

22    water is going to be covering the scales.

23        Q    Do you think you could ascertain whether

24    those scales were floating or not floating from the

25    location of the stop sign?

1        A       Based on this photograph and not being in a
2    truck at the time at the stop sign I can't answer that
3    question.

4        Q       Okay.  Did anyone ever give -- did you do a
5    site visit?

6        A       In this case, I did not.

7        Q       Okay.  Do you typically do a site visit?

8        A       In non-pandemic times, yes, I typically try
9    to do site inspections when it's warranted; but
10   sometimes we rely on measurements that we get and
11   photographs that we get to base our opinions; and that
12   is what happened in this case.

13       Q       Why was it important -- why is it important
14   in your other cases to do a site visit?

15       A       In cases where it's warranted to have
16   measurements of certain areas to make observations of
17   certain areas then sometimes a site visit is the only
18   way to get that.  There are times, as I said, such as
19   this where getting out to the site was more difficult
20   because of the pandemic; and I had access to
21   measurements, photographs, video from alternate means
22   that provided me the information that I needed to base
23   my opinions.

24              In a non-pandemic world I would have been
25   happy to go out to the site and double check the

1  measurements myself, but that wasn't unfortunately

2  feasible in the last year or so.

3      Q    Okay.  Were you told that you could not make

4  a site visit?

5      A    I don't recall the specifics of the

6  conversation if we even got that far because of the

7  restrictions on travel for my part.

8      Q    What do you mean in the sense of you didn't

9  go on a site visit?

10     A    In a sense that during COVID to get there

11 and travel that would have been required was not

12 within my abilities at the time so, thus, relying on

13 others who were able to be at the site.

14     Q    But what I'm trying to figure out is it was

15 your decision not to do a site visit.  Correct?

16     A    I was not told I could not.

17     Q    Right.  And so you chose not to do a site

18 visit?

19     A    Based on the fact of the pandemic and that I

20 had other measurements that were consistent with

21 photographs I had that I could rely on.

22     Q    Right.  So the answer is you decided not to

23 do a site visit.  Correct?

24          MS. MURPHPY:  Asked and answered and

25 irrelevant.  Move to strike.

1    Q    (By Mr. Darr) Correct?

2    A    My recollection is it was primarily my

3    choice not to get out to the site in this case so far.

4    Q    Okay.  And the photographs that are

5    contained in your report what is your understanding as

6    to when they were taken in relationship to the actual

7    fall?

8    A    Well, it's my understanding that not all of

9    the photographs were taken at the same time or by the

10   same person.

11   Q    Okay.  But I'm trying to figure out when

12   they were taken in relationship to the fall.

13   A    Can you specify which photographs you are

14   talking about?

15   Q    Let's talk about page 6.

16   A    I believe that these are part of the set of

17   photographs that I got that were taken on the day of

18   the fall.

19   Q    Okay.  I want to know what time in

20   relationship to the fall.  Was that the water

21   conditions that existed at the time of the fall or had

22   the water been pumped out by then?

23   A    I believe that these photographs were taken

24   prior to significant pumping.

25   Q    Okay.  So you think that Exhibits Figure 3

1    and Figure 4 accurately depict the water conditions

2    that Steve Liss confronted?

3        A    I believe so.  I think Mr. Liss testified

4    that specifically Exhibit 5 was a fair and accurate

5    representation.

6        Q    Of the water or where he fell?

7        A    I thought it was of the conditions, but I

8    would have to look at the testimony specifically to

9    confirm.

10       Q    Okay.  What about Figure 2 on page 5?  Is it

11   your understanding that's the conditions that Mr. Liss

12   confronted when he arrived?

13       A    I believe or close thereof.  If anything,

14   there may have been more water on the scales at the

15   time of the incident given that these photographs were

16   taken sometime after the incident.

17       Q    Was TMS attempting to pump water out of

18   their scales when Steve Liss arrived?

19       A    I don't recall specifically if the testimony

20   indicated that they were pumping the water out at that

21   time or not.

22       Q    But clearly after he fell they started

23   pumping the water out.  Correct?

24       A    At some point it is my understanding after

25   they closed the scales in the morning that they did

1    start pumping the water out, but I just don't recall

2    specifically what time.

3        Q    You would agree with me that the pumping of

4    water would change the conditions that were present

5    when Steve Liss was injured?

6        A    Possibly.  It also depends if it was still

7    raining.

8        Q    Well, do you know if it was still raining

9    when he fell?

10       A    I believe he indicated that it was rainy and

11   quite wet.

12       Q    Okay.  So you believe it was raining when he

13   fell?  Raining?

14       A    Specifically what -- whether it was raining

15   at that moment I don't have any information beyond his

16   testimony just that that morning that it had been

17   rainy and wet; and my indication is just that if it

18   had been raining after the scales were closed at

19   approximately 7:30 in the morning, that even if the

20   pumps had started, if it was still raining at a time,

21   all of that would affect the levels of the water on

22   the site at the time of the incident.

23       Q    Did it rain significantly after he fell?

24       A    I don't know how you are defining

25   significantly, but I am not aware of information

1    beyond general information that it rained throughout

2    the morning on and off regarding how much it rained

3    after the incident.

4        Q    Well, I'm just trying to figure out like

5    Figure 3 and 4.  Do you believe that there was more

6    water present when Steve fell or less water than

7    what's depicted in those photographs?

8        A    I have no reason to believe that the

9    photographs aren't close enough for me to be able to

10    render an opinion related to what I was opining on.

11        Q    You think it's approximately the same amount

12    of water?  Fair enough?

13        A    Yes.  I have no reason to believe that it's

14    not.

15        Q    Okay.  And you said you had measurements

16    available to you.  What measurements did you have

17    available to you?

18        A    I had measurements that were taken by Jason

19    Lunsford of the structure of the catwalk; and I had

20    available to me the information, measurements,

21    photographs and video taken by SEA during their site

22    inspection.

23        Q    Well, the only measurements I have from your

24    report are those on page 7 and page 8 which would be a

25    crossbar that was approximately 60 inches from the

1    ground and then measurements on a diagonal bar.  Is

2    that -- do you have other measurements available to

3    you?

4        A    There were other measurements related to the

5    catwalk support that I have, but I only included in

6    the report what I thought was most pertinent regarding

7    my opinions in this case for this report.

8        Q    Okay.  So there is a horizontal bar that was

9    going -- that Steve would have encountered first as he

10   is leaving the office.  That bar was approximately

11   60 inches or 5 feet above the ground level.  Is that

12   correct?

13       A    Yes.

14       Q    Okay.  And then if he passed under that bar,

15   then there was a diagonal bar that was 69 inches high

16   at one end and went down to approximately 50 inches?

17   Am I reading your report correctly?

18       A    Yes.

19       Q    Okay.  So he would have went under a 5-foot

20   bar, and then he would have been confronted with a bar

21   that is approximately 5.7 inches or 5.7 feet tall at

22   one end and down to 4 feet and an inch at the short

23   end.  Correct?

24       A    Your numbers aren't exactly correct but so

25   the -- based on my report the diagonal was

1    approximately 4 feet 2 inches at the low end and

2    5 feet 9 inches at the high end.

3         Q     Okay.  And is it your understanding that he

4    broke his ankle or leg in between the horizontal bar

5    and the diagonal bar?

6         A     Well, it's my understanding based on his

7    testimony that his incident occurred between those two

8    bars, yes.

9         Q     Okay.  And what was the distance between the

10   horizontal bar and the diagonal bar?

11        A     I don't have a specific measurement on that.

12        Q     So based on Steve's testimony at least is

13   if -- well, first of all this was an unwitnessed

14   accident.  You agree?

15        A     Yes.

16        Q     Okay.  So then we have Steve's testimony as

17   to what transpired.  Correct?

18        A     Yes.

19        Q     And Steve testified that he went under the

20   horizontal bar and then was walking, his leg broke and

21   then he fell and hit the horizontal bar -- I mean the

22   diagonal bar?

23        A     Yes.

24        Q     Okay.  And it's your opinion that it

25   couldn't have happened the way that he relayed it that

```
 1   it happened?
 2        A    Based on the principals of biomechanics it's
 3   inconsistent.
 4        Q    Okay.  Are you saying it's inconsistent or
 5   it couldn't have happened?
 6        A    Well, based on biomechanics it didn't happen
 7   that way.
 8        Q    Did you do any equations to reach your
 9   conclusions in this case?
10        A    I don't believe any equations were
11   necessary.
12        Q    Okay.  I'm just trying to figure out did you
13   do any equations.  No?
14        A    No.
15        Q    Did you use any specific methodology to
16   reach your opinions in this case?
17        A    Well, I based my methods on the scientific
18   method of presenting a hypothesis and going through
19   the details of that hypothesis to see if it is
20   consistent or not.
21        Q    But other than testing a hypothesis was
22   there any specific methodology that you consulted or
23   utilized that would walk you through the steps
24   necessary to test that hypothesis?
25        A    Well, I reviewed the materials that have
```

1    been provided including the information regarding the

2    catwalk and the environment that he was traversing at

3    the time based on his testimony.  I looked at the

4    kinematics based on his testimony as he relayed that

5    the incident happened.

6              Based on those two sets of information then

7    I tested the hypothesis that given his kinematics is

8    that consistent with the biomechanics based on the

9    understanding of in this case trip and falls and the

10   biomechanics of such events and the dimensions that

11   were presented of the catwalk, research related to

12   such incidents to determine whether the described

13   kinematics of the event are consistent with

14   biomechanics as known in the research literature.

15       Q    I'm just trying to figure out though what --

16   is there a published methodology that you adhere to

17   when considering the data that you collected to

18   determine whether or not it happened in the way Steve

19   claims?

20       A    Well, the scientific method is explained in

21   the Carey reference that I referenced in the report.

22       Q    Okay.  And which reference?

23       A    So that is Number 1.

24       Q    Okay.

25       A    It's a general indication of applying the

1    scientific method which is the hypothesis that I was

2    talking about and then testing it based on the data

3    and information available to determine if it is

4    consistent or can be ruled out as not being a possible

5    hypothesis.

6         Q    I want to direct your attention to your

7    conclusion 7, if he had fallen as described, he would

8    not have received the reported laceration on the top

9    of his head.  Tell me what you mean by that?

10        A    So Mr. Liss described the kinematics of the

11   event as that as he was walking between the two

12   support posts of the catwalk foundation, that he

13   stepped in a hole, twisted his ankle and fell and hit

14   the angle iron in front of him.

15             Now the first -- the first kinematic event

16   that is inconsistent for me although there isn't the

17   details in the testimony that suggest that when he

18   trips and falls that he is falling forward which is

19   not consistent with twisting your ankle which causes a

20   lateral movement of the body; but even so given that

21   he testified that he fell forward, given the location

22   that he indicated that he fell, that he stepped in the

23   hole twisted his foot and then fell and hit the angle

24   iron and the height of the angle iron, it's my opinion

25   that the parietal section, the top of his head, which

1    is actually given in the photograph and location of

2    the laceration it is the top and slightly rear of his

3    head that was cut would not have come into contact

4    with the angle iron and certainly not appear that it

5    would come into contact with an edge of the angle

6    iron.

7        Q    Okay.  Well, once again you don't have a

8    medical background to look at his -- in the sense of

9    you can't look at a photograph of his head injury and

10   tell whether or not it was created by an angle iron?

11   You would agree?

12       A    I don't know that having a medical

13   background allows you to identify what causes a

14   laceration or any type of wound.  Biomechanics allows

15   us to understand the injury of mechanisms though of

16   injuries, and in this case a laceration is going to

17   require that there be an interaction between the

18   location where the laceration is and an object that is

19   going to create the laceration.

20       Q    Okay.  But you are not saying that the angle

21   iron could not have caused the laceration to Steve

22   Liss's head.  Correct?

23       A    I am not saying that the angle iron in and

24   of itself could not have -- the interaction with the--

25   I'm not saying that interaction with the angle iron in

1    and of itself could not have created the laceration.

2         Q    Do you have an opinion what caused Steve's

3    laceration to his head?

4         A    Based on the potential alternative scenario

5    that was presented in the materials it is my opinion

6    that it's more likely given the information that's

7    known that he -- that the location of the laceration

8    on his head, that that area struck the edge of the

9    angle iron likely from below.

10        Q    So you think that the angle iron, the

11   diagonal support caused Steve's head injury.  Correct?

12        A    Based on the materials presented there

13   obviously could have been many other alternatives, but

14   based on the information that was presented and the

15   realistic realm of what we are looking at I think it's

16   possible that the edge of the angle iron that was

17   exposed on the bottom side could have caused the

18   laceration.

19        Q    Okay.  You agree with me that the angle iron

20   is the most likely cause of the laceration to Steve

21   Liss's head?

22        A    Given the materials, yes.

23        Q    Okay.  Well, you keep saying given the

24   materials.  Is there something else that would -- I

25   don't understand your qualification.

1      A    I'm just qualifying that there is no

2  information that was presented, for instance, that

3  somebody came by with some other weapon, for instance,

4  and cut him.

5      Q    Okay.

6      A    That it's based on the materials and given

7  the environment and the task he was performing it's

8  reasonable that he could have cut his head on the

9  angle iron.

10      Q    Well, in civil litigation we deal with

11  probabilities.  And you would agree with me that the

12  most probable scenario is that this angle iron is what

13  caused the injury to his scalp.  Correct?

14      A    Yes.

15      Q    You have no reason to believe that any other

16  item caused injury to his head other than that angle

17  iron.  Correct?

18      A    Yes.

19      Q    Okay.  And by angle iron we mean an iron

20  that is at an angle and it has two edges, one at the

21  bottom and one at the top.  Correct?

22      A    Yes.

23      Q    And it's your opinion that he hit his head

24  on the edge of the angle iron that is closest to the

25  ground.  Correct?

1    A    That appears to be the most likely scenario,

2    yes.

3    Q    Okay.  And that's because of the location of

4    the laceration on his head.  Correct?

5    A    And the alternate incident report that I saw

6    in the materials.

7    Q    What's the alternate incident report in the

8    materials?

9    A    There was an incident description in one of

10   the records I was reading not in one of the formal

11   incident reports that indicated that he was ducking

12   under the angle iron and came up and misjudged and hit

13   his head.

14   Q    Are you able to identify that report that

15   you relied on?

16   A    Where that's indicated?

17   Q    Yes.

18   A    Specifically right now I'm not going to be

19   able to.  I believe it was part of the -- maybe the

20   workers' compensation file but I don't specifically

21   have it identified right here with me.

22   Q    Okay.  So there was a singular report that

23   indicated that he hit his head on a crossbar that is

24   consistent with your testimony here today.  Is that a

25   fair statement?

1    A    Right.  It just presented an alternate

2 scenario.

3    Q    Okay.  Other than that one report that you

4 testified to exist was there any other reports that

5 would provide that alternate approach?

6    A    I don't remember seeing it in other reports

7 or in testimony, but the main opinion is that it was

8 his described kinematics was inconsistent.  This was

9 just a possible alternate scenario that I also looked

10 at.

11    Q    Well, I'm trying to figure out is your

12 opinion that that's how he struck his head based on

13 your review of that report or is it based on something

14 else?

15    A    Well, it's based on my kinematic analysis

16 and the understanding of the environment and the

17 location of the laceration and understanding the

18 situation of the position of the angle iron that it's

19 my opinion for him to have cut his head on the angle

20 iron he had to have had his -- that portion of his

21 head in locating against the angle iron edge, and

22 there is one edge that is pointed towards the ground,

23 and there is one edge that would be pointed towards

24 the outside of the catwalk, and there was nothing to

25 indicate based on the plaintiff's testimony that he

1    actually got past the second angle iron.  So there is

2    no reason to believe that he would have interacted

3    with the portion of the angle iron pointing outside of

4    the catwalk.  So thus that leaves interaction with the

5    edge of the catwalk that's pointed towards the ground.

6        Q    What are you relying on for your description

7    of the angle iron?

8        A    The photographs and measurements that I was

9    provided.

10       Q    Okay.  When you say his kinematic analysis

11   or your kinematic analysis of his description

12   indicates that his description is inconsistent explain

13   to me what you mean by the kinematic analysis?

14       A    Kinematics is a scientific word for looking

15   at the motions of the body.  So I am doing analysis of

16   how he describes his fall.

17       Q    Okay.  And what about -- I'm sorry.  I'm

18   sorry.  Go ahead.

19            Did you finish?

20       A    I said how he describes his trip and fall.

21       Q    Okay.  What is it about his description

22   other than what we talked about that was inconsistent?

23       A    I think the two main things that were

24   inconsistent I've already described.

25       Q    Okay.  So there is nothing else that you

1    could point to that would show which would indicate

2    that his description was inadequate or inconsistent?

3    I'm sorry.

4        A    Well, given the fact that I don't believe

5    based on how he describes his trip and fall that

6    the -- that he would have -- he would have gotten that

7    head injury I think is a primary indicator that it's

8    inconsistent.

9        Q    Okay.

10       A    He doesn't give --

11       Q    I'm sorry.  Go ahead.

12       A    He doesn't give a lot of details as I

13    mentioned earlier about the kinematics of the actual

14    trip event only indicating as I said earlier that he

15    twisted his ankle which likely should have resulted in

16    a lateral displacement of his center of mass.  Yet he

17    says that he falls forward because of the fact that he

18    actually testifies that he strikes the angle iron.

19    Other than that there are very few details regarding

20    any other aspects of the actual fall.

21       Q    Okay.  Is the lack of details difficult then

22    for you to form an opinion in this case or do you have

23    enough details to form an opinion?

24       A    I believe I have enough details to perform

25    an evaluation such that I did to get to the opinions

1   that I have.

2       Q    Are you able to say within a reasonable

3   degree of scientific certainty that your version of

4   events is how this fall occurred?

5       A    Within scientific certainty I can say that

6   the event as described by Mr. Liss is inconsistent

7   with biomechanics.  It didn't occur that way.

8           It is my opinion that as far as a plausible

9   alternate the one that I gave where he tries to duck

10  under the angle iron and hits the angle iron from

11  below is a plausible alternative.

12          It is possible given other details that

13  would arise that it's possible it happened some other

14  way, but without more material to review there is no

15  way to analyze that.

16      Q    Okay.  So you're saying it's possible but

17  you can't say within a reasonable degree of scientific

18  certainty that he hit his head while ducking under the

19  angle iron.  Correct?

20      A    Not by the ducking but it is a reasonable

21  certainty based on everything that he did ascertain

22  the laceration by an upward movement of his head

23  against the bottom edge of the angle iron.  Whether he

24  was ducking under it or for some other reason that he

25  was interacting in that way I can't.  I can't say for

1    certain.

2        Q    What about if he was falling forward and was

3    trying to stabilize himself?  Could that be an

4    explanation as to how he hit the angle iron?

5        A    Not in that position, no.

6        Q    Why not?

7        A    Because given the direction of his fall

8    there is no reason that he would be in an upward

9    position at that height given the kinematic of, you

10   know, how people fall and when we lose our balance and

11   fall to the ground we're falling in a downward motion.

12       Q    Well, when he was -- you agree that he was

13   falling when he hit the angle iron.  Correct?

14       A    No.

15       Q    You think he was completely stable on his

16   feet when he hit the angle iron?

17       A    I think that there had to have been enough

18   stability for him to be able to create the upward

19   force with his head that would have been needed to

20   cause that laceration against the edge of the angle

21   iron.

22       Q    Can you even say that he was on his feet

23   when he hit the angle iron?

24       A    I suppose depending on exactly what level he

25   hit the angle iron at its -- I'd have to do a full-on

1    analysis to see, but it might be possible.  I'm not

2    even sure he could have reached if he was on his

3    knees.  So to me it would be more likely that he would

4    had to have been on his knees creating the necessary

5    force to create the upward movement and impact force

6    necessary to create the laceration.

7         Q    How tall is Steve Liss?

8         A    He reported to be 6'3".

9         Q    Okay.  Do you know where on this angle iron

10   he struck it?

11        A    Generally speaking based on his indications

12   on Exhibit 5.

13        Q    Well, angle -- or Number 5 he identified a

14   general area where he fell.  Correct?

15        A    Yes.

16        Q    Okay.  So is it your understanding that he

17   hit the angle iron somewhere directly above where that

18   circle is placed?

19        A    There or the general vicinity.  He also

20   testified that he tried to go under the -- he was

21   going to go under the angle iron a little bit more

22   towards the right where it was a little bit higher.

23   So it's based on his indications in his testimony and

24   his indications in marking the exhibit, but the exact

25   location wasn't needed for me to render my opinions.

1    Q    You would agree with me that any of the

2  edges on the diagonal could have caused his head

3  injury.  Correct?

4         MS. MURPHPY:  Form of the question.

5    A    Could you, please, rephrase?

6    Q    (By Mr. Darr) Sure.

7         Any of the angles or any of the edges on the

8  angle iron could have caused his head laceration?

9    A    Either of the two open edges could have,

10 yes.

11   Q    What about the -- what about the other edge

12 where the two angles meet?  Could that have caused his

13 laceration?

14   A    Not based on his kinematics I don't believe

15 so.

16   Q    What do you mean his -- what about his

17 kinematics includes that as a source of his

18 laceration?

19   A    Well, that type of interaction, that angle

20 is not a -- it's not a sharp 90-degree angle on an

21 angle iron.  It's a rounded edge.

22   Q    And can you opine that that is a rounded

23 edge on this particular angle iron?

24   A    It is my understanding from looking at the

25 photographs that it is a typical angle iron and that

1    there is a rounded edge.  It's not a harsh, sharp

2    edge.

3         Q    And you gave no consideration to the fact

4    that he hit something else besides the horizontal

5    crossbar?

6         A    He testified that that is the bar that he

7    hit.

8         Q    Right.  But I'm just saying you didn't give

9    any consideration that he may have hit something else

10   besides this diagonal bar?

11        A    Well, given the testimony I couldn't analyze

12   every alternate.

13        Q    Yes or no is great.  I mean if you didn't,

14   we can just move on.

15        A    I didn't.  It wasn't necessary.

16             THE WITNESS:  May we take one quick personal

17   break?

18             MR. DARR:  Sure.

19             THE WITNESS:  Thank you.  Five minutes I

20   will be back.

21             (There was a brief recess.)

22        Q    (By Mr. Darr) All right.  Ma'am, I have got

23   just a few more.  Then I'm really getting near the end

24   here.

25             You would agree that a trip usually results

1    in a person falling forward?

2        A    It depends on what is causing the

3    perturbation.

4        Q    I'm sorry.  What was that word?

5        A    Perturbation.

6        Q    I don't know what that words means.  Can you

7    tell me?

8        A    What is causing -- it depends what's causing

9    the person to trip.  As I mentioned earlier, generally

10   trip and falls cause the center of mass to move

11   forward which could constitute a forward fall; but any

12   disruption of the motion of the foot during swing

13   phase would be defined as a trip.

14            In this case Mr. Liss testified that he

15   twist his angle.  So twisting of the ankle would

16   generally have a substantially horizontal component to

17   it by the nature of the twisting mechanism.

18       Q    Okay.  So when you say a significant

19   horizontal motion to it you mean he would go forward?

20       A    No.  Horizontal, left right.  That if you

21   twist your ankle to, for instance, to the right, that

22   that is going to affect the basis support that's

23   trying to be reestablished by that foot.  So if the

24   foot twist to the right, the center of mass is going

25   to go towards the right and also likely forward.

1    Q    Okay.  So you think he would go to the left

2  or to the right and forward at the same time or within

3  rapid succession?

4    A    It depends on the specifics of the incident;

5  but, yes, it's possible that given the twisting of the

6  ankle there could be a substantial horizontal or

7  lateral component.

8    Q    Okay.  And also a forward component if you

9  were walking or in the direction that you were

10  walking.  Correct?

11    A    Possibly.  It's going to depend again on the

12  specifics of each event.  Unfortunately except for

13  fact that Mr. Liss says that he hit the angle iron

14  that's in front of him he doesn't provide any

15  additional details about the specifics of the

16  movements of his fall.  So I just took it for, you

17  know, based on his testimony that regardless of the

18  ankle twisting that he did have a substantial forward

19  component.

20    Q    Okay.  So according to Mr. Liss's testimony

21  he injured his ankle, fell forward and struck his

22  head.  Correct?

23    A    Yes.

24    Q    Okay.  And no one has testified differently.

25  Correct?

1        A     There were no other witnesses to the events

2   so, no, no other testimony.

3        Q     Okay.  And you never went on site to attempt

4   to create a recreation of this event.  Correct?

5        A     I did not go on site, no.

6        Q     Okay.  And there's no way for you to

7   recreate the event from just sitting there reviewing

8   the written materials that were provided to you.

9   Correct?

10       A     It wasn't necessary to recreate the event

11  just to analyze his testimony.

12       Q     Okay.  But I'm saying, just so we're on the

13  same page, there was no recreation attempted.

14  Correct?

15       A     Assuming you mean recreation as in having a

16  surrogate try to trip and fall, no, that did not

17  happen.

18       Q     And have you seen any data about interviews

19  of people that have been involved in trip and fall

20  type accidents as to the accuracy of their statements?

21       A     I can't specifically recall any specific

22  information about that type of information.

23       Q     Okay.  So Steve Liss testified that he

24  injured his ankle, fell forward, hit an angle iron or

25  hit something on his head; and you disagree with that.

1    Correct?

2        A    Correct.

3        Q    And a large -- the basis of your opinion is

4    the location of the laceration on his head.  Correct?

5        A    That is a large part of it, yes.

6        Q    Okay.  Did you see his laceration before it

7    had been operated on?

8        A    I have photographs before it was stitched,

9    yes.

10        Q    Okay.  But before it was debrided?

11        A    I don't know exactly what was done prior to

12    the photographs, but I also relied on the information

13    provided in other reports such as the fire department.

14        Q    Would you agree with me that the majority of

15    the records in this case when they are quoting Steve

16    Liss say that he injured his ankle then injured his

17    head?

18        A    The majority of the reports appear to be

19    based on his testimony that that's what happened, yes.

20        Q    Okay.  And you identified a single report

21    that indicates that he hit his head first, correct, or

22    hit his head as he was trying to maneuver under this

23    angle iron?

24        A    Yes.

25        Q    Okay.  And why did you choose to rely on

1    that report as opposed to any others?

2         A    I didn't rely on it.  I performed a

3    kinematic analysis of his testimony first and

4    foremost.

5         Q    But when you came up with an alternative

6    plausible theory you relied on that singular report.

7    Am I correct?

8              MS. MURPHPY:  Asked and answered.

9         A    Based on the materials that I had available

10   to me that was the only alternate that fit the

11   kinematic description and the injury pattern that I

12   analyzed.  Without that alternate my kinematic

13   analysis still stands that his description is not

14   consistent with biomechanical principals.

15        Q    (By Mr. Darr) And tell me again what's

16   inconsistent about what he described.  Just the way he

17   fell, the direction?

18        A    What's inconsistent is that if he tripped

19   and fell in the environment that he was in given the

20   way he described, it is my opinion that the location

21   of the laceration on his head would not have occurred

22   at that location given the interaction that would have

23   been possible between his head and that angle iron.

24        Q    Okay.  So really the only -- when you talk

25   about the kinematic analysis all you're really talking

1    about is the location of the laceration on his head?

2        A    Well, again I had mentioned earlier about

3    the twisting of the ankle creating that lateral

4    component to the fall; but beyond that Mr. Liss

5    doesn't describe any additional specifics to the fall

6    except that he moves forward and hits his head on the

7    angle iron.  So the moving forward is another

8    inconsistency related to the twisting of the foot, but

9    the only other action that was testified to that

10   produced an injury that I could analyze was the

11   laceration to the head and the location of that

12   laceration.  So understanding tripping and falling

13   forward and the movement of the body it's my opinion

14   that the location on his head where that laceration

15   is, is not going to interact with the angle iron in a

16   way that would create that laceration given his trip

17   and fall description.

18       Q    Okay.  What studies have you looked at that

19   would tell you the direction that Steve Liss would

20   have fallen with a tibia-fibula fracture?

21       A    Well, it's understanding the injury

22   mechanism that occurs that that has a rotational

23   component or a large impact force with a rotational

24   component.

25       Q    Well, but what I'm -- how can you say that

1    his -- in this case that he didn't initially fall to

2    the left or fall to the right and then fall forward

3    when he tried to gain his balance or when he touched

4    the ground or when he did any of a million different

5    things?

6         A    There is no testimony that describes that.

7    I can only --

8         Q    I understand that.  Was he asked that?

9         A    He was asked how his fall occurred, and the

10   information he provided is what he provided which

11   included I twisted my foot in a hole or uneven ground

12   and I struck the angle iron.  There was no information

13   provided that there was anything that happened in

14   between those two events.

15        Q    So if he said that I started to fall, as

16   best I can recall I tried to stabilized myself and

17   then I fell forward, would that or would that not be

18   consistent with his injury?

19        A    If he changed his testimony, I would have to

20   do a new kinematic analysis to see if it was

21   consistent with the injuries.

22        Q    Well, he only asked the question -- he's not

23   changing his testimony.

24             I'm just saying if it turns out that he

25   wasn't asked the right questions, then you wouldn't

1    have the right data.  You would agree?

2         A    If more data became available or if there

3    was more testimony, then I would have to do a new

4    kinematic analysis to see if my opinions are the same.

5         Q    Okay.  Well, what I'm saying is there could

6    be more data that becomes available to you that would

7    make your initial opinions incorrect?

8         A    I'm sorry.  Is that a question?

9         Q    Yeah.

10        You would agree with me that if you have

11   additional data made available to you as to how he

12   fell, your opinions expressed today could be

13   incorrect?

14        A    Well, new data presents a new scenario which

15   would require a new analysis.  So a new analysis could

16   result in different opinions or the same.  It would

17   depend on that analysis.

18        Q    So what type of things or new information

19   would cause you to have a different analysis?

20        A    A different analysis or a different opinion?

21        Q    A different opinion.

22        A    Well, I'm not going to answer and come up

23   with a kinematic chain that results in this injury

24   beyond what I did in my report.  If there was more

25   information that was provided by Mr. Liss regarding

1   his fall kinematic, I would analyze them when I was

2   given them.

3       Q    So I guess what I'm understanding is if you

4   had more details as to how he fell, it may change your

5   opinion.  Correct?

6       A    If the details of how he fell change the

7   principals of what he has already testified to, then

8   possibly but based on what he testified to that

9   described kinematic is inconsistent with the

10  principals of biomechanics.

11      Q    Okay.  But you would agree with me that

12  there is not a lot of detail relative to how his

13  actual fall occurred?

14      A    There is not a lot of detail provided by

15  Mr. Liss, but there is a lot of detail in the research

16  about understanding biomechanics of how the body trips

17  and falls.

18      Q    I understand.

19           But there wasn't a great amount of detail

20  elicited from Mr. Liss during his deposition as to the

21  specifics of his fall.  You would agree?

22      A    I would agree that you can always get more

23  detail about a fall.  What he testified to in my

24  opinion was sufficient for me to render the opinions I

25  did, but he could always provide more details.

1      Q     Okay.  Is there any way for you to quantify

2   Steve Liss's ability to react to his loss of balance

3   caused by the environmental factors from

4   February 7, 2019?

5           MS. MURPHPY:  Form of the question.

6      A     Could you, please, rephrase?

7      Q     (By Mr. Darr) Sure.

8           I just want to know if there is any way for

9   you to quantify how Steve Liss would react or his body

10  would react to flood water.

11     A     That's too broad of a hypothetical.  I can't

12  answer that without more specifics.

13     Q     Okay.  Could you quantify in any way how his

14  body would move as he tripped within flood water?

15     A     There is no information provided that would

16  suggest that the flood waters would have significantly

17  affected the movements relative to what I was looking

18  at.

19     Q     What about if what caused him to-- his ankle

20  to break would that affect his movement whether it was

21  a hole or if it was an uneven surface or what it was

22  underneath the flood water that caused his ankle to

23  break?

24          MS. MURPHPY:  Form of the question.

25     A     It's possible that it could affect the

1    initial motion from that perturbation, but the general

2    aspect of the fall would be the same.  So that

3    wouldn't affect my overall opinions.

4         Q    (By Mr. Darr) Okay.  So whether he stepped

5    in a hole or hit something that caused his ankle to

6    break may affect slightly the movement that his body

7    undertook, but it wouldn't change your opinions.  Is

8    that accurate?

9         A    Correct.

10        Q    What about if he was in a stooped position

11   as he tried to walk under the catwalk?  Would that

12   affect the mobility or the movement of his body?

13             MS. MURPHPY:  Form of the question.

14        A    If he was in a stooped position while he was

15   walking between the posts of the catwalk, it would

16   change the orientation of his body; but generally

17   speaking it's not going to change the kinematics of

18   the trip and fall because that would just place his

19   center of mass more forward and would also lower the

20   location of his head relative to the angle iron.

21        Q    (By Mr. Darr) Okay.  But you would agree

22   with me that if he was in stooped or bent over

23   posture, his center of gravity would be more forward.

24   Correct?

25        A    Yes.

1    Q    And that would make him more likely when he

2  lost his balance to proceed -- continue to proceed

3  forward?

4    A    Forward and down.

5    Q    Okay.  Do you know how -- what the height of

6  his head was at the time his ankle broke or leg broke?

7    A    Not specifically but he didn't give any

8  testimony that he wasn't walking upright.

9    Q    Okay.  So you just assumed he was walking

10  upright?

11    A    Yes.  When someone is saying that they are

12  walking if they don't specifically say otherwise, I

13  assume that they're walking in a reasonably upright

14  posture.  That's how we define walking.

15    Q    Okay.  Even though in this situation you

16  know he had just ducked under one support and was

17  approaching another support he was going to have to

18  duck under.  Correct?

19    A    Yes.  But he specifically testified that he

20  was walking in between and did not indicate that he

21  hadn't stood up afterwards.

22    Q    Okay.  Look at Number 6.  Where did Mr. Liss

23  enter the catwalk if you are looking at Figure 6?

24        MS. MURPHPY:  Form of the question.

25    A    Mr. Liss testified that he walked underneath

1    the catwalk underneath the angle irons because he said

2    that he came back out the way that he had gone in.

3         Q    (By Mr. Darr) I'm sorry.  My question was

4    not clear.

5              When he left the office immediately before

6    he was injured how did he enter back into the catwalk?

7         A    By walking under the first horizontal angle

8    iron.

9         Q    Okay.  Is there a horizontal bar in the far

10   right part of the catwalk support?

11        A    Yes.  There is another section towards the

12   right referencing his travel path that included a

13   horizontal angle iron also.

14        Q    Okay.  Well, was that an angle iron or was

15   that just a bar?

16        A    I specifically don't recall at this point.

17   A metal bar say for generality.

18        Q    And did he walk between the two vertical

19   posts there or did he walk over by what is I call it

20   the cigarette, ashtray thing?  Do you see what I'm

21   talking about?

22        A    Yes.  It was my understanding that he walked

23   through the left side of the catwalk versus that right

24   side.

25        Q    Okay.  If he walked through the right side

1    of the catwalk between the two vertical supports,

2    would that change your opinions in any way in this

3    case?

4         A    No.

5         Q    Was the water deeper further to the right or

6    to the left of this photo?

7         A    I'm sorry.  Which photo are you looking at

8    again?

9         Q    Figure 6.

10        A    Based on the materials and the testimony it

11   was a little bit deeper towards the right of this

12   figure.

13        Q    Okay.  When you say a little bit what's your

14   understanding as to the depth like out there by where

15   these scales were as opposed to where Mr. Liss

16   indicates he fell?

17        A    I don't have a specific number for that, but

18   Mr. Liss did testify that as he was walking through

19   the water into the building that for the most part the

20   water was covering the soles of his boots.

21        Q    Okay.  But was it your understanding that

22   Mr. Liss chose the path underneath the catwalk that

23   had the shallowest water?

24        A    Compared to?

25        Q    Compared to further to the right?

1      A      Picking the left section versus the right

2   section as we defined earlier, yes, then it would be

3   my understanding that there would be less depth in the

4   water in that left section versus the right section

5   based on the testimony.

6      Q      Does any of your opinions in this case take

7   into account the placement of his leg at the time of

8   his injury whether it was the lead foot, whether it

9   was behind him, where it was at when he was injured?

10     A      It wouldn't change my opinions, but it had

11   to be weightbearing to cause the trip and fall.

12     Q      Okay.  So would that have meant that it was

13   his forward foot, his front foot?

14     A      Not necessarily.  It would be hard to tell

15   without more details from him exactly where in the

16   stance cycle he was.

17     Q      Okay.

18     A      Although it would be a good scientific

19   assumption that it wouldn't be near the end of the

20   cycle because he would have already been weightbearing

21   on that foot, and whatever he had encountered he would

22   have interacted with already and likely would have

23   caused whatever perturbation he was going to.

24     Q      So is it your opinion that he hit his head

25   and then broke his ankle?

1      A     It's my opinion that the laceration on his

2   head was likely caused by the upward movement as I

3   stated in my report, and it's also my opinion that the

4   sequence of events provided from him are inconsistent

5   with biomechanics that he tripped the way he said and

6   then got the injury the way he did.

7      Q     But my question is do you -- are you -- do

8   you have an opinion as to which occurred first, the

9   striking of the head or the breaking of the leg?

10      A     Again my opinion is that his story is

11   inconsistent.  So given his testimony his leg did not

12   break prior to hitting his head.

13          As an alternate plausible scenario he is

14   ducking under the angle iron in an upward motion.  His

15   head hits the angle iron, causes him to lose his

16   balance; and he could then break his leg; and his

17   balance recovered afterwards.

18      Q     Okay.  He could have done that, but I mean

19   also he could not have done that?  I mean he could

20   have broken his ankle under your theory at the same

21   time he hit his leg -- hit his head?

22          MS. MURHPY:  Form of the question.

23      A     Again, as we discussed earlier, if there is

24   a different described kinematic chain, then that would

25   have to be analyzed.  There are thousands if not

1    millions of potential alternates as to how somebody

2    could break their leg and get a laceration on their

3    head in this environment, but given the information

4    that I have his described kinematics are inconsistent,

5    and this what I provide as a plausible alternate is a

6    plausible alternate based on the materials that I had

7    available.  I cannot say for certain that that's

8    exactly what happened, but given everything in the

9    material I think it's a likely scenario.

10        Q    Well, do you have an opinion within a

11   reasonable degree of scientific certainty what

12   happened to Steve Liss that caused him to break his

13   ankle?

14        A    Well, as I said I think it's likely that he

15   hit his head first and then broke his ankle after.

16        Q    Okay.  Do you believe that he broke his

17   ankle because of uneven terrain?

18        A    Again now we're getting into details that

19   just aren't provided, and they're hypotheticals that

20   would have to be analyzed separately.

21        Q    So you don't have an opinion as to why he

22   broke his ankle?

23        A    Based on the information I have I don't know

24   if he broke his ankle because he stepped on uneven

25   terrain or because he just stepped down with a loss of

1   balance and twisted his ankle and in that process even

2   though the first instance of the steel plate was

3   smooth and relatively flat he still could have twisted

4   his ankle and broken it.  It didn't require uneven

5   terrain for the break.

6        Q    But it's your opinion within a reasonable

7   degree of scientific certainty that he struck his head

8   before he broke his ankle.  Correct?

9        A    That is my opinion you know based on what

10  information I have.  His described testimony where he

11  trips first is inconsistent with biomechanics.

12       Q    And you agree with me that you have less

13  than an ideal amount of information available to you

14  to form your opinions?

15       A    I had enough information available to form

16  the opinions that I did.  If I had more information, I

17  might have had more opinions.

18       Q    Okay.  And so your opinion that he struck

19  his head before he broke his ankle is to the exclusion

20  of all the other millions of other opportunities he

21  had to have injured himself that day.  Correct?

22       A    No.  I provided the opinion that it's likely

23  based on the injury pattern and what was going on that

24  the laceration was created by the upward movement of

25  the head against the edge of the angle iron.  Any

 1    other kinematics that happened around there would just

 2    be pure hypothetical because the only kinematics I

 3    have are the description of the plaintiff who was the

 4    only one there.

 5         Q    But what I'm trying to figure out is you

 6    have said that he injured his ankle after he struck

 7    his head, and I'm saying that that is to the exclusion

 8    of all other options.   Correct?

 9              MS. MURPHPY:  Asked and answered.

10         A    No.  My opinion is that his description of

11    twisting his ankle and breaking his ankle and then

12    hitting his head is not consistent.  The injury

13    pattern of getting the laceration on his head is a

14    separate opinion.  Given new kinematic information

15    that would provide a new set of kinematics to analyze

16    to see if it explained a possibility of how you could

17    break your leg first.

18              If I did an analysis and thought about it, I

19    probably could come up with a way that you could break

20    your ankle first and then hit your head; but given the

21    information that I had in this case, it seems more

22    likely that the -- that that -- well, it didn't happen

23    the way that Mr. Liss described and so my opinion is

24    that the head laceration is from that upward movement

25    likely without a broken leg.

1    Q    (By Mr. Darr) Is it possible that he was

2    trying to duck under the angle iron, broke his ankle

3    and as his ankle broke he lifted his head up and

4    struck the angle iron?

5    A    Again, that's a hypothetical that would need

6    details and be analyzed separately.

7    Q    What details would you need?

8    A    Well, given the fact that his description of

9    the event doesn't match what you just said, that doing

10   a kinematic analysis I'm not going to do that based on

11   an incomplete hypothetical here.

12   Q    Well, but it doesn't match what you have

13   also said here today.  Correct?  Steve Liss's

14   testimony doesn't match what you have said.  You

15   agree?

16   A    What I said is that his testimony is

17   inconsistent with principals of biomechanics.

18   Q    Okay.  But does the science of biomechanics

19   exclude the possibility that he broke his ankle as he

20   was trying to duck under the bar and it caused him to

21   raise his head up and he struck his head at about the

22   same time?

23   A    Again that is -- that is a hypothetical that

24   would require its own analysis to determine what the

25   kinematics are.  You are providing a general

 1    description versus testimony of actual detailed

 2    kinematics.

 3        Q    Well, is the description I gave any more

 4    general than the description Steve Liss gave in his

 5    deposition?

 6        A    I believe so.

 7        Q    Okay.  Tell me what is more specific about

 8    Steve's testimony in his deposition than what I have

 9    given you today as a scenario?

10        A    Well, he is describing that he was walking.

11    He described the general vicinity of where he fell.

12    He described what perturbation caused him -- that he

13    twisted his ankle, what caused him to lose his balance

14    and that he fell and hit his head on the angle iron.

15        Q    No.

16        A    That is --

17        Q    I'm sorry.  Go ahead.

18        A    That is a kinematic chain that can be

19    analyzed, that I did analyze and wrote the report on.

20        Q    Right.

21            And my scenario is all of that being the

22    same except that when Steve breaks his ankle he was

23    also bending to try and go under the angle iron and

24    that causes his head to go up.  And I'm saying isn't

25    that equally possible?

1    A    Well, again that's not what he's testified

2    to.

3    Q    I understand.

4    A    The -- his head to go up is a very general

5    statement as opposed to what does that mean

6    scientifically, what are the forces being produced.

7    So it's not a very specific description that you're

8    providing.

9    Q    But why?  I still don't understand why is

10    that less specific than his deposition testimony

11    because his deposition testimony didn't address any of

12    those issues you just discussed?

13    A    But in his deposition testimony there is in

14    my opinion no interaction between the location of the

15    head and the angle iron.  It's not necessarily about

16    the velocity or the forces that are produced because

17    if there is no interaction at that location then there

18    is no force.  So there is no force magnitude to even

19    consider.  So looking at your scenario it's a

20    different scenario.  It's a different analysis that

21    needs to be formed.

22    Q    Okay.  So you can't say one way or another

23    because you don't have enough information?

24    A    I am not going to perform that type of

25    analysis during this deposition.

1    Q    But my answer [SIC] is you don't have that

2    opinion because you don't have that information?

3    Fair?

4              MS. MURPHPY:   Form of the question.

5    Q    (By Mr. Darr) You would agree?

6    A    I'm sorry.  As I said, I don't do kinematic

7    analyses in a couple of minutes based on while I'm

8    sitting during depositions.  I get -- it takes

9    understanding what information is being provided.  So,

10   yes, part of not analyzing your description is not

11   necessarily having more than just a general

12   description that you're providing.

13   Q    You would agree with me that Steve Liss was

14   not asked in his deposition alternative possibilities

15   as to how his injuries occurred?

16   A    No, he wasn't.

17   Q    Okay.  And had he been asked alternative

18   theories or whether they could be true or not true

19   would allow you to form a more definite opinion in

20   this particular case?

21   A    I have never heard of a plaintiff providing

22   alternative.  They testify to what they believe is

23   what happened.

24   Q    No.  I'm asking you if he was asked about

25   alternatives.

1      A    And as I said, I don't believe I recall
2  anything where he was asked about alternatives.
3      Q    And if he asked about alternatives and he
4  denied alternatives, then you could exclude those from
5  your theories in this case.  Correct?
6      A    I guess if he was asked about alternative,
7  they could have been alternatives that additionally
8  analyzed, yes.
9              MR. DARR:  Okay.  All right.
10             I don't have anything else.
11             Somebody else has some questions.
12             MS. BAKER-SEAL:  I have a couple of
13  questions.
14             Are you okay proceeding, Dr. Levitan?  I
15  think I will be very brief.
16             THE WITNESS:  Yes.
17             MS. BAKER-SEAL:  Okay.
18                      CROSS-EXAMINATION
19  BY MS. BAKER-SEAL
20     Q    I'm Denise Baker-Seal.  I represent Supreme
21  Trucking.
22             You've described a couple of different times
23  that what you did in this case is a kinematic
24  analysis.  How long did that analysis take you to do?
25     A    Well, part of what was in my report was the

1    kinematic analysis.  To quantify actually doing the

2    analysis I mean that's difficult to do considering,

3    you know, it's reviewing the information that's

4    provided.  Primarily in a kinematic analysis such as

5    this where it's a non-witness event the primary

6    testimony is that of Mr. Liss.  It's also

7    understanding the other materials that provide

8    information about the site, the environment.  Then

9    understanding the taking it to the next step that I

10   described earlier of understanding the biomechanics

11   related to the tripping and falling, understanding the

12   information related to the injury that he sustained

13   that being the laceration but also the general

14   mechanism for his description of how he broke his

15   ankle, broke his leg.  So it's hard to quantify.  It's

16   a multiple-step process.

17       Q    Okay.  And I appreciate your description of

18   the process but can you tell me an estimate in terms

19   of time about how long that took?

20       A    That would be really tough to do.  There

21   were so many materials that I reviewed.  To try to

22   differentiate what materials I reviewed that weren't

23   necessarily directly relevant to this analysis would

24   be difficult, and I don't want to give you an estimate

25   which I'm not even sure I would know as to all the

1    review I did plus the report which would be I guess

2    the outside -- like the maximum amount I spent would

3    be the maximum amount I spent on this case.

4        Q    Okay.  And we'd have to look at your

5    invoices to figure that out?

6        A    Correct.

7        Q    Okay.  So my understanding of your opinion

8    is that you believe Mr. Liss made an unsafe choice in

9    his walking path as he exited the building and walked

10   back to his truck; is that correct?

11       A    Yes, that is one of my opinions.

12       Q    Okay.  And you believe that Mr. Liss had

13   sufficient knowledge, experience and training to

14   choose a safer path.  Is that true?

15       A    I believe that there is nothing in the

16   materials that suggest that he shouldn't have been

17   able to make a better choice, that he should have

18   known better than to walk through the water, to walk

19   on a path that had an obstruction.

20       Q    Okay.  So based upon all of the materials

21   that you reviewed you believe that he had sufficient

22   knowledge and experience and training to make a better

23   choice?

24       A    Yes.  There's nothing that I'm pointed to to

25   say that he shouldn't have been able to do that.

116

1      Q     Okay.

2      A     He should have had that knowledge.

3      Q     And part of the materials that you reviewed

4   included the deposition testimony of Mr. and Mrs. Liss

5   I mean Mr. and Mrs. Zimmerman; is that correct?

6      A     Yes.

7      Q     Okay.  And I want to direct your attention

8   to page 4 of your report where you describe the

9   testimony of Mr. and Mrs. Zimmerman.

10     A     I'm there.

11     Q     Are you on page 4?

12     A     Yes.

13     Q     Okay.  In looking under the first paragraph

14   labeled, Deposition Testimony and Findings, the last

15   sentence reads Mrs. Zimmerman and Mr. Zimmerman both

16   testified that Supreme provided safety training to the

17   drivers which included being aware of your

18   surroundings, avoiding hazardous areas and contacting

19   Supreme if an adverse condition was encountered at a

20   delivery site or if the site was closed.

21           Did I read that correctly?

22     A     Yes.

23     Q     Okay.  And you found the testimony of the

24   Zimmermans in this regard significant to your

25   findings.  Is that right?

1      A    Yes.

2      Q    Okay.  And what was significant about their

3  testimony?

4      A    Well, I mean my opinions are based not only

5  as Mr. Liss being a reasonably cautious person

6  hopefully being on an industrial site but also the

7  fact that he is a truck driver and has been for years

8  and, therefore, has some previous knowledge about what

9  he should be doing when he's on sites; and given the

10  fact that he's worked for Supreme for I believe eight

11  years some of that knowledge likely came from the

12  information and training and reinforcement that he got

13  from Supreme and from, you know, those in positions at

14  Supreme who would impart training and knowledge on

15  their drivers.

16          I also did review the -- I don't remember

17  exactly what it's called but the Supreme Employee

18  Handbook which had some information in it that was

19  consistent with what I have in my report.

20          So this just adds more to it's not just that

21  Mr. Liss was a person who should be reasonably

22  cautious but he's also a truck driver with some

23  additional training who should have known better than

24  to do what he did and to act in an unsafe way and

25  should have found alternate means to get to his truck.

1      Q     Okay.  And setting aside the Supreme

2  Employee Handbook, just take that from your memory,

3  would you believe that one of the reasons why he

4  should have known better, he should have known to take

5  an alternative path than what he took, was because

6  Supreme training was sufficient and reasonable?

7      A     There is no reason for me to question

8  because I didn't -- I didn't get into that as part of

9  my analysis to specifically look into any more details

10  beyond the testimony that was provided.  So beyond the

11  testimony that was -- within the testimony that was

12  provided from Supreme it seemed reasonable that they

13  were imparting the information that would allow a

14  truck driver in a situation such as Mr. Liss the

15  opportunity to make good decisions.

16      Q     And you have not criticism of Supreme

17  Trucking or its training?

18      A     That wasn't part of the scope of anything I

19  was looking at as I said beyond the testimony that was

20  provided.

21      Q     It was your understanding that Supreme

22  Trucking had a work rule that required Mr. Liss to

23  wear a hardhat; is that correct?

24      A     Yes.

25      Q     And Mr. Liss was in violation of that rule?

1      A    At the time of the incident, yes.

2      Q    And it is your opinion that had Mr. Liss

3 followed that safety rule in wearing his hardhat he

4 would not have received the head injury.  Correct?

5      A    Correct.

6      Q    Okay.  And it's also your opinion that the

7 head injury occurred first and the ankle injury

8 second?

9           MR. DARR:  I'm going to object as to

10 foundation.

11           Subject to go ahead.

12      Q    (By Ms. Baker-Seal) Is that your opinion?

13      A    As we discussed earlier, it's my opinion

14 that the ankle injury didn't occur first as testified

15 to by Mr. Liss and that the head injury occurred in

16 that -- in an upward motion of his head contacting the

17 edge of the angle iron.  That being said, the

18 alternate scenario where he's ducking and gets the

19 head injury and then looses his balance is a plausible

20 scenario in my opinion; but without additional

21 information I can't definitively say that that's what

22 happened.

23      Q    Okay.  Okay.

24           Setting aside that plausible theory that he

25 was ducking your opinion is that the head injury came

1    first and then the ankle injury came second?

2         A    It's more likely based on the information

3    that I have.

4         Q    Okay.  And if that scenario is more likely,

5    if Mr. Liss would have been wearing his hardhat, then

6    the head injury would not have occurred and the ankle

7    injury would not have occurred.  True?

8         A    Not necessarily.

9         Q    Okay.  Why do you say that?

10        A    Because it is my opinion that the hardhat

11   would have protected the upper portion of his head and

12   he wouldn't have gotten the laceration.  It wouldn't

13   necessarily have prevented a loss of balance because

14   of the contact with hitting the angle iron.  So again

15   this is something that's plausible.  It's an alternate

16   scenario.  He still could have lost his balance which

17   still could have led to balance recovery which could

18   have possibly led to twisting his ankle.

19             Again these are all like hypotheticals that

20   we're just looking at that don't have any basis based

21   on his testimony.

22        Q    Okay.  Have you ever testified in a case

23   where a lawyer from the law firm of Brown and James

24   was involved?

25        A    Not to my recollection.  It doesn't sound

```
 1    familiar.
 2              MS. BAKER-SEAL:  Okay.  Thank you.
 3              I have no more questions.
 4              MR. HENNELLY:  I have one for clarification.
 5                        CROSS-EXAMINATION
 6    BY MR. HENNELLY
 7         Q    Hi.
 8         A    Hi.
 9         Q    My name is Mark Hennelly, and I have just
10    one question for you.
11              Earlier you were talking about OSHA and
12    employment and things like that, and I just wanted to
13    clarify.  Who is Mr. Liss's employer?
14         A    He was employed by Supreme.
15              MR. HENNELLY:  Okay.  That's all I got.
16              Thank you.
17              MR. DARR:  I just have a couple real quick
18    follow ups.
19                      REDIRECT EXAMINATION
20    BY MR. DARR
21         Q    Ma'am, how much have you billed on this file
22    to date?
23         A    I don't know.
24         Q    Could you give me --
25         A    That is --
```

1      Q      -- some estimation?  I mean we can -- okay.

2  Can we get your current and up-to-date invoices at the

3  same time we get your file list?

4      A      I'm sure that that could be -- I could get

5  that for you.

6      Q      Okay.  I'm sure if you give that to Siobhan

7  and her office they can get that to us.

8              MS. MURHPHY:  Give it to Abbi.  She'll be

9  better at it.

10             MR. DARR:  I'm sorry?

11             MS. MURHPHY:  I said give it to Abbi, she'll

12  be better.

13             MR. DARR:  Okay.

14      Q      (By Mr. Darr) Now my last line of questions

15  here.

16              When you're judging the conduct of Mr. Liss

17  are you using a reasonable person's standard or are

18  you using a reasonable truck driver's standard?

19      A      Well, I think that in this case the -- if

20  we're talking about the awareness and the ability to

21  note the cone, note the flood waters, note the flood

22  waters underneath the catwalk, to be able to see the

23  obstruction in the travel path created by the

24  structure of the catwalk, that is within the realm of

25  any typical human being.  That doesn't necessarily

```
1    require anything from the truck driver's standpoint.

2            The comments that I made about the fact that

3    he was a truck driver just makes him more familiar

4    with industrial settings such as these; but the actual

5    understanding of and seeing flood waters in your field

6    of view, seeing a metal obstruction in your pathway,

7    that's something that any person with typical

8    capabilities should be able to discern.

9        Q    Okay.  So then it would be accurate to state

10   that you're judging his character based upon a

11   reasonable person's standard.  Fair?

12       A    At the base of it, yes.

13           MR. DARR:  Okay.  That's all I have.

14           MS. MURPHPY:  We'll reserve signature unless

15   somebody else wants to ask another question or two

16   which I don't encourage.

17           All right, my friends.  It has been a

18   pleasure.

19           MR. DARR:  All right.

20           MS. MURPHPY:  We can go off the record.

21

22           (Signature was not waived.)

23

24

25
```

1                    C E R T I F I C A T E

2

3          I, Rachelle Zigrang, IL-CSR and MO-CCR, do

4    hereby certify that pursuant to Notice there came

5    before me **Angela Levitan, Ph.D.**, who was by me first

6    duly sworn of her oath to testify to the truth of her

7    knowledge touching and concerning the matters in

8    controversy in this cause; that she was thereupon

9    examined upon her oath, and her examination was taken

10   in shorthand by me and later transcribed into

11   computer-aided transcription under my supervision, and

12   that the deposition is a true record of the testimony

13   given by the witness.

14          IN WITNESS WHEREOF, I have hereunto

15   subscribed my name this 23rd day of June 2021.

16

17

18          _____

19                  Rachelle Zigrang
                 IL. CSR #084-004014
20                 MO. CCR #608

21

22

23

24

25

## *Bi-State Reporting, Inc.*
**1204 Seasons Drive**
**Godfrey, IL  62035**
**Missouri (636)225-9293        Illinois (618)466-2039**


June 23, 2021


Siobhan M. Murphy
Lewis Brisbois Bisgaard & Smith LLP
550 West Adams Street, Suite 300
Chicago, IL  60661
siobhan.murphy@lewisbrisbois.com


In re:  Liss v. TMS
        Case No. 3:19-CV-00810

Dear Ms.  Muprhy:

    Enclosed is a copy of the transcript of Angela Levita, Ph.D. taken on June 22, 2021.
    Please have the deponent read the transcript, and if there are any corrections to be made, use the errata sheet also enclosed.  Have the deponent sign before a Notary Public and return the signature page and errata sheet to Lanny Darr at Darr Law Offices, 307 Henry Street, Suite 406, Alton, Illinois.
    If the signature page is not returned within thirty (30) days, the transcript may be filed without changes.
    If you have any questions, please feel free to call me at (618)466-2039.

Sincerely,


Rachelle Zigrang, IL-CSR, MO-CCR

TRANSCRIPT CORRECTION SHEET

Upon reading the deposition and before subscribing thereto, the deponent indicated the following changes:

(Any misspellings may be noted once with the notation to change throughout transcript.)

Page ____, Line ___, Should read:

Reason for change:

Page ____, Line ___, Should read:

Reason for change:

Page ____, Line ___, Should read:

Reason for change:

Page ____, Line ___, Should read:

Reason for change:

Page ____, Line ___, Should read:

Reason for change:

_____
SIGNATURE OF WITNESS

(RCZ)          BI-STATE REPORTING, INC
                    (618)466-2039

Page ____, Line ___, Should read:

Reason for change:


Page ____, Line ___, Should read:

Reason for change:


Page ____, Line ___, Should read:

Reason for change:


Page ____, Line ___, Should read:

Reason for change:


Page ____, Line ___, Should read:

Reason for change:


Page ____, Line ___, Should read:

Reason for change:

Page ____, Line ___, Should read:

Reason for change:


Page ____, Line ___, Should read:

Reason for change:


                                        _____
                                        SIGNATURE OF WITNESS

Page ____, Line ___, Should read:

Reason for change:


Page ____, Line ___, Should read:

Reason for change:


Page ____, Line ___, Should read:

Reason for change:


Page ____, Line ___, Should read:

Reason for change:


Page ____, Line ___, Should read:

Reason for change:


Page ____, Line ___, Should read:

Reason for change:

Page ____, Line ___, Should read:

Reason for change:


Page ____, Line ___, Should read:

Reason for change:


_____
SIGNATURE OF WITNESS

I, **ANGELA LEVITAN, Ph.D.**, hereby state that I have read the foregoing questions and answers appearing in this transcript of my deposition, and that this is a true and accurate (corrected) report of said answers given in response to the questions appearing herein.


_____

ANGELA LEVITAN, PH.D.




Subscribed before me this _____ day of _____, 2021.



My commission expires _____


_____

Notary Public

MR. DARR: [14]  43/7 45/2 47/5 47/8
47/15 57/2 90/17 114/8 120/8 122/16
123/9 123/12 124/12 124/18
MR. HENNELLY: [5]  22/11 42/14 47/17
122/3 122/14
MS. BAKER-SEAL: [3]  114/11 114/16
122/1
MS. HORVAT: [1]  47/14
MS. MURPHPY: [41]  24/10 26/21 27/7
27/15 27/18 28/2 28/10 28/18 29/1 29/10
29/25 30/9 32/19 34/3 38/17 40/1 41/20
42/15 43/3 43/10 44/25 47/9 49/5 52/13
57/1 57/14 58/14 69/23 89/3 95/7 100/4
100/23 101/12 102/23 106/21 109/8
113/3 123/7 123/10 124/13 124/19
THE WITNESS: [5]  47/7 47/12 90/15
90/18 114/15

-

-o0o [3]  3/10 3/12 4/24
-oOo [1]  3/18
-vs [2]  1/5 2/5

0

004014 [2]  1/22 125/19
00810 [3]  1/5 2/5 126/11
084-004014 [2]  1/22 125/19

1

10 [1]  21/3
100 [1]  18/7
1010 [1]  3/3
11 [2]  6/2 53/6
114 [1]  3/22
1204 [2]  1/24 126/1
122 [2]  3/22 3/23
1547 [1]  3/8
1910 [1]  20/19
1926 [1]  20/19
1999 [1]  20/6

2

2 inches [1]  75/1
200 [1]  3/7
2005 [1]  13/17
2007 [2]  13/19 44/6
2019 [18]  22/19 23/23 27/25 28/10 29/24
30/7 30/22 31/10 31/16 31/23 32/18 34/1
37/7 37/11 39/3 44/10 53/22 100/4
2021 [6]  1/17 4/7 125/15 126/5 126/14
130/17
2039 [4]  1/25 126/2 126/20 127/21
22 [3]  1/17 4/7 126/14
225-9293 [1]  126/2
23 [1]  126/5
23rd [1]  125/15

3

30 [1]  126/18
30-hour [1]  21/3
300 [3]  2/23 11/1 126/8
307 [2]  2/18 126/17
314 [1]  1/25
3:19-CV-00810 [3]  1/5 2/5 126/11

4

4 feet [2]  74/22 75/1
406 [2]  2/18 126/17
466-2039 [4]  1/25 126/2 126/20 127/21

5

5 feet [2]  74/17 75/1
5-foot [1]  74/19
5.7 feet [1]  74/21
5.7 inches [1]  74/21
50 [1]  74/16
500 [2]  3/3 11/1
525 [1]  3/7
550 [2]  2/23 126/8

6

6'3 [1]  88/8
60 inches [2]  73/25 74/11
60661 [2]  2/23 126/8
608 [2]  1/21 125/20
618 [4]  1/25 126/2 126/20 127/21
62002 [1]  2/19
62035 [2]  1/24 126/2
62220-1547 [1]  3/8
63101 [1]  3/3
636 [1]  126/2
6578 [1]  1/25
69 inches [1]  74/15

7

7:30 [1]  72/19
7th [1]  58/12

8

805-6578 [1]  1/25

9

9 inches [1]  75/2
90-degree [1]  89/20
9293 [1]  126/2

A

A-R-C-C-A [1]  9/9
Abbi [3]  6/12 123/8 123/11
abbreviation [1]  9/22
Abigail [1]  2/24
abilities [1]  69/12
ability [4]  50/11 63/7 100/2 123/20
able [16]  17/9 17/22 20/17 31/1 55/7
64/2 69/13 73/9 82/14 82/19 86/2 87/18
116/17 116/25 123/22 124/8
about [63]  7/24 14/6 17/3 18/17 19/20
19/21 23/4 26/14 29/4 33/25 35/4 36/15
42/5 44/19 48/1 49/15 50/12 53/8 55/4
55/10 55/11 61/14 62/9 64/25 70/14
70/15 71/10 78/2 84/17 84/21 84/22
85/13 87/2 89/11 89/11 89/16 92/15
93/18 93/22 95/16 95/25 96/1 96/2 99/16
99/23 100/19 101/10 103/21 109/18
110/21 111/7 112/15 113/24 114/2 114/3
114/6 115/8 115/19 118/2 118/8 122/11
123/20 124/2
above [3]  45/17 74/11 88/17
absence [1]  13/23
accept [4]  46/3 46/6 46/9 64/3
accepted [2]  17/9 49/4
accepting [5]  45/20 45/24 63/16 64/12
65/20
access [9]  25/12 57/10 58/8 59/2 59/7
59/11 63/22 66/13 68/20
accessing [2]  29/6 32/13
accident [3]  13/4 15/11 75/14
accidents [3]  7/7 15/17 93/20
according [1]  92/20
account [1]  105/7

accuracy [1]  93/20
accurate [6]  25/15/15 71/4 104/8 124/9
130/6
accurately [1]  71/1
acronym [2]  9/8 9/22
act [1]  118/24
acted [1]  55/9
action [2]  43/14 96/9
actual [8]  31/7 43/15 70/6 85/13 85/20
99/13 111/1 124/4
actually [12]  20/23 23/5 31/7 34/24 36/10
38/24 39/1 43/21 79/1 84/1 85/18 115/1
Adams [2]  2/23 126/8
addition [2]  41/19 44/18
additional [7]  58/21 59/8 92/15 96/5
98/11 118/23 120/20
additionally [1]  114/7
address [3]  43/22 43/23 112/11
adds [1]  118/20
adequate [1]  61/1
adhere [1]  77/16
adjuster [1]  11/14
administrative [1]  26/16
admitted [1]  44/14
adverse [1]  117/19
affect [7]  72/21 91/22 100/20 100/25
101/3 101/6 101/12
affected [1]  100/17
after [15]  7/2 7/20 9/1 19/16 31/1 50/21
50/21 71/16 71/22 71/24 72/18 72/23
73/3 107/15 109/6
afternoon [1]  4/8
afterwards [2]  102/21 106/17
again [29]  22/2 31/25 32/21 33/4 35/21
41/22 42/9 44/22 49/12 50/17 54/11
55/12 63/5 64/23 66/11 66/12 79/7 92/11
95/15 96/2 104/8 106/10 106/23 107/18
110/5 110/23 112/1 121/14 121/19
against [9]  26/7 26/7 26/15 26/20 29/5
83/21 86/23 87/20 108/25
age [1]  5/2
agree [50]  21/8 21/12 21/21 21/24 22/3
22/17 24/5 24/6 24/18 25/6 25/13
25/16 26/19 28/18 31/5 38/6 40/5 43/2
46/25 49/1 53/13 58/25 59/17 63/14
63/19 65/3 65/18 65/21 66/17 66/21 72/3
75/14 79/11 80/19 81/11 87/12 89/1
90/25 94/14 98/1 98/10 99/11 99/21
99/22 101/21 108/12 110/15 113/5
113/13
agreed [2]  4/1 4/18
ahead [10]  9/11 14/8 23/14 24/14 42/17
42/21 84/18 85/11 111/17 120/11
AHLEIM [1]  3/2
aided [1]  125/11
all [37]  4/6 4/16 4/19 4/19 5/24 9/20 13/1
17/7 20/17 21/24 28/7 37/16 42/22 44/5
44/8 45/5 57/23 58/9 58/19 59/18 61/12
70/8 72/21 75/13 90/22 95/25 108/20
109/8 111/21 114/9 115/25 116/20
121/19 122/15 124/13 124/17 124/19
allow [2]  113/19 119/13
allowed [4]  17/11 17/15 32/12 58/8
allows [3]  53/3 79/13 79/14
almost [1]  18/16
along [1]  48/25
already [5]  26/14 84/24 99/7 105/20
105/22
also [37]  5/22 11/4 16/16 16/24 17/2
18/19 19/8 22/10 22/14 26/18 44/24

**A**

also... [26] 48/20 52/7 56/14 57/8 60/7 60/19 61/1 72/6 83/8 88/19 91/25 92/8 94/12 101/19 103/13 106/3 106/19 110/13 111/23 115/16 115/13 118/6 118/16 118/22 120/6 126/16
alternate [18] 46/5 49/14 68/21 82/5 82/7 83/1 83/5 83/9 86/9 90/12 95/10 95/12 106/13 107/5 107/6 118/25 120/18 121/15
alternates [1] 107/1
alternative [21] 28/18 28/24 29/6 46/9 46/12 48/8 56/4 56/17 56/25 57/10 57/25 58/5 58/13 80/4 86/11 95/5 113/14 113/17 113/22 114/6 119/5
alternatives [11] 49/8 50/6 50/8 61/10 61/19 80/13 113/25 114/2 114/3 114/4 114/7
although [15] 8/10 13/17 15/2 15/13 18/16 19/19 36/1 50/17 52/7 53/2 61/9 62/11 63/11 78/16 105/18
Alton [2] 2/19 126/17
always [3] 55/10 99/22 99/25
am [12] 5/12 14/19 17/19 25/2 49/7 53/3 72/25 74/17 79/23 84/15 95/7 112/24
Amazon [1] 56/10
amount [11] 14/12 14/12 14/15 34/16 37/20 57/20 73/11 99/19 108/13 116/2 116/3
amounts [1] 34/21
analyses [1] 113/7
analysis [35] 18/14 33/24 40/12 40/17 41/12 42/10 55/12 83/15 84/10 84/11 84/13 84/15 88/1 95/3 95/13 95/25 97/20 98/4 98/15 98/15 98/17 98/19 98/20 109/18 110/10 110/24 112/20 112/25 114/24 114/24 115/1 115/2 115/4 115/23 119/9
analyze [7] 86/15 90/11 93/11 96/10 99/1 109/15 111/19
analyzed [8] 33/18 34/23 95/12 106/25 107/20 110/6 111/19 114/8
analyzing [2] 42/9 113/10
ANGELA [8] 1/16 4/3 5/1 5/9 125/5 126/14 130/3 130/11
angle [70] 78/14 78/23 78/24 79/4 79/5 79/10 79/20 79/23 79/25 80/9 80/10 80/16 80/19 81/9 81/12 81/16 81/19 81/20 81/24 82/12 83/18 83/19 83/21 84/1 84/3 84/7 85/18 86/10 86/10 86/19 86/23 87/4 87/13 87/16 87/20 87/23 87/25 88/9 88/13 88/17 88/21 89/8 89/19 89/20 89/21 89/23 89/25 91/15 92/13 93/24 94/23 95/23 96/7 96/15 97/12 101/20 103/1 103/7 103/13 103/14 106/14 106/15 108/25 110/2 110/4 111/14 111/23 112/15 120/17 121/14
angles [2] 89/7 89/12
ankle [42] 75/4 78/13 78/19 85/15 91/15 91/21 92/6 92/18 92/21 93/24 94/16 96/3 100/19 100/22 101/5 102/6 105/25 106/20 107/13 107/15 107/17 107/22 107/24 108/1 108/4 108/8 108/19 109/6 109/11 109/11 109/20 110/2 110/3 110/19 110/13 111/22 112/15 115/16 115/16 120/7 120/14 121/1 121/6 121/18
anniversary [1] 9/7
another [9] 6/2 14/15 52/5 52/9 96/7 102/17 103/11 112/22 124/15

answer [10] 23/11 24/15 24/17 38/16 97/4 98/2 69/23 98/22 100/16 115/1 115/3 115/6
answered [5] 60/25 67/2 69/24 95/8 109/9
answering [1] 49/7
answers [2] 130/4 130/7
anticipate [2] 56/16 57/9
anticipated [1] 56/24
any [88] 4/18 4/19 8/18 8/18 9/21 9/22 14/21 15/11 15/13 16/20 17/11 21/17 22/15 25/17 25/20 27/6 27/10 28/5 28/13 33/19 34/19 39/5 39/6 39/15 39/25 40/23 41/7 41/8 46/8 46/16 47/3 47/23 48/3 48/24 50/11 52/18 54/2 54/23 58/4 58/12 59/5 59/8 59/9 59/12 59/20 60/19 61/6 62/4 62/18 62/22 65/13 72/15 76/8 76/10 76/13 76/15 76/22 79/14 81/15 83/4 85/20 89/1 89/7 89/7 90/9 91/11 92/14 93/18 93/21 95/1 96/5 97/4 100/1 100/8 100/13 102/7 104/2 105/6 108/25 111/3 112/11 119/9 121/20 123/25 124/7 126/15 126/19 127/4
anybody [12] 10/18 11/13 23/5 30/13 30/18 32/5 32/23 34/10 51/6 51/11 56/9 60/5
anyone [3] 28/1 47/11 68/4
anything [17] 13/2 13/23 13/25 14/24 31/7 33/14 39/20 41/19 48/25 49/2 58/22 71/13 97/13 114/2 114/10 119/18 124/1
anyway [1] 32/10
anywhere [1] 35/16
apologize [1] 47/1
appear [2] 79/4 94/18
appearing [2] 130/5 130/8
appears [1] 82/1
applicable [4] 4/6 19/23 20/10 21/13
application [1] 16/9
apply [1] 56/13
applying [1] 77/25
appointments [1] 64/24
appreciate [2] 45/2 115/17
approach [2] 41/8 83/5
approached [2] 44/11 50/2
approaching [1] 102/17
appropriateness [1] 42/9
approximate [2] 11/1 39/8
approximated [1] 39/19
approximately [7] 72/19 73/11 73/25 74/10 74/16 74/21 75/1
approximation [1] 39/13
ARCCA [17] 7/12 9/4 9/6 9/8 9/13 9/16 9/19 10/3 10/4 10/7 10/12 10/20 11/8 12/21 12/22 12/24 20/2
are [97] 4/20 6/19 8/16 9/13 10/7 10/12 10/14 10/14 11/13 11/22 12/21 13/4 14/9 15/7 15/22 16/2 16/12 16/14 17/16 18/10 18/12 21/17 21/23 21/25 22/8 22/14 23/4 23/15 26/15 27/10 30/19 31/1 33/7 34/15 34/21 35/6 35/12 35/14 35/15 35/24 36/2 42/4 46/5 49/8 49/17 50/15 51/21 52/11 52/22 53/9 54/15 59/5 59/13 59/22 60/3 60/11 60/20 60/24 62/8 63/9 67/15 68/18 70/4 70/13 70/16 72/24 73/24 76/4 77/13 79/20 80/15 82/14 84/6 85/19 86/2 94/15 98/4 102/11 102/23 104/7 106/4 106/7 106/25 107/4 109/3 110/25 110/25 112/6 112/16 114/14 117/11 118/4 121/19 123/17 123/17 126/15
area [25] 19/4 20/11 24/22 25/9 29/7

30/9 31/11 31/15 31/19 33/8 34/11 36/23 37/12 38/4 38/7 39/17 39/19 45/15 58/8 59/14 60/5 60/11 60/13 62/16 80/8 88/14
areas [16] 8/13 8/17 13/4 15/21 19/23 20/13 35/12 36/4 39/9 39/22 39/23 44/15 57/14 68/16 68/17 117/18
aren't [5] 21/6 35/13 73/9 74/24 107/19
arguably [1] 14/22
arise [1] 86/13
arose [1] 8/6
around [15] 8/15 13/17 23/23 23/25 36/14 37/24 56/20 58/7 58/17 58/24 59/1 59/6 59/10 59/19 109/1
around 2005 [1] 13/17
arrived [2] 71/12 71/18
as [137]
ascertain [3] 67/21 67/23 86/21
ashtray [1] 103/20
aside [2] 119/1 120/24
ask [5] 9/11 59/21 61/7 63/9 124/15
asked [16] 16/19 42/19 57/2 69/24 95/8 97/8 97/9 97/22 97/25 109/9 113/14 113/17 113/24 114/2 114/3 114/6
asking [1] 113/24
aspect [4] 15/4 15/5 49/3 101/2
aspects [5] 16/25 18/15 18/19 19/7 85/20
assess [1] 33/21
assessing [1] 34/15
assume [1] 14/22 102/13
assumed [1] 102/9
assumes [4] 26/22 27/19 30/1 30/10
assuming [4] 59/22 63/24 64/19 93/15
assumption [5] 40/1 54/6 54/7 64/5 105/19
attempt [3] 57/20 61/2 93/3
attempted [1] 93/13
attempting [8] 25/5 32/17 33/1 56/17 56/25 61/15 62/5 71/17
attended [1] 20/21
attention [2] 78/6 117/7
attorney [1] 11/13
Atty [5] 2/19 2/24 2/24 3/4 3/8
authority [2] 28/1 28/9
avail [1] 51/19
available [19] 13/10 40/15 44/6 44/9 47/22 51/2 51/20 73/16 73/17 73/20 74/2 78/3 95/9 98/2 98/6 98/11 107/7 108/13 108/15
avoid [6] 24/1 24/1 24/4 56/18 56/25 57/23
avoided [1] 58/5
avoiding [2] 57/14 117/18
aware [12] 13/25 15/13 17/18 17/19 28/5 44/12 52/1 52/7 54/2 59/5 72/25 117/17
awareness [1] 123/20

**B**

back [9] 23/21 43/9 43/10 64/3 64/15 90/20 103/2 103/6 116/10
background [8] 5/25 6/1 6/16 18/22 46/17 50/10 79/8 79/13
Baker [3] 3/8 3/22 114/20
Baker-Seal [3] 3/8 3/22 114/20
balance [12] 87/10 97/3 100/2 102/2 106/16 106/17 108/1 111/13 120/19 121/13 121/16 121/17
bar [20] 74/1 74/8 74/10 74/14 74/15 74/20 74/20 75/4 75/5 75/10 75/10 75/20 75/21 75/22 90/6 90/10 103/9 103/15 103/17 110/20

**B**

barricade [2]  25/25 26/7
barricaded [2]  65/4 65/4
barricading [1]  26/3
bars [1]  75/8
base [3]  68/11 68/22 124/12
based [77]  8/13 23/3 24/21 25/8 25/14
28/4 30/3 31/6 31/25 33/18 35/21 37/21
39/10 39/21 40/24 41/22 44/16 50/16
51/16 51/25 52/6 52/11 52/17 53/4 53/18
54/5 54/14 54/15 54/19 55/12 60/16 62/7
65/7 67/12 68/1 69/19 74/25 75/6 75/12
76/2 76/6 76/17 77/3 77/4 77/6 77/8 78/2
80/4 80/12 80/14 81/6 83/12 83/13 83/15
83/25 85/5 86/21 88/11 88/23 89/14
92/17 94/19 95/9 99/8 104/10 105/5
107/6 107/23 108/9 108/23 110/10 113/7
116/20 118/4 121/2 121/20 124/10
basis [4]  17/18 91/22 94/3 121/20
BCPE [1]  13/12
be [152]
became [4]  7/2 14/10 24/25 98/2
because [37]  14/1 15/1 19/4 19/12 19/14
25/12 27/12 30/17 31/13 32/5 32/9 33/9
34/10 44/2 46/3 51/13 53/11 68/20 69/6
82/3 85/17 87/7 101/18 103/1 105/20
107/17 107/24 107/25 109/2 112/11
112/16 112/23 113/2 119/5 119/8 121/10
121/13
become [2]  14/14 25/1
becomes [1]  98/6
becoming [1]  14/6
been [83]  4/16 6/8 9/17 10/20 10/23
10/25 17/3 17/10 17/17 18/6 20/5 30/18
31/12 32/6 32/13 33/9 34/9 34/10 42/7
42/13 43/13 43/15 43/21 44/12 44/13
45/23 46/13 46/13 51/4 51/6 52/1 53/5
53/6 53/14 53/19 53/19 53/21 54/1 54/6
54/9 54/16 54/17 54/22 56/1 56/5 56/8
56/15 57/24 61/10 61/19 61/25 63/16
65/1 65/9 65/19 65/22 65/23 66/12 66/19
66/21 68/24 69/11 70/22 71/14 72/16
72/18 74/20 77/1 80/13 87/17 87/19 88/4
93/19 94/7 95/23 105/20 113/17 114/7
116/16 116/25 118/7 121/5 124/17
before [19]  4/9 16/19 30/15 30/22 33/15
37/6 52/9 53/20 53/22 94/6 94/8 94/10
103/5 108/8 108/19 125/5 126/16 127/2
130/16
begin [3]  27/9 55/14 61/12
beginning [1]  32/2
behalf [4]  1/16 4/4 4/13 5/4
behave [1]  50/8
behind [1]  105/9
being [22]  5/2 16/12 17/7 17/8 17/9
17/14 17/14 19/24 51/9 54/11 60/21 68/1
78/4 111/21 112/6 113/9 115/13 117/17
118/5 118/6 120/17 123/25
believe [65]  12/14 12/18 12/19 13/16
17/7 18/24 21/2 22/6 22/23 26/17 30/6
31/18 39/18 42/5 48/5 48/6 48/8 50/22
51/5 51/18 51/25 52/3 52/6 53/6 53/7
53/15 53/18 55/20 55/23 55/25 57/5 60/5
60/23 61/3 62/21 63/12 66/2 66/6 67/10
70/16 70/23 71/3 71/13 72/10 72/12 73/5
73/8 73/13 76/10 81/15 82/19 84/2 85/4
85/24 89/14 107/16 111/6 113/22 114/1
116/8 116/12 116/15 116/21 118/10
119/3

Belleville [1]  3/8
below [3]  24/23 80/9 86/11
bending [1]  17/5
bent [1]  101/22
besides [4]  28/6 40/23 90/4 90/10
best [7]  50/19 65/9 65/19 65/22 66/7
66/12 97/16
better [8]  61/10 116/17 116/18 116/22
118/23 119/4 123/9 123/12
between [25]  4/1 4/7 15/19 15/21 16/3
31/15 35/9 36/15 38/2 38/7 38/11 38/20
44/19 75/4 75/7 75/9 78/11 79/17 95/23
97/14 101/15 102/20 103/18 104/1
112/14
beyond [14]  17/14 40/19 41/11 42/10
47/5 47/25 66/5 72/15 73/1 96/4 98/24
119/10 119/10 119/19
Bi [3]  1/23 126/1 127/20
Bi-State [3]  1/23 126/1 127/20
billed [1]  122/21
biomechanical [3]  10/8 19/5 95/14
biomechanics [21]  6/18 7/1 15/19 16/4
16/8 16/22 16/24 76/2 76/6 77/8 77/10
77/14 79/14 86/7 99/10 99/16 106/5
108/11 110/17 110/18 115/10
biomechanist [1]  5/13
biomechanists [1]  12/22
BISGAARD [2]  2/22 126/7
bit [7]  7/17 23/21 47/20 88/21 88/22
104/11 104/13
block [1]  25/25
Board [1]  13/12
bodies [1]  23/19
body [11]  16/10 16/10 78/20 84/15 96/13
99/16 100/9 100/14 101/6 101/12 101/16
boots [1]  104/20
both [5]  11/6 11/17 12/1 22/19 117/15
bottom [4]  37/23 80/17 81/21 86/23
break [14]  45/2 45/4 47/6 90/17 100/20
100/23 101/6 106/12 106/16 107/2
107/12 108/5 109/17 109/19
breakdown [3]  11/18 12/5 12/10
breaking [2]  106/9 109/11
breaks [1]  111/22
brief [4]  45/2 47/19 90/21 114/15
bringing [1]  32/3
BRISBOIS [2]  2/22 126/7
broad [6]  6/22 23/2 23/10 23/12 24/12
27/12 51/21 100/11
broke [16]  75/4 75/20 102/6 102/6
105/25 107/15 107/16 107/22 107/24
108/8 108/19 110/2 110/3 110/19 115/14
115/15
broken [3]  106/20 108/4 109/25
broker [1]  42/14
BROWN [2]  3/7 121/23
build [1]  53/4
building [14]  30/4 36/14 37/24 56/20 58/7
58/14 58/17 58/24 59/2 59/7 59/10 59/19
104/19 116/9
bunch [1]  6/1

**C**

call [12]  19/13 47/15 48/9 48/10 52/1
52/2 52/4 66/1 66/8 66/10 103/19 126/20
called [4]  19/11 66/17 66/18 118/17
calling [1]  62/14
calls [1]  63/8
came [8]  81/3 82/12 95/5 103/2 118/11
120/25 121/1 125/4

can [49]  5/7 6/12 6/16 11/13 13/23 14/1
15/18 15/25 16/16 19/24 23/1 23/24
24/14 26/9 26/25 27/5 27/13 33/4 34/18
35/1 35/25 43/7 44/3 44/5 44/8 47/15
50/12 56/2 59/16 67/7 67/17 67/19 70/13
78/4 86/5 87/22 89/22 90/14 91/6 96/25
97/7 97/16 99/22 111/18 115/18 123/1
123/2 123/7 124/20
can't [18]  14/1 19/13 26/4 26/6 26/13
27/9 43/1 46/2 46/3 68/2 79/9 86/17
86/25 86/25 93/21 100/11 112/22 120/21
cannot [4]  13/23 25/23 60/2 107/7
capabilities [1]  124/8
care [1]  47/16
career [1]  46/22
Carey [1]  77/21
cargo [1]  46/17
CARY [1]  3/2
case [40]  1/5 2/5 6/5 6/7 12/12 17/20
28/8 33/7 39/11 40/13 40/17 41/12 42/11
47/4 49/3 56/15 60/6 63/8 68/6 68/12
70/3 74/7 76/9 76/16 77/9 79/16 85/22
91/14 94/15 97/1 104/3 105/6 109/21
113/20 114/5 114/23 116/3 121/22
123/19 126/11
cases [6]  6/8 10/22 11/2 11/11 12/17
20/3 68/14 68/15
catwalk [25]  31/8 31/15 31/19 34/7 37/5
56/5 73/19 74/5 77/2 77/11 78/12 83/24
84/4 84/5 101/11 101/15 102/23 103/1
103/6 103/10 103/23 104/1 104/22
123/22 123/24
causal [1]  7/7
causative [2]  19/24 25/3
cause [9]  4/10 4/21 24/10 80/20 87/20
91/10 98/19 105/11 125/8
caused [19]  79/21 80/2 80/11 80/17
81/13 81/16 89/2 89/8 89/12 100/2 100/3
100/19 100/22 101/5 105/23 106/2
107/12 110/20 111/12 111/13
causes [4]  78/19 79/13 106/15 111/24
causing [3]  91/2 91/8 91/8
cautious [2]  118/5 118/22
CCR [5]  1/21 4/9 125/3 125/20 126/23
center [7]  7/3 7/21 85/16 91/10 91/24
101/19 101/23
certain [12]  4/10 14/11 14/12 39/17
39/19 42/2 42/6 64/7 68/16 68/17 87/1
107/7
certainly [1]  79/4
certainty [6]  86/3 86/5 86/18 86/21
107/11 108/7
certificate [2]  19/12 19/14
certification [14]  13/9 13/11 13/12 13/15
13/22 13/24 14/2 14/2 14/18 14/22 15/14
20/4 21/4 21/7
certifications [2]  20/24 21/1
certified [7]  13/8 13/19 14/6 14/10 14/14
15/7 15/9
certify [1]  125/4
chain [3]  98/23 106/24 111/18
challenge [1]  17/19
challenged [1]  17/18
chances [1]  66/22
change [31]  11/21 72/4 99/4 99/6 101/7
101/16 101/17 104/2 105/10 127/4 127/7
127/9 127/12 127/14 127/17 128/2 128/4
128/7 128/9 128/12 128/14 128/16
128/19 129/2 129/4 129/7 129/9 129/12
129/14 129/16 129/19

## C

changed [1] 97/19
changes [2] 126/19 127/3
changing [1] 97/23
character [1] 124/10
charge [1] 28/5
check [2] 12/14 68/25
Chicago [2] 2/23 126/8
CHILDRESS [1] 3/2
choice [6] 33/8 61/10 70/3 116/8 116/17 116/23
choices [4] 49/15 55/23 55/25 56/4
choose [3] 52/8 94/25 116/14
chose [3] 61/23 69/17 104/22
chosen [1] 9/17
cigarette [1] 103/20
circle [1] 88/18
circumstances [4] 27/6 33/10 52/22 52/23
City [5] 21/14 22/5 22/18 22/20 40/8
civil [2] 4/5 81/10
claim [2] 8/18 20/12
claims [7] 8/5 8/9 8/11 8/14 8/19 11/14 77/19
clarification [1] 122/4
clarify [2] 17/2 122/13
classes [1] 19/14
clear [2] 37/22 103/4
clearly [2] 15/21 71/22
clientele [1] 11/8
close [5] 5/18 5/19 40/25 71/13 73/9
closed [34] 32/1 33/9 39/1 41/1 41/5 41/24 42/2 42/4 42/14 44/10 44/18 44/23 48/11 53/20 58/20 59/23 60/3 60/20 63/6 63/15 64/6 64/13 65/5 65/6 65/10 65/19 65/24 66/1 66/9 66/19 66/22 71/25 72/18 117/20
closest [1] 81/24
collected [1] 77/17
come [7] 18/20 62/9 66/9 79/3 79/5 98/22 109/19
comes [1] 50/23
coming [4] 22/10 25/24 56/9 65/1
comment [1] 55/7
comments [1] 124/2
commercial [1] 49/5
commission [1] 130/20
common [1] 55/21
company [4] 8/1 9/16 9/18 11/13
Compared [2] 104/24 104/25
compensation [1] 82/20
competent [1] 21/6
completely [3] 45/13 59/6 87/15
completion [1] 7/10
compliance [2] 18/23 20/9
complied [1] 4/17
comply [1] 21/9
component [7] 91/16 92/7 92/8 92/19 96/4 96/23 96/24
computer [1] 125/11
computer-aided [1] 125/11
concerning [1] 125/7
conclusion [1] 78/7
conclusions [1] 76/9
condition [12] 25/21 27/3 27/5 27/7 27/11 27/23 27/24 33/6 34/25 40/7 54/21 117/19
conditions [10] 40/16 40/22 44/4 53/14 54/22 70/21 71/1 71/7 71/11 72/4

conduct [1] 123/16
cone [22] 30/13 32/2 40/23 41/3 41/4 41/15 41/19 42/15(?) 49/11 50/2 50/5 51/12 51/13 51/23 58/20 59/24 60/1 60/11 60/18 61/4 123/21
confirm [2] 48/10 71/9
confronted [1] 71/2 71/12 74/20
conjunction [1] 60/21
connected [1] 58/18
consider [9] 5/25 16/25 18/8 20/8 20/15 21/18 40/14 42/12 112/19
consideration [2] 90/3 90/9
considered [3] 27/24 31/24 35/17
considering [4] 21/22 64/24 77/17 115/2
consistent [14] 55/3 55/9 69/20 76/20 77/8 77/13 78/4 78/19 82/24 95/14 97/18 97/21 109/12 118/19
constitute [4] 23/8 32/19 33/11 91/11
construct [2] 60/10 60/14
constructed [5] 34/8 35/6 35/13 35/23 36/14
Construction [2] 20/19 21/4
constructive [1] 33/13
constructs [1] 53/4
consultancy [1] 11/12
consultant [1] 10/5
consultation [1] 11/10
consulted [1] 76/22
consulting [1] 11/11
contact [5] 25/24 48/18 79/3 79/5 121/14
contacting [3] 42/3 117/18 120/16
contained [1] 70/5
continue [8] 7/14 14/17 17/15 41/6 44/21 47/21 60/2 102/2
continued [3] 19/15 19/17 20/1
continuing [1] 14/19
controlling [1] 28/17 28/23
controls [1] 26/16 29/9 29/12
controversy [1] 125/8
conversation [1] 69/6
copy [2] 67/4 126/14
correct [93] 5/18 5/22 8/1 9/23 14/9 21/10 22/1 22/5 25/11 26/8 28/1 28/9 28/25 29/10 30/23 31/17 31/20 32/19 35/2 36/18 36/19 36/25 37/12 43/3 43/18 43/20 45/7 46/18 49/2 51/20 52/13 52/19 52/20 52/24 53/14 53/16 54/18 55/19 55/22 61/16 61/23 62/4 64/3 64/4 64/22 65/14 66/5 67/15 69/15 69/23 70/1 71/23 74/12 74/23 74/24 75/17 79/22 80/11 81/13 81/17 81/21 81/25 82/4 86/19 87/13 88/14 89/3 92/10 92/22 92/25 93/4 93/9 93/14 94/1 94/2 94/4 94/21 95/7 99/5 101/9 101/24 102/18 108/8 108/21 109/8 110/13 114/5 116/6 116/10 117/5 119/23 120/4 120/5
corrected [1] 130/6
CORRECTION [1] 127/1
corrections [1] 126/15
correctly [3] 51/13 74/17 117/21
could [94] 6/11 10/10 24/9 24/10 24/23 26/11 26/14 26/15 27/14 28/20 29/20 32/22 33/15 34/22 36/24 37/4 37/8 41/5 44/21 48/20 49/15 49/18 49/20 49/23 50/6 50/11 50/13 51/9 52/4 52/8 57/4 57/17 58/2 59/15 61/17 62/22 63/12 63/21 64/21 64/23 65/3 65/5 65/6 65/10 66/10 66/17 66/18 67/21 67/23 69/3 69/16 69/21 79/21 79/24 80/1 80/13 80/17 81/8 85/1 87/3 88/2 89/2 89/5 89/8

89/9 89/12 91/11 92/6 96/10 98/5 98/12 98/15 98/25 100/6 100/13 100/23 106/16 106/18 106/19 106/19 107/2 108/3 109/16 109/19 109/19 113/18 114/4 114/7 121/16 121/17 121/17 122/24 123/4 123/4
couldn't [10] 7/18 10/17 48/1 50/19 51/14 51/14 63/1 75/25 76/5 90/11
counsel [2] 4/2 4/2
country [1] 8/15
couple [7] 27/13 45/4 60/23 113/7 114/12 114/22 122/17
course [2] 20/22 64/1
courses [1] 19/8
court [10] 1/1 2/1 4/6 4/11 5/14 17/5 17/11 18/7 43/8 67/2
courthouse [1] 18/1
courtroom [1] 17/14
cover [3] 13/2 15/3 22/4
covered [9] 25/9 31/9 31/13 31/14 31/16 31/20 39/23 44/16 45/15
covering [7] 21/21 22/3 33/13 34/7 37/19 67/22 104/20
covers [2] 20/11 20/13
COVID [1] 69/10
create [8] 27/11 44/3 79/19 87/18 88/5 88/6 93/4 96/16
created [4] 79/10 80/1 108/24 123/23
creating [4] 22/13 34/24 88/4 96/3
criticism [4] 48/3 61/6 62/5 119/16
Cross [4] 3/22 3/22 114/18 122/5
Cross-Examination [1] 3/22 3/22 114/18 122/5
crossbar [3] 73/25 82/23 90/5
CSR [5] 1/22 4/9 125/3 125/19 126/23
cue [11] 44/17 44/21 44/23 44/24 45/19 45/22 45/23 61/2 62/18 65/20 65/23
cues [7] 44/5 44/9 47/21 47/23 59/13 60/23 63/6
current [4] 6/19 7/16 9/2 123/2
Currently [1] 21/2
Curriculum [1] 3/16
cut [5] 41/2 79/3 81/4 81/8 83/19
cutting [1] 7/18
CV [8] 1/5 2/5 5/16 5/21 5/25 6/15 21/5 126/11
cycle [2] 105/16 105/20

## D

dangerous [7] 26/20 27/3 27/5 27/7 27/11 27/18 27/24
DARR [6] 2/18 2/19 3/21 3/23 126/17 126/17
data [8] 77/17 78/2 93/18 98/1 98/2 98/6 98/11 98/14
date [2] 122/22 123/2
Daubert [3] 17/17 17/18 17/19
day [8] 4/9 34/6 37/22 59/8 70/17 108/21 125/15 130/16
days [1] 126/18
deal [5] 40/11 40/21 42/25 43/18 81/10
deals [1] 55/16
Dear [1] 126/13
debrided [1] 94/10
decided [3] 62/11 63/25 69/22
decision [2] 62/1 69/15
decisions [1] 119/15
dedicated [6] 27/15 28/16 28/22 36/6 36/16 65/13
Dedimus [1] 4/14

**D**

deep [1]  57/14
deeper [2]  104/5 104/11
DEFENDANT [7]  1/7 2/7 2/21 3/1 3/5 4/2
4/13
DEFENDANT-SUPREME [1]  3/5
DEFENDANT-TMS [1]  2/21
DEFENDANT-UNITED [1]  3/1
DEFENDANTS [2]  1/13 2/13
defense [6]  11/15 11/17 11/19 11/24
12/5 12/10
define [1]  102/14
defined [2]  91/13 105/2
defining [1]  72/24
definite [1]  113/19
definitely [3]  24/3 34/21 35/11
definition [3]  33/20 35/5 35/21
definitively [1]  120/21
degree [7]  19/1 19/2 86/3 86/17 89/20
107/11 108/7
degrees [1]  7/20
delineated [1]  36/21
deliver [4]  55/4 55/11 63/21 64/14
delivered [1]  47/3
deliveries [5]  65/11 65/14 65/17 65/20
65/24
delivering [4]  46/15 46/17 53/7 56/10
delivers [1]  48/21
delivery [3]  46/10 56/11 117/20
denied [1]  114/4
Denise [2]  3/8 114/20
department [2]  8/12 94/13
depend [2]  92/11 98/17
depending [4]  20/11 24/2 24/8 87/24
depends [4]  72/6 91/2 91/8 92/4
depict [1]  71/1
depicted [2]  40/6 73/7
deponent [4]  4/22 126/15 126/16 127/3
deposes [1]  5/4
deposition [20]  1/16 4/3 4/15 4/20 11/4
11/6 16/20 99/20 111/5 111/8 112/10
112/11 112/13 112/25 113/14 117/4
117/14 125/12 127/2 130/5
depositions [2]  4/6 113/8
depth [13]  34/12 39/14 39/16 39/18
39/19 40/1 40/3 45/6 45/8 45/8 45/10
104/14 105/3
depths [4]  39/2 39/6 39/9 39/11
describe [3]  6/16 96/5 117/8
described [17]  77/12 78/7 78/10 83/8
84/24 86/6 95/16 95/20 99/9 106/24
107/4 108/10 109/23 111/11 111/12
114/22 115/10
describes [4]  84/16 84/20 85/5 97/6
describing [1]  111/1
description [21]  3/15 82/9 84/6 84/11
84/12 84/21 85/2 95/11 95/13 96/17
109/3 109/10 110/8 111/1 111/3 111/4
112/7 113/10 113/12 115/14 115/17
designate [1]  58/4
designated [1]  58/1
designation [1]  15/2
designing [1]  15/25
detail [5]  99/12 99/14 99/15 99/19 99/23
detailed [1]  111/1
details [19]  33/18 33/23 76/19 78/17
85/12 85/19 85/21 85/23 85/24 86/12
92/15 99/4 99/6 99/25 105/15 107/18
110/6 110/7 119/9

determine [10]  8/12 8/16 33/21 34/3
34/13 54/23 77/12 77/18 78/5 110/20
determining [2]  113/6 114/23
development [1]  10/5
diagonal [9]  74/1 74/15 74/25 75/5 75/10
75/22 80/11 89/2 90/10
did [64]  5/17 6/7 8/3 8/7 8/12 8/16 8/20
8/22 18/1 19/20 23/22 25/1 27/25 37/15
41/3 41/18 49/9 49/16 50/21 50/24 51/19
55/2 55/20 58/4 58/12 62/18 64/9 68/4
68/4 68/6 71/25 72/23 73/16 76/8 76/12
76/15 84/19 85/25 86/21 92/18 93/5
93/16 94/6 94/25 97/4 98/24 99/25
102/20 102/22 103/6 103/18 103/19
104/18 106/6 106/11 108/16 109/18
111/19 114/23 114/24 116/1 117/21
118/16 118/24
didn't [21]  40/14 42/12 52/8 54/7 54/11
64/8 69/8 76/6 86/7 90/8 90/13 90/15
95/2 97/1 102/7 108/4 109/22 112/11
119/8 119/8 120/14
DiDomenico [2]  5/17 5/21
difference [3]  15/19 35/9 53/1
differences [1]  35/11
different [23]  10/22 15/2 20/3 20/11
23/15 33/17 34/21 36/4 39/8 39/9 41/24
50/6 53/11 97/4 98/16 98/19 98/20 98/20
98/21 106/24 112/20 112/20 114/22
differentiate [1]  115/22
differently [3]  50/9 50/12 92/24
difficult [4]  68/19 85/21 115/2 115/24
dimensions [1]  77/10
direct [7]  3/21 5/5 58/13 59/1 59/6 78/6
117/7
directing [1]  64/22
direction [4]  87/7 92/9 95/17 96/19
directions [1]  61/8
directly [5]  8/11 15/5 28/14 88/17 115/23
disagree [1]  93/25
disallowed [1]  17/10
discern [1]  124/8
discipline [1]  16/5
disclosed [1]  6/9
discovery [1]  4/3
discuss [1]  61/15
discussed [3]  106/23 112/12 120/13
discussion [1]  7/13
disguising [1]  29/21
dispatch [3]  48/25 52/5 66/18
dispatcher [4]  48/10 48/18 52/1 66/14
displacement [1]  85/16
disruption [1]  91/12
distance [2]  38/11 75/9
distinction [3]  15/20 16/3 57/16
distinctly [1]  17/20
DISTRICT [6]  1/1 1/1 2/1 2/1 4/11 4/11
do [108]  6/7 6/10 8/7 9/4 10/8 10/12
10/13 10/15 10/16 11/15 11/17 11/18
12/4 12/7 12/10 13/3 13/6 13/10 13/23
14/1 14/6 14/21 15/14 15/15 17/4 17/6
17/13 17/23 18/8 19/9 20/8 20/15 21/1
26/9 26/11 26/15 33/23 34/1 34/2 38/19
39/5 39/16 39/25 41/7 41/16 42/3 42/7
47/6 47/9 47/18 48/3 48/6 49/1 49/2
49/13 50/5 52/11 52/13 52/23 53/4 54/9
56/15 59/20 60/10 61/8 62/24 63/14
63/19 66/2 67/4 67/6 67/23 68/4 68/7
68/7 68/9 68/14 68/9 69/15 69/17 69/23
72/8 73/5 74/2 76/8 76/13 80/2 85/22
87/25 88/9 89/16 97/20 98/3 102/5

103/20 106/7 106/7 107/10 107/16
110/10 113/8 114/24 115/2 116/20
116/25 118/24 121/9 125/3
doctoral [2]  7/2 19/2
documentation [1]  6/4
does [17]  9/13 12/16 12/18 12/19 12/19
12/24 14/2 27/11 27/11 29/3 60/15 60/19
65/8 66/3 105/6 110/18 112/5
doesn't [13]  36/4 53/25 63/1 65/25 85/10
85/12 92/14 96/5 110/9 110/12 110/14
121/25 123/25
doing [13]  18/12 42/7 84/15 110/9 115/1
118/9
don't [96]  9/21 9/21 10/17 11/20 12/1
12/9 12/18 13/8 13/18 17/25 18/4 20/12
22/23 25/6 37/20 38/5 38/13 38/15 39/4
39/10 39/15 39/20 40/23 41/13 42/4 43/8
43/23 45/5 45/10 46/8 46/16 46/22 47/16
48/5 48/16 48/24 49/12 49/25 50/1 50/3
50/17 52/18 53/23 54/4 54/11 54/25 55/5
57/16 58/21 61/3 61/6 62/2 62/4 62/10
62/21 63/11 63/12 64/6 64/25 65/21 66/6
66/11 66/14 69/5 71/19 72/1 72/15 72/24
75/11 76/10 79/7 79/12 80/25 82/20 83/6
85/4 89/14 91/6 94/11 102/12 103/16
104/17 107/21 107/23 112/9 112/23
113/1 113/2 113/6 114/1 114/10 115/24
118/16 121/20 122/23 124/16
done [23]  6/24 19/24 46/22 49/11 49/13
49/15 49/18 49/19 49/23 49/24 50/2 50/4
50/6 50/11 50/13 50/24 52/21 55/3 62/3
66/12 94/11 106/18 106/19
door [9]  31/4 31/8 36/12 37/5 37/16
37/17 37/19 37/23 38/15
double [1]  68/25
down [6]  47/11 65/8 74/16 74/22 102/4
107/25
downward [1]  87/11
dozen [1]  11/2
Dr [1]  114/14
drawn [1]  15/21
drive [4]  1/24 60/12 60/19 126/1
driver [14]  46/13 46/18 46/21 49/5 51/8
52/11 53/6 53/10 54/20 56/10 118/7
118/22 119/14 124/3
driver's [2]  123/18 124/1
drivers [25]  30/25 31/12 32/3 32/13 36/9
36/24 37/2 37/8 41/5 42/4 56/14 56/16
56/24 57/9 57/19 57/22 58/1 59/22 60/6
62/8 62/23 63/7 66/13 117/17 118/15
driving [2]  44/22 54/23
drove [2]  49/11 50/25
dry [5]  38/4 38/20 38/23 39/22 59/14
duck [4]  86/9 102/18 110/2 110/20
ducked [1]  102/16
ducking [7]  82/11 86/18 86/20 86/24
106/14 120/18 120/25
duly [2]  5/2 125/6
during [11]  16/12 17/8 19/10 20/5 36/12
69/10 73/21 91/12 99/20 112/25 113/8
duty [1]  28/24

**E**

e-mails [1]  42/6
each [1]  92/12
earlier [17]  14/25 20/25 29/4 31/25 32/21
36/9 52/17 61/9 85/13 85/14 91/9 96/2
105/2 106/23 115/10 120/13 122/11
east [1]  66/8
eastern [1]  65/16

**E**

edge [18]  38/14 79/5 80/8 80/16 81/24 83/21 83/22 83/23 84/5 86/23 87/20 89/11 89/21 89/23 90/1 90/2 108/25 120/17
edges [4]  81/20 89/2 89/7 89/9
education [4]  6/25 14/4 14/12 19/16
educational [2]  6/1 6/16
effect [1]  4/16
effects [1]  16/12
eight [3]  4/7 53/8 118/10
eighth [1]  9/7
either [3]  64/15 66/17 89/9
elicited [1]  99/20
eliminate [3]  26/4 26/6 26/14
else [16]  28/1 29/21 33/14 39/18 47/11 51/11 58/22 64/15 80/24 83/14 84/25 90/4 90/9 114/10 114/11 124/15
employed [4]  8/20 10/7 10/20 122/14
employee [7]  25/17 35/16 35/18 36/4 62/23 118/17 119/2
employees [8]  22/1 22/9 22/14 22/20 23/22 25/23 28/2 62/19
employer [7]  21/17 26/12 28/16 42/14 52/3 52/4 122/13
employers [4]  21/9 21/22 21/25 22/3
employment [4]  7/10 7/16 9/2 122/12
enclosed [2]  126/14 126/16
encompass [2]  16/16 19/20
encompasses [1]  16/24
encountered [3]  74/9 105/21 117/19
encountering [1]  60/17
encourage [1]  124/16
end [7]  74/16 74/22 74/23 75/1 75/2 90/23 105/19
engineer [6]  5/12 7/12 14/5 14/24 15/1 26/13
engineering [9]  10/4 11/12 13/3 14/21 15/2 15/3 19/2 19/3 19/6
engineers [2]  13/5 13/5
enough [9]  5/19 24/16 73/9 73/12 85/23 85/24 87/17 108/15 112/23
entailed [1]  14/11
enter [4]  30/4 60/5 102/23 103/6
entered [2]  44/14 44/20
entering [1]  61/5
entire [1]  37/13
entities [2]  41/25 42/3
entity [3]  28/5 28/23 29/12
environment [13]  16/7 16/18 18/18 22/13 22/15 28/14 36/19 77/2 81/7 83/16 95/19 107/3 115/8
environmental [1]  100/3
environments [3]  19/22 20/12 21/21
equally [1]  111/25
equations [3]  76/8 76/10 76/13
equipment [1]  15/25
ergonomic [1]  16/1
ergonomics [10]  7/4 7/22 13/13 13/22 14/22 15/4 15/20 15/22 15/23 16/2
ergonomist [6]  13/9 13/19 14/5 14/7 14/11 14/14
errata [2]  126/16 126/17
established [3]  27/4 27/22 29/3
estimate [2]  115/18 115/24
estimation [1]  123/1
evaluate [1]  16/1
evaluation [2]  43/13 85/25
even [13]  19/21 57/13 61/18 63/9 69/6
72/19 78/20 87/22 88/2 102/15 108/1
event [12]  11/7 78/8 78/11 78/15 85/14 86/6 92/12 93/4 93/7 93/10 110/9 115/5
events [6]  18/16 77/10 86/4 93/1 97/14 106/4
ever [7]  12/12 17/10 17/17 42/23 54/22 68/4 121/22
every [5]  14/18 27/9 33/17 34/22 90/12
everybody [2]  51/20 64/22
everybody's [1]  10/17
everything [3]  20/13 86/21 107/8
Everywhere [1]  35/18
evidence [4]  26/23 27/20 30/2 30/11
exact [1]  88/24
exactly [9]  16/14 46/22 49/13 74/24 87/24 94/11 105/15 107/8 118/17
examination [10]  3/21 3/22 3/22 3/23 5/5 14/16 114/18 122/5 122/19 125/9
examined [1]  125/9
example [1]  51/10
examples [1]  27/14
EXCAVATING [2]  1/12 2/12
except [6]  4/21 39/21 45/10 92/12 96/6 111/22
exception [2]  61/22 62/6
exclude [2]  110/19 114/4
exclusion [2]  108/19 109/7
exercise [1]  55/20
exhibit [6]  3/15 5/15 67/3 71/4 88/12 88/24
Exhibits [1]  70/25
exist [2]  21/19 83/4
existed [6]  22/18 24/6 29/23 34/1 39/3 70/21
existence [1]  34/24
exit [1]  47/24
exited [1]  116/9
expect [1]  57/6
expected [1]  25/22
experience [19]  6/20 6/21 14/13 14/15 15/6 18/23 19/16 20/1 44/17 51/7 51/8 51/9 51/25 53/5 54/20 54/21 54/24 116/13 116/22
experiences [3]  14/19 60/16 60/17
experiments [1]  7/6
expert [14]  8/21 10/8 10/13 10/19 10/23 11/10 17/7 18/8 18/24 20/8 20/13 50/3 50/4 53/2
expertise [8]  17/1 20/14 20/16 48/24 50/22 52/17 52/19 53/3
experts [2]  10/14 12/22
expires [1]  130/20
explain [1]  84/12
explained [2]  77/20 109/16
explanation [1]  87/4
exposed [2]  19/7 80/17
expressed [1]  98/12
expressing [1]  14/3
extra [1]  19/14

**F**

faced [1]  54/22
facility [4]  44/11 44/14 44/15 63/16
fact [24]  32/1 35/12 39/22 40/24 44/12 46/20 50/7 51/12 53/5 53/16 55/2 61/11 62/3 64/2 64/5 69/19 85/4 85/17 90/3 92/13 110/8 118/7 118/10 124/2
factor [1]  25/3
factors [21]  5/12 6/18 7/1 7/7 14/5 15/4 15/4 16/9 16/18 16/20 16/23 16/24 16/22 16/24 17/8 18/15 18/17 19/5 19/25 100/3
facts [4]  26/23 27/20 30/2 30/11
fair [5]  71/4 73/12 82/25 113/3 124/11
fall [34]  21/4 35/14 70/7 70/12 70/18 70/20 70/21 84/16 84/20 85/5 85/20 86/4 87/7 87/10 87/11 91/11 92/16 93/16 93/19 96/4 96/5 96/17 97/1 97/2 97/2 97/9 97/15 99/1 99/13 99/21 99/23 101/2 101/18 105/11
fallen [2]  78/7 96/20
falling [8]  7/9 78/18 87/2 87/11 87/13 91/1 96/12 115/11
falls [6]  21/20 77/9 78/18 85/17 91/10 99/17
familiar [4]  17/16 48/19 122/1 124/3
familiarity [2]  53/9 53/11
far [9]  6/15 16/3 37/18 50/14 67/14 69/6 70/3 86/8 103/9
fashion [1]  16/1
feasible [2]  26/17 69/2
February [20]  22/19 23/23 24/7 27/25 28/10 29/24 30/7 30/22 31/10 31/16 31/23 32/18 34/1 37/7 37/11 39/3 44/10 53/22 58/12 100/4
February 7 [1]  24/7
February 7, 2019 [18]  22/19 23/23 24/7 27/25 28/10 29/24 30/7 30/22 31/10 31/16 31/23 32/18 34/1 37/7 37/11 39/3 44/10 53/22 100/4
February 7th [1]  58/12
federal [4]  4/5 17/20 18/7 20/18
feel [3]  53/3 63/11 126/19
feet [7]  74/11 74/21 74/22 75/1 75/2 87/16 87/22
fell [23]  71/6 71/22 72/9 72/13 72/23 73/6 75/21 78/13 78/21 78/22 78/23 88/14 92/21 93/24 95/17 95/19 97/17 98/12 99/4 99/6 104/16 111/11 111/14
ferret [1]  15/18
few [2]  85/19 90/23
fibula [1]  96/20
field [8]  6/17 6/25 14/15 14/20 16/21 70/25 71/1 71/10 73/4 73/5 76/12 77/15 83/11 102/23 104/9 104/12 109/5 116/5
figure [18]  38/2 51/17 59/4 69/14 70/11
file [3]  82/20 122/21 123/3
filed [1]  126/18
finally [1]  14/16
findings [2]  117/14 117/25
finger [1]  39/18
finish [1]  84/19
fire [1]  94/13
firm [2]  10/4 121/23
first [25]  5/2 13/17 14/13 33/12 45/5 48/13 67/8 74/9 75/13 78/15 78/15 94/21 95/3 103/7 106/8 107/15 108/2 108/11 109/17 109/20 117/13 120/7 120/14 121/1 125/5
fit [1]  95/10
five [4]  6/9 14/18 47/11 90/19
flat [1]  108/3
floating [3]  45/13 67/24 67/24
flood [52]  22/18 22/23 23/6 23/8 23/23 24/4 24/6 24/19 25/6 25/11 29/18 29/23 31/10 31/20 31/24 32/8 32/15 32/18

## F

flood... [34]  32/21 33/2 33/4 33/11 33/12 33/19 34/5 34/9 34/19 37/24 40/11 40/16 40/21 41/9 53/14 54/22 56/12 56/18 56/22 57/1 57/11 57/20 57/23 58/5 58/9 60/22 100/10 100/14 100/16 100/22 123/21 123/21 124/5
flooded [13]  30/5 30/13 32/1 38/23 40/24 41/20 45/21 53/19 54/21 58/10 58/16 62/16 67/20
flooding [1]  40/6
floors [1]  35/8
focus [2]  8/13 8/17
focusing [1]  18/14
follow [2]  63/7 122/18
followed [1]  120/3
following [1]  127/3
foot [12]  58/13 74/19 78/23 91/12 91/23 91/24 96/8 97/11 105/8 105/13 105/13 105/21
force [7]  4/15 87/19 88/5 88/5 96/23 112/18 112/18
forced [1]  32/14
forces [5]  16/11 16/12 16/15 112/6 112/16
foregoing [1]  130/4
foremost [1]  95/4
forenoon [1]  4/8
forensic [1]  7/11
form [36]  4/21 22/12 24/12 26/22 27/8 27/16 27/19 28/3 28/11 28/19 29/2 29/21 30/1 30/10 32/20 34/4 40/2 41/21 42/15 43/4 49/6 52/14 57/15 58/15 85/22 85/23 89/4 100/5 100/24 101/13 102/24 106/22 108/14 108/15 113/4 113/19
formal [2]  19/16 82/10
formed [1]  112/21
formulate [1]  40/4
forth [2]  20/20 21/23
forward [24]  78/18 78/21 85/17 87/2 91/1 91/11 91/11 91/19 91/25 92/2 92/8 92/18 92/21 93/24 96/6 96/7 96/13 97/2 97/17 101/19 101/23 102/3 102/4 105/13
found [2]  117/23 118/25
foundation [2]  78/12 120/10
four [1]  6/9
fracture [1]  96/20
free [2]  29/16 126/19
friends [1]  124/17
front [7]  60/1 60/11 66/2 67/4 78/14 92/14 105/13
full [3]  13/19 14/14 87/25
full-certified [1]  14/14
full-on [1]  87/25
funded [1]  8/10
further [5]  4/18 60/19 61/7 104/5 104/25

## G

gain [1]  97/3
gate [14]  65/4 65/5 65/7 65/10 65/13 65/15 65/16 65/19 65/25 66/5 66/8 66/19 66/21
gave [5]  19/21 86/9 90/3 111/3 111/4
general [23]  8/7 8/12 8/14 8/16 11/12 12/20 21/3 36/23 37/7 37/11 52/12 60/8 73/1 77/25 88/14 88/19 101/1 110/25 111/4 111/11 112/4 113/11 115/13
generality [1]  103/17
generally [20]  12/10 13/2 14/11 15/22 20/18 21/12 27/21 27/23 34/15 36/17

37/10 43/12 44/3 60/9 61/24 64/17 88/11 91/4 98/16 103/16
get [32]  6/12 12/13 14/22 31/2 47/13 48/1 50/19 51/24 52/6 57/12 58/17 62/16 63/9 63/10 63/25 64/8 65/17 68/10 68/11 68/18 69/10 70/3 85/25 99/22 107/2 113/8 118/25 119/8 123/2 123/3 123/4 123/7
gets [2]  50/15 120/18
getting [11]  36/9 37/2 49/9 50/18 50/21 61/13 61/14 68/19 90/23 107/18 109/13
give [6]  6/12 8/21 11/23 27/13 45/3 66/7 68/4 85/10 85/12 90/8 102/7 115/24 122/24 123/6 123/8 123/11
given [43]  10/19 16/20 30/12 36/19 37/1 42/23 45/25 46/12 48/17 48/18 51/7 57/24 58/16 64/5 71/15 77/7 78/20 78/21 79/1 80/6 80/22 80/23 81/6 85/4 86/12 87/7 87/9 90/11 92/5 95/19 95/22 96/16 99/2 106/11 107/3 107/8 109/14 109/20 110/8 111/9 118/9 125/13 130/7
gives [1]  50/10
giving [4]  44/22 52/10 52/12 52/15
glass [1]  47/13
go [28]  9/11 14/6 14/7 23/14 24/14 37/16 42/17 49/23 55/17 55/21 61/7 61/15 68/25 69/9 84/18 85/11 88/20 88/21 91/19 91/25 92/1 93/5 111/17 111/23 111/24 112/4 120/11 124/20
Godfrey [2]  1/24 126/2
goes [1]  6/1
going [37]  10/25 11/22 13/1 24/2 24/8 24/11 25/2 29/21 35/13 35/14 35/22 35/24 37/5 46/14 58/8 59/18 64/3 64/20 67/22 74/9 76/18 79/16 79/19 82/18 88/21 91/22 91/24 92/11 96/15 98/22 101/17 102/17 105/23 108/23 110/10 112/24 120/9
gone [2]  42/21 103/2
good [8]  5/7 5/9 43/22 43/25 45/1 60/23 105/18 119/15
got [10]  14/13 42/20 52/9 69/6 70/17 84/1 90/22 106/6 118/12 122/15
gotten [7]  52/16 55/13 61/11 61/17 66/24 85/6 121/12
graduate [1]  19/12
Granite [5]  21/14 22/5 22/18 22/20 40/8
gravity [2]  7/9 101/23
great [2]  90/13 99/19
ground [9]  23/16 74/1 74/11 81/25 83/22 84/5 87/11 97/4 97/11
group [2]  8/11
guard [2]  26/7 26/14
guarding [2]  26/3 29/5
guess [3]  99/3 114/6 116/1
guidelines [1]  35/15
guy [1]  64/21
guys [3]  47/6 47/9 47/17

## H

had [90]  4/16 5/17 9/7 14/16 14/17 17/21 19/9 24/23 25/14 40/15 40/21 40/25 41/14 42/21 44/13 46/13 46/13 46/22 48/9 48/18 48/20 50/15 51/2 53/6 53/13 53/19 53/21 54/1 54/6 54/9 54/16 54/16 54/22 55/3 55/4 55/10 55/10 57/20 56/19 62/23 63/5 63/6 63/12 63/20 64/8 64/21 66/12 66/16 66/19 66/21 66/24 68/20 69/20 69/21 70/21 72/16 72/18 72/20 73/15 73/18 73/19 78/7 83/20

83/20 87/17 88/4 94/7 95/9 96/2 99/4 102/16 103/2 104/23 105/10 106/21 106/23 107/6 108/15 108/16 108/17 108/21 109/21 113/17 116/12 116/19 116/21 117/2 118/18 119/22 120/2
hadn't [2]  53/19 102/21
hall [1]  47/11
Handbook [2]  118/18 119/2
happen [3]  76/6 93/17 109/22
happened [15]  67/1 68/12 75/25 76/1 76/5 77/5 77/18 86/13 94/19 97/13 107/8 107/12 109/1 113/23 120/22
happening [1]  66/22
happy [1]  68/25
hard [2]  105/14 115/15
hardhat [4]  119/23 120/3 121/5 121/10
harsh [1]  90/1
has [27]  13/3 14/5 15/2 15/23 17/10 20/20 25/17 27/4 27/23 28/17 28/23 33/18 43/13 43/14 43/21 46/4 53/5 53/8 53/11 81/20 92/24 96/22 99/7 114/11 118/7 118/8 124/17
hasn't [1]  57/3
have [305]
having [4]  13/21 29/6 35/24 63/14 64/25 66/8 79/12 93/15 113/11
hazard [39]  22/19 22/24 23/9 24/7 24/9 25/18 25/25 26/5 26/12 26/19 27/2 27/5 27/11 27/15 28/15 28/22 29/4 29/19 29/21 29/25 31/24 32/5 32/9 32/19 32/22 33/3 33/5 33/5 33/11 33/16 34/3 34/14 34/20 35/2 43/13 43/15 43/17 43/21 43/24
hazardous [7]  25/20 27/23 33/6 33/22 34/10 34/25 117/18
hazards [4]  29/16 42/25 44/1 44/3
he [342]
he's [7]  51/23 97/22 112/1 118/9 118/10 118/22 120/18
head [70]  13/18 78/9 78/25 79/3 79/9 79/22 80/3 80/8 80/11 80/21 81/8 81/16 81/23 82/4 82/13 82/23 83/12 83/19 83/21 85/7 86/18 86/22 87/19 89/2 89/8 92/22 93/25 94/4 94/17 94/21 94/22 95/21 95/23 96/1 96/6 96/11 96/14 101/20 102/6 105/24 106/2 106/9 106/12 106/15 106/21 107/3 107/15 108/7 108/19 108/25 109/7 109/12 109/13 109/20 109/24 110/3 110/21 110/21 111/14 111/24 112/4 112/15 120/4 120/7 120/15 120/16 120/19 120/25 121/6 121/11
headquarters [1]  10/2
heard [1]  113/21
hearing [2]  17/21 17/23
height [3]  78/24 87/9 102/5
held [2]  13/14 17/24
help [1]  8/16
Hennelly [3]  3/4 3/22 122/9
Henry [2]  2/18 126/17
her [5]  123/7 125/6 125/6 125/9 125/9
here [12]  18/12 45/4 47/7 52/10 52/12 54/15 82/21 82/24 90/24 110/11 110/23 123/15
hereby [3]  4/20 125/4 130/3
herein [1]  130/8
hereunto [1]  125/14
hey [1]  42/3
Hi [2]  122/7 122/8
hierarchy [3]  26/2 26/4 26/18

Case 3:19-cv-00810-GCS    Document 43-1    Filed 01/10/22    Page 138 of 165

high [2]  74/15 75/2
higher [1]  88/22
him [36]  44/17 44/22 47/23 48/3 48/7
49/8 50/8 50/14 51/2 51/2 51/4 51/13
56/1 56/6 59/10 61/21 62/5 63/25 64/9
64/11 78/14 81/4 83/19 87/18 92/14
100/19 102/1 105/9 105/15 106/4 106/15
107/12 110/20 111/12 111/13 124/3
himself [4]  42/20 51/19 87/3 108/21
hires [1]  11/9
his [244]
Historically [1]  15/23
history [1]  46/19
hit [28]  75/21 78/13 78/23 81/23 82/12
82/23 86/18 87/4 87/13 87/16 87/23
87/25 88/17 90/4 90/7 90/9 92/13 93/24
93/25 94/21 94/22 101/5 105/24 106/21
106/21 107/15 109/20 111/14
hits [3]  86/10 96/6 106/15
hitting [3]  106/12 109/12 121/14
hold [2]  13/7 14/21
hole [5]  78/13 78/23 97/11 100/21 101/5
hopefully [1]  118/6
hopes [1]  6/22
Hopkinton [1]  8/25
horizontal [13]  74/8 75/4 75/10 75/20
75/21 90/4 91/16 91/19 91/20 92/6 103/7
103/9 103/13
Horvat [1]  2/24
hour [1]  21/3
hours [1]  4/7
how [49]  8/3 9/6 10/7 10/22 13/14 14/6
18/18 19/23 37/18 38/3 47/9 53/9 53/21
53/23 53/25 54/5 55/4 55/9 55/11 65/1
72/24 73/2 83/12 84/16 84/20 85/5 86/4
87/4 87/10 88/7 96/25 97/9 98/11 99/4
99/6 99/12 99/16 100/9 100/13 102/5
102/14 103/6 107/1 109/16 113/15
114/24 115/14 115/19 122/21
However [1]  47/16
human [22]  5/12 6/18 6/25 7/6 14/5 15/4
15/4 15/19 15/22 16/1 16/3 16/4 16/9
16/14 16/22 16/23 17/8 18/15 18/17 19/4
51/9 123/25
hundred [1]  54/17
hypothesis [7]  76/18 76/19 76/21 76/24
77/7 78/1 78/5
hypothetical [7]  24/13 43/5 100/11 109/2
110/5 110/11 110/23
hypotheticals [2]  107/19 121/19

I
I'd [2]  55/7 87/25
I'm [89]  7/11 9/10 9/11 10/9 10/25 11/6
13/1 13/1 13/8 13/25 14/7 14/25 15/9
15/13 15/13 18/7 20/23 21/4 23/14 24/11
26/24 28/4 28/20 33/25 36/15 37/6 38/2
41/2 44/6 47/1 49/2 49/7 49/20 50/17
50/19 50/23 51/17 52/15 53/2 54/2 56/2
59/4 61/10 61/14 61/16 65/8 69/14 70/11
73/4 76/12 77/15 79/25 81/1 82/18 83/11
84/17 84/17 85/3 85/11 88/1 90/8 90/23
99/3 103/3 103/20 104/7 109/5 109/7
110/10 111/17 111/24 113/6 113/7
113/24 114/20 115/25 116/24 117/10
120/9 123/4 123/6 123/10
I've [1]  84/24
idea [1]  46/8

ideal [1]  108/13
identified [8]  23/13 43/19 43/19 45/22
43/25 82/21 88/15 94/20
identify [4]  10/17 44/8 79/13 82/14
identifying [2]  41/24 42/2
ignore [1]  43/25
IL [10]  1/24 2/19 2/23 3/8 4/9 125/3
125/19 126/2 126/8 126/23
IL-CSR [3]  4/9 125/3 126/23
ILLINOIS [9]  1/1 1/22 1/25 2/1 4/11
12/13 22/5 126/2 126/17
immediately [1]  103/5
impact [2]  88/5 96/23
impart [1]  118/14
imparting [1]  119/13
importance [1]  13/21
important [4]  21/9 21/17 68/13 68/13
impossible [1]  18/16
impression [1]  67/17
inadequate [1]  85/2
INC [10]  1/6 1/8 1/12 1/23 2/6 2/8 2/12
4/12 126/1 127/20
inch [1]  74/22
inches [8]  39/20 73/25 74/11 74/15 74/16
74/21 75/1 75/2
incident [20]  23/3 32/11 32/24 34/6 50/9
64/1 64/8 66/25 71/15 71/16 72/22 73/3
75/7 77/5 82/5 82/7 82/9 82/11 92/4
120/1
incidents [4]  7/9 8/15 15/15 77/12
included [6]  41/10 74/5 97/11 103/12
117/4 117/17
includes [1]  89/17
including [5]  11/3 11/4 11/6 48/9 77/1
incomplete [3]  24/13 43/5 110/11
inconsistency [1]  96/8
inconsistent [18]  76/3 76/4 78/16 83/8
84/12 84/22 84/24 85/2 85/8 86/6 95/16
95/18 99/9 106/4 106/11 107/4 108/11
110/17
Incorporated [3]  7/12 9/16 9/19
incorrect [2]  98/7 98/13
incredibly [1]  24/12
indicate [11]  11/25 12/20 41/1 41/4 48/1
59/9 60/3 60/24 83/25 85/1 102/20
indicated [12]  28/8 30/14 58/23 60/4 61/9
71/20 72/10 78/22 82/11 82/16 82/23
127/3
indicates [3]  84/12 94/21 104/16
indicating [1]  85/14
indication [5]  11/23 23/3 46/11 72/17
77/25
indications [3]  88/11 88/23 88/24
indicative [1]  12/2
indicator [2]  66/7 85/7
individual [1]  33/6
industrial [7]  19/1 19/2 19/6 19/7 36/1
118/6 124/4
Industry [2]  20/18 21/3
information [43]  34/2 34/17 48/11 63/10
65/7 68/22 72/15 72/25 73/1 73/20 77/1
77/6 78/3 80/6 80/14 81/2 93/22 93/22
94/12 97/10 97/12 98/18 98/25 100/15
107/3 107/23 108/10 108/13 108/15
108/16 109/14 109/21 112/23 113/2
113/9 115/3 115/8 115/12 118/12 118/18
119/13 120/21 121/2
initial [2]  98/7 101/1
initially [2]  7/20 97/1
initials [1]  9/14

injured [13]  24/19 24/25 25/1 25/5 72/5
92/21 95/24 94/16 94/16 105/6 105/9
108/21 109/6
injuries [9]  7/7 8/13 15/16 18/21 19/18
19/25 79/16 97/21 113/15
injury [30]  24/10 63/22 66/22 79/9 79/15
80/11 81/13 81/16 85/7 89/3 95/11 96/10
96/21 97/18 98/23 105/8 106/6 108/23
109/12 115/12 120/4 120/7 120/7 120/14
120/15 120/19 120/25 121/1 121/6 121/7
inquire [4]  61/18 62/1 62/5 62/9
inquired [1]  55/10
inspection [1]  73/22
inspections [1]  68/9
instance [7]  33/19 35/25 53/12 81/2 81/3
91/21 108/2
institute [6]  7/5 7/19 7/23 8/10 8/24 40/15
instruct [1]  62/23
instructing [1]  63/20
instructional [1]  20/22
instructions [2]  61/8 62/19
insufficient [1]  65/23
insurance [1]  7/25
intended [18]  27/22 29/13 29/19 29/24
30/4 30/7 30/8 30/8 30/17 30/21 31/3
33/13 33/22 34/8 35/10 35/23 36/2 36/5
intentionally [1]  6/22
interact [5]  16/17 23/5 23/8 23/16 96/15
interacted [2]  84/2 105/22
interacting [2]  23/18 86/25
interaction [9]  16/5 79/17 79/24 79/25
84/4 89/19 95/22 112/14 112/17
interacts [1]  18/18
INTERNATIONAL [5]  1/6 1/8 2/6 2/8
4/12
interviews [1]  93/18
investigating [1]  7/7
invited [1]  22/15
invoices [2]  116/5 123/2
involved [3]  42/19 93/19 121/24
iron [65]  78/14 78/24 78/24 79/4 79/6
79/10 79/21 79/23 79/25 80/9 80/10
80/16 80/19 81/9 81/12 81/7 81/19
81/19 81/24 82/12 83/18 83/20 83/21
84/1 84/3 84/7 85/18 86/10 86/10 86/19
86/23 87/4 87/13 87/16 87/21 87/23
87/25 88/9 88/17 88/21 89/8 89/21 89/23
89/25 92/13 93/24 94/23 95/23 96/7
96/15 97/12 101/20 103/8 103/13 103/14
106/14 106/15 108/25 110/2 110/4
111/14 111/23 112/15 120/17 121/14
irons [1]  103/1
irrelevant [1]  69/25
is [302]
isn't [6]  36/20 36/21 53/17 64/16 78/16
111/24
issuance [1]  4/14
issue [1]  62/10
issues [4]  8/6 13/11 18/11 112/12
it [228]
it's [97]  9/15 13/16 16/8 16/10 16/11
18/16 24/12 25/1 28/12 29/18 29/20
30/24 31/11 33/5 34/5 34/14 34/20 36/11
36/20 36/20 37/15 37/24 38/22 42/18
43/12 43/25 44/2 45/14 47/10 48/19
54/19 56/20 57/5 57/22 58/18 58/20
59/12 59/25 63/11 63/12 64/11 64/23
65/1 67/17 67/19 68/9 68/15 70/8 73/11
73/13 75/6 75/24 76/2 76/4 77/25 78/24
80/6 80/15 81/6 81/7 81/23 83/15 83/18

## I

it's... [34]  85/7 86/13 86/16 88/23 89/20
89/21 90/1 92/5 92/11 96/13 96/21
100/25 101/17 106/1 106/3 107/9 107/14
108/6 108/22 112/7 112/15 112/19
112/20 115/3 115/5 115/6 115/15 115/15
118/17 118/20 120/6 120/13 121/2
121/15
item [1]  81/16
its [7]  25/18 28/2 40/22 58/5 87/25
110/24 119/17
itself [6]  25/2 30/17 44/16 62/2 79/24
80/1

## J

JAMES [2]  3/7 121/23
Jason [1]  73/18
job [1]  7/11
Join [1]  42/16
judging [2]  123/16 124/10
JUNE [5]  1/17 4/7 125/15 126/5 126/14
just [67]  6/24 7/17 8/4 8/7 9/7 10/12
11/10 16/15 17/1 22/8 27/12 36/17 36/23
37/6 37/7 39/10 43/20 45/3 49/17 51/5
51/10 51/16 51/22 51/23 57/13 59/4
59/16 61/22 62/6 64/22 72/1 72/16 72/17
73/4 76/12 77/15 81/1 83/1 83/9 90/8
90/14 90/23 92/16 93/7 93/11 93/12
95/16 97/24 100/8 101/18 102/9 102/16
103/15 107/19 107/25 109/1 110/9
112/12 113/11 118/20 118/20 119/2
121/20 122/9 122/12 122/17 124/3

## K

keep [4]  11/20 12/18 53/25 80/23
keeping [1]  18/19
kind [3]  6/24 7/16 15/18
kinds [1]  15/15
kinematic [8]  78/15 83/15 84/10 84/11
84/13 87/9 95/3 95/11 95/12 95/25 97/20
98/4 98/23 99/1 99/9 106/24 109/14
110/10 111/18 113/6 114/23 115/1 115/4
kinematics [1]  18/15 77/4 77/7 77/13
78/10 83/8 84/14 85/13 89/14 89/17
101/17 107/4 109/1 109/2 109/15 110/25
111/2
knees [2]  88/3 88/4
knew [1]  46/8
know [49]  10/17 11/18 12/1 12/4 12/7
15/25 17/25 20/2 23/17 34/1 34/2 34/13
34/17 35/6 36/1 37/20 38/5 38/13 38/13
39/4 39/15 45/5 45/10 48/16 49/12 53/23
55/9 63/1 64/6 65/1 66/9 70/19 72/8
72/24 79/12 87/10 88/9 91/6 92/17 94/11
100/8 102/5 102/16 107/23 108/9 115/3
115/25 118/13 122/23
knowledge [8]  17/12 116/13 116/22
117/2 118/8 118/11 118/14 125/7
known [15]  25/17 25/24 26/12 28/16
28/22 29/3 42/21 42/25 43/23 77/14 80/7
116/18 118/23 119/4 119/4

## L

labeled [1]  117/14
laceration [35]  78/8 79/2 79/14 79/16
79/18 79/19 79/21 80/1 80/3 80/7 80/18
80/20 82/4 83/17 86/22 87/20 88/6 89/8
89/13 89/18 94/4 94/6 95/21 96/1 96/11
96/12 96/14 96/16 106/1 107/2 108/24
109/13 109/24 115/13 121/12

Jack [2]  44/23 85/21
family [2]  2/9 126/17
large [4]  16/16 94/3 94/5 96/23
larger [1]  13/3
last [6]  5/17 20/21 43/10 69/2 117/14
123/14
later [1]  125/10
lateral [4]  78/20 85/16 92/7 96/3
law [3]  2/18 121/23 126/17
lawful [1]  5/2
lawyer [1]  121/23
lay [1]  53/12
lead [2]  37/4 105/8
leading [2]  37/18 38/3
learn [1]  19/21
least [5]  12/20 17/20 51/3 57/20 75/12
leave [5]  48/7 63/16 64/4 64/20 64/22
leaves [1]  84/4
leaving [2]  48/4 74/10
led [4]  50/8 50/9 121/17 121/18
left [10]  25/14 64/7 91/20 92/1 97/2
103/5 103/23 104/6 105/1 105/4
leg [12]  75/4 75/20 102/6 105/7 106/9
106/11 106/16 106/21 107/2 109/17
109/25 115/15
less [4]  73/6 105/3 108/12 112/10
let [4]  7/16 23/20 45/3 59/20
let's [4]  47/18 67/8 67/8 70/15
letters [1]  9/17
level [4]  7/1 14/13 74/11 87/24
levels [1]  72/21
Levita [1]  126/14
LEVITAN [8]  1/16 4/3 5/1 5/9 114/14
125/5 130/3 130/11
LEWIS [2]  2/22 126/7
lewisbrisbois.com [1]  126/9
Liberty [9]  7/4 7/22 7/24 7/25 8/6 8/10
8/14 8/20 8/23
license [2]  13/8 14/21
licenses [1]  13/6
life [1]  60/16
lifted [1]  110/3
like [11]  17/16 26/15 38/14 51/10 55/6
60/1 73/4 104/14 116/2 121/19 122/12
likely [20]  50/8 66/23 80/6 80/9 80/20
82/1 85/15 88/3 91/25 102/1 105/22
106/2 107/9 107/14 108/22 109/22
109/25 118/11 121/2 121/4
line [22]  123/14 127/6 127/8 127/11
127/13 127/16 128/1 128/3 128/6 128/8
128/11 128/13 128/15 128/18 129/1
129/3 129/6 129/8 129/11 129/13 129/15
129/18
lines [1]  48/25
LISS [60]  1/3 2/3 4/12 23/20 24/19 42/19
44/6 44/9 44/11 45/6 47/22 51/2 51/18
52/21 53/5 53/21 59/6 63/20 67/10 71/2
71/3 71/11 71/18 72/5 78/10 86/6 88/7
91/14 92/13 98/23 99/15 99/20 100/9
98/25 99/15 99/20 100/9 102/22 102/25
104/15 104/18 104/22 107/12 109/23
111/4 113/13 115/16 116/8 116/12 117/4
118/5 118/21 119/14 119/22 119/25
120/2 120/15 121/5 123/16 126/11
Liss's [7]  42/13 79/22 80/21 92/20 100/2
110/13 122/13
list [8]  6/8 6/8 11/22 12/4 12/15 12/16
20/17 123/3
listed [1]  54/12
literature [1]  77/14

litigated [1]  11/11
litigation [4]  3/6 123/20/2 81/10
little [7]  7/17 23/21 47/20 88/21 88/22
104/11 104/13
LLC [2]  1/12 2/12
LLP [2]  2/22 126/7
load [6]  55/4 55/11 61/15 63/21 64/3
64/4
loads [2]  63/16 64/12
located [4]  8/24 10/1 12/17 52/8
locating [1]  83/21
location [22]  12/20 21/14 36/7 48/17
54/23 67/25 78/21 79/1 79/18 80/7 82/3
83/17 88/25 94/4 95/20 95/22 96/1 96/11
96/14 101/20 112/14 112/17
locations [2]  39/6 55/3
long [8]  8/3 9/6 13/14 47/9 47/10 47/17
114/24 115/19
look [11]  15/15 16/15 42/19 67/7 67/8
71/8 79/8 79/9 102/22 116/4 119/9
looked [4]  47/4 77/3 83/9 96/18
looking [14]  16/10 16/16 40/18 45/7
80/15 84/14 89/24 100/17 102/23 104/7
112/19 117/13 119/19 121/20
looks [2]  16/5 18/17
looses [1]  120/19
lose [3]  87/10 106/15 111/13
loss [3]  100/2 107/25 121/13
lost [2]  102/2 121/16
lot [7]  20/11 23/13 23/15 85/12 99/12
99/14 99/15
lots [1]  35/8
Louis [1]  3/3
low [1]  75/1
lower [1]  101/19
Lunsford [1]  73/19

## M

ma'am [4]  24/14 59/4 90/22 122/21
made [8]  33/8 39/13 55/23 56/4 98/11
116/8 124/2 126/15
magnitude [1]  112/18
maiden [1]  5/19
mails [1]  42/6
main [4]  3/7 64/18 83/7 84/23
majority [1]  38/7 94/14 94/18
make [11]  7/19 12/15 54/7 63/8 68/16
69/3 98/7 102/1 116/17 116/22 119/15
makes [3]  18/24 63/3 124/3
man [1]  56/11
manager [1]  12/19
maneuver [1]  94/22
many [10]  10/7 10/22 19/8 34/21 53/21
53/24 53/25 54/5 80/13 115/21
Mark [2]  3/4 122/9
marked [3]  5/14 31/7 67/2
Market [1]  3/3
marking [1]  88/24
mass [4]  85/16 91/10 91/24 101/19
Massachusetts [1]  8/25
master's [3]  19/1 19/10 20/5
match [3]  110/9 110/12 110/14
material [2]  86/14 107/9
materials [30]  28/4 28/8 30/3 31/6 36/8
41/22 46/6 50/16 54/3 54/12 58/22 62/7
76/25 80/5 80/12 80/22 80/24 81/6 82/6
82/8 93/8 95/9 104/10 107/6 115/7
115/21 115/22 116/16 116/20 117/3
matters [1]  125/7
maximum [2]  116/2 116/3

## M

may [21]  4/4 4/15 4/20 9/17 10/15 16/19
18/6 35/2 36/2 36/4 39/19 43/6 61/10
61/25 71/14 90/9 90/16 99/4 101/6
126/18 127/4
maybe [3]  20/25 47/11 82/19
me [70]  6/10 6/16 6/24 7/16 7/17 14/13
15/18 18/22 19/21 21/8 21/12 21/24
22/17 23/1 23/11 23/20 24/6 24/17 24/18
25/16 27/13 30/6 38/6 40/4 43/2 44/5
44/8 45/3 45/3 49/10 53/1 53/3 53/13
55/6 59/20 63/14 65/3 65/18 68/22 72/3
73/9 73/20 78/9 78/16 80/19 81/11 82/21
84/13 88/3 88/25 89/1 91/7 94/14 95/10
95/15 98/10 99/11 99/24 101/22 108/12
111/7 113/13 115/18 119/7 122/24 125/5
125/5 125/10 126/20 130/16
mean [35]  13/22 14/22 17/4 17/6 18/1
22/9 23/24 30/8 36/5 42/3 45/8 53/16
55/8 60/15 60/19 62/13 62/25 63/1 65/4
69/8 75/21 78/9 81/19 84/13 89/16 90/13
91/19 93/15 106/18 106/19 112/5 115/2
117/5 118/4 123/1
means [15]  14/3 29/6 46/5 46/9 46/12
57/10 60/11 60/16 62/12 62/13 62/15
65/9 68/21 91/6 118/25
meant [1]  105/12
measurement [3]  37/21 38/5 75/11
measurements [16]  38/13 39/5 68/10
68/16 68/21 69/1 69/20 73/15 73/16
73/18 73/20 73/23 74/1 74/2 74/4 84/8
mechanical [1]  13/5
mechanism [3]  91/17 96/22 115/14
mechanisms [1]  79/15
medical [2]  79/8 79/12
meet [1]  89/12
members [1]  9/18
memory [1]  119/2
mental [3]  53/4 60/10 60/14
mentioned [8]  27/22 32/21 36/9 52/17
54/25 85/13 91/9 96/2
metal [5]  1/12 2/12 3/1 103/17 124/6
method [3]  76/18 77/20 78/1
methodology [3]  76/15 76/22 77/16
methods [1]  76/17
might [3]  8/17 88/1 108/17
million [1]  97/4
millions [2]  107/1 108/20
mind [3]  18/16 18/19 18/21
minor [1]  19/13
minutes [4]  45/4 47/11 90/19 113/7
misjudged [1]  82/12
mispronouncing [1]  14/7
Missouri [3]  1/21 1/25 126/2
misspellings [1]  127/4
misunderstanding [1]  30/19
misunderstood [1]  20/25
MO [5]  3/3 4/9 125/3 125/20 126/23
MO-CCR [3]  4/9 125/3 126/23
mobility [1]  101/12
moment [2]  10/16 72/15
more [50]  10/9 12/10 15/24 16/15 18/14
19/21 33/23 34/2 39/20 41/14 47/12
47/21 53/8 54/9 58/2 58/23 59/3 68/19
71/14 73/5 80/6 86/14 88/3 88/21 90/23
98/2 98/3 98/6 98/24 99/4 99/22 99/25
100/12 101/19 101/23 102/1 105/15
108/16 108/17 109/21 111/3 111/7
113/11 113/19 118/20 119/9 121/2 121/4

122/3 124/3
morning [6]  5/21 5/21 71/25 72/16 72/19
73/2
most [7]  38/11 60/9 74/6 80/20 81/12
82/1 104/19
motion [6]  87/11 91/12 91/19 101/1
106/14 120/16
motions [1]  84/15
motivated [1]  19/18
motor [2]  13/4 15/9 15/16
move [4]  69/25 90/14 91/10 100/14
movement [11]  16/15 78/20 86/22 88/5
96/13 100/20 101/6 101/12 106/2 108/24
109/24
movements [3]  16/10 92/16 100/17
moves [1]  96/6
moving [1]  96/7
Mr [3]  3/21 3/22 3/23
Mr. [36]  42/19 44/11 71/3 71/11 78/10
86/6 91/14 92/13 92/20 96/4 98/25 99/15
99/20 102/22 102/25 104/15 104/18
104/22 109/23 115/6 116/8 116/12 117/4
117/5 117/9 117/15 118/5 118/21 119/14
119/22 119/25 120/2 120/15 121/5
122/13 123/16
Mr. and [3]  117/4 117/5 117/9
Mr. Liss [30]  42/19 44/11 71/3 71/11
78/10 86/6 91/14 92/13 96/4 98/25 99/15
99/20 102/22 102/25 104/15 104/18
104/22 109/23 115/6 116/8 116/12 118/5
118/21 119/14 119/22 119/25 120/2
120/15 121/5 123/16
Mr. Liss's [2]  92/20 122/13
Mr. Zimmerman [1]  117/15
Mrs. [4]  117/4 117/5 117/9 117/15
Mrs. Liss [1]  117/4
Mrs. Zimmerman [3]  117/5 117/9 117/15
Ms [2]  3/22 126/13
much [4]  38/3 73/2 122/21
multiple [1]  115/16
multiple-step [1]  115/16
Murphy [1]  126/13
Murphy [2]  2/24 126/7
must [1]  25/20
Mutual [9]  7/4 7/22 7/24 7/25 8/6 8/11
8/14 8/20 8/23
my [152]
myself [2]  69/1 97/16

## N

name [8]  5/8 5/17 5/20 7/19 9/15 9/18
122/9 125/15
names [1]  21/5
national [1]  35/22
nature [1]  91/17
navigate [5]  23/23 23/25 24/19 25/6
58/14
navigating [2]  25/9 56/13
near [5]  41/19 45/21 59/24 90/23 105/19
necessarily [26]  13/25 17/1 20/12 22/25
33/5 35/13 35/19 36/5 50/18 54/20 61/4
62/10 62/25 63/18 64/7 65/2 65/21 66/12
66/14 105/14 112/15 113/11 115/23
121/8 121/13 123/25
necessary [16]  15/14 29/7 30/16 31/1
34/13 40/3 48/5 48/6 63/11 63/13 76/11
76/24 88/4 88/6 90/15 93/10
need [8]  33/22 34/1 34/2 63/11 63/21
66/14 110/5 110/7
needed [6]  58/21 63/2 63/4 68/22 87/19

88/25
needs [1]  112/21
never [4]  46/24 53/13 93/3 113/21
new [10]  18/6 97/20 98/3 98/14 98/14
98/15 98/15 98/18 109/14 109/15
next [2]  50/20 115/9
no [71]  1/5 2/5 8/22 12/6 14/25 15/10
17/15 18/6 22/6 22/22 23/3 30/13 32/4
32/5 32/5 32/9 32/22 38/23 40/20 41/16
46/11 47/5 52/25 57/3 59/1 59/3 59/16
59/18 59/19 62/25 63/3 63/21 66/4 73/8
73/13 76/13 76/14 81/1 81/15 84/2 86/14
87/5 87/8 87/14 90/3 90/13 91/20 92/24
93/1 93/2 93/2 93/5 93/6 93/13 93/16
97/6 97/12 100/15 104/4 108/22 109/10
111/15 112/14 112/17 112/18 112/18
113/16 113/24 119/7 122/3 126/11
non [4]  56/13 68/8 68/24 115/5
non-pandemic [2]  68/8 68/24
non-witness [1]  115/5
none [2]  8/17 15/3
normal [2]  36/13 37/1
normally [2]  47/3 59/3
not [199]
Notary [2]  126/16 130/23
notation [1]  127/4
note [3]  123/21 123/21 123/21
noted [1]  127/4
nothing [7]  5/3 47/25 58/21 83/24 84/25
116/15 116/24
Notice [2]  4/14 125/4
noticed [1]  5/16
now [8]  4/10 7/11 20/1 20/23 78/15
82/18 107/18 123/14
number [17]  1/21 1/22 11/7 35/25 48/14
48/20 54/3 66/1 66/3 66/4 66/8 66/10
66/15 77/23 88/13 102/22 104/17
numbers [1]  74/24

## O

o'clock [2]  4/7 4/8
o0o [3]  3/10 3/12 4/24
oath [2]  125/6 125/9
object [5]  22/12 24/11 42/15 79/18 120/9
objection [1]  43/11
objections [1]  4/19
obligation [3]  25/17 28/17 40/10
obscuring [1]  32/8
observations [1]  68/16
observe [1]  51/9
observed [1]  42/20
obstructed [1]  29/24
obstructing [1]  29/22
obstruction [4]  59/25 116/19 123/23
124/6
obvious [8]  51/2 51/4 51/6 51/11 51/20
56/1 56/5 56/8
obviously [3]  16/13 52/5 80/13
occasions [2]  18/10 62/8
occupation [1]  5/10
occur [4]  8/13 8/15 86/7 120/14
occurred [14]  20/3 63/23 64/1 75/7 86/4
95/21 97/9 99/13 106/8 113/15 120/7
120/15 121/6 121/7
occurring [1]  19/18
occurs [1]  96/22
off [7]  5/25 7/13 13/17 25/25 53/8 73/2
124/20
offered [2]  17/7 19/11
office [57]  10/1 15/24 25/12 25/15 30/4

office... [52]  30/9 30/22 31/2 31/4 31/8
31/23 32/14 32/18 33/2 36/7 36/12 36/16
36/18 36/24 37/5 37/9 37/16 37/17 37/19
37/23 38/3 38/24 48/12 48/15 55/17
55/22 55/24 56/17 56/20 57/10 58/5 58/8
58/17 59/2 59/7 59/11 61/2 61/5 61/7
61/15 61/18 61/22 62/2 62/5 62/9 63/9
63/22 64/10 66/19 74/10 103/5 123/7
OFFICES [2]  2/18 126/17
often [1]  65/1
okay [201]
on 2007 [1]  44/6
once [2]  79/7 127/4
one [33]  8/18 10/9 12/7 17/20 19/10 26/3
26/9 26/11 28/9 29/5 32/9 38/25 52/1
54/16 74/16 74/22 81/20 81/21 82/9
82/10 83/3 83/22 83/23 86/9 90/16 92/24
102/16 109/4 112/22 116/11 119/3 122/4
122/10
only [19]  10/16 11/1 19/19 22/9 28/9
41/10 57/13 68/17 73/23 74/5 85/14
95/10 95/24 96/9 97/7 97/22 109/2 109/4
118/4
oOo [1]  3/18
open [2]  37/7 89/9
operated [1]  94/7
operating [1]  28/12
operation [2]  36/13 37/1
operational [3]  44/25 45/22 60/24
operations [1]  62/9
opine [3]  18/10 50/11 89/22
opined [2]  20/10 42/24
opining [8]  49/2 49/7 50/17 50/19 50/23
55/13 61/11 73/10
opinion [70]  14/3 28/12 29/18 29/20 34/5
34/8 40/23 41/13 41/17 42/18 43/12
46/14 49/12 49/25 50/1 50/3 51/1 51/3
52/15 54/19 55/16 58/21 61/17 62/2 63/5
67/19 73/10 75/24 78/24 80/2 80/5 81/23
83/7 83/12 83/19 85/22 85/23 86/8 94/3
95/20 96/13 98/20 98/21 99/5 99/24
105/24 106/1 106/3 106/8 106/10 107/10
107/21 108/6 108/9 108/18 108/22
109/10 109/14 109/23 112/14 113/2
113/19 116/7 120/2 120/6 120/12 120/13
120/20 120/25 121/10
opinions [34]  39/25 40/4 40/19 40/20
49/14 49/15 49/17 49/23 50/7 52/10
52/12 54/5 54/14 60/18 61/18 68/23 74/7 76/16
85/25 88/25 98/4 98/7 98/12 98/16 99/24
101/3 101/7 104/2 105/6 105/10 108/14
108/16 108/17 116/11 118/4
opportunities [1]  108/20
opportunity [2]  19/21 119/15
opposed [8]  42/21 49/9 49/18 49/23
57/11 95/1 104/15 112/5
option [3]  50/19 52/1 52/5
options [11]  50/14 50/15 50/25 51/1
51/18 51/19 61/25 64/16 64/18 64/20
109/8
orientation [1]  101/16
original [1]  19/3
originally [1]  9/16
OSHA [22]  20/9 20/9 20/10 20/11 20/13
20/15 20/17 20/20 20/22 20/24 21/1 21/3
21/3 21/9 21/13 21/16 21/20 21/23 22/3
22/4 22/8 122/11
other [67]  6/15 8/15 12/8 12/21 12/22

12/22 12/24 16/16 16/17 22/10 22/15
26/11 26/15 26/22 28/5 54/19 56/12 59/9
39/13 41/7 44/23 48/22 48/22 49/25 50/8
50/25 54/16 54/17 55/3 59/13 60/17
61/19 61/25 62/8 62/12 62/13 62/15 63/8
63/10 68/14 69/20 74/2 74/4 76/21 80/13
81/3 81/15 81/16 83/3 83/4 83/6 84/22
85/19 85/20 86/12 86/13 86/24 89/11
93/1 93/2 94/13 96/9 108/20 108/20
109/1 109/8 115/7
others [5]  8/16 10/13 65/22 69/13 95/1
otherwise [1]  102/12
our [10]  8/12 9/18 10/1 11/12 13/3 42/4
60/16 60/16 68/11 87/10
out [58]  7/18 7/19 15/18 26/13 35/15
36/1 36/9 37/2 38/2 40/25 41/2 41/3 41/4
42/6 48/2 49/9 50/18 50/19 50/21 51/17
51/24 52/6 52/9 52/16 55/14 59/4 61/11
61/13 61/14 61/17 62/16 62/23 63/9
63/15 63/20 63/25 64/21 64/25 68/19
68/25 69/14 70/3 70/11 70/22 71/17
71/20 71/23 72/1 73/4 76/12 77/15 78/4
83/11 97/24 103/2 104/14 109/5 116/5
outdoor [1]  36/20
outdoors [1]  35/25
outside [7]  6/25 15/16 16/21 17/1 83/24
84/3 116/2
over [6]  11/21 53/12 60/22 67/14 101/22
103/19
overall [3]  12/2 39/16 101/3
overlap [1]  16/13
own [3]  17/5 23/18 110/24
owner [1]  9/18

P
P.C [1]  3/7
page [37]  3/15 3/21 5/24 6/2 67/7 67/8
67/9 70/15 71/10 73/24 73/24 93/13
117/8 117/11 126/16 126/18 127/6 127/8
127/11 127/13 127/16 128/1 128/3 128/6
128/8 128/11 128/13 128/15 128/18
129/1 129/3 129/6 129/8 129/11 129/13
129/15 129/18
pandemic [4]  68/8 68/20 68/24 69/19
paragraph [1]  117/13
parameters [1]  17/5
parietal [1]  78/25
Park [1]  9/24
parked [1]  67/18
parking [2]  35/8 58/18
part [22]  4/19 16/8 16/23 17/2 18/21
40/12 40/17 41/16 46/6 52/3 52/9 69/7
70/16 82/19 94/5 103/10 104/19 113/10
114/25 117/3 119/8 119/18
partially [2]  19/18 30/15
particular [4]  14/1 17/16 89/23 113/20
parties [3]  22/20 25/24 42/6
PARTY [4]  1/9 1/13 2/9 2/13
pass [1]  14/17
passed [1]  74/14
past [3]  6/9 31/8 84/1
path [21]  36/6 36/22 37/4 37/22 38/20
38/23 55/24 56/19 57/20 57/25 58/5
58/13 61/23 62/6 103/12 104/22 116/9
116/14 116/19 119/5 123/23
paths [2]  56/17 56/25
pathway [7]  28/24 32/8 36/16 55/16
55/21 56/21 124/6
pathways [1]  28/18
pattern [1]  95/11 108/23 109/13

pedestrian [2]  35/7 35/24
pending [1]  4/10
Penns [1]  9/24
Pennsylvania [1]  9/25
people [18]  10/7 10/12 10/14 10/16
15/16 16/6 16/17 22/10 23/17 35/12 39/8
52/2 53/4 53/12 57/6 60/10 87/10 93/19
percent [1]  18/7
percentage [1]  11/19
perform [4]  11/9 24/3 85/24 112/24
performed [3]  7/6 24/9 95/2
performing [5]  16/6 16/7 16/11 36/25
81/7
performs [1]  10/5
person [10]  16/13 18/18 21/6 22/15
70/10 91/1 91/9 118/5 118/21 124/7
person's [2]  123/17 124/11
personal [2]  15/16 90/16
pertaining [1]  4/6
pertinent [1]  74/6
perturbation [5]  91/3 91/5 101/1 105/23
111/12
PH.D [7]  1/16 4/4 5/1 125/5 126/14
130/3 130/11
phase [1]  91/13
phone [4]  48/9 48/14 48/20 63/8
photo [2]  104/6 104/7
photograph [4]  67/9 68/1 79/1 79/9
photographs [20]  37/21 39/10 39/21 40/6
68/11 68/21 69/21 70/4 70/9 70/13 70/17
70/23 71/15 73/7 73/9 73/21 84/8 89/25
94/8 94/12
physical [3]  7/3 7/21 24/10
physics [1]  16/9
Picking [1]  105/1
piece [1]  34/16
pizza [1]  56/11
place [9]  9/2 40/11 40/21 41/18 42/24
43/14 43/17 48/13 101/18
placed [6]  30/15 32/2 44/19 58/20 60/1
88/18
placement [3]  41/15 59/24 105/7
placing [1]  41/19
plaintiff [18]  1/4 1/9 1/16 2/4 2/9 2/16 4/2
4/4 4/12 4/2 4/13 5/4 11/17 11/19 11/24 12/5
12/11 109/3 113/21
plaintiff's [4]  3/14 5/14 67/2 83/25
plan [9]  40/11 40/15 40/21 41/8 41/14
41/18 42/24 43/14 43/17
plate [1]  108/2
plausible [9]  86/8 86/11 95/6 106/13
107/5 107/6 120/19 120/24 121/15
play [1]  50/23
please [13]  5/7 10/10 23/24 43/7 44/8
47/8 49/21 57/4 57/17 89/5 100/6 126/15
126/19
pleasure [1]  124/18
plus [1]  116/1
point [7]  39/21 60/25 64/8 66/18 71/24
85/1 103/16
pointed [4]  83/22 83/23 84/5 116/24
pointing [1]  84/3
policies [2]  8/7 40/18
pooling [1]  67/20
portion [3]  83/20 84/3 121/11
position [8]  43/3 43/6 51/6 83/18 87/5
87/9 101/10 101/14
positions [1]  118/13
possibilities [2]  29/5 113/14
possibility [3]  27/10 109/16 110/19

# P

Case 3:19-cv-00810-GCS

possible [19]  24/3 48/19 57/23 57/24
64/23 65/6 65/10 78/4 80/16 83/9 86/12
86/13 86/16 88/1 92/5 95/23 100/25
110/1 111/25
possibly [6]  11/2 61/19 72/6 92/11 99/8
121/18
posted [1]  66/5
posts [3]  78/12 101/15 103/19
posture [2]  101/23 102/14
potential [3]  24/7 80/4 107/1
potentially [5]  23/17 24/9 29/20 32/22
33/4
practical [1]  9/20
practice [4]  43/20 43/22 43/24 43/25
49/4 63/17
precludes [1]  61/4
presence [1]  61/3
present [7]  33/15 33/15 34/6 41/9 53/22
72/4 73/6
presented [6]  77/11 80/5 80/12 80/14
81/2 83/1
presenting [1]  76/18
presents [1]  98/14
prevent [2]  25/23 32/3
prevented [1]  121/13
previous [1]  118/8
previously [1]  5/17
primarily [5]  7/8 11/15 39/23 70/2 115/4
primary [5]  19/3 62/15 65/16 85/7 115/5
principals [7]  16/9 18/20 76/2 95/14 99/7
99/10 110/17
prior [4]  46/21 70/24 94/11 106/12
probabilities [1]  81/11
probable [1]  81/12
probably [2]  14/7 109/19
Procedure [1]  4/5
proceed [4]  51/14 51/15 102/2 102/2
proceeding [1]  114/14
process [7]  13/16 14/10 20/23 25/8
108/1 115/16 115/18
produced [5]  6/4 16/12 96/10 112/6
112/16
producing [1]  16/11
profession [1]  5/11
professional [11]  6/17 7/1 13/6 13/9
13/13 13/19 14/11 14/14 14/23 15/1 15/1
program [4]  19/5 19/6 19/10 19/12
project [1]  12/19
projects [1]  8/8
promptly [1]  25/21
promptness [1]  25/22
pronounce [2]  5/18 9/4
proof [1]  14/19
proper [1]  33/24
properly [1]  26/20
property [12]  22/21 28/2 28/17 29/9
29/12 29/25 39/3 39/6 40/8 56/9 62/20
64/21
proportion [1]  12/1
protect [1]  22/9
protected [1]  121/11
Protection [1]  21/4
protocol [1]  46/15
provide [17]  11/9 11/23 12/24 14/2 21/25
22/9 28/17 28/24 39/10 66/1 66/3 83/5
92/14 99/25 107/5 109/15 115/7
provided [25]  11/1 44/17 44/21 44/24
56/19 68/22 77/1 84/9 93/8 94/13 97/10

provides [2]  10/4 10/6
providing [8]  20/2 22/14 29/13 61/16
110/25 112/8 113/12 113/21
public [4]  52/12 60/8 126/16 130/23
publications [1]  6/2
published [1]  77/16
pull [1]  51/15
pulled [2]  45/7 50/5
pulling [1]  51/14
pulls [1]  51/22
pump [1]  71/17
pumped [1]  70/22
pumping [5]  70/24 71/20 71/23 72/1 72/3
pumps [1]  72/20
pure [1]  109/2
purpose [1]  35/23
purposes [1]  9/20
pursuant [2]  4/5 125/4
put [6]  20/20 21/23 40/25 41/3 41/4
43/14

# Q

qualification [1]  80/25
qualified [3]  17/3 17/4 17/5
qualifying [1]  81/1
quality [1]  14/4
quantify [5]  100/1 100/9 100/13 115/1
115/15
quantity [3]  14/3 54/8 54/12
question [58]  4/22 6/22 9/11 10/9 23/2
23/10 24/12 24/15 24/17 25/4 26/22
26/25 27/8 27/12 27/16 27/19 28/3 28/11
28/19 28/20 29/2 29/11 30/1 30/10 30/20
32/7 32/16 32/20 32/25 34/4 40/2 41/21
43/4 43/7 49/6 49/8 49/21 51/21 52/14
56/23 57/15 58/11 58/15 68/3 89/4 97/22
98/8 100/5 100/24 101/13 102/24 103/3
106/7 106/22 113/4 119/7 122/10 124/15
questions [13]  43/10 52/2 55/4 55/10
57/17 97/25 114/11 114/13 122/3 123/14
126/19 130/4 130/7
quick [2]  90/16 122/17
quite [1]  72/11
quoting [1]  94/15

# R

Rachelle [5]  1/21 4/9 125/3 125/19
126/23
rail [1]  36/19
rain [1]  72/23
rained [1]  73/1 73/2
raining [8]  44/13 72/7 72/8 72/12 72/13
72/14 72/18 72/20
rainwater [1]  34/19
rainy [3]  44/13 72/10 72/11
raise [1]  110/21
raised [1]  4/20
range [1]  39/2
ranging [1]  39/22
rapid [1]  92/3
RCZ [1]  127/20
re [1]  126/11
reach [2]  76/8 76/16
reached [1]  88/2
react [3]  100/2 100/9 100/10
read [26]  43/9 43/10 117/21 126/15
127/6 127/8 127/11 127/17 127/16 128/1

128/3 128/6 128/8 128/11 128/13 128/15
128/17 129/4 129/1 129/3 129/6 129/11
129/13 129/15 129/18 130/4
reading [4]  39/7 74/17 82/10 127/2
reads [1]  117/15
real [1]  122/17
realistic [1]  80/15
really [9]  9/21 16/1 19/13 41/11 50/23
90/23 95/24 95/25 115/20
realm [2]  80/15 123/24
reapply [1]  14/18
rear [1]  79/2
reason [39]  22/6 25/11 30/13 32/4 32/23
33/2 36/3 59/20 62/22 62/25 63/3 73/8
73/13 81/15 84/2 86/24 87/8 119/7 127/7
127/9 127/12 127/14 127/17 128/2 128/4
128/7 128/9 128/12 128/14 128/16
128/19 129/2 129/4 129/7 129/9 129/12
129/14 129/16 129/19
reasonable [20]  25/22 43/5 56/16 57/5
57/8 57/19 57/22 61/21 65/2 81/8 86/2
86/17 86/20 107/11 108/6 119/6 119/12
123/17 123/18 124/11
reasonably [3]  102/13 118/5 118/21
reasons [2]  38/25 119/3
recall [20]  12/9 13/18 39/7 39/17 41/23
43/1 54/2 54/4 54/11 54/25 55/5 58/22
59/19 69/5 71/19 72/1 93/21 97/16
103/16 114/1
receive [1]  62/18
received [6]  19/4 19/13 20/6 52/4 78/8
120/4
receiving [2]  7/2 7/20
recertified [1]  14/20
recertifying [1]  20/24
recess [2]  47/19 90/21
recollection [3]  59/12 70/2 121/25
reconstructionist [1]  15/8 15/10 15/12
reconstructionists [1]  13/4
reconstructions [1]  15/14
record [4]  7/13 9/8 124/20 125/12
records [3]  53/25 82/10 94/15
recovered [1]  106/17
recovery [1]  121/17
recreate [2]  93/7 93/10
recreation [1]  93/4 93/13 93/15
red [3]  41/3 49/11 50/2
Redirect [2]  3/23 122/19
reduce [1]  18/21
reestablished [1]  91/23
reference [3]  7/25 77/21 77/22
referenced [2]  20/4 77/21
referencing [2]  38/14 103/12
referring [1]  6/19
regard [1]  117/24
regarding [9]  35/15 41/23 46/21 58/23
73/2 74/6 77/1 85/19 98/25
regardless [1]  92/17
regards [1]  33/23
regulations [12]  19/22 20/9 20/10 20/15
20/18 20/19 20/19 21/10 21/13 21/16
21/22 22/8
reinforcement [1]  118/12
related [16]  7/8 7/8 7/9 8/9 8/11 14/23
15/5 18/15 28/14 40/19 73/10 74/4 77/11
96/8 115/11 115/12
relates [1]  6/17
relationship [3]  70/6 70/12 70/20
relative [8]  6/4 6/25 8/6 18/23 29/25
99/12 100/17 101/20

Case 3:19-cv-00810-GCS   Document 133-1   Filed 01/10/22   Page 143 of 165   Page ID #3478

relatively [1]  108/3
relayed [2]  75/25 77/4
Relevance [1]  38/18
relevancy [1]  42/18
relevant [3]  27/14 55/8 115/23
relied [3]  82/15 94/12 95/6
rely [4]  68/10 69/21 94/25 95/2
relying [2]  69/12 84/6
remediate [2]  25/17 25/20
remember [5]  17/20 17/23 18/4 83/6
118/16
render [3]  73/10 88/25 99/24
reoccurring [2]  40/7 42/25
repeat [3]  26/25 28/20 43/7
rephrase [4]  49/20 57/17 89/5 100/6
report [27]  3/16 6/2 67/4 70/5 73/24 74/6
74/7 74/17 74/25 77/21 82/5 82/7 82/14
82/22 83/3 83/13 94/20 95/1 95/6 98/24
106/3 111/19 114/25 116/1 117/8 118/19
130/6
reported [4]  1/20 8/16 78/8 88/8
reporter [4]  5/14 43/9 43/10 67/2
Reporting [3]  1/23 126/1 127/20
reports [5]  82/11 83/4 83/6 94/13 94/18
represent [3]  9/17 53/10 114/20
representation [1]  71/5
require [5]  79/17 98/15 108/4 110/24
124/1
required [7]  21/25 23/7 23/22 56/21
58/14 69/11 119/22
requirement [2]  23/5 29/9
requirements [2]  4/16 21/17
research [18]  7/3 7/4 7/5 7/6 7/22 8/7 8/8
8/10 8/18 8/24 10/5 10/13 10/16 19/17
19/19 77/11 77/14 99/15
reserve [1]  124/14
reserved [1]  4/20
response [2]  42/10 130/7
responsible [2]  28/13 29/13
rest [2]  39/25 50/12
restate [1]  56/2
restrictions [1]  69/7
result [3]  24/25 27/17 98/16
resulted [1]  85/15
results [2]  90/25 98/23
retained [3]  10/23 10/25 11/24
retainment [1]  12/2
return [1]  126/16
returned [1]  126/18
returning [1]  25/15
review [9]  28/14 28/7 30/3 36/8 41/22
83/13 86/14 116/1 118/16
reviewed [14]  31/6 37/22 40/7 46/7 50/16
54/3 54/13 62/7 65/7 76/25 115/21
115/22 116/21 117/3
reviewing [2]  93/7 115/3
right [39]  5/24 20/23 31/3 37/6 38/1
52/18 64/14 65/12 67/14 69/17 69/22
82/18 82/21 83/1 88/22 90/8 90/21 91/20
91/21 91/24 91/25 92/2 97/2 97/25 98/1
103/10 103/12 103/23 103/25 104/5
104/11 104/25 105/1 105/4 111/20 114/9
117/25 124/17 124/19
roles [1]  10/17
rotational [2]  96/22 96/23
rounded [2]  89/21 89/22 90/1
routine [1]  36/25
rule [3]  119/22 119/25 120/3
ruled [2]  33/15 78/4
rules [2]  4/5 4/8
run [1]  6/23

safe [4]  21/18 21/25 22/14 43/20
safer [7]  22/15 61/20 62/1 62/12 62/13
63/17 116/14
safety [26]  7/5 7/23 16/25 17/8 18/9
18/11 18/19 18/21 18/23 18/23 19/9
19/11 19/14 19/22 20/4 26/2 26/4 26/18
28/1 28/9 35/15 35/22 40/18 40/19 117/16
117/16 120/3
said [26]  14/25 39/17 53/19 58/19 61/24
62/11 63/24 68/18 73/15 84/20 85/14
97/15 103/1 106/5 107/14 109/6 110/9
110/13 110/14 110/16 113/6 114/1
119/19 120/17 123/11 130/7
same [18]  4/15 16/14 43/11 52/22 52/23
54/15 70/9 70/10 73/11 92/2 93/13 98/4
98/16 101/2 106/20 112/22 111/22 123/3
saw [5]  44/14 44/15 51/12 51/13 82/5
say [29]  10/24 11/3 17/4 30/8 41/3 42/1
45/8 60/14 61/3 61/17 63/3 63/15 84/10
86/2 86/5 86/17 86/25 87/22 91/18 94/16
96/25 102/12 103/17 104/13 107/7
112/22 116/25 120/21 121/9
saying [15]  37/6 42/3 76/4 79/20 79/23
79/25 80/23 86/16 90/8 93/12 97/24 98/5
102/11 109/7 111/24
says [3]  5/4 85/17 92/13
scale [1]  45/16
scales [99]  30/9 30/12 30/14 30/16 30/17
30/18 30/22 30/25 31/1 31/4 31/8 31/13
31/13 31/16 31/23 32/1 32/2 32/3 32/4
32/12 32/14 32/15 32/18 32/23 33/2 33/9
34/7 36/7 36/10 36/13 36/15 36/17 36/24
37/2 37/3 37/9 37/25 38/3 38/7 38/9
38/12 38/15 38/20 38/22 38/24 39/1
39/23 40/22 40/24 40/25 41/1 41/5 41/6
41/20 41/24 42/2 42/4 42/14 44/10 44/18
44/20 44/22 44/23 44/24 44/25 45/9
45/11 45/21 45/22 46/1 48/11 50/15
51/10 51/15 54/23 58/10 58/16 58/20
59/23 60/1 60/2 60/3 60/20 60/21 60/22
60/24 63/6 64/6 64/12 65/17 67/15 67/18
67/22 67/24 71/14 71/18 71/25 72/18
104/15
scalp [1]  81/13
scenario [16]  80/4 81/12 82/1 83/2 83/9
98/14 106/13 107/9 111/9 111/21 112/19
112/20 120/18 120/20 121/4 121/16
science [1]  110/18
scientific [11]  16/5 76/17 77/20 78/1
84/14 86/3 86/5 86/17 105/18 107/11
108/7
scientifically [1]  112/6
scientist [3]  7/3 7/5 19/17
scope [6]  40/12 41/11 41/16 42/10 55/12
119/18
scrap [12]  1/12 2/12 3/1 45/20 45/24
46/3 46/6 46/9 46/15 47/3 56/10 64/15
Scrap's [1]  64/16
SEA [1]  73/21
Seal [3]  3/8 3/22 114/20
Seasons [2]  1/24 126/1
second [3]  84/1 120/8 121/1
section [9]  37/13 37/14 55/7 78/25
103/11 105/1 105/2 105/4 105/4
sections [1]  35/8

see [14]  5/21 24/23 27/10 62/16 67/17
67/19 95/19 98/1 94/8 97/20 98/4 103/20
109/16 123/22
seeing [4]  56/12 83/6 124/5 124/6
seek [3]  56/17 56/25 57/9
seemed [1]  119/12
seems [2]  62/7 109/21
seen [1]  93/18
selected [1]  55/21
send [1]  42/4
sending [1]  42/6
sense [6]  8/14 11/9 55/21 69/8 69/10
79/8
senses [1]  16/16
sentence [1]  117/15
separate [2]  8/9 109/14
separately [2]  107/20 110/6
sequence [1]  106/4
services [2]  10/5 12/2
set [3]  8/18 70/16 109/15
sets [1]  77/6
setting [3]  36/20 119/1 120/24
settings [7]  15/24 19/8 19/20 35/25 36/1
53/9 124/4
several [1]  46/12
Shall [1]  7/14
shallowest [1]  104/23
sharp [2]  89/20 90/1
she [1]  125/8
she'll [2]  123/8 123/11
sheet [3]  126/16 126/17 127/1
short [1]  74/22
shorthand [1]  125/10
should [70]  10/23 11/25 21/22 30/18 32/9
34/9 36/3 40/21 41/14 42/7 42/13 42/13
42/24 43/14 43/17 44/17 48/17 49/11
49/13 49/18 49/24 50/1 50/4 50/24 51/4
51/24 51/25 52/11 52/13 52/16 52/16
52/21 53/13 56/1 56/5 56/13 56/24 61/11
66/13 85/15 116/17 117/2 118/9 118/21
118/23 118/25 119/4 119/4 124/8 127/6
127/8 127/11 127/13 127/16 128/1 128/3
128/6 128/8 128/11 128/13 128/15
128/18 129/1 129/3 129/6 129/8 129/11
129/13 129/15 129/18
shouldn't [5]  33/8 34/10 62/3 116/16
116/25
show [2]  55/6 85/1
shut [1]  65/8
shy [1]  8/4
SIC [1]  113/1
side [5]  67/14 80/17 103/23 103/24
103/25
sides [1]  12/1
sidewalks [1]  35/7
sight [1]  48/14
sign [8]  41/20 59/24 65/25 67/10 67/18
67/25 68/2 126/16
signage [8]  59/1 59/5 59/8 59/9 59/13
59/16 59/18 66/2
signature [8]  4/22 124/14 124/22 126/16
126/18 127/19 128/21 129/22
significant [4]  70/24 91/18 117/24 118/2
significantly [3]  72/23 72/25 100/16
similar [1]  60/17
simply [1]  59/23
since [4]  10/20 32/7 58/19 64/8
Sincerely [1]  126/21
single [2]  27/9 94/20
singular [2]  82/22 95/6

## S

Siobhan [4]  2/24 6/12 123/6 126/7
siobhan.murphy [1]  126/9
site [52]  18/9 21/18 21/20 21/25 22/5 22/10 22/11 22/16 22/19 25/18 26/21 28/6 28/13 28/14 28/23 39/16 40/15 40/19 42/20 42/22 42/24 48/19 51/8 52/9 53/22 58/23 65/8 65/24 66/25 67/21 68/5 68/7 68/9 68/14 68/17 68/19 68/25 69/4 69/9 69/13 69/15 69/17 69/23 70/3 72/22 73/21 93/3 93/5 115/8 117/20 117/20 118/6
sites [4]  19/24 20/3 48/22 118/9
sitting [2]  93/7 113/8
situation [10]  16/21 23/17 27/18 33/17 33/21 33/23 34/23 83/18 102/15 119/14
situations [3]  11/16 27/10 60/17
six [1]  4/8
slightly [4]  11/21 53/11 79/2 101/6
SMITH [2]  2/22 126/7
smooth [1]  108/3
so [117]  5/21 6/24 7/2 7/16 8/14 9/20 10/17 12/14 16/13 16/25 19/8 20/4 20/15 21/5 23/20 28/7 30/16 31/9 31/18 32/4 33/20 34/9 34/22 35/1 36/23 37/18 38/15 38/23 40/14 40/20 41/13 41/16 42/12 43/12 43/16 45/6 47/11 49/17 49/25 52/21 58/25 59/16 61/6 61/21 62/4 62/10 62/21 64/14 65/8 66/7 66/9 69/2 69/12 69/17 69/22 70/3 70/25 71/3 72/12 74/8 74/19 74/24 75/12 75/16 77/23 78/10 78/20 80/10 82/22 84/1 84/4 84/15 84/25 86/16 88/3 88/16 88/23 89/15 91/15 91/18 91/23 92/1 92/16 92/20 93/2 93/12 93/23 95/24 96/7 96/12 97/15 98/15 98/18 99/3 101/2 101/4 102/9 105/12 105/24 106/11 107/21 108/18 109/23 111/6 112/7 112/18 112/19 112/22 113/9 115/15 115/21 116/7 116/20 118/20 119/10 121/14 124/9
solely [1]  7/8
soles [1]  104/20
solution [1]  65/2
some [28]  8/12 10/12 10/15 13/3 16/24 18/20 20/24 35/1 35/14 39/7 39/8 41/23 42/5 43/14 44/24 49/15 50/7 73/1 74/24 81/3 86/13 86/24 114/11 118/8 118/11 118/18 118/22 123/1
somebody [8]  39/17 39/18 63/24 64/25 81/3 107/1 114/11 124/15
someone [6]  31/22 32/17 61/4 63/14 63/20 102/11
something [13]  6/11 6/12 29/21 47/4 63/24 80/24 83/13 90/4 90/9 93/25 101/5 121/15 124/7
sometime [1]  71/16
sometimes [3]  35/7 68/10 68/17
somewhere [2]  64/15 88/17
sorry [23]  9/10 9/11 10/9 21/5 23/14 26/24 28/20 41/2 44/7 47/1 49/20 56/2 84/17 84/18 85/3 85/11 91/4 98/8 103/3 104/7 111/17 113/6 123/10
sound [1]  121/25
source [1]  89/17
SOUTHERN [3]  1/1 2/1 4/11
space [2]  37/7 60/12
speaking [12]  12/10 13/2 15/23 27/21 34/15 43/12 44/3 60/9 61/24 64/17 88/11 101/17

specialists [1]  12/21
specialties [2]  12/24 13/2
specialty [1]  65/3 66/18
specific [32]  5/5 5/9 6/18 8/19 11/20 21/5 21/6 36/21 38/5 38/15 38/23 39/11 39/16 39/20 40/3 47/25 54/2 54/7 54/12 54/21 58/2 58/22 59/13 59/18 75/11 76/15 76/22 93/21 104/17 111/7 112/7 112/10
specifically [25]  10/18 13/18 17/25 37/20 39/4 39/17 40/18 43/1 45/10 48/16 53/23 54/25 71/4 71/8 71/19 72/2 72/14 82/18 82/20 93/21 102/7 102/12 102/19 103/16 119/9
specificity [1]  33/20
specifics [11]  23/3 24/16 46/21 55/5 69/5 92/4 92/12 92/15 96/5 99/21 100/12
specify [3]  10/10 23/24 70/13
specifying [1]  51/22
spent [2]  116/2 116/3
St [1]  3/3
stability [1]  87/18
stabilize [1]  87/3
stabilized [1]  97/16
stable [1]  87/15
stairs [9]  35/8 37/16 37/18 37/23 37/24 38/3 38/8 38/12 38/21
stance [1]  105/16
stand [2]  9/13 9/21
standard [4]  17/17 123/17 123/18 124/11
standards [2]  19/23 35/14
standing [2]  63/15 64/25
standpoint [1]  124/1
stands [1]  95/13
start [1]  72/1
started [4]  44/12 71/22 72/20 97/15
starts [1]  5/25
state [7]  1/23 5/7 18/6 124/9 126/1 127/20 130/3
stated [2]  53/23 106/3
statement [1]  25/7 49/22 82/25 112/5
statements [1]  93/20
STATES [3]  1/1 2/1 4/10
stations [1]  15/25
statutory [1]  4/16
steel [1]  108/2
step [5]  13/16 13/17 50/20 115/9 115/16
stepped [5]  78/13 78/22 101/4 107/24 107/25
steps [6]  24/1 24/4 26/3 58/4 58/12 76/23
Steve [41]  23/20 24/18 42/13 44/6 44/9 45/6 46/8 47/22 51/2 51/18 52/21 53/21 54/6 55/2 55/17 55/20 59/1 59/6 61/7 63/20 67/10 71/2 71/18 72/5 73/6 74/9 75/19 77/18 79/21 80/20 88/7 93/23 94/15 96/19 100/2 100/9 107/12 110/13 111/4 111/22 113/13
Steve's [6]  51/6 75/12 75/16 80/2 80/11 111/8
STEVEN [4]  1/3 2/3 4/12 53/5
still [9]  33/4 72/6 72/8 72/20 95/13 108/3 112/9 121/16 121/17
stipulated [2]  4/1 4/18
stitched [1]  94/8
stood [1]  102/21
stooped [3]  101/10 101/14 101/22
stop [6]  41/19 59/24 67/10 67/18 67/25 68/2
stopped [2]  51/12 67/10
stops [1]  51/23
story [1]  106/10

Street [6]  2/18 2/23 3/3 3/7 126/8 126/17
strike [1]  69/25
strikes [1]  85/18
striking [1]  106/9
struck [10]  80/8 83/12 88/10 92/21 97/12 108/7 108/18 109/6 110/4 110/21
structural [1]  13/5
structure [2]  73/19 123/24
studies [1]  96/18
sub [1]  60/21
subcategories [1]  15/3
subject [5]  32/24 34/6 50/9 66/25 120/11
subjects [1]  7/6
submerged [2]  45/11 45/13
subscribed [2]  125/15 130/16
subscribing [1]  127/2
substantial [2]  92/6 92/18
substantially [1]  91/16
subtopic [1]  41/17
succession [1]  92/3
such [12]  11/16 17/13 27/12 60/1 68/18 77/10 77/12 85/25 94/13 115/4 119/14 124/4
sufficient [4]  99/24 116/13 116/21 119/6
suggest [3]  78/17 100/16 116/16
suggesting [1]  65/22
Suite [6]  2/18 2/23 3/3 3/7 126/8 126/17
supervision [1]  125/11
support [11]  6/10 10/15 12/3 20/2 74/5 78/12 80/11 91/22 102/16 102/17 103/10
supports [1]  104/1
suppose [1]  87/24
supposed [2]  33/7 60/12
SUPREME [18]  1/11 2/11 3/5 47/1 53/7 114/20 117/16 117/19 118/10 118/13 118/14 118/17 119/1 119/6 119/12 119/16 119/21 122/14
sure [18]  9/12 10/11 12/15 13/1 18/7 27/1 28/21 56/3 57/18 58/3 65/8 88/2 89/6 90/18 100/7 115/25 123/4 123/6
surface [3]  45/14 45/17 100/21
surrogate [1]  93/16
surroundings [1]  117/18
sustained [1]  115/12
swing [1]  91/12
sworn [2]  5/2 125/6
synonomous [2]  15/23 16/2
systems [3]  19/1 19/3 19/6

## T

take [19]  14/17 24/1 24/4 31/4 43/3 45/4 47/6 50/20 58/4 58/12 61/22 62/6 62/10 64/15 90/16 105/6 114/24 119/2 119/4
taken [13]  1/16 4/4 4/15 70/6 70/9 70/12 70/17 70/23 71/16 73/18 73/21 125/9 126/14
takes [1]  113/8
taking [1]  115/9
talk [9]  7/24 17/3 18/17 35/4 47/20 50/12 61/22 70/15 95/24
talked [5]  26/14 29/4 44/18 48/1 84/22
talking [11]  23/4 33/25 36/15 61/14 64/24 70/14 78/2 95/25 103/21 122/11 123/20
tall [2]  74/21 88/7
task [3]  16/11 24/8 81/7
tasks [4]  16/6 16/12 24/2 36/25
Tech [2]  19/7 19/11
telephone [2]  66/1 66/4
tell [18]  5/3 6/24 12/16 18/22 23/1 30/6 40/9 44/10 53/1 64/9 78/9 79/10 91/7

tell... [5]  95/15 96/19 105/14 111/7
 115/18
tells [1]  60/18
ten [5]  8/4 9/1 47/15 47/18 54/10
tended [2]  8/13 15/24
tends [1]  12/7
term [1]  33/19
terms [1]  115/18
terrain [1]  107/17 107/25 108/5
test [1]  76/24
tested [1]  77/7
testified [25]  10/23 11/25 12/12 12/17
 17/21 51/11 71/3 75/19 78/21 83/4 88/20
 90/6 91/14 92/24 93/23 96/9 99/7 99/8
 99/23 102/19 102/25 112/1 117/16
 120/14 121/22
testifies [1]  85/18
testify [6]  10/15 17/9 17/22 104/18
 113/22 125/6
testimony [88]  6/5 8/21 10/13 10/19 11/2
 11/3 11/4 11/5 11/7 11/10 11/22 12/9
 12/15 12/16 12/25 16/20 16/23 17/3
 17/10 17/15 18/2 24/21 25/8 25/14 39/7
 39/15 40/24 41/11 41/23 42/5 42/23 47/5
 50/16 51/16 52/7 53/15 53/18 55/1 55/6
 67/13 71/8 71/19 72/16 75/7 75/12 75/16
 77/3 77/4 78/17 82/24 83/7 83/25 88/23
 90/11 92/17 92/20 93/2 93/11 94/19 95/3
 97/6 97/19 97/23 98/3 102/8 104/10
 105/5 106/11 108/10 110/14 110/16
 111/1 111/8 112/10 112/11 112/13 115/6
 117/4 117/9 117/14 117/23 118/3 119/10
 119/11 119/11 119/19 121/21 125/12
testing [2]  76/21 78/2
than [29]  6/15 10/9 12/11 12/22 16/15
 28/2 36/12 39/9 41/7 41/14 48/22 50/12
 54/10 58/23 59/3 73/6 76/21 81/16 83/3
 84/22 85/19 108/13 111/4 111/8 112/10
 113/11 116/18 118/23 119/5
Thank [3]  90/19 122/2 122/16
that [936]
that's [41]  5/22 7/25 9/24 10/9 19/24
 23/16 27/2 29/8 29/21 43/2 43/20 43/24
 44/2 47/14 50/22 53/16 53/16 62/10
 65/25 67/12 71/11 80/6 82/3 82/16 83/12
 84/5 91/22 92/14 94/19 100/11 102/14
 107/7 110/5 112/1 115/2 115/3 120/21
 121/15 122/15 124/7 124/13
their [25]  16/17 18/18 22/1 23/18 23/18
 36/10 36/11 36/25 37/2 37/8 39/18 42/10
 52/2 53/4 62/19 64/21 66/13 66/17 71/18
 73/21 93/20 107/2 107/2 118/2 118/15
them [13]  7/10 15/3 42/3 46/5 48/20 51/3
 56/13 58/14 63/10 66/1 66/7 99/1 99/2
then [56]  5/22 6/2 14/13 19/15 20/1
 22/14 26/6 27/5 27/23 29/4 29/6 32/14
 35/10 45/4 46/1 46/3 63/25 64/1 64/14
 66/25 67/14 68/17 70/22 74/1 74/14
 74/15 74/20 75/16 75/20 75/21 77/6 78/2
 78/23 85/21 90/23 94/16 97/2 97/17
 97/25 98/3 99/7 105/2 105/25 106/6
 106/16 106/24 107/15 109/11 109/20
 112/17 114/4 115/8 120/19 121/1 121/5
 124/9
theories [2]  113/18 114/5
theory [3]  95/6 106/20 120/24
there [193]
there's [2]  93/6 116/24

thereabouts [1]  13/20
thereof [1]  71/3
therefore [3]  6/9 57/8 116/8
thereto [1]  127/3
thereupon [1]  125/8
these [8]  21/6 53/9 70/16 70/23 71/15
 104/15 121/19 124/4
they [80]  6/12 9/21 9/21 16/14 19/11
 19/12 23/7 23/22 24/2 24/3 26/12 31/1
 31/4 33/1 33/6 33/7 33/8 36/2 36/3 36/11
 36/17 41/3 41/4 41/18 42/7 42/12 45/12
 45/13 45/19 45/23 46/3 51/5 52/2 53/10
 56/8 56/9 56/10 62/22 63/1 63/1 63/4
 63/5 63/5 63/6 63/10 63/12 63/19 64/2
 64/9 64/11 64/12 64/21 64/23 65/3 65/4
 65/6 65/10 65/18 65/20 66/9 66/10 66/14
 66/16 66/17 66/18 70/6 70/12 71/20
 71/22 71/25 71/25 94/15 102/11 102/12
 113/18 113/22 113/22 114/7 119/12
 123/7
they're [6]  16/6 16/7 21/21 36/10 102/13
 107/19
thing [2]  19/10 103/20
things [10]  17/13 26/9 26/11 26/15 49/14
 52/22 84/23 97/5 98/18 122/12
think [39]  7/15 13/18 18/6 23/10 30/19
 32/7 32/11 33/17 33/22 42/7 49/10 50/17
 51/7 52/23 54/9 56/12 56/15 56/19 60/7
 60/9 61/21 61/24 62/11 66/11 67/23
 70/25 71/3 73/11 80/10 80/15 84/23 85/7
 87/15 87/17 92/1 107/9 107/14 114/15
 123/19
third [6]  1/9 1/13 2/9 2/13 22/20 25/24
THIRD-PARTY [4]  1/9 1/13 2/9 2/13
thirty [1]  126/18
this [87]  4/15 4/19 4/21 6/5 10/16 12/9
 16/19 23/3 23/16 27/21 28/8 30/14 32/24
 36/7 39/11 39/21 40/11 40/13 40/14
 40/17 41/12 42/11 43/1 44/16 47/4 49/3
 51/15 54/4 54/19 55/5 56/15 59/21 60/6
 63/8 66/22 66/25 68/1 68/6 68/12 68/19
 70/3 74/7 74/7 75/13 76/9 76/16 77/9
 79/16 81/12 83/8 85/22 86/4 88/9 89/23
 90/10 91/14 93/4 94/15 94/22 97/1 98/23
 102/15 103/16 104/2 104/6 104/11 105/6
 107/3 107/5 109/21 112/25 113/20 114/5
 114/23 115/5 115/23 116/3 117/24
 118/20 121/15 122/21 123/19 125/8
 125/15 130/5 130/6 130/16
thorough [1]  41/14
those [19]  15/21 17/9 21/22 29/15 34/9
 48/25 52/22 52/23 55/25 64/17 67/24
 73/7 73/24 75/7 77/6 97/14 112/12 114/4
 118/13
though [7]  43/2 46/17 61/18 77/15 79/15
 102/15 108/2
thought [4]  49/22 71/7 74/6 109/18
thousands [1]  106/25
three [3]  11/2 15/21 39/19
through [13]  24/22 32/15 56/13 56/22
 57/6 57/11 58/8 76/18 76/23 103/23
 103/25 104/18 116/18
throughout [3]  46/22 73/1 127/4
thus [6]  51/5 32/5 32/13 50/9 69/12 84/4
tibia [1]  96/20
tibia-fibula [1]  96/20
tilt [1]  12/7
time [35]  11/21 12/9 20/21 27/21 32/11
 32/23 42/21 43/1 45/1 46/19 51/22 54/4
 54/16 55/5 58/9 58/19 68/2 69/12 70/9

70/19 70/21 71/15 71/21 72/3 72/20
 72/23 73/3 92/10 96/7 105/7 109/21
 110/22 115/19 120/1 123/3
times [10]  11/1 53/21 53/24 54/1 54/5
 54/10 54/17 68/8 68/18 114/22
TMS [51]  1/6 1/8 2/6 2/8 2/21 4/12 21/13
 22/5 22/19 22/19 23/22 25/13 28/2 28/6
 28/8 28/12 29/25 32/1 39/6 40/10 40/21
 40/25 41/8 41/14 46/14 46/15 46/20
 46/24 48/10 48/15 48/19 48/22 51/8 53/7
 53/25 54/21 56/16 56/19 56/24 57/5 57/9
 58/1 58/4 58/12 62/19 66/3 66/5 66/14
 66/19 71/17 126/11
TMS's [1]  39/3
today [10]  9/21 18/13 18/14 23/4 54/5
 54/15 82/24 98/12 110/13 111/9
told [6]  7/17 47/23 51/13 64/11 69/3
 69/16
too [5]  23/10 23/12 24/12 24/16 100/11
took [5]  19/8 55/17 92/16 115/19 119/5
top [5]  13/18 78/8 78/25 79/2 81/21
topics [1]  17/9
touched [1]  97/3
touching [1]  125/7
tough [1]  115/20
towards [7]  83/22 83/23 84/5 88/22
 91/25 103/11 104/11
track [2]  11/20 17/13
traffic [1]  58/13
training [18]  14/4 14/12 14/19 15/5 19/3
 19/15 19/16 26/17 47/2 52/3 116/13
 116/22 117/16 118/12 118/14 118/23
 119/6 119/17
transcribed [1]  125/10
transcript [6]  126/14 126/15 126/18
 127/1 127/4 130/5
transcription [1]  125/11
transitioned [1]  7/11
transpired [1]  75/17
travel [7]  18/1 35/7 35/24 69/7 69/11
 103/12 123/23
traveled [1]  18/5
traversed [2]  31/12 59/15
traversing [2]  34/11 77/2
trial [5]  4/21 11/4 11/6 16/21 17/8
tried [5]  39/8 88/20 97/3 97/16 101/11
tries [1]  86/9
trip [13]  77/9 84/20 85/5 85/14 90/25
 91/9 91/10 91/13 93/16 93/19 96/16
 101/18 105/11
tripped [3]  95/18 100/14 106/5
tripping [2]  96/12 115/11
trips [3]  78/18 99/16 108/11
truck [58]  30/25 31/12 32/3 32/13 36/9
 36/24 37/2 37/3 37/8 37/8 41/5 44/20
 44/22 46/13 46/18 46/21 48/17 49/5 51/8
 51/12 51/15 51/23 51/24 52/6 52/8 52/11
 52/16 53/6 53/10 54/20 54/23 56/14
 57/22 57/25 60/2 60/6 60/19 61/12 61/13
 61/14 61/18 62/8 63/7 63/25 65/10 65/13
 65/16 65/24 66/13 68/2 116/10 118/7
 118/22 118/25 119/14 123/18 124/1
 124/3
trucking [12]  1/11 2/11 3/5 48/25 49/3
 50/4 52/17 52/19 53/2 114/21 119/17
 119/22
trucks [6]  32/12 37/4 44/24 45/25 46/2
 65/1
true [7]  60/7 113/18 113/18 116/14 121/7
 125/12 130/6

**T**

truth [4]  5/3 5/3 5/4 125/6
try [9]  7/14 18/20 48/10 57/23 61/22 68/8
93/16 111/23 115/21
trying [21]  24/19 25/12 31/22 38/2 51/17
59/4 59/10 60/5 61/7 69/14 70/11 73/4
76/12 77/15 83/11 87/3 91/23 94/22
109/5 110/2 110/20
turns [1]  97/24
twist [3]  91/15 91/21 91/24
twisted [7]  78/13 78/23 85/15 97/11
108/1 108/3 111/13
twisting [9]  78/19 91/15 91/17 92/5 92/18
96/3 96/8 109/11 121/18
two [18]  11/2 13/16 39/19 43/10 57/17
64/16 64/18 75/7 77/6 78/11 81/20 84/23
89/9 89/12 97/14 103/18 104/1 124/15
two-step [1]  13/16
type [9]  14/21 15/11 34/19 79/14 89/19
93/20 93/22 98/18 112/24
types [1]  53/9
typical [3]  89/25 123/25 124/7
typically [2]  68/7 68/8

**U**

umbrella [1]  22/2
under [33]  21/20 22/2 33/10 34/7 35/14
37/5 40/10 40/16 52/22 52/23 53/14 56/5
74/14 74/19 75/19 82/12 86/10 86/18
86/24 88/20 88/21 94/22 101/11 102/16
102/18 103/7 106/14 106/20 110/2
110/20 111/23 117/13 125/11
underneath [7]  29/22 31/19 100/22
102/25 103/1 104/22 123/22
understand [12]  48/21 50/5 53/3 55/15
57/16 59/23 79/15 80/25 97/8 99/18
112/3 112/9
understanding [62]  6/3 9/15 24/22 25/1
30/12 30/24 31/11 36/11 36/21 37/15
38/9 38/19 38/22 38/25 39/12 40/1 40/9
41/8 45/12 45/14 45/18 45/25 46/2 46/7
46/16 46/19 48/12 56/20 57/24 58/18
59/25 64/11 65/15 67/12 67/21 70/5 70/8
71/11 71/24 75/3 75/6 77/9 83/16 83/17
88/16 89/24 96/12 96/21 99/3 99/16
103/22 104/14 104/21 105/3 113/9 115/7
115/9 115/10 115/11 116/7 119/21 124/5
understood [1]  46/15
undertook [2]  19/15 101/7
underwater [5]  37/12 37/14 38/8 38/10
38/12
uneven [5]  97/11 100/21 107/17 107/24
108/4
unfortunately [2]  69/1 92/12
unintended [1]  34/18
UNITED [7]  1/1 1/12 2/1 2/12 3/1 4/10
64/15
unless [1]  124/14
unobstructed [1]  37/4
unpack [1]  7/16
unreasonable [1]  43/3
unsafe [6]  43/24 44/2 44/3 55/23 116/8
118/24
unwitnessed [1]  75/13
up [20]  7/15 23/21 37/16 45/7 49/11 50/5
50/15 50/25 51/22 63/8 82/12 95/5 98/22
102/21 109/19 110/3 110/21 111/24
112/4 123/2
up-to-date [1]  123/7
upon [8]  7/10 39/25 52/11 54/14 116/20
124/10 125/9 127/2
upper [1]  126/1
upright [3]  102/10 102/13
ups [1]  122/18
upward [9]  86/22 87/8 87/18 88/5 106/2
106/14 108/24 109/24 120/16
us [9]  6/13 8/16 10/15 11/23 11/23 12/16
50/12 79/15 123/7
use [4]  9/22 37/8 76/15 126/15
used [4]  15/24 32/6 41/8 52/5
useful [1]  34/17
using [8]  26/16 30/25 31/12 32/9 33/18
48/9 123/17 123/18
usual [3]  58/23
usually [3]  35/7 52/2 90/25
utilized [1]  76/23

**V**

various [1]  40/6
vehicle [20]  13/4 15/9 15/16 25/15 38/24
47/24 48/2 48/4 48/7 49/9 50/18 50/20
50/21 50/22 50/24 55/14 60/12 62/17
66/24 67/11
vehicles [5]  23/18 32/4 36/10 36/12 37/2
velocity [1]  112/16
venue [1]  12/17
verbal [1]  62/18
verse [1]  11/19
version [1]  86/3
versus [4]  103/23 105/1 105/4 111/1
vertical [2]  103/18 104/1
very [5]  45/2 85/19 112/4 112/7 114/15
via [7]  1/16 2/17 2/21 3/1 3/6 4/3 5/2
vicinity [2]  88/19 111/11
video [2]  68/21 73/21
view [2]  29/22 124/6
violation [1]  119/25
violations [3]  28/2 28/9 28/13
Virginia [2]  19/6 19/11
visible [1]  45/16
visit [9]  68/5 68/7 68/14 68/17 69/4 69/9
69/15 69/18 69/23
visual [13]  44/5 44/9 44/17 44/21 45/19
45/22 45/23 47/21 47/23 48/14 60/23
61/1 65/20
Vitae [1]  3/16

**W**

waived [3]  4/14 4/23 124/22
walk [22]  31/22 32/14 32/17 33/1 35/12
36/4 36/11 36/17 36/24 37/8 47/10 57/6
59/1 59/6 59/10 61/2 76/23 101/11
103/18 103/19 116/18 116/18
walked [5]  24/22 102/25 103/22 103/25
116/9
walking [20]  33/6 55/24 56/5 56/21 57/11
75/20 78/11 92/9 92/10 101/15 102/8
102/9 102/12 102/13 102/14 102/20
103/7 104/18 111/10 116/9
walks [2]  35/16 35/18
walkway [44]  26/19 27/2 27/4 27/15
27/22 28/16 28/23 28/24 29/3 29/19
29/22 30/7 30/8 30/17 30/21 31/3 31/9
32/6 33/13 33/22 34/8 34/16 34/20 34/22
35/1 35/4 35/5 35/10 35/10 35/15 35/17
35/19 35/21 35/22 35/23 36/2 36/5 36/6
36/16 37/23 58/7 58/17 58/24 59/14
walkways [8]  29/14 29/15 29/24 30/4
30/9 35/6 35/13 36/13
want [12]  8/17 47/6 47/9 47/12 47/13

47/17 47/20 70/19 78/6 100/8 115/24
117/8
wanted [2]  17/2 122/12
wants [1]  124/15
warned [1]  26/20
warning [2]  26/16 42/13
warranted [2]  68/9 68/15
was [294]
was 2007 [1]  13/19
wasn't [20]  19/19 31/7 32/9 40/3 40/12
41/16 46/6 55/2 55/13 64/20 65/13 69/1
88/25 90/15 93/10 97/25 99/19 102/8
113/16 119/18
water [89]  22/18 22/23 23/16 23/23 24/4
24/6 24/20 24/23 24/24 25/2 25/6 25/9
29/18 29/23 31/10 31/13 31/14 31/16
31/20 31/24 32/8 32/19 33/3 33/11 33/12
33/19 33/21 33/25 34/12 34/15 34/16
34/18 34/19 34/19 34/22 34/24 35/1
37/19 39/2 39/6 39/8 39/11 39/14 39/16
39/24 40/1 40/3 40/11 44/15 44/16 45/6
45/8 45/9 45/15 45/17 45/21 47/13 51/10
57/14 57/21 60/22 61/3 61/4 67/19 67/20
67/22 70/20 70/22 71/1 71/6 71/14 71/17
71/20 71/23 72/1 72/4 72/21 73/6 73/6
73/12 100/10 100/14 100/22 104/5
104/19 104/20 104/23 105/4 116/18
waters [25]  23/6 23/8 25/12 32/15 32/22
33/4 34/5 34/9 37/15 37/25 41/9 56/12
56/18 56/22 57/1 57/7 57/11 57/23 58/6
58/9 60/22 100/16 123/21 123/22 124/5
way [26]  12/7 26/17 37/16 68/18 75/25
76/7 77/18 86/7 86/14 86/15 86/25 93/6
95/16 95/20 96/16 100/1 100/8 100/13
103/2 104/2 106/5 106/6 109/19 109/23
112/22 118/24
ways [5]  16/17 23/15 48/8 63/8 63/10
we [42]  7/24 8/9 8/12 8/17 13/2 17/21
23/4 23/17 26/14 29/4 34/15 35/4 43/8
45/4 47/15 50/20 51/21 58/25 59/16
61/13 64/7 66/21 68/10 68/10 68/11 69/6
75/16 80/15 81/10 81/19 84/22 87/10
90/14 90/16 102/14 105/2 106/23 120/13
123/1 123/2 123/3 124/20
we'd [1]  116/4
We'll [1]  124/14
we're [8]  33/18 63/15 63/15 87/11 93/12
107/18 121/20 123/20
weapon [1]  81/3
wear [1]  119/23
wearing [2]  120/3 121/5
weighed [3]  46/1 46/3 46/4
weightbearing [2]  105/11 105/20
well [101]  7/15 10/25 11/22 12/4 16/23
21/8 22/4 22/13 23/2 23/7 23/20 24/5
24/18 26/2 26/13 27/6 28/12 29/1 29/12
30/12 30/24 31/6 32/7 32/25 33/12 33/25
34/5 35/6 35/9 35/11 35/21 36/6 37/1
39/12 40/23 44/11 45/3 46/24 48/3 48/21
50/10 50/14 51/7 51/17 53/1 53/2 53/13
53/16 53/21 53/25 54/9 54/14 54/19 55/8
57/13 59/20 60/8 61/18 61/24 63/5 64/9
67/7 70/8 72/8 73/4 73/23 75/6 75/13
76/6 76/17 76/25 77/20 79/7 80/23 81/10
83/11 83/15 85/4 87/12 88/13 89/19
90/11 96/2 96/21 96/25 97/22 98/5 98/14
98/22 103/14 107/10 107/14 109/22
110/8 110/12 111/3 111/10 112/1 114/25
118/4 123/19
went [8]  9/1 30/21 48/12 64/9 74/16

**W**

went... [3]  74/19 75/19 93/3

were [96]  7/18 8/5 8/8 8/9 8/20 11/24
12/17 19/3 19/18 19/23 23/7 23/22 24/2
30/13 30/25 31/13 32/1 33/1 33/9 34/6
34/7 36/13 37/25 38/9 38/22 39/1 39/22
39/22 39/23 41/1 41/5 41/9 41/20 41/24
42/2 42/14 44/6 44/9 44/10 44/15 44/18
44/23 45/11 45/12 45/13 45/24 47/21
47/23 48/8 48/11 49/8 49/14 50/6 51/2
51/19 51/19 56/9 56/10 58/10 58/16
58/20 59/23 61/19 61/25 62/11 63/6 64/6
64/12 65/20 65/22 67/24 69/3 69/13
69/20 70/6 70/9 70/12 70/17 70/23 71/15
71/20 72/4 72/18 73/18 74/4 76/10 77/11
84/23 92/9 92/9 93/1 93/8 104/15 115/21
119/13 122/11

weren't [8]  30/4 32/12 44/25 45/20 64/2
64/12 64/24 115/22

West [2]  2/23 126/8

wet [3]  44/13 72/11 72/17

what [155]

what's [9]  6/15 39/12 54/6 73/7 82/7 91/8
95/15 95/18 104/13

whatever [6]  18/24 33/1 47/16 51/1
105/21 105/23

when [74]  5/21 7/24 7/24 8/20 11/3
14/10 17/4 20/21 21/18 30/8 30/24 35/4
36/10 40/24 41/9 41/20 42/1 42/20 44/18
45/6 45/7 45/8 49/11 50/2 50/5 50/14
50/20 50/25 52/2 53/19 55/4 55/10 55/21
56/17 56/25 59/10 60/14 61/13 62/16
64/9 65/4 68/9 70/6 70/11 71/12 71/18
72/5 72/9 72/12 73/6 77/17 78/17 84/10
87/10 87/12 87/13 87/16 87/23 91/18
94/15 95/5 95/24 97/3 97/3 97/4 99/1
102/1 102/11 103/5 104/13 105/9 111/22
118/9 123/16

where [46]  8/23 10/1 16/8 17/23 18/4
18/10 18/20 24/23 27/10 27/14 30/6
35/16 38/14 38/14 44/19 48/15 49/9
50/22 58/24 62/8 67/10 67/18 68/15
68/19 71/6 79/18 82/16 86/9 88/9 88/14
88/17 88/22 89/12 96/14 102/22 104/14
104/15 105/9 105/15 108/10 111/11
114/2 115/5 117/8 120/18 121/23

wherein [2]  4/11 42/23

WHEREOF [1]  125/14

whether [35]  11/10 11/18 11/24 16/20
21/18 33/21 34/3 34/13 34/18 36/3 40/14
40/20 41/14 42/12 46/8 47/2 51/24 52/15
54/15 54/16 55/9 55/13 56/9 58/9 67/23
72/14 77/12 77/18 79/10 86/23 100/20
101/4 105/8 105/8 113/18

which [38]  5/25 6/8 7/11 8/13 9/8 13/9
16/7 18/21 19/20 27/7 38/25 39/10 41/10
48/11 53/10 58/13 63/25 70/13 73/24
77/22 78/1 78/18 78/19 78/25 85/1 85/15
91/11 97/10 98/14 104/7 106/8 115/25
116/1 117/17 118/18 121/16 121/17
124/16

while [8]  16/10 24/19 25/5 37/3 62/19
86/18 101/14 113/7

who [20]  10/12 10/13 10/14 10/15 10/16
11/8 11/9 13/11 19/17 22/15 39/8 60/4
60/4 69/13 109/3 118/14 118/21 118/23
122/13 125/5

whoever [2]  28/16 29/9

whole [2]  5/3 65/8

why [16]  23/1 23/12 35/20 38/25 43/8
46/8 48/12 68/3 68/13 87/6 94/25
107/21 112/6 113/5 121/9

will [4]  16/15 45/4 90/20 114/15

within [17]  7/4 7/22 19/5 20/16 26/3 54/3
69/12 86/2 86/5 86/17 92/2 100/14
107/10 108/6 119/11 123/24 126/18

without [11]  18/18 33/19 37/5 58/8 86/14
95/12 100/12 105/15 109/25 120/20
126/18

witness [9]  6/9 10/8 10/13 115/5 125/13
125/14 127/19 128/21 129/22

witnesses [2]  39/13 93/1

word [2]  84/14 91/4

words [2]  50/1 91/6

work [28]  6/17 6/19 8/3 10/8 10/8 11/15
11/17 12/10 12/11 15/25 18/9 19/24 20/3
20/18 21/18 21/20 21/25 22/5 22/10
22/13 22/13 25/18 26/21 28/23 40/15
40/18 42/24 119/22

worked [7]  7/19 7/21 8/8 9/6 46/20 46/24
118/10

workers [1]  35/2

workers' [1]  82/20

working [5]  8/5 9/1 14/20 19/17 53/7

workplace [4]  18/11 19/19 19/20 19/22

workplaces [1]  19/8

world [1]  68/24

would [226]

wouldn't [12]  16/25 20/17 55/8 64/1
66/25 97/25 101/3 101/7 105/10 105/19
121/12 121/12

wound [1]  79/14

written [1]  93/8

wrote [1]  111/19

**Y**

yard [1]  64/16

Yeah [3]  6/21 7/15 98/9

year [2]  9/7 69/2

years [10]  6/9 8/4 9/1 14/18 46/12 46/13
53/6 53/8 118/7 118/11

yes [84]  5/19 5/23 6/6 6/14 8/2 9/3 9/5
10/21 12/23 18/3 18/11 20/7 20/14 21/11
21/15 21/21 22/2 24/10 25/19 25/22 26/5
26/10 29/17 31/18 31/21 35/3 37/10
43/19 43/21 44/4 46/2 47/8 47/18 48/23
51/4 53/18 55/24 56/7 56/13 57/12 64/17
66/20 67/16 68/8 73/13 74/13 74/18 75/8
75/15 75/18 75/23 80/22 81/14 81/18
81/22 82/2 82/17 88/15 89/10 90/13 92/5
92/23 94/5 94/9 94/19 94/24 101/25
102/11 102/19 103/11 103/22 105/2
113/10 114/8 114/16 116/11 116/24
117/6 117/12 117/22 118/1 119/24 120/1
124/12

Yet [1]  85/16

York [1]  18/6

you [379]

you're [10]  7/15 17/18 52/10 64/24 86/16
95/25 112/7 113/12 123/16 124/10

you've [2]  6/8 114/22

your [107]  5/7 5/10 5/10 5/16 6/1 6/3 6/4
6/15 6/16 6/17 6/21 7/16 7/20 9/2 9/11
11/8 11/18 11/22 17/5 17/10 18/22 20/5
20/16 28/7 29/18 38/14 39/12 39/25 42/4
45/12 49/7 49/22 49/22 50/10 51/1 54/5
54/6 54/14 55/16 57/16 60/12 60/19
62/17 67/4 67/17 68/14 69/15 70/5 70/5
71/11 73/23 74/17 74/24 75/3 75/24 76/8

76/16 78/6 78/6 78/18 80/25 81/23 82/24
83/11 85/15 84/6 84/11 86/3 88/6 91/21
94/3 98/7 98/12 99/4 101/7 104/2 104/13
104/21 105/6 105/24 106/20 108/6
108/14 108/18 109/17 109/20 109/20
112/19 113/10 114/5 115/17 116/4 116/7
117/7 117/8 117/17 117/24 119/2 119/21
120/2 120/6 120/12 120/25 123/2 123/3
124/5 124/6

yourself [2]  18/8 20/8

**Z**

Zigrang [5]  1/21 4/9 125/3 125/19 126/23

Zimmerman [4]  117/5 117/9 117/15
117/15

Zimmermans [1]  117/24

ZOOM [7]  1/16 2/17 2/21 3/1 3/6 4/3 5/2





**ANGELA LEVITAN, Ph.D., CPE**
PROFESSIONAL BIOGRAPHICAL OUTLINE

## BACKGROUND

Dr. Levitan earned a Ph.D. and an M.S. in Industrial and Systems Engineering, with an emphasis in Human Factors Engineering, at Virginia Polytechnic Institute and State University, Blacksburg, Virginia. Dr. Levitan also earned an M.S. in Mathematics from Virginia Polytechnic Institute and State University and a B.A. in Mathematics at The University of Connecticut, Storrs, Connecticut. She is a Certified Professional Ergonomist (CPE). Prior to joining ARCCA, Dr. Levitan spent 10 years working as a research scientist in the Center for Physical Ergonomics at the Liberty Mutual Research Institute for Safety in Hopkinton, Massachusetts. While at the Institute, she developed and conducted research projects in occupational biomechanics and human factors, focusing on the prevention of slips, trips, and falls and determining causal factors of related injuries. Findings were disseminated by Dr. Levitan through peer-reviewed journals, technical seminars, and presentations.

Dr. Levitan has completed research projects examining the mechanisms of balance control and the effect of task and environmental factors. Research projects have included the examination of microslips during gait, lateral reaching while working on stepladders, and postural transitions from non-erect postures to standing. Dr. Levitan investigated the relationship of kinematic, kinetic, and electromyographic data collected during laboratory studies performed on human participants to advance scientific knowledge regarding the interaction between human movement during task performance and the mechanisms of balance control as measured by the center of mass and the center of pressure. In addition to laboratory studies, Dr. Levitan gained valuable experience as part of a diverse interdisciplinary team that included engineers, safety professionals, physiologists, psychologists, and epidemiologists to identify high-risk tasks, particularly those in the construction industry, and potential causal factors of injuries related to falls. As part of the team, Dr. Levitan went on worksite visits, including commercial and residential construction sites, and interacted with various types of employees to obtain an accurate assessment of injury risks.

In addition to her work related to slips and falls, Dr. Levitan has extensive experience related to construction safety (including the New York Labor Laws), distracted walking, gait analysis, slip resistance testing, assessment of physical and mental workload, and effects of dual-tasking on performance. Dr. Levitan is also involved in accident and mishap investigation involving workplace injuries, ladder safety, falls from scaffolding and the biomechanics of injury. Dr. Levitan's work includes site and equipment inspections, applicable code compliance, testing, injury causation and tolerance analysis.

Dr. Levitan's academic and professional experience represents a unique combination of knowledge in slips, trips, and falls, occupational biomechanics, human factors, construction, general worksite safety, live subject kinematic and kinetic testing, and human anatomy. She has published in the areas of postural control, gait analysis, occupational biomechanics, safety, human factors, and ergonomics. Currently, she specializes in slip/trip/fall analysis, construction safety, human factors and ergonomics, and biomechanical and injury causation analysis.

## SUMMARY OF EXPERIENCE

- Investigations of construction and industrial workplace accidents based on safety principles, human factors, proper equipment design and biomechanics.

- Developed and executed testing programs to assess various potential factors of workplace accidents, including personal protective equipment, fall protection, ladders and injury mechanisms.

- Investigations of slip, trip and fall mishaps utilizing expertise in codes, human factors, ergonomics and biomechanics.

PROFESSIONAL BIOGRAPHICAL OUTLINE | Angela Levitan, Ph.D., CPE
Page 2



- Evaluation of OSHA compliance/non-compliance in construction environments and general industry workplace settings.

- Conducted laboratory research studies involving identification techniques of microslips during gait and quantifying kinematic and kinetic differences between normal gait and slip events.

- Conducted laboratory research studies involving data collection from younger and older healthy participants, with a focus on age-related alterations in balance control mechanisms.

- Modified uni-planar methodological techniques for determining stabilization time after the application of an external perturbation during various tasks including manual materials handling, lateral reaching on stepladders, and multi-planar postural transitions.

- Conducted research on the interaction of physical and mental workload, including assessment (objective and subjective) and resource allocation.

## AREAS OF SPECIALTY

- Slip/Trip/Fall Kinematics and Kinetics
- Ladder and Scaffolding Falls
- Injury Causation Biomechanics
- Human Kinematic Analysis and Testing
- Illumination Analysis and Testing
- Balance Control Measurement

- Human Factors and Ergonomics
- OSHA and NYC DOB Certified
- Construction Safety
- Industrial Safety
- Building Code Compliance
- ADA Compliance

## CERTIFICATIONS AND AWARDS

- Certified Professional Ergonomist
- OSHA 30 Hour Outreach Training for the Construction Industry Certification (2013)
- OSHA Fall Protection for the Competent Person Certification (2013)
- OSHA Scaffolding Safety for the Competent Person Certification (2013)
- OSHA 10 Hour Outreach Training Program – General Industry Certification (2015)
- OSHA Industrial Truck Operator Certification (2017)
- NYC DOB 4-Hour Supported Scaffolding User Certification (2015)
- NYC DOB 32-Hour Supported Scaffold Installer/Remover Certification (2015)
- NYC DOB 8-Hour Site Safety Coordinator Training (2016)
- Designated as one of "100 Women Making a Difference in the Safety, Health and Environmental Profession" by ASSE's Women in Safety Engineering (2011)
- National Academies member of the Committee on Review of NIOSH Construction Research Program (invited July 2007)
- Grant Reviewer for NIOSH Study Section Meeting 2019

PROFESSIONAL BIOGRAPHICAL OUTLINE | Angela Levitan, Ph.D., CPE
Page 3



## EDUCATION

**Ph.D. Industrial and Systems Engineering, Human Factors Option** (2003)
Virginia Polytechnic Institute and State University (Virginia Tech), Blacksburg, VA
**Dissertation:** *An investigation on subjective assessments of workload and postural stability under conditions of joint mental and physical demands*

**M.S. Industrial and Systems Engineering, Human Factors Option and Safety Certificate** (1999)
Virginia Polytechnic Institute and State University (Virginia Tech), Blacksburg, VA
**Thesis:** *Finger force capability: measurement and prediction using anthropometric and myoelectric measures*

**M.S. Mathematics Department** (1996)
Virginia Polytechnic Institute and State University (Virginia Tech), Blacksburg, VA

**B.A. Mathematics Department** (1992)
University of Connecticut, Storrs, CT

## PROFESSIONAL EXPERIENCE

**June 2013 – Present | ARCCA, Incorporated | Human Factors/Biomechanics**

- Investigates the cause, nature, and severity of injuries using biomechanics.
- Evaluates slip, trip and fall mishaps including ladder falls, scaffolding falls, and slip resistance testing of walkway surfaces
- Performs analysis of building, industrial and construction codes associated with personal injuries and premise liability
- Applies the principles of human factors and biomechanics to the anatomy and physiology of the human body to explore the cause, nature, and severity of injuries, particularly those caused by slip, trip, and fall incidents.
- Participates in biomechanical investigations involving human volunteers and anthropometric test devices that explore human response to injury mechanisms, tolerance thresholds, and injury prevention.
- Analysis of ingress and egress issues from buildings and vehicles as related to loss of balance and consequential injury risk.
- Provides instruction in the area of slip/trip/fall analysis, human factors, and biomechanical and injury causation analysis.

**August 2003 – May 2013 | Center for Physical Ergonomics (LMRIS) | Research Scientist**

- Developed and conducted research projects in human factors and occupational biomechanics, focusing on the prevention of slips, trips, and falls and determining causal factors.
- Disseminated results to scientific community and customers through peer-reviewed journals, technical seminars, and presentations.
- Accountable for the design and management of research projects and associated team and technical staff.
- Also provided internal and external peer review of publications and presentations.

ARCCA

**August 1999 – July 2003 | Army Research Laboratories | Research Assistant**
- Internship

**January 1998 – August 1999 | National Institute of Occupational Safety and Health| Research Assistant**
- Fellowship

**Summer 1997 | Industrial Ergonomics Laboratory | Research Assistant**
- Internship

## MEMBERSHIPS IN PROFESSIONAL SOCIETIES
- Member, American Society of Safety Professionals
- Member, American Society of Biomechanics
- Member, Human Factors and Ergonomics Society
- Member, ASTM International, F13 Committee, Pedestrian/Walkway Safety and Footwear
- Member, IEA Slips, Trips and Falls Committee
- Member, Ladder Subgroup for National Fall Prevention Campaign (2012-2013)
- Member, NIOSH Fall Prevention Work Group (2011-2013)
- Member, Massachusetts Dept. of Public Health Working Group on Falls in Construction (2008-2013)

## SELECT PUBLICATIONS

**DiDomenico, A.,** Cohen, T.L. and Joganich, T. (2018). Effect of stair tread marking on foot placement during stair descent, in Proceedings of the Human Factors and Ergonomics Society's 2018 International Annual Meeting, Philadelphia, PA.

**DiDomenico, A.** (2018). Lateral reaching on stepladders and the belly button rule, in Proceedings of the XXX[th] Annual Occupational Ergonomics and Safety Conference, Pittsburgh, PA.

Colman, J.H. and **DiDomenico, A.** (2017). A slippery slope: How counsel and experts can work together to detect slip and fall claims fraud, The CLM, April, 14-16.

**DiDomenico, A.** (2016). Injuries resulting from slips and trips on a construction site, The Insurance Research Letter, October, 21-23.

**DiDomenico, A.,** McGorry, R.W. and Banks, J.J. (2016). Stabilization times after transitions to standing from different working postures, Ergonomics, 59(10), 1288-1293.

Li, Z., Chang, C.C., **DiDomenico, A.,** Qi, C., Chiu, S.L. (2015). Investigating gait adjustments and body sway while walking across flexible wooden scaffold boards, Ergonomics, 58(9), 1581-1588.

**DiDomenico, A.,** McGorry, R.W. and Banks, J.J. (2015). Factors affecting time-to-contact during quiet standing, Motor Control, 19(1), 1-9.

**DiDomenico, A.** and Lesch, M.F. (2015). Overreaching on ladders: Motivated to succeed or fail? In Proceedings of the 2012 American society of Safety Engineers PDC, Session No. 763.

**DiDomenico, A.** and Audino, D.C. (2014). Can worker behavior be the cause? How workplace pressure can lead to serious injury, New Jersey Law Journal, October.



DiDomenico, A., McGorry, R.W. and Banks, J.J. (2013). Methodological considerations of existing techniques for determining stabilization times following a multi-planar transition, Gait and Posture, 38(3), 541-543.

Strang A., DiDomenico A., Berg W., McGorry R.W. (2013). Assessment of differenced center of pressure time series improves detection of age-related changes in postural coordination, Gait and Posture, 38(2), 345-348.

DiDomenico, A, and Lesch, M.F. (2013). Taking risks: Reaching on ladders is affected by motivation and acclimation, Professional Safety, Feb, 50-53.

DiDomenico, A., McGorry, R. W. and Banks, J. J. (2012). Determining stabilization time using a negative exponential mathematical model. Proceedings of the American Society of Biomechanics, 35th Annual Meeting of the American Society of Biomechanics, Gainesville, FL.

DiDomenico, A., McGorry, R. W. and Banks, J. J. (2012). Considerations in determining stabilization times following a perturbation. Proceedings of the International Society of Posture and Gait Research, Trondheim, Norway.

DiDomenico, A., McGorry, R. W. and Banks, J. J. (2011). Effects of common working postures on balance control during the stabilisation phase of transitioning to standing, Ergonomics, 54(11), 1053-1059.

Catena, R. D., DiDomenico, A., Banks, J. J. and Dennerlein, J. T. (2011). Balance control during lateral load transfers over a slippery surface, Ergonomics, 54(11), 1060-1071.

DiDomenico, A. and Nussbaum, M. A. (2011). Effects of different physical workload parameters on mental workload and performance. International Journal of Industrial Ergonomics, 41(3), 255-260.

DiDomenico, A., McGorry, R.W., Blair, M.F., and Huang, Y.H. (2011). Losing Balance Upon Standing: Do Construction Workers Perceive the Problem? Professional Safety.

DiDomenico, A., Lesch, M.F. and Chang, C.C. (2011). Effects of motivation and acclimation on lateral reach distances while standing on a stepladder. Proceedings of the National Occupational Injury Research Symposium, Morgantown, WV.

DiDomenico, A., McGorry, R. W. and Banks, J. J. (2011). Are age-related modifications during a squatting task implemented by working-age men? Proceedings of the American Society of Biomechanics, 34th Annual Meeting of the American Society of Biomechanics, Long Beach, CA.

DiDomenico, A., Strang, A. J. and McGorry, R.W. (2011). Changes in postural sway related to age in adults 18-65 years old. Proceedings of the International Society of Biomechanics, Brussels, Belgium.

Catena, R. D., DiDomenico, A., Banks, J.J. and Dennerlein, J.T. et al. (2010). The effect of load weight on balance control during lateral box transfers. Ergonomics, 53(11), 1359-1367.

Strang, A. J. and DiDomenico, A. (2010). Postural Control: Age-related changes in working-age men. Professional Safety, 55(12), 27-3

DiDomenico, A., Gielo-Perczak, K., McGorry, R. W. and Chang, C. C. (2010). Effects of simulated occupational task parameters on balance. Applied Ergonomics, 41, 484-489.

DiDomenico, A., McGorry, R. W., Huang, Y. H., and Blair, M. F. (2010). Perceptions of postural stability after transitioning to standing among construction workers. Safety Science, 48, 166-172.

McGorry, R. W., DiDomenico, A., and Chang, C. C. (2010). The anatomy of a slip: Kinetic and kinematic characteristics of slip and non-slip matched trials. Applied Ergonomics, 41, 41-46.

DiDomenico, A. and McGorry, R. W. (2010). Effects of movement speed and final foot placement on postural imbalance following a postural transition to standing. Proceedings of the American Society of Biomechanics, 34th Annual Meeting of the American Society of Biomechanics, Providence, RI.



**DiDomenico, A.**, Chang, C.C. and Lesch, M.F. (2010). Effects of lateral reaching on the stability of stepladders. Proceedings of the National Institute of Occupational Safety and Health, The 2010 International Conference on Fall Prevention and Protection, Morgantown, WV.

**DiDomenico, A.** and McGorry, R.W. (2010) Imbalance Caused by Transitioning to a Standing Posture. Proceedings of the National Institute of Occupational Safety and Health, The 2010 International Conference on Fall Prevention and Protection, Morgantown, WV.

**DiDomenico, A.** and McGorry, R. W. (2009). Perceptions of stability upon standing from working postures used in the construction industry, in *Proceedings of the 53rd Annual Meeting of the Human Factors and Ergonomics Society*, San Antonio, TX.

**DiDomenico, A.** and McGorry, R. W. (2009). Magnitude of potential vulnerability to balance control after a transition to standing, in *Proceedings of the 2009 Annual Meeting of the American Society of Biomechanics*, State College, PA.

Catena, R. D., **DiDomenico, A.** and Dennerlein, J. T. (2009). Balance control during material handling over a slippery surface, in *Proceedings of the 2009 Annual Meeting of the American Society of Biomechanics*, State College, PA.

**DiDomenico, A.** and McGorry, R. W. (2009). Balance disturbances associated with transitioning to a standing posture, in *Proceedings of the International Society of Posture and Gait Research*, Bologna, Italy.

Catena, R. D., **DiDomenico, A.**, Banks, J. and Dennerlein, J. T. (2009). The effects of a load on balance during lateral load transfers, in *Proceedings of the International Society of Posture and Gait Research*, Bologna, Italy.

**DiDomenico, A.**, McGorry, R. W., Huang, Y. H., and Blair, M. F. (2008). Self-reported postures and task parameters within the construction industry that lead to instability upon standing, in *Proceedings of the National Occupational Injury Research Symposium*, Pittsburgh, PA.

**DiDomenico, A.**, McGorry, R. W., Huang, Y. H., and Blair, M. F. (2008). Perceived Postural Instability Upon Standing - A Possible Influence on Falls Within the Construction Industry, in *Proceedings of the American Industrial Hygiene Conference and Exposition*, Minneapolis, MN.

McGorry, R.W., Chang, C.-C., and **DiDomenico, A.** (2008). To slip or not to slip?: A comparison of matched trials, in *Proceedings of the Ergonomics Society, STF Symposium*, University of Nottingham, UK.

**DiDomenico, A.** and Nussbaum, M. A. (2008). Interactive effects of physical and mental workload on subjective workload assessment. International Journal of Industrial Ergonomics, 38(11-12), 977-983.

**DiDomenico, A.** and Nussbaum, M.A. (2008). Estimation of forces exerted by the fingers using standardized surface EMG. Ergonomics, 51(6), 858-871.

McGorry, R. W., Chang, C. C. and **DiDomenico, A.** (2008) Rearward movements of the heel at heel strike. Applied Ergonomics, 39(6), 678-684.

**DiDomenico, A.**, McGorry, R. W. and Chang, C. C. (2007). Association of subjective ratings of slipperiness to heel displacement following contact with the floor. Applied Ergonomics, 38(5), 533-539.

McGorry, R. W., **DiDomenico, A.** and Chang, C. C. (2007). The use of a heel mounted accelerometer as an adjunct measure of slip distance. Applied Ergonomics, 38(3), 369-376.

**DiDomenico, A.**, Gielo-Perczak, K., McGorry, R. W. and Chang, C.-C. (2007). Limitations of postural stability ratings, in *Proceedings of the 51st Annual Meeting of the Human Factors and Ergonomics Society*, Baltimore, MD. pp. 1219-1223.

**DiDomenico, A.** and Matz, S. (2007). Multiple locomotor adjustments required during goal-directed walking, in *Proceedings of the International Conference on Slips, Trips and Falls 2007: From Research to Practice,* Hopkinton, MA. pp. 40-44.

**DiDomenico, A.**, Gielo-Perczak, K., McGorry, R. W. and Chang, C.-C. (2007). Influences of center of pressure and body segment movements on perceived postural stability, in *Proceedings of the 18th International Society for Posture and Gait Research Conference*, Burlington, VT. pp. TP-71.

Gielo-Perczak, K., Maynard, W., and **DiDomenico, A.** (2006). Multidimensional Aspects of Slips and Falls. In R.C. Williges (Ed.), Reviews of Human Factors and Ergonomics Volume 2 (pp. 165-194). Santa Monica, CA: Human Factors and Ergonomics Society.

**DiDomenico, A.** (2006). Accommodating slips and falls hazards using anticipatory locomotor adjustments, in *Proceedings of the Human Factors and Ergonomics Society*, San Francisco, CA. pp. 1346-1350.

**DiDomenico, A.** (2006). Anticipatory locomotor adjustments during goal-directed walking, in *Proceedings of the 30th Annual Meeting of the American Society of Biomechanics*, Blacksburg, VA.

McGorry, R.W., Chang, C.-C., and **DiDomenico, A.** (2006). Rearward heel movements at heel strike during normal walking, in *Proceedings of the 16th World Congress on Ergonomics*, Maastricht the Netherlands.

**DiDomenico, A.** and Nussbaum, M. A. (2005). Interactive effects of mental and postural demands on subjective assessment of mental workload and postural stability. Safety Science, 43, 485-495.

**DiDomenico, A.**, McGorry, R. W. and Chang, C.-C. (2005). Biomechanics of a micro-slip, in *Proceedings of the Human Factors and Ergonomics Society*, Orlando, FL. pp. 1297-1301.

**DiDomenico, A.**, McGorry, R.W. and Chang, C.-C. (2005). The effects of age and gender on the biomechanics of slips not leading to a fall, in *Proceedings of the XIX Annual International Occupational Ergonomics and Safety Conference*, Las Vegas, N.V. pp. 460-466.

**DiDomenico, A.** and McGorry, R. W. (2004). Relationship between slip distance and perceptions of slipperiness and stability, in *Proceedings of the Human Factors and Ergonomics Society*, New Orleans, LA. pp. 1449-1453.

McGorry R. W., **DiDomenico A.**, Chang C. C. (2004) The use of an accelerometer to discriminate non-slips, mini-slips and slides during human gait. In *Proceedings of the 7th World Conference on Injury Prevention and Safety Promotion*, Vienna, Austria, p492.

**DiDomenico, A.** and Nussbaum, M. A. (2004) Postural stability ratings as a predictor of postural sway. In *Proceedings of the Ninth Annual Gait and Clinical Movement Analysis Society Meeting,* Lexington, KY. pp. 142-143.

**DiDomenico, A.** and Nussbaum, M.A. (2003) Effects of mental workload on objective and subjective measures of postural stability, in *Proceedings of the Human Factors and Ergonomics Society*, Denver, CO. pp.1145-1149.

**DiDomenico, A.** and Nussbaum, M. A. (2003). Measurement and prediction of single and multi-digit finger strength. Ergonomics, 46(15), 1531-48.

**DiDomenico, A.** and Nussbaum, M.A. (2000) Prediction of single and multi-digit forces from standardized forearm EMG measures, in *Proceedings of the 19th Southern Biomedical Engineering Conference*, Blacksburg, VA, p.31.

**DiDomenico, A.**, Nussbaum, M.A. and Kroemer, K.H.E. (1998). Measurement and Prediction of Finger Forces, in *Advances in Occupational Ergonomics and Safety 2: Proceedings of the International Occupational Ergonomics and Safety Conference*, Ypsilanti, MI, Kumar, S. (ed.), IOS Press, Amsterdam, pp. 386-389.

**DiDomenico, A.** and Nussbaum, M.A. (1998) Intraabdominal Pressure, in *Industrial and Occupational Ergonomics: Users Encyclopedia*, Mital, A. (ed.), The International Journal of Industrial Engineering.



**ARCCA, INCORPORATED**
2288 SECOND STREET PIKE
P.O. BOX 78
PENNS PARK, PA 18943
**PHONE** 215-598-9750 **FAX** 215-598-9751
www.arcca.com

EXHIBIT

PLTF'S EX. 2  6-22-21  RZ

February 19, 2021

Siobhan M. Murphy, Esquire
Lewis, Brisbois, Bisgaard & Smith, LLP
550 West Adams Street
Suite 300
Chicago, IL 60661

Re:  *Liss, Steven v. TMS International, Inc.*
ARCCA File No.: 3298-330

Dear Ms. Murphy:

Thank you for the opportunity to participate in the above-referenced matter. Your firm hired ARCCA, Incorporated to perform an analysis of the subject fall incident in relation to Mr. Steven Liss. This analysis is based on information currently available to ARCCA and is only to be issued in its entirety. However, ARCCA reserves the right to supplement or revise this information if additional material becomes available.

The opinions given are based on my analysis of the available materials using scientific and engineering methodologies generally accepted in the scientific community. These opinions are also based on my education, experience, background, and knowledge of biomechanics, safety, human factors and kinematics, and human injury mechanisms and tolerance. I am presently employed as a Senior Biomechanist for an engineering firm known as ARCCA, Inc. I obtained a Doctor of Philosophy degree in Industrial and Systems Engineering, Human Factors Option from Virginia Tech and a Master of Science degree in Industrial and Systems Engineering, with an emphasis in Safety Engineering from Virginia Tech. I also received a Master of Science degree in Mathematics from Virginia Tech and a Bachelor of Arts in Mathematics from the University of Connecticut. I have completed advanced coursework in the fields of musculoskeletal biomechanics, human factors, safety, kinesiology, physiology, ergonomics, occupational biomechanics, and impact biomechanics. I am a Certified Professional Ergonomist (CPE) and a member of the American Society of Biomechanics, American Society of Safety Professionals, Human Factors and Ergonomics Society, ASTM International F13 Committee on Pedestrian/Walkway Safety, and IEA Slips, Trips and Falls Committee. I was a National Academies member of the Committee on Review of the NIOSH Construction Research Program, NIOSH Study Section Grant Reviewer, and in 2011 was designated as one of "100 Women Making a Difference in the Safety, Health and Environmental Profession" by ASSE's Women in Safety Engineering.

While at Virginia Tech, I taught courses to both undergraduate and graduate students related to Human Factors Engineering, Industrial Engineering, and Occupational Biomechanics. I performed experimental three-dimensional motion analyses, as well as extensive kinematic and kinetic studies of the human body. My testing and research have been performed with human subjects. These tests and research studies have added to my formal education in biomechanics and injury causation. As such, I am very familiar with the theory and application of human tolerance to the areas of slip, trip, and fall incidents and ergonomics, as well as the techniques and processes for evaluating mechanisms of injury using scientifically accepted techniques to assess the potential for injury during a particular incident.



Upon graduating from Virginia Tech, I worked for approximately 10 years at the Liberty Mutual Research Institute for Safety in Hopkinton, Massachusetts. During my tenure at Liberty Mutual, I completed multiple research projects that examined the mechanisms of balance control on level and elevated surfaces, including slips and falls, and working on ladders. This included the influence of individual, task, and environmental factors. Completion of these projects required knowledge, use, and application of ANSI and ASTM standards to accurately translate real-world situations to laboratory scenarios and apply laboratory findings to real-world circumstances and conditions. Motivation for the research projects was partially derived from the construction industry and integrated site visits and consultations with field representatives.

I also have extensive experience related to distracted walking, assessment of physical and mental workload, and effects of dual-tasking on performance. I have published in the areas of postural control, gait analysis, occupational biomechanics, and human factors and ergonomics, and have given multiple technical presentations at domestic and international scientific conferences. While at ARCCA, I continue to conduct technical lectures dealing with the causation and prevention of injury trauma.

## Background and Incident Description:

According to the materials reviewed, on February 7, 2019, at approximately 10:00 a.m., Mr. Steven Liss, a 47-year-old man at the time, reportedly fell while walking under a catwalk at the TMS International ["TMS"] site located at 2500 East 23rd Street in Granite City, Illinois. [See Figure 1] Mr. Liss was employed by Supreme Trucking and Excavating ["Supreme"] as a truck driver and testified that he had previously been to the TMS facility and was familiar with the site. According to Mr. Liss, he was wearing steel-toed work boots at the time of the subject incident. Mr. Liss testified that the weather was rainy and historical weather data confirmed that it had rained in Granite City the morning of the subject incident. Mr. Liss testified that he was 75 inches in height. Based on Saint Louis University Hospital medical records dated February 7, 2019, Mr. Liss weighed approximately 185 pounds at the time of the subject incident.



**Figure 1. TMS International scale entrance located at 2500 E. 23rd Street.**



Siobhan M. Murphy, Esq.
February 19, 2021
Page 3

**Materials Reviewed:**

As part of my analysis in this matter, I reviewed numerous documentary materials, including, but not limited to, the following:

- Granite City Fire Department Report

- Illinois Form 45: Employer's First Report of Injury dated February 8, 2019

- TMS International Incident Investigation Report dated February 7, 2019

- Color reproductions of photographs of the subject location

- Color reproductions of photographs of the plaintiff's injuries

- Google images of the subject location

- Worker's Compensation and Accident File pertaining to Steven Liss

- United State Steel Emergency Services Voluntary Statement of Rick Mercer dated February 7, 2019

- United State Steel Emergency Services Voluntary Statement of Jason Lunsford

- Pleadings and Discovery Materials

- Deposition Transcript of Steven Liss taken on January 8, 2020

- Deposition Transcript of Ricky Mercer taken on February 12, 2020

- Deposition Transcript of Jason Lunsford taken on February 12, 2020

- Deposition Transcript of Charlotte Liss taken on January 8, 2020

- Deposition Transcript of Garland Zimmerman taken on August 19, 2020

- Deposition Transcript of Jerimi Yost taken on June 22, 2020

- Deposition Transcript of Jim Bryant taken on June 19, 2020

- Deposition Transcript of Chester Razer taken on September 3, 2020

- Deposition Transcript of Catherine Wittgen taken on September 8, 2020

- Deposition Transcript of Cory Bateman taken on October 13, 2020

- Deposition Transcript of Jarod Finley taken on November 13, 2020

- Deposition Transcript of Jesse Branson taken on November 13, 2020

- Deposition Transcript of Thomas Revak taken on December 11, 2020

- Deposition Transcript of Thomas Upton taken on January 15, 2021

- Deposition Transcript of James Sause taken on January 22, 2021

- Deposition Transcript of Diane Zimmerman taken on February 2, 2021

- Deposition Exhibits

- Expert Report of Chester Razer

- Medical Records pertaining to Steven Liss

Siobhan M. Murphy, Esq.
February 19, 2021
Page 4



- Measurements of the subject location provided by Jason Lunsford taken on, or about, February 24, 2020

- Color reproductions of photographs taken at the SEA Site Investigation

- Video footage from SEA Site Investigation

- Historical weather data for Granite City, Illinois obtained from timeanddate.com

- Numerous learned treatises and published literature including, but not limited to, the documents referenced.

## Deposition Testimony and Findings:

Mr. Garland Zimmerman, Supreme's operations manager, testified that Supreme hauls rock, sand, dirt, and scrap. Mr. Zimmerman further testified that Supreme also does demolition and rock crushing. According to Mr. Zimmerman, it was standard procedure for drivers to arrive at a delivery site and take the provided paperwork into the office in order to obtain instructions for the delivery. Mr. Zimmerman testified that an hourly ticket is filled out if the scales are closed. Mr. Zimmerman, who testified to being familiar with the TMS site, also testified that there were instructional signs at the TMS site stipulating the rules for the property. According to Mr. Zimmerman, Supreme required drivers to wear a hard hat anytime they are outside of the truck. Ms. Diane Zimmerman, the owner of Supreme, also testified that it was company policy that Supreme truck drivers, including Mr. Liss, were required to wear hard hats, reflective vests, and steel-toed boots when they were outside of their truck. Ms. Zimmerman and Mr. Zimmerman both testified that Supreme provided safety training to the drivers, which included being aware of your surroundings, avoiding hazardous areas, and contacting Supreme if an adverse condition was encountered at a delivery site or if the site was closed.

Mr. Liss testified that on the morning of the subject incident he left Supreme with an empty tractor-trailer. Mr. Liss further testified that he drove to United Scrap where the trailer was loaded. According to Mr. Liss, United Scrap provided him with paperwork related to the load, which included the destination, TMS.

Mr. Liss testified that when he arrived at TMS to deliver his load, the east gate was open and he observed a lot of water on the property. Mr. Liss further testified that he drove his truck towards the scale, which he would normally drive onto, but there was a cone blocking the scale so he stopped his truck near the stop sign located near the scale. [Figure 2] According to Mr. Liss, instead of calling his dispatch or TMS, he exited his truck and went to walk to the building to ascertain if he could unload his truck. Mr. Liss testified that there was no clear dry path from his truck to the TMS door, although he noted some areas that appeared to be dry. Mr. Liss approximated that one-fourth of the path from his truck to the TMS door was dry.

ARCCA



**Figure 2. Stop sign at which Mr. Liss left his truck in order to walk into the office.**

Mr. Liss testified that in order to reach the office door he walked past the posted warning signs [Figure 3] and then walked under the catwalk [Figure 4]. Mr. Liss further testified that the area under the catwalk was covered with water at the time of the subject incident and he could not determine the depth of the water. According to Mr. Liss, he walked to the TMS office door and entered the building without any issues. Mr. Liss testified that he had to duck under two metal cross bars located underneath the catwalk in order to reach the office door. Mr. Liss further testified that after exiting the building, he began to walk back to his truck, utilizing the same path as when he entered the building. Mr. Liss testified that while he was walking back to his truck, he ducked underneath the first metal cross bar, but prior to reaching the second metal cross bar, his foot twisted and he fell. Mr. Liss further testified that he fell due to the uneven ground under the water and then hit his head on the second metal cross bar.

Siobhan M. Murphy, Esq.
February 19, 2021
Page 6





**Figure 3. Mr. Liss' travel path from his truck to the TMS office door.**



**Figure 4. Area under the catwalk at which Mr. Liss fell. The circle identifies the location of the subject fall as indicated by Mr. Liss during his deposition.**

Based on the medical records from Saint Louis University, Mr. Liss had a laceration on his head and was diagnosed with a comminuted and displaced fracture of the right distal tibial shaft and a minimally displaced fracture of the right posterior malleolus. Mr. Liss was also diagnosed with a comminuted fracture of the right distal fibula and lateral malleolus. It was noted that the medical



records included inconsistencies regarding the size and location of Mr. Liss' head laceration. Based on the materials reviewed, including photographs of Mr. Liss' injury and the Granite City Fire Department report, my analyses are based on a head laceration located generally on the top of Mr. Liss' scalp as best illustrated in the photographs.

Mr. Jason Lunsford, the TMS site manager, testified that hard hats were required on site. Mr. Lunsford further testified that there was signage to this effect on the site. [Figure 5] Based on the materials reviewed, Mr. Liss was not wearing a hard hat at the time of the subject incident.



**Figure 5. Example of personal protective equipment signage on TMS site.**

Mr. Cory Bateman, the TMS site clerk, testified that sometimes when there is a lot of hard rain the flood water causes the scales to be closed, but the site remains open. Based on the materials reviewed, the TMS employees and other visitors to the site typically approached the building from the west side where there was a parking lot and a designated walkway to the TMS office door. According to Mr. Lunsford, when it rains and the scales flood the other sides of the building, including the parking lot, remain dry. Mr. Bateman testified that TMS employees typically walked around the building and do no walk across the scales. Mr. Jesse Branson, a mechanic for Supreme, was tasked with retrieving Mr. Liss' truck after the subject incident. Mr. Branson testified that when he arrived at the TMS site, he parked his vehicle "where all the other cars were parked" [Branson p9] and walked around the building until he saw the entrance to the building. Mr. Branson further testified that he did not have to walk under the catwalk to enter the building.

Based on the materials reviewed, particularly the photographs and measurements taken during the SEA site investigation and those of Mr. Lunsford, the catwalk is located on the south side of the building and is supported by multiple metal vertical supports and metal cross bars. [Figure 6] In the direction of Mr. Liss' travel path, a smooth steel plate was located on the ground in between two sets of vertical posts. An asphalt surface surrounded the steel plate outside of the footprint of the catwalk. The first metal cross bar was oriented horizontally at a height of approximately 60 inches. The second metal cross bar, which Mr. Liss alleges to have struck with his head, was oriented diagonally with the



right side higher (approximately 69 inches above the steel plate) than the left (approximately 50 inches above the steel plate) at a length of approximately 67 inches. [Figure 7] The metal cross bar was an angle iron with a 3-inch flat surface oriented vertically and facing underneath the catwalk, while the back side of the angle iron projected away from the catwalk at a 90-degree angle from the top of the cross bar as viewed from underneath the catwalk.



**Figure 6. Subject location. Photograph taken at SEA Inspection.**



**Figure 7. Subject metal cross bar that Mr. Liss alleges to have struck with his head.**



Siobhan M. Murphy, Esq.
February 19, 2021
Page 9

**Analysis and Discussion:**

The scope of my analysis entailed assessing the causative factor(s) of Mr. Steven Liss' incident. The scientific method was employed, which enables a systematic examination of the subject incident.[1] In doing so, my analysis considered the facts of the case regarding Mr. Liss' incident in the context of the laws of physics, fundamental principles of human movement biomechanics, and human factors.[2,3,4,5,6,7]

Mr. Liss alleges that the mechanism of his fall was a trip event due to an uneven ground surface that he was unable to observe due to the presence of water on the ground under the catwalk. Based on the materials reviewed, Mr. Liss was walking in an area that was not a pedestrian walkway without wearing his hard hat. Mr. Liss was walking through the structural components of the catwalk, which were located adjacent to the scale. The catwalk itself was a raised platform, located above the scale, which was used by employees to examine truck loads from above. Based on the materials reviewed, there was no parking area on the south side of the building, where the scale was located and Mr. Liss left his truck by a stop sign, although there was a parking lot on the west side of the building. Mr. Liss testified that there was no clear and dry path for him to walk from the location of his vehicle to the building, however, he still chose to exit his vehicle and walk towards the building, instead of moving his truck to the parking lot on the other side of the building and/or walking around the building so he could utilize the pedestrian walkway provided from the parking lot to the building, which was dry. Mr. Liss chose to leave his vehicle and proceed directly to the building using the shortest travel path even though there was no pedestrian walkway present, water was present in his chosen path, and his truck was parked by the stop sign. Furthermore, Mr. Liss had been to the facility on prior occasions and was familiar with the site. When he realized that the scale was closed, or at least observed the cone blocking the scale, he could have moved the truck to the parking area and entered the building without having to walk by the scale or underneath the catwalk. Alternatively, he could have left his truck at the cone and simply walked around the building. Mr. Liss chose to walk in an area that was not a pedestrian walkway and was clearly covered with water.

As Mr. Liss approached the building, it should have been evident to Mr. Liss that he was not walking on an intended pedestrian walkway when he observed the structural components of the catwalk within his field of view and subsequent travel path. Given the height of the cross bars, they would have clearly been observable since they would have been located at approximately chest level. In fact, Mr. Liss testified to having observed the cross bars and ducking underneath them to get into the building. When presented with the physical obstructions within his travel path, instead of ducking under the metal cross bars, especially without wearing a hard hat, Mr. Liss should have chosen an alternative route to the office door and then to his truck upon his return trip. Upon exiting the office door and descending the stairs to the ground level, the dry designated pedestrian path to the west side parking lot would have been directly in front of Mr. Liss.

Based on Mr. Liss' described scenario and kinematics, he indicated that his foot twisted, causing him to fall and hit his head on the diagonally oriented metal cross bar located ahead of him. Based on Mr. Liss' described kinematics, when his foot twisted he fell and his head hit the metal cross bar located

1    Carey, S.S. (2004). A Beginner's Guide to Scientific Method. Belmont, CA: Wadsworth.
2    Halliday, D., Resnick, R., Walker, J. (2003). Fundamentals of Physics. New York, John Wiley & Sons, Inc.
3    Nordin, M. and Frankel, V. H. (2012). Basic Biomechanics of the Musculoskeletal System. Third Edition. Lippincott Williams & Wilkins, Philadelphia, Pennsylvania.
4    Sanders, M.S. and McCormick, E.J. (1993). Human factors in engineering and design: Seventh edition, McGraw-Hill, NY.
5    Woodson, W.E. (1992). Human factors design handbook. McGraw-Hill, NY.
6    Winter, D.A. (1990). Biomechanics and motor control of human movement. John Wiley & Sons, Inc. New York, NY.
7    Perry, J. (1992). Gait analysis: Normal and pathological function. SLACK Incorporated: Thorofare, NJ.



in front of him at a height of approximately 50-69 inches, which would be below Mr. Liss' eye height. Normal ambulation entails that the foot entering its swing phase be lifted off the ground (i.e. joists) and progressed forward as part of the human gait cycle.[8] A tripping mechanism occurs when the foot, during swing phase, interacts with an obstacle or some structure of the surface that protrudes above the walking surface. A trip and fall occurs when the body's lower extremity's forward progress is impeded, causing the body's center of mass to unexpectedly move forward beyond its base of support to an extent that it compromises the body's dynamic equilibrium and leads to forward fall kinematics.[9] From a biomechanical perspective, a trip event interrupts the swing leg from supporting the forward leaning torso that accompanies normal gait.[10] Without this support or an appropriate recovery step, forward torso flexion continues until a forward fall ensues.[11] Thus, this would entail Mr. Liss' head moving in a forward and downward direction, to strike the top and/or front portion of the angle iron. This movement would not have exposed the top of Mr. Liss' head, to a sharp edge of the angle iron. Therefore, given Mr. Liss' described kinematics, he would not have obtained his reported head laceration. If Mr. Liss had been wearing his hard hat, the hard hat would have covered the top of his head and prevented the reported head injury. An alternative possibility is that, based on the location of Mr. Liss' reported head laceration and the fact that he was not wearing a hard hat, it is likely that Mr. Liss obtained this injury during an upward movement of his head and body, with the top his scalp striking the bottom edge of the angle iron. This motion would not be associated with his described foot twist and fall.

**Conclusions:**

Based upon a reasonable degree of scientific certainty, and the information received and reviewed to date, I conclude the following:

1. On February 7, 2019, at approximately 10:00 a.m., Mr. Steven Liss, a 47-year-old man at the time, reportedly fell while walking under a catwalk at the TMS International site located at 2500 East 23rd Street in Granite City, Illinois.

2. Mr. Liss, who was familiar with the site, parked his truck at the stop sign prior to the scale and exited his truck to go into the building, even though this was not a designated parking area and a parking lot existed on the other side of the building.

3. An intended pedestrian pathway existed on the other side of the building connecting the parking lot and the entrance/exit door to the office.

4. Mr. Liss chose to walk into the building using a path with which he observed the majority to be covered with water.

5. Mr. Liss chose to walk into the building using a path that was obstructed by the structural components of the catwalk.

6. Mr. Liss chose to walk into the building using a path that was not a designated pedestrian walkway.

---

[8]    Winter, D.A. (1992). Foot trajectory in human gait: a precise and multifactorial motor control task. Physical Therapy, 72(1), 45-55.

[9]    Pavol, M.J. et al. (2001). Mechanism leading to a fall from an induced trip in healthy older adults. Journal of Gerontology, Medical Science 56A(7), M428-M437.

[10]    Robinovitch, S.N., Hsiao, E. T., Sandler, R., et al. (2000). "Prevention of Falls and Fall-Related Fractures through Biomechanics." Exercise and Sport Sciences Reviews 28(2): 74-79.

[11]    Eng, J.J., Winter, D.A., and Patla, A.E. (1997). "Intralimb Dynamics Simplify Reactive Control Strategies During Locomotion." J Biomechanics 30(6): 581-588.



Siobhan M. Murphy, Esq.
February 19, 2021
Page 11

7. Based on Mr. Liss' described kinematics and the materials reviewed, if he had fallen as described, he would not have received the reported laceration to the top of his head.

8. Mr. Liss' described kinematics are inconsistent with the laws of physics and the principles of biomechanics.

9. If Mr. Liss had been wearing his hard hat, he would not have received the reported head laceration during his described motion.

10. Based on the materials reviewed, it is likely that Mr. Liss obtained his head laceration during an upward movement of his head and body, with the top his scalp striking the bottom edge of the angle iron.

11. Mr. Liss' actions, or lack thereof, were causative factors of the subject incident.

If you have any questions, require additional assistance, or if any additional information becomes available, please do not hesitate to call.

Sincerely,

*Angela Levitan*

Angela Levitan, Ph.D., CPE
Senior Biomechanist