# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **STEVEN LISS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **Case No. 3:19-cv-00810-GCS** |
| **TMS INTERNATIONAL, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| **TMS INTERNATIONAL, LLC,** | ) | |
| | ) | |
| **Third-Party Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **SUPREME TRUCKING &** | ) | |
| **EXCAVATING, LLC, and UNITED** | ) | |
| **SCRAP METAL, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM & ORDER</u>

**SISON, Magistrate Judge:**

Plaintiff Steven Liss filed suit against Defendant TMS International, LLC ("TMS") on July 25, 2019, for injuries Mr. Liss sustained while delivering a scrap metal shipment on TMS's property. (Doc. 1). Mr. Liss alleges that, on February 7, 2019, he delivered scrap metal to TMS as part of his employment as a delivery driver for Supreme Trucking & Excavating, LLC ("Supreme"). (Doc. 22, p. 2). Mr. Liss first picked up the scrap metal for United Scrap Metal, Inc. ("USM"), who was the general contractor who employed Supreme. *Id.* However, when he arrived at TMS, Mr. Liss found that the property was

flooded. *Id.* He then exited his vehicle, walked through the flood water and under a catwalk, and entered the TMS office to ask what to do with his delivery. *Id.* at p. 3. When returning to his truck, Mr. Liss claims that he stepped in uneven terrain concealed by the water, causing him to twist his ankle and fall to the ground.[1] *Id.* Mr. Liss asserts that TMS failed to maintain a flat walkway, failed to warn USM or Supreme of the flooding, failed to provide safe ingress and egress to visitors, failed to provide a safe workspace, failed to barricade entry to the site by closing the gates, failed to maintain proper drainage on its property, and failed to create or enforce protocols to ensure safe ingress or egress. *Id.* at p. 3-4. Accordingly, in his amended complaint, Mr. Liss brings one count against TMS for negligence. *Id.* at p. 3.

On March 10, 2020, TMS brought a third-party complaint against Supreme and USM for contribution in the event that TMS was found negligent and liable to Mr. Liss. (Doc. 45). Against Supreme, TMS alleges that the subcontractor failed to train Mr. Liss to exercise appropriate care when exiting his vehicle; to exercise appropriate protocol when a delivery location is closed; to wear proper safety gear, including a hard hat; and to supervise Mr. Liss's delivery. *Id.* at p. 3. TMS also alleges that USM negligently hired Supreme, as USM knew or should have known that Supreme did not properly train and supervise its employees. *Id.* at p. 4-5. TMS brings both claims pursuant to 740 ILL. COMP. STAT. § 100/1, *et seq.* (the "Joint Contribution Act"). *Id.* at p. 4, 5.

---

[1]      TMS disputes this accounting of the injury and argues instead that Mr. Liss first hit his unprotected head on the catwalk, which caused him to fall and twist his leg.

Now before the Court is USM's motion for summary judgment against TMS, which USM filed on September 30, 2021. (Doc. 114). TMS timely responded on November 4, 2021, (Doc. 128), and the Court held a hearing on the motion on May 2, 2022. (Doc. 188). For the reasons delineated in the order below, the motion for summary judgment is **GRANTED.**

### FACTUAL ALLEGATIONS

Prior to the date of the accident, USM sold and delivered scrap metal to TMS pursuant to contractually accepted terms and conditions. (Doc. 128, p. 2). These terms and conditions included a warranty on behalf of USM and to TMS that the transportation of the scrap metal would comply with all applicable federal, provincial, state or local laws, ordinances, rules, and regulations. *Id*. USM also markets itself as operating every project with an emphasis on health, safety, and environmental excellence. *Id*. This promise includes dedication to a "comprehensive Risk Management program to protect from downstream liabilities." *Id*. (citing USM's website).

USM also adheres to an admittedly self-imposed vetting process for selecting carrier subcontractors. (Doc. 128, p. 4). According to USM's Midwest Regional General Manager, Tony Stuewe, USM conducts its background check for potential subcontractors by contacting the company's representative and searching the internet to determine their reputation. *Id*. USM's Midwest Transportation Manager Javier Aquino then reviews the subcontractor's Department of Transportation ("DOT") rating, which is based on factors including out-of-service rates and past safety violations. *Id*. Mr. Aquino explained that

USM would only use subcontractors with out-of-service rates and safety violations below the national average, or, in other words, an "above-average" safety rating. *Id*. As part of USM's commitment to safety, USM also outlined the expectation that drivers wear their hard hat, vest, and glasses throughout delivery, and that drivers "represent [USM] well" when making deliveries. *Id*. at p. 8.

USM's Chief Operating Officer, James Sause, explained USM's relationship with subcontractors thusly:

> Now, when it comes to third-party carriers, we're always very careful. We cannot manage them. They are not our team members. So, we have an expectation that they will follow whatever the requirements are, whatever the USM requirement is if they're on a USM property, and whatever the requirement would be where they are making their delivery.

*Id*. TMS's expert witness, Lew Grill, testified that, based on USM's testimony via Mr. Sause, had USM requested safety program material or other information sufficient to develop an informed opinion as to whether Supreme was truly an "above-average" subcontractor, USM would have realized that Supreme did not meet its qualifications. *Id*. Mr. Grill further noted that approximately sixteen out of twenty-six inspections resulted in safety violations for Supreme. *Id*. at p. 5. Further, when Supreme received violations during a safety inspection, it usually received multiple violations. *Id*. Overall, Supreme received thirty-nine violations during inspections, rendering it less than "above-average" in safety. *Id*. The DOT website confirms this finding: Supreme rates below-average for vehicle maintenance and out-of-service rates. *Id*.

USM maintains a close relationship with its subcontractors. Supreme's owner, Garland Zimmerman, explained that Supreme's drivers would go "down there [to USM], and [USM] would tell them what to do." (Doc. 128, p. 6). USM also provided a bill of lading and an assignment to drivers when they arrived at USM's site. *Id*. The bill of lading is a slip of paper with directions for the driver on the load to be carried, including the commodity, purchase order number, weights for the load, delivery destination, pick-up point, and load number. *Id*. USM also maintained contact between TMS and itself in case any problems arose with the delivery. *Id*. TMS is not able to contact the subcontractors USM chooses, nor are those subcontractors able to contact TMS. *Id*.

Historically, USM has exercised its ability to communicate between its subcontractors and TMS by handling issues arising during the delivery. (Doc. 128, p. 7). For instance, on February 19, 2015, a subcontracted driver contacted USM for assistance when his load froze and could not be dumped; USM then contacted TMS to address the issue. *Id*. Equally, on December 7, 2016, TMS contacted USM for instructions on assisting a driver that left without dumping the load due to mechanical problems. *Id*. Finally, on June 14, 2018, a driver hauling for USM damaged one of TMS's switch points; when notified of the issue, USM stated "we will address the issue." *Id*. However, prior to that moment, TMS employee Don Vesling also informed USM that "this driver is no longer [allowed] to ship to Gary until [this] investigation is over," indicating a degree of cooperation between TMS and USM regarding the drivers who deliver between USM and TMS. (Doc. 128, Exh. 4, p. 69-70). TMS also provides examples in which TMS requested

that USM remove a disrespectful driver from TMS's premises and when USM removed a driver from service at TMS's request after the driver was injured when failing to obey a railroad crossing signal. (Doc. 128, p. 7-8).

USM has also referred to its subcontractor's trucks as its own during communications with TMS. For example, in January 2019, TMS reached out to Beelman, a subcontractor between USM and TMS, about a "missing truck" which left no weigh ticket after delivering scrap metal. (Doc. 128, Exh. 4, p. 77). Beelman contacted USM, who responded to TMS's inquiry by asking for paperwork from the account department for "our missing truck." *Id*. However, TMS's employee made clear that it preferred to deal with Beelman directly, as communicating with USM and Beelman was "inefficient." *Id*. at p. 76. Nevertheless, Mr. Stuewe coordinated further discussion with TMS about the missing load. *Id*. TMS's employee claimed that USM stated that the driver failed to scale out; however, Mr. Stuewe explained that he "made no such statement about what the driver did on your [TMS's] property." *Id*. at p. 75. Mr. Stuewe also stated that he did not "have any information on what happened to your [TMS's] property . . . ." *Id*. at p. 74. However, TMS objected to this characterization and claimed that it suggested that TMS had control over "what your [USM's] trucker does . . . ." *Id*. at p. 74. TMS claims that the reference to "your trucker" indicates that both USM and TMS understood that USM exercised control over deliveries with its subcontractors, though only TMS has referred to the truckers as such. (Doc. 128, p. 7).

Though USM coordinates deliveries between its subcontractors and TMS, Supreme is also engaged in aspects of the delivery. For example, Supreme provides its drivers with uniforms; pays their paychecks; and provides drivers healthcare and retirement benefits, holiday pay, and personal protective equipment including a hard hat, truck, safety gear, and training. (Doc. 115, p. 3). Supreme also holds an orientation with safety training for new employees, weekly "toolbox meetings" in which drivers discuss safety, and monthly safety meetings. *Id*. Moreover, Supreme instructs its drivers to contact Supreme's office with any delivery issues off-site. *Id*. at p. 4. USM also leaves open to Supreme or to individual truckers the delivery route to be used to carry scrap metal from USM to its delivery sites. (Doc. 115, p. 4). After Mr. Liss sustained his injury, Supreme drivers retrieved the truck Mr. Liss used at Supreme's direction. *Id*. at p. 5.

## LEGAL STANDARDS

Summary judgment is proper when the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(c); *Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The movant bears the burden of establishing the absence of a genuine issue as to any material fact and entitlement to judgment as a matter of law. *See Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)(citing *Celotex*, 477 U.S. at 323). This Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *See Regensburger v. China Adoption Consultants*, *Ltd.*, 138 F.3d 1201, 1205

(7th Cir. 1998)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). *See also Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009)(stating that "we are not required to draw every conceivable inference from the record . . . we draw only reasonable inferences") (internal citations omitted). Summary judgment is also appropriate if a plaintiff cannot make a showing of an essential element of his claim. *See Celotex*, 477 U.S. at 322. While the Court may not "weigh evidence or engage in fact-finding[,]" it must determine if a genuine issue remains for trial. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

In response to a motion for summary judgment, the non-movant may not simply rest on the allegations in his pleadings; rather, he must show through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial. *See Walker v. Shansky*, 28 F.3d 666, 670–671 (7th Cir. 1994), aff'd, 51 F.3d 276 (citing *Celotex*, 477 U.S. at 324). No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party . . . if the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–250 (citations omitted). *Accord Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994). In other words, "inferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009) (internal citation omitted). *See also Anderson*, 477 U.S. at 252 (finding that "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]"). Instead, the

non-moving party must present "definite, competent evidence to rebut the [summary judgment] motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (internal citation omitted).

## ANALYSIS

USM asserts that summary judgment is proper because the relationship between USM and Supreme is that of a principal and an independent contractor. (Doc. 115, p. 6). Illinois has accepted Restatement (Second) of Torts § 409 as part of its common law. *See Carney v. Union Pacific Railroad Co.*, 77 N.E.3d 1, 7 (Ill. 2016)(citing generally *Larson v. Commonwealth Edison Co.*, 211 N.E.2d 247 (Ill. 1965)). Accordingly, one who employs an independent contractor "is not liable for harm caused by the latter's acts or omissions" in Illinois. *Id. See also* RESTATEMENT (SECOND) OF TORTS § 409. Instead, the independent contractor is charged with the responsibility and risk of harm because that contractor retains control over its and its employees' work. *Id.* at 7-8. The parties agree that USM and Supreme had an independent contractor and principal relationship. (Doc. 128, p. 12)(discussing exceptions to § 409); (Doc. 115, p. 6).

Although Illinois law broadly prohibits the assignment of liability for an independent contractor's acts to a principal, this "does not mean, however, that one who hires an independent contractor is absolutely immune from tort liability for a plaintiff's injuries." *Carney*, 77 N.E.3d at 8. Illinois law maintains two exceptions to this general rule: (i) a hiring entity may be liable for its own negligence when it retains some amount of control over the independent contractor, *id.* (citing RESTATEMENT (SECOND) OF TORTS §

414); and (ii) a hiring entity may be liable for an independent contractor's negligence if the hiring entity negligently selected the independent contractor. *See Carney*, 77 N.E.3d at 8 (citing RESTATEMENT (SECOND) OF TORTS § 411). TMS invokes both exceptions in arguing against USM's motion for summary judgment.

TMS brings this claim pursuant to the Illinois Joint Contribution Act. (Doc. 128, p. 11). Both parties further agree that the issues in this case are a matter of state law. *Id*. When interpreting state law, a federal court must determine how the state's highest court would rule. *See Rodas v. Seidlin*, 656 F.3d 610, 626 (7th Cir. 2011). If the state's supreme court has not yet addressed the issue, the federal court should "consult and follow the decisions of intermediate appellate courts" to predict how the state supreme court would act, unless "there is convincing reason to predict the state's highest court would disagree." *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012). Absent any authority from the relevant state courts, the federal court must examine the reasoning of courts in other jurisdictions addressing the same issue. *See In re Zimmer, NexGen Knee Implant Products Liability Litigation*, 884 F.3d 746, 751 (7th Cir. 2018)(citing *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007)).

The Joint Contribution Act "is addressed only to the relative culpability of tortfeasors at fault in fact." *Sperl v. Henry*, 124 N.E.3d 936, 943 (Ill. 2018)(quoting *American National Bank & Trust Co. v. Columbus-Cuneo-Cabrini Medical Center*, 609 N.E.2d 285 (Ill. 1992)). In order for a third-party plaintiff to recover from a third-party defendant under the Joint Contribution Act, "some basis for liability to the original plaintiff must exist."

*Raab v. Frank*, 157 N.E.3d 470, 478 (Ill. 2019)(citing *Vroegh v. J & M Forklift*, 651 N.E.2d 121, 125 (Ill. 1995)). "Illinois law is clear that . . . [i]f a defendant is not a tortfeasor *vis-à-vis* the original plaintiff, it cannot be a joint tortfeasor *vis-à-vis* a codefendant and may not be held liable to that codefendant for contribution." *Rivers v. Central Illinois Arena Management, Inc.*, 129 F.Supp.3d 643, 654 (C.D. Ill. 2015)(quoting *Vroegh*, 651 N.E.2d at 125) (internal quotation marks omitted). As TMS explains, if USM bears liability in contribution, that liability must be owed to Mr. Liss, regardless of the additional obligations USM may owe to TMS. *See* (Doc. 128, p. 11).

## I.   Whether USM Negligently Hired Supreme, Entailing Liability under § 411.

Under Restatement (Second) of Torts § 411, an employer may be liable in tort for failing to exercise reasonable care in selecting a careful and competent contractor when: (a) the contractor is hired to do work "which will involve a risk of physical harm unless it is skillfully and carefully done," or (b) the contractor is hired to "perform any duty which the employer owes to third persons."[2] A careful and competent contractor is one which possesses the knowledge, skill, experience, personal characteristics, and equipment a reasonable person would recognize as necessary to do the work the contractor is employed to do. *See* Restatement (Second) of Torts § 411, cmt. a, at 377. The amount of care that an employer must exercise when selecting an independent contractor is "that which a reasonable [person] would exercise under the circumstances."

---

[2]     Illinois adopted this section of the restatement in its common law in *Gomien v. Wear-Ever Aluminum, Inc.*, 276 N.E.2d 336 (Ill. 1971).

*Id.* cmt. c, at 378. In order to succeed on a claim under § 411, a plaintiff must therefore demonstrate that: (i) the employer knew or should have known that the employee had "a particular unfitness for the position so as to create a danger of harm to third persons;" (ii) that the employer knew or should have known of this unfitness at the time of hiring or retention; and (iii) that the particular unfitness was the proximate cause of the plaintiff's injury. *Doe v. Boy Scouts of America*, 4 N.E.3d 550, 560 (Ill. App. Ct. 2014)(quoting *Van Horne v. Muller*, 705 N.E.2d 898, 904 (Ill. 1998)). *See also* RESTATEMENT (SECOND) OF TORTS § 411, cmt. b (stating that the harm must result from the quality which made the contractor unfit for the employer to entrust work to them in order for that employer to be liable). However, even if there remains a genuine issue of material fact as to the reasonableness of the contractor's hire or proximate causation, if the plaintiff at issue is the contractor's employee, the general contractor must succeed on summary judgment. *See Carney*, 77 N.E.3d at 15 (explaining that the conclusion that a fact question existed as to whether the defendant failed to exercise reasonable care to employ a careful and competent contractor did "not end [the Court's] analysis" because the plaintiff, an employee of the contractor, was not a 'third person' to whom the defendant owed a duty under § 411).

Restatement (Second) of Torts § 411 explains that "[a]n employer is subject to liability for physical harm to *third persons* caused by" the employer's failure to exercise reasonable care in selecting a competent and careful contractor. (Emphasis added). Though USM left unchallenged TMS's declaration that Mr. Liss is considered a third

party under § 411 during the hearing on this motion, Illinois law does not support that proposition. The only Illinois Supreme Court decision to address the issue of whether a contractor's employee may sue a general contractor under a theory of negligent retention is *Carney*.[3] The plaintiff in *Carney* was an employee of independent contractor Chicago Explosive Services who sued the general contractor, United Pacific Railroad Company for negligently hiring Chicago Explosive Services under § 411. 77 N.E.3d at 16. In order to determine whether § 411 included employees of a negligently retained independent contractor, the Illinois Supreme Court first turned to the Restatement itself before analyzing decisions from other state courts.

First, the Court determined that § 411 did not include employees of a negligently retained contractor in the term "third persons" by its plain text. *Carney*, 77 N.E.3d at 16. Although § 411 does not explicitly define the term, it does provide a number of examples as to when the section would apply; "not one of the illustrations to section 411 involves a plaintiff who was an employee of the negligently hired contractor, or an employee of a subcontractor." *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 411, illus. 1-8, at 377-381).

> Instead, the plaintiffs [in the illustrations] were a customer who was injured by the defendant's violent collecting agent (illustration 1); a motorist who was injured by the negligence of a contractor the defendant hired to haul logs (illustration 2); a motorist whose car was hit by a bus hired by a hotel owner to transport guests, as well as the hotel guests riding on the bus who were injured in the collisions (illustrations 3 and 4); a pedestrian who was run over by a teamster hired by the

---

[3]      Prior to *Carney*, one Illinois appellate court questioned in *dicta* whether the term "third parties" in § 411 included employees of an independent contractor. *See Reico v. GR-MHA Corp.*, 851 N.E.2d 106, 116 (Ill. App. Ct. 2006). One other case to consider the issue cited summarily to *Reico* to hold that the term "third parties" did not include employees like Mr. Liss. However, that case was not published, and therefore does not constitute binding authority. *See Alvis v. City of Du Quoin*, No. 05-09-0543, 2011 WL 10500871, at *5-6 (Ill. App. Ct. Feb. 16, 2011).

defendant builder to haul materials (illustration 5); a pedestrian who was injured by a cornice failing from the defendant's house when the contractor the defendant hired failed to make timely repairs or was negligent in making the repairs (illustrations 6 and 7); and a motorist who was injured by falling brick from a building that abutted a public highway, owing to the shoddy work of the defendant's contractor (illustration 8).

*Id.* As none of these illustrations contemplate the employee of a subcontractor suing a general contractor for negligent retention, the Court found that the plaintiff's argument that such a suit was possible was not well-founded in the Restatement. *Id.*

The *Carney* Court next turned to other state courts to determine whether the reasoning of those courts was applicable in this context. First, the Court noted that the "overwhelming majority of the courts of other jurisdictions that have addressed the question have concluded that an employee of a contractor is *not* a third person for the purposes of section 411." *Carney*, 77 N.E.3d at 17 (quoting *Camargo v. Tjaarda Dairy*, 25 P.3d 1096, 1100 (Cal. 2001) (emphasis in original). *But see Bagley v. Insight Communications Co., L.P.*, 658 N.E.2d 584, 587-588 (Ind. 1995)(holding that the underlying policy considerations of § 411 supported finding that employees of a contractor may sue under the section, particularly because Indiana's joint contribution statute allocates fault so as to avoid a plaintiff's double-recovery under its workers' compensation regime); *Sievers v. McClure*, 746 P.2d 885, 891 (Alaska 1987)(noting that the language of § 411 may not support finding that the duties encapsulated in the description of negligent retention do not run to an employee of an independent contractor, but the overall purpose of the section, to prevent personal negligence, supported a contrary finding).

These courts identified five possible reasons for finding that § 411 did not include employees of a contractor in the term "third persons:" (i) the illustrations and comments to § 411 do not contemplate that scenario; *see Mentzer v. Ognibene*, 597 A.2d 604, 608 (Penn. 1991); *Chapman v. Black*, 741 P.2d 998, 1005 (Wash. 1987); (ii) the purpose of § 411 is to ensure an injured person has a remedy, however, this purpose is "already satisfied when that person receives workers' compensation benefits;" *see Jones v. Schneider National, Inc.*, 797 N.W.2d 611, 615 (Iowa App. Ct. 2011); *see also Urena Capano homes, Inc.*, 930 A.2d 877, 880 (Del. 2007); *Valdez v. Cillessen & Son, Inc.*, 734 P.2d 1258, 1263 (N.M. 1987); (iii) because the cost of workers' compensation is included in the contractor's price, holding the employer liable would constitute a double-recovery for the contractors employees; *see Lipka v. United States*, 369 F.2d 288, 293 (2d Cir. 1966); (iv) it would be inequitable to impose liability on the employer for negligent hiring when the contractor is limited to providing workers' compensation coverage; *see Camargo*, 25 P.3d at 1101; *Valdez*, 734 P.2d at 1263; and (v) a contractor's employees are better able to protect themselves against the negligence of an improperly hired contractor than members of the general public. *See Mentzer*, 597 A.2d at 609; *Payne v. Lee*, 686 F. Supp. 677, 679 (E.D. Tenn. 1988); *Urena*, 930 A.2d at 880. Based on these same considerations, the *Carney* Court determined that § 411 did not provide an employee of a subcontractor with a right to sue a general contractor for negligent retention. *See Carney*, 77 N.E.3d at 19.

The *Carney* Court also noted that Illinois appellate courts had determined that the term "others" did not include an independent contractor's employees in §§ 413, 416, and

427. 77 N.E.3d at 18-19 (citing *Apostal v. Oliveri Construction Co.*, 678 N.E.2d 756 (Ill. App. Ct. 1997)). The illustrations to those sections likewise referred only to injuries occurring to third-parties, supporting a finding that the Restatement did not include employees of an independent contractor in that term. *Id*. at 19.

Finally, though not addressed by the *Carney* Court, one additional reason supports interpreting the term "third persons" or "others" in the Restatement as excluding employees of a general contractor. The draft of the second Restatement initially stated that the liability to third parties does not include employees of the contractor because the cost of risk to the employee is encapsulated in workers' compensation statues and is borne by the defendant who hires the plaintiff. *See Camargo*, 25 P.3d at 1099-1110 (citing RESTATEMENT (SECOND) OF TORTS (Tentative Draft No. 7, Apr. 16, 1962) ch. 15, special note, p. 17-18).[4] This broad statement included not only § 411, but also the use of the terms throughout the Restatement. *Id*.

The Joint Contribution Act requires that a contributing tortfeasor be liable in tort to the plaintiff directly. As the Illinois Supreme Court has already determined that an employee of a subcontractor does not have a right to sue for a general contractor's negligent hiring of the subcontractor under § 411, that direct liability is not present in this case. Accordingly, summary judgment on this issue in favor of USM is proper.

---

[4] The reporter for the Second Restatement, William L. Prosser, recommended that this note be omitted for the final draft of the Restatement due to lack of uniformity on the issue, particularly regarding the effect of various state workers' compensation acts. *See Monk v. Virgin Islands Water & Power Authority*, 53 F.3d 1381, 1391 (3d Cir. 1995)(citing 39 A.L.I. Proc. 24-49(1962)).

## II.     Whether USM Undertook to Ensure Safety During Deliveries, Entailing Liability under § 411.

Although USM does not owe Mr. Liss a duty to avoid negligently hiring a subcontractor under § 411 by its terms, USM may nevertheless owe such a duty if it voluntarily undertook to reasonably hire its subcontractors. *See Keenan v. Home Depot U.S.A., Inc.*, Case No. 16-cv-4530, 2021 WL 4264358, at *6 (N.D. Ill. Sept. 20, 2021). The voluntary undertaking doctrine is outlined in § 324(a) of the Restatement (Second) of Torts; Illinois courts have adopted this section as common law. *See Hutchinson v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1023 (7th Cir. 2018)(citing *Jakubowski v. Alden-Bennett Constr. Co.*, 763 N.E.2d 790, 799 (Ill. App. Ct. 2002)). Under the voluntary undertaking doctrine, a defendant that does not owe a duty of care to the plaintiff is still liable for a breach of a voluntary undertaking if: (i) the party undertakes to do something and then fails to exercise reasonable care in a way that increases a third party's risk of harm; (ii) a party undertakes to perform a duty that a different party was obligated to perform and then negligently fulfills its duty; or (iii) a third party relies to its detriment on the fact that a duty has been voluntarily undertaken. *See LM ex rel. KM v. United States*, 344 F.3d 695, 701 (7th Cir. 2003)(citing *Wakulich v. Mraz*, 785 N.E.2d 843, 855-856 (Ill. 2003)). The Illinois Supreme Court has noted that public policy considerations support a narrow construction of voluntary undertakings. *See Frye v. Medicare-Glaser Corp.*, 605 N.E.2d 557, 560 (Ill. 1992); *see also Bell v. Hutsell*, 955 N.E.2d 1099, 1104 (Ill. 2011). Punishing those who voluntarily undertake to assist others "would discourage benign acts of assistance in contravention of public policy." *Padilla v. Hunter Douglas Window Coverings, Inc.*, No. 09

CV 1222, 2012 WL 3265002, at *5 (N.D. Ill. Aug. 8, 2012) (internal citations omitted). This is particularly pertinent when a plaintiff seeks to hold a defendant liable for nonfeasance, or the omission of a promised voluntary undertaking, rather than misfeasance, which is the negligent performance of a voluntary undertaking.[5] *See Thornton v. M7 Aerospace LP*, 796 F.3d 757, 768 (7th Cir. 2015).

The duty of care imposed on a defendant under the voluntary undertaking doctrine is limited to the extent of the undertaking. *See Frye*, 605 N.E.2d at 560-561. Under the first prong of the voluntary undertaking doctrine, mere knowledge of a risk is insufficient to invoke liability; instead, the defendant must affirmatively increase the risk of harm. *See Hutchinson*, 910 F.3d at 1025. For example, a witness's testimony that an accident would not have occurred if a forklift had a backup alarm is insufficient to find that a defendant increased the risk of harm by failing to recommend installation of the alarm. *Id.*

The second prong of the doctrine requires that the defendant "supplant the duty it undertakes from the party that originally held the duty," rather than merely assist or supplement the service provided by the other. *Padilla*, 2012 WL 3265002, at *5. For instance, evidence that a defendant provided warnings on products and sales materials, provided signage and pamphlets on the safety of the products at issue for retailers to

---

[5]     TMS does not explicitly allege that USM engaged in either nonfeasance or misfeasance. However, because TMS alleges that USM failed to vet Supreme for its safety record *at all*, rather than asserting that USM did so negligently, the Court interprets TMS's argument as one for nonfeasance. *Cf. Wakulich*, 785 N.E.2d at 846 (holding that defendants who supplied alcohol for a minor and then prevented others from caring for her committed misfeasance); *Hutchinson*, 910 F.3d at 1024-1025 (noting that the alleged failure to recommend installation of a backup alarm in a forklift despite promises of safety constituted nonfeasance).

make available to customers, and issued press releases to the media concerning the products' safety is insufficient to establish a voluntary undertaking. *Id*. Instead, these actions supplemented the safety efforts of the industry trade group which regulated the product, rather than supplanting the duty to ensure customer safety. *Id*.

Finally, under the last prong of the voluntary undertaking doctrine, a plaintiff must show that the harm suffered is a result of the plaintiff's reliance upon such an undertaking. *See Thornton*, 796 F.3d at 768 (citing *Bell*, N.E.2d at 1107-1108). Reliance is particularly vital when a plaintiff alleges nonfeasance. *See Hutchinson*, 910 F.3d at 1025 n.4. As TMS brings this claim pursuant to the Joint Contribution Act, it must show that USM voluntarily undertook the obligation to reasonably hire its subcontractors in relation to Mr. Liss. Further, if continuing under the reliance prong of the voluntary undertaking doctrine, TMS must demonstrate that Mr. Liss relied on USM's undertaking to his detriment.

TMS alleges that USM voluntarily undertook the obligation to ensure that its subcontractors complied with all pertinent laws, ordinances or regulations according to the terms and conditions of its contract with TMS. (Doc. 128, p. 13). It further argues that USM represented to TMS that its safety program was sufficient to ensure that TMS would not be subjected to risks, including the risk of physical injury to the drivers USM sent to TMS. *Id*. Although TMS outlines the representations USM made to it, it fails to outline whether USM made similar promises to *Mr. Liss*, to whom USM must owe a duty if TMS is to recover under the Joint Contribution Act. There is no evidence that USM promised

its subcontractors' employees that they would not face physical injuries when driving for USM. There is likewise no evidence that USM's failure to fully vet Supreme increased the risk of harm to Mr. Liss, or that Mr. Liss relied on USM's representations when hauling USM's scrap. In fact, there is no evidence Mr. Liss knew of these representations *at all*.

Finally, USM's representations regarding safety cannot be said to supplant Supreme's obligations to provide for the safety of its employees. Rather, the promise to select contractors with high safety ratings merely supplements these obligations. Although USM undertook to coordinate deliveries between its subcontractors and TMS, and although USM expected its subcontractors to represent it well with regards to safety requirements, Supreme still maintained its obligation to account for the safety of its employees by providing initial, weekly, and monthly training meetings, as well as the safety equipment necessary for its employees to do their job. *See* (Doc. 115, Exh. 8, 35:14 – 37:1; 68:5 - 17). Accordingly, even if USM voluntarily undertook to secure safety during deliveries of its scrap metal such that it owed a duty to Mr. Liss, such an undertaking was insufficient to supplant Supreme's primary obligation, making it impossible for Mr. Liss to recover under this theory. As Mr. Liss could not recover for a voluntary undertaking of USM, TMS also cannot recover pursuant to the Joint Contribution Act under this same theory.

### III. Whether USM Retained Control over Supreme's Work, Entailing Liability under § 414.

A second exception to the general rule that a general contractor is not liable in tort for the negligence of its subcontractor is found in Restatement (Second) of Torts § 414,

which Illinois has also adopted as common law. *See Carney*, 77 N.E.3d at 8 (citing generally to *Larson*, 211 N.E.2d 247). Section 414 states that an employer who entrusts work to an independent contractor, "but who retains the control of any part of the work" is subject to liability "for physical harm to others for whose safety the employer owes a duty to exercise reasonable care . . . " so long as the harm arises from the employer's failure to exercise such care. RESTATEMENT (SECOND) OF TORTS § 414. This rule imposes only direct liability on an employer. *See Aguirre v. Turner Construction Co.*, 501 F.3d 825, 828-829 (7th Cir. 2007)(predicting the Illinois Supreme Court's interpretation of § 414, cmt. a). *See also Carney*, 77 N.E.3d at 9 (adopting the Seventh Circuit's reading of the section). The retained control under § 414 is necessarily less than that contemplated when distinguishing between a master-servant and principal-contractor relationship. *See Carney*, 77 N.E. 3d at 9. The former relationship requires complete control, which is contemplated by agency law. *Id*. In contrast, the latter is governed by § 414, which "takes over where agency law ends." *Id*. (citing *Aguirre*, 501 F.3d at 829). *See also O'Connell v. Turner Construction Co.*, 949 N.E.2d 1105, 1108 (Ill. App. Ct. 2011).

When determining whether a principal has retained control over a part of a contractor's work, courts consider several factors, including the ability to fire an employee of the contractor, which entity provides equipment and materials for the job, the degree of skill required for the job, and which entity provides the employee payment. *See Boyle v. RJW Transport, Inc.*, No. 05 C 1082, 2008 WL 4877108, at *5-6 (N.D. Ill. Jun. 20, 2008). *See also Bokodi v. Foster Wheeler Robbins, Inc.*, 728 N.E.2d 726, 734-736 (Ill. App. Ct.

2000)(deploying the above considerations without explicitly outlining them). Although the question of retained control is typically one of fact, a court may decide the issue as a matter of law if the question is "so clear as to be indisputable." *Perkinson v. Manion,* 516 N.E.2d 977, 980 (Ill. App. Ct. 1987). The right to control the manner in which the work is preformed, rather than merely the result of the work, is often dispositive. *Id.* at 981. *See also Fonseca v. Clark Construction Group, LLC,* 10 N.E.3d 274, 281-282 (Ill. App. Ct. 2014)(finding that retained control over incidental aspects of the work must be so substantial that the contractor is not free to perform the job in its own manner). If a principal retains control only over matters ancillary to the job, such as loading the truck which facilitates performance of the work or providing instructions on where to deliver a load, there is insufficient control to establish liability under § 414. *See Shoemaker v. Elmhurst-Chi. Stone Co.*, 652 N.E.2d 1037, 1041 (Ill. App. Ct. 1994). Likewise, the principal's handling of complaints against a contractor's driver is also insufficient. *See Cable v. Perkins*, 459 N.E.2d 275, 276 (Ill. App. Ct. 1984).

As an initial matter, the Illinois Supreme Court has not addressed the issue of whether the use of the term "others" in § 414 gives an employee of a contractor a right to sue for personal injury.[6] This question presents a much closer call than the use of the term

---

[6]     Although the *Carney* Court considered this question extensively when contemplating § 411, it did not address the issue at all when considering § 414. However, the plaintiff's claim in *Carney* may have survived summary judgment had the Court not determined that the term "third parties" did not include employees of a contractor. 77 N.E.3d at 14. In contrast, the *Carney* Court determined that the plaintiff's case could not survive summary judgment under § 414 because the defendant did not retain control of safety assurances when the plaintiff sustained his injury. *Id*. The Court therefore did not need to address the interpretation of the term in order to arrive at a clear decision in that case.

"third parties" in § 411. Although the commentary to § 414 does not contain illustrations as the commentary to § 411 does, Mr. Prosser's Reporter's Notes for the section refer to twelve leading cases supporting this portion of the Restatement. Of those cases, four concern a plaintiff who is an employee of a contractor or subcontractor who sued the employer or general contractor for failure to reasonably exercise control of the contractor. *See Wilson v. Hibbert*, 194 F. 838 (3d Cir. 1912); *Bergquist v. Penterman*, 134 A.2d 20 (N.J. Superior Ct. 1957), *cert. denied*, 134 A.2d 832; *McGrath v. Pennsylvania Sugar Co.*, 127 A. 780 (Penn. 1925); *Voeckler v. Stroehamann's Vienna Bakery*, 83 S.E. 1025 (W. Va. App. Ct. 1914). The possibility that an employee of a contractor might sue a general contractor under this section is therefore at least contemplated by Mr. Prosser. Nevertheless, other state courts have held that the term "others" in § 414 *does not* include such employees by the plain language of the commentary to § 414. *See, e.g., Thompson v. Jess*, 979 P.2d 322, 327 (Utah 1999)(noting that cmt. c of § 414 imposes a requirement that the principal employer "actively participated" in the contracted work in order to entail liability; this requirement negates the obligation of a general contractor to protect an employee against the negligence of those who had employed him). Additional courts reason that, like § 411, § 414 is premised on the direct liability of a general contractor, making the sections sufficiently similar to support a similar reading of their terms. *See Toland v. Sunland Housing Group, Inc.*, 955 P.2d 504, 523 (Cal. 1998)(Werdegar, J., concurring in part). Moreover, the same policy considerations which supported limiting the term "third parties" also supports similarly limiting the term "others" in § 414. *See, e.g., Monk*, 53 F.3d at 1391 (considering whether the Restatement as a whole permits employees of a

contractor to sue a general contractor and finding that the policy considerations did not support such a construction); *Stockwell v. Parker Drilling Co., Inc.*, 733 P.2d 1029, 1033 (Wyo. 1987)(rejecting the argument that permitting an employee of a contractor to sue a general contractor under § 414 would "circumvent" Wyoming's workers' compensation scheme and finding that the term "others" does not include such plaintiffs). *See also Dow v. Louisiana Land and Exploration Co.*, 77 F.3d 342, 346 (10th Cir. 1996)(noting that the term "others" under Wyoming law references those for whose protection a duty is imposed for the harm caused by a contractor's failure to provide precautions, and finding that this term does not include employees of a contractor) (internal citations omitted); *Dillard v. Strecker*, 877 P.2d 371, 380 (Kan. 1994)(excluding employees of a contractor from the term "others" because such employees are already covered by workers' compensation schemes) (internal citations omitted). *Cf. Curless v. Lathrop Co.*, 583 N.E.2d 1367, 1378 (Ohio Ct. App. 1989)(finding that the term "others" as used in Ohio statutory law analogous to the Restatement did not include employees of a contractor because such employees are already covered under workers' compensation laws). As such reasoning was persuasive to the Illinois Supreme Court in *Carney*, the Court predicts that the Illinois Supreme Court would likewise find that the public policy rationales behind excluding employees of a contractor from the term "third parties" in § 411 apply with equal force to excluding such plaintiffs from the term "others" in § 414. TMS would therefore be unable to recover under the Joint Contribution Act, as USM would not owe a duty to Mr. Liss to responsibly control Supreme's safety measures.

However, even if the Illinois Supreme Court would not so find, USM still failed to retain control over Supreme's safety measures sufficient to be liable under § 414. TMS argues that USM retained significant control over the operative details of its subcontractors' work, including by remaining the point of contact for Supreme and TMS regarding the delivery. (Doc. 128, p. 15). Further, TMS points out that USM provided the bill of lading directly to drivers, rather than to Supreme, leaving USM involved in the operative details of the delivery. *Id.* TMS also argues that USM retained "sole" responsibility for addressing customer concerns with drivers; although, this contention is undermined by TMS's handling of a "missing truck" with both USM and its subcontractor Beelman. (Doc. 128, Exh. 4, p. 77). When exercising this power, USM also had the ability to request that a driver leave the delivery site, respond to damage the drivers may have caused at the site, and to remove Supreme's trucks from the site after a personal injury. (Doc. 128, p. 15). Finally, when USM discovered that drivers did not wear proper personal protective equipment, it instructed those drivers to comply with personal protective equipment requirements and reminded the drivers of their obligation to wear such gear when on other sites. (Doc. 128, Exh. 14, 23:17-24:3).

Although these examples evidence USM's involvement in the delivery process, they do not indicate that USM retained so much control over Supreme's safety program that Supreme was not free to perform its work in its own manner. *Cf. Fonseca*, 10 N.E.3d at 281-282. One case exemplary of the amount of control necessary for liability under § 414 is *Bradley v. United States*, 19 C 903, 2021 WL 1837381, at *6 (N.D. Ill. May 7, 2021). In

*Bradley*, the United States Postal Service ("USPS") retained a contractor to repair the office's HVAC system; this contractor employed the plaintiff. *Id*. at *3. The USPS retained control over the plaintiff's ability to choose which type of ladder he would use to reach the air handler's opening, as a post office employee directed him to use only the Post Office's ladders which were already in the room in which the plaintiff would work. *Id*. at *5. The plaintiff then used an unsafe ladder and injured himself. *Id*. at * 6. The Court found that by excluding the plaintiff's choice as to what ladders he could use, the USPS sufficiently supplanted his ability to determine the method of his work, triggering liability under § 414. Similarly, in *Bokodi,* the Court noted that the general contractor imposed twenty-nine safety measures and procedures subcontractor employees were required to follow, installed personnel to monitor for compliance with those procedures, retained the power to halt subcontractor work, monitored the subcontractor's safety meetings, and participated in the subcontractor's safety program. 728 N.E.2d at 735.

In contrast, there is no evidence here that USM supplanted Supreme's safety regime in this case. Unlike in *Bradley*, Supreme employees maintained the ability to determine their own routes to and from USM to the hauling sites. (Doc. 115, Exh. 8, 12:8-12, 26:8-24). Furthermore, although USM provides Supreme's drivers with a bill of lading and maintains contact between TMS and Supreme, these measures are only ancillary to the actual work of dropping off the scrap metal. *Cf. Shoemaker*, 652 N.E.2d at 1041 (finding that instructions on where to deliver material are merely specifications about the particular task, rather than retaining control of the task's performance); *Peterson v. U.S.*

*Reduction Co.*, 641 N.E.2d 845, 851 (Ill. App. Ct. 1994)(holding that setting an employee's schedule and providing the specialized tools necessary for the task was insufficient to find retained control); *Wilson-McCray v. Stokes*, No. 01 C 1929, 01 C 5808, 2003 WL 22901569, *1 (N.D. Ill. Dec. 9, 2003)(determining that providing an hour limit and report on the task merely provided the parameters of said task). Equally USM's ability to refuse to use or to recall a particular driver is not the same as the ability to fire said driver, and it does not indicate retained control. *See Wilson-McCray*, 2003 WL 22901569, at *1. As Supreme was free to conduct its initial, weekly, and monthly safety meetings, to provide personal protective equipment, and to otherwise hire and fire its drivers, USM did not retain control over Supreme's safety operations.

TMS points to *Sperl v. C.H. Robinson World Wide, Inc.* in support of its proposition that USM retained control over Supreme's safety operations. (Doc. 128, p. 16). TMS argues that the court in that case found that the general contractor had retained control by virtue of its interest in the mutual benefit received by the subcontractor's successful delivery of the contractor's materials. *Id*. Although the court in *Sperl* noted that the general contractor and subcontractor were closely aligned in the nature of their work, it did not find that the parties' mutual interest in successful delivery indicated retained control. 946 N.E.2d 463, 471 (Ill. App. Ct. 2011). Instead, the Court noted that the general contractor required specific trailers, dictated special instructions for hauling a load, including staying in constant communication with the general contractor, and imposed a system of fines for failing to follow those instructions. *Id. Cf. Wilson-McCray*, 2003 WL 22901569, at *1 (noting

that the general contractor's interest in timeliness did not render it liable under § 414 as having retained control of the subcontractor). Such significant control over the subcontractor in *Sperl* constituted retained control, rather than the parties' mutual interests. As those indications of control are absent here, *Sperl* is inapposite, and USM is not liable under § 414 as having retained control over Supreme. Accordingly summary judgment is proper in this case.

## CONCLUSION

For the above-stated reasons, USM's motion for summary judgment against TMS (Doc. 114) is **GRANTED.** The Clerk of the Court is directed to dismiss USM from this case.

**IT IS SO ORDERED.**

**DATED:  June 6, 2022.**

Digitally signed by Judge Sison 2
Date: 2022.06.06 11:40:05 -05'00'

_____
**GILBERT C. SISON**
**United States Magistrate Judge**