UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| STEVEN LISS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 3:19-cv-00810-GCS |
| TMS INTERNATIONAL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| TMS INTERNATIONAL, LLC, | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SUPREME TRUCKING & | ) | |
| EXCAVATING, LLC, and UNITED | ) | |
| SCRAP METAL, INC. | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

Plaintiff Stephen Liss filed suit against Defendant TMS International, LLC ("TMS") on July 25, 2019. (Doc. 1). In his complaint, Plaintiff alleges that his employer, Third-Party Defendant Supreme Trucking & Excavating, LLC ("Supreme") directed him to deliver scrap metal from Third-Party Defendant United Scrap Metal, Inc.[1] ("USM") to TMS. (Doc. 22, p. 2). However, when Plaintiff arrived at TMS, its property was flooded. *Id*. When crossing the flooded portion of the property, Plaintiff turned his right ankle and fell to

---

[1]     USM is the general contractor responsible for hiring Supreme.

the ground, injuring his head. *Id.* at p. 3.[2] Plaintiff therefore brings one count for common law negligence against TMS due to the unsafe conditions on its property. *See generally, id.*

On March 10, 2020, TMS filed a third-party complaint against USM and Supreme for contribution, should TMS be found liable for Plaintiff's injuries. (Doc. 45). TMS alleges that Supreme negligently failed to supervise Plaintiff's delivery and failed to train Plaintiff on proper safety gear and appropriate protocol when a delivery facility is closed. *Id.* at p. 3. Against USM, TMS brings one count for negligently hiring Supreme. *Id.* at p. 4. TMS brings both claims pursuant to 740 ILL. COMP. STAT. § 100/1, *et seq.* (the "Joint Contribution Act"). *Id.* at p. 4, 5. Now before the Court is Supreme's motion for summary judgment against TMS. (Doc. 113). For the reasons delineated below, Defendant Supreme's motion for summary judgment is **DENIED.**

### FACTUAL BACKGROUND

Prior to his injuries, Supreme employed Plaintiff as a truck driver for approximately eight years. (Doc. 113, p. 2). In this position, Plaintiff regularly transported scrap metal from one facility to another using a truck Supreme owned. *Id.* On February 7, 2019, Plaintiff picked up a load from a USM facility and drove it to a TMS facility in Granite City, Illinois. *Id.* Plaintiff had some familiarity with the TMS facility, as he had been to the facility "off and on" throughout his eight-year employment with Supreme.

---

[2]       There is a dispute between the parties as to the sequence of events directly preceding Plaintiff's injury. Plaintiff asserts that he twisted his ankle on uneven terrain, causing him to fall and hit his head on the catwalk. TMS alleges that Plaintiff first hit his unprotected head on the catwalk, causing him to fall onto his leg.

*Id.* Supreme maintained a policy of requiring truck drivers to wear hard hats whenever outside their vehicles at an unloading facility. (Doc. 113, p. 4).

Typically, when arriving at an unloading site, a driver would bring the truck onto the scale at the destination facility to weigh the scrap metal load. (Doc. 113, p. 2). However, when Plaintiff arrived at the facility on February 7th, heavy rain had flooded portions of the property, including the portion where Plaintiff would usually drive onto the scale. *Id.* A cone in front of the scale indicated to Plaintiff that he was prohibited from further driving onto the scale per custom in the industry. *Id.* He therefore exited his truck and walked to TMS's office to see if he could unload his shipment at the facility. *Id.* at p. 3. Plaintiff did not call Supreme, USM, or TMS for instructions prior to exiting his vehicle. (Doc. 123, p. 5).

Plaintiff kept a hard hat in the cab of his truck. (Doc. 113, p. 2-3). He also admits that he saw a sign at the TMS facility stating that hard hats were required at all times. *Id.* at p. 2. However, Plaintiff did not wear his hard hat when he exited his vehicle. *Id.* at p. 3.

Plaintiff approached the TMS office by walking under a catwalk structure, so as to avoid the deepest part of the floodwater. (Doc. 113, p. 3). Water under the catwalk also forced Plaintiff to walk closer to the building and under the diagonal supports of the structure. *Id.* Plaintiff could have alternatively accessed the office by walking around the building, through the parking lot, to the door on the opposite side. (Doc. 123, p. 6). This path would not have required walking under the catwalk structure. *Id.* Plaintiff is six feet

and three inches tall; the horizontal iron crossbar of the catwalk is approximately five feet higher than the ground. (Doc. 123, p. 6). Plaintiff was therefore forced to "duck" under the crossbar when going to and leaving from TMS's office to his truck. *Id.*

When Plaintiff entered the office, he asked TMS employees whether he could unload his scrap metal; the employees told him he could not. (Doc. 113, p. 3). Plaintiff then returned to his truck using the same path by which he accessed the office. *Id.* This time, according to Plaintiff, Plaintiff twisted his foot on uneven ground under the floodwater and severely injured his leg. *Id.* He also struck his head on the catwalk support bars. (Doc. 123, p. 6).

LEGAL STANDARDS

Summary judgment is proper when the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(c); *Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The movant bears the burden of establishing the absence of a genuine issue as to any material fact and entitlement to judgment as a matter of law. *See Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)(citing *Celotex*, 477 U.S. at 323). This Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *See Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1205 (7th Cir. 1998)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). *See also Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009)(stating that "we are not required to draw

every conceivable inference from the record . . . we draw only reasonable inferences")
(internal citations omitted). Summary judgment is also appropriate if a plaintiff cannot
make a showing of an essential element of his claim. *See Celotex*, 477 U.S. at 322. While
the Court may not "weigh evidence or engage in fact-finding[,]" it must determine if a
genuine issue remains for trial. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

In response to a motion for summary judgment, the non-movant may not simply
rest on the allegations in his pleadings; rather, he must show through specific evidence
that an issue of fact remains on matters for which he bears the burden of proof at trial.
*See Walker v. Shansky*, 28 F.3d 666, 670–671 (7th Cir. 1994), aff'd, 51 F.3d 276 (citing *Celotex*,
477 U.S. at 324). No issue remains for trial "unless there is sufficient evidence favoring
the non-moving party for a jury to return a verdict for that party . . . if the evidence is
merely colorable, or is not sufficiently probative, summary judgment may be granted."
*Anderson*, 477 U.S. at 249–250 (citations omitted). *Accord Starzenski v. City of Elkhart*, 87
F.3d 872, 880 (7th Cir. 1996); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994). In
other words, "inferences relying on mere speculation or conjecture will not suffice." *Trade
Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009) (internal citation omitted).
*See also Anderson*, 477 U.S. at 252 (finding that "[t]he mere existence of a scintilla of
evidence in support of the [non-movant's] position will be insufficient; there must be
evidence on which the jury could reasonably find for the [non-movant]"). Instead, the
non-moving party must present "definite, competent evidence to rebut the [summary

judgment] motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (internal citation omitted).

**ANALYSIS**

A Court sitting in diversity jurisdiction applies the substantive law of the state in which it resides. *See Maroules v. Jumbo, Inc.*, 452 F.3d 639, 645 (7th Cir. 2006). TMS brings this claim pursuant to the Illinois Joint Contribution Act. (Doc. 45, p. 4). Both parties further agree that the issues in this case are a matter of state law. (Doc. 113, p. 5). When interpreting state law, a federal court must determine how the state's highest court would rule. *See Rodas v. Seidlin*, 656 F.3d 610, 626 (7th Cir. 2011). If the state's supreme court has not yet addressed the issue, the federal court should "consult and follow the decisions of intermediate appellate courts" to predict how the supreme court would act, unless "there is convincing reason to predict the state's highest court would disagree." *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012). Absent any authority from the relevant state courts, the federal court must examine the reasoning of courts in other jurisdictions addressing the same issue. *See In re Zimmer, NexGen Knee Implant Products Liability Litigation*, 884 F.3d 746, 751 (7th Cir. 2018)(citing *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007)).

The Joint Contribution Act "is addressed only to the relative culpability of tortfeasors at fault in fact." *Sperl v. Henry*, 124 N.E.3d 936, 943 (Ill. 2018)(quoting *American National Bank & Trust Co. v. Columbus-Cuneo-Cabrini Medical Center*, 609 N.E.2d 285 (Ill. 1992)). In order for a third-party plaintiff to recover from a third-party defendant under

the Joint Contribution Act, "some basis for liability to the original plaintiff must exist." *Raab v. Frank*, 157 N.E.3d 470, 478 (Ill. 2019)(citing *Vroegh v. J & M Forklift*, 651 N.E.2d 121, 125 (Ill. 1995)). "Illinois law is clear that . . . [i]f a defendant is not a tortfeasor *vis-à-vis* the original plaintiff, it cannot be a joint tortfeasor *vis-à-vis* a codefendant and may not be held liable to that codefendant for contribution." *Rivers v. Central Illinois Arena Management, Inc.*, 129 F. Supp.3d 643,  654 (C.D. Ill. 2015)(quoting *Vroegh*, 651 N.E.2d at 125) (internal quotation marks omitted). Thus, if Supreme bears liability in contribution, that liability must be owed to Mr. Liss, regardless of the additional obligations Supreme may owe to TMS.

The ultimate question before the Court on this particular motion is whether Supreme owed Mr. Liss a duty to exercise reasonable care in training Mr. Liss for the performance of his job duties. *See* (Doc. 113, p. 6). Duty and liability are distinct concepts under Illinois law; both concepts must be considered separately. *See Thompson v. Gordon*, 948 N.E.2d 39, 45 (Ill. 2011). Unless the defendant owes the plaintiff a duty of reasonable care, the defendant cannot be liable for the plaintiff's injury. *See Bell v. Hutsell*, 955 N.E.2d 1099, 1104 (Ill. 2011). Establishing such a duty requires the plaintiff to demonstrate that the plaintiff and the defendant stood in relation to one another such that the law imposes on the defendant an obligation of reasonable conduct for the benefit of the plaintiff. *See Vancura v. Katris*, 939 N.E.2d 328, 347 (Ill. 2010).

Supreme initially alleges that it owed Mr. Liss no duty of reasonable care in training or supervising him, rendering TMS's count for negligent training against

Supreme misplaced. (Doc. 113, p. 6). It also asserts that finding such a duty under either Illinois common-law or the Occupational Health and Safety Act ("OSHA") would circumvent public policy and the scope of the act respectively. *Id*. at p. 10, 13. In the alternative, Supreme claims that any legal duty that it owed to Mr. Liss did not extend to warning him about or protecting him against potential hazards on TMS's premises of which Supreme had no notice. *Id*. at p. 8.

Because the parties are disputing the existence of a duty at common law, the Court must turn to jurisprudence from the Illinois Supreme Court. Absent jurisprudence from that source, the Court will have to predict what the Illinois Supreme Court would do by turning to the decisions of Illinois appellate courts or courts of neighboring jurisdictions. Within that framework, TMS contends that Supreme did owe Mr. Liss a duty, even if not explicitly stated in Illinois Supreme Court cases, because: (i) Illinois imposes a four-factor test for determining whether a situation-specific duty exists, and those factors support finding a duty in the instant case, (Doc. 123, p. 8); (ii) analogous sections of the Restatement (Second) of Torts, Restatement (Second) of Agency, and OSHA support finding a duty, *id*. at p. 10; (iii) public policy considerations support finding the existence of a duty flowing from Supreme to Mr. Liss in these circumstances, *id*. at p. 15; and (iv) OSHA codifies common law obligations between an employer and an employee regarding the duty to train. *Id*. at p. 14. TMS also responds that training Mr. Liss to recognize and appropriately respond to potential hazards is well within the scope of that duty. *Id*. at p. 12.

The Court predicts that the Illinois Supreme Court would find that a duty to reasonably train an employee flows from the employer to the employee. Furthermore, while the contours of the scope of that duty are not presently defined in Illinois Supreme Court jurisprudence, the Court predicts that it would include training about common job-site hazards. Therefore, summary judgment is not appropriate in this case.

## I.     Whether Employers Owe Employees a Duty of Reasonable Training

Supreme's argument against the existence of a duty of reasonable training flowing from Supreme to Mr. Liss hinges on the interpretation of the term "harming party" in cases outlining the duty to reasonably supervise an employee for the benefit of third parties. (Doc. 113, p. 6). In *Doe v. Coe*, the Illinois Supreme Court highlighted the three elements of a claim for negligent supervision: (i) the employer has a duty to supervise the "harming party," (ii) the employer negligently conducted that supervision, and (iii) that negligent supervision proximately caused the plaintiff's injuries.[3] 135 N.E.3d 1, 5 (Ill. 2019) (internal citations omitted).[4] Supreme alleges that the term "harming party" must necessarily refer to a party different than the plaintiff. (Doc. 113, p. 7).

---

[3]     Supreme does not argue that it reasonably trained Mr. Liss or that its negligent training did not proximately cause Mr. Liss's injuries. Of the three prongs of the negligent supervision test, Supreme focuses only on prong (i), whether an employer has a duty to supervise the harming party. Accordingly, the Court finds no need to analyze whether Supreme negligently trained Mr. Liss, prong (ii), or whether that negligent training caused Mr. Liss's injuries, prong (iii).

[4]     Illinois courts apply the same elements considered in a negligent supervision claim to claims for negligent training. *See, e.g., Van Horne v. Muller*, 691 N.E.2d 74, 79 (Ill. App. Ct. 1998), *rev'd in part on other grounds*, 705 N.E.2d 898 (Ill. 1999)(applying the negligent supervision factors to a negligent training case); *Vancura v. Katris*, 907 N.E.2d 814, 826-827 (Ill. App. Ct. 2008), *rev'd*, 939 N.E.2d 328 (Ill. 2010)(noting that the same considerations applied in a case regarding negligent training as with a case regarding negligent supervision). The Illinois Supreme Court overturned *Vancura* on narrow grounds, instead finding that the defendant bore a duty to train its public notary employees consistently with and no more than was required

Illinois courts do distinguish between duties to prevent workplace injury owed to third persons and those owed to an employee-plaintiff. Consider, for example, the more explicit Restatement (Second) of Torts § 411 and Restatement (Second) of Torts § 414. Section 411 contemplates a "danger of harm to third persons . . . ." *Doe v. Boy Scouts of America*, 4 N.E.3d 550, 560 (Ill. App. Ct. 2014)(quoting *Van Horne v. Muller*, 705 N.E.2d 898, 904 (Ill. 1998)). Section 414 concerns liability for "physical harm to others . . . ." *Aguirre v. Turner Construction Co.*, 501 F.3d 825, 829 (7th Cir. 2007). Regarding the former section, the Illinois Supreme Court explicitly defined the term "third parties" so as to exclude an employer's employee. *See Carney v. Union Pacific Railroad Co.*, 77 N.E.3d 1, 16 (Ill. 2016). As to the latter, the Illinois Supreme Court would likely interpret "others" consistently with the term "third parties." However, the term "harming party" differs from the terms "third party" and "others" in one vital respect: the *Doe* Court's use of the term "harming party" broadly refers to the party which committed the tort, and it does not exclude the plaintiff from the class of people who can sue by its definition.

Unlike the term "third party" and the term "others," which exclude specific people from the class of those who are able to sue by definition, the term "harming party" merely connotes a tortfeasor. *Doe v. Coe* was the first Illinois Supreme Court case to synthesize the differing factors numerous appellate courts had employed in order to define the tort

---

under the Illinois Public Notary Act, 5 ILL. COMP. STAT. § 312/1-102(b) (1996). 939 N.E.2d at 348. Federal courts in Illinois also treat negligent supervision claims and negligent training claims as if they share a common set of elements. *See Kreher v. Polaris Industries, Inc.*, Case no. 20-cv-126-DWD, 2020 WL 7263285, at *2 (S.D. Ill. Dec. 10, 2020); *Glickman v. Main-Niles Association of Special Recreation*, 440 F. Supp.3d 946, 955 (N.D. Ill. 2020). *Cf. Doe*, 135 N.E.3d at 15 (holding that negligent supervision is a distinct cause of action from negligent hiring or retention, but not commenting on negligent training).

of negligent supervision. 135 N.E.3d at 5. The Court's primary objective in *Doe* was to determine whether these factors included an employer's notice of an employee's particular unfitness for the job; the Court did not consider whether the term "harming party" included the employee to be supervised in the potential class of plaintiffs. *Id.* When lower courts used the term "harming party," they did so to distinguish between the defendant employer and the party who actually committed a tort: typically, the employee. *See Doe v. Coe,* 103 N.E.3d 436, 452-453 (Ill. Ct. App. 2d 2018), *rev'd* 135 N.E.3d (Ill. 2019). Though the employee is often the actor in negligent supervision cases, it does not stand to reason that the employee cannot also be the plaintiff. Indeed, the *Doe* Court itself alluded to this when it noted that an "employer's duty to supervise . . . is general in nature." 135 N.E.3d at 16.[5] The general nature of the employer's duty to supervise suggests that the duty of reasonable supervision extends not only to third-parties, but to anyone who might be harmed if the employer is not reasonable in that duty, including the employee themselves.

The Court's research has not found any Illinois case specifically finding that an employer owes a duty of reasonable training to its employee. This is not surprising, however, given the existence of the Illinois Workers Compensation Act, 820 ILL. COMP. STAT. § 305/1, *et seq.* The Act provides the exclusive remedy for employees injured in the line of duty. *See* 820 ILL. COMP. STAT. § 305/5(a). As such, it prohibits an employee from

---

[5]       The *Doe* Court also declined to limit a cause of action for negligent supervision to those which demonstrate that the employer had prior notice of the harming party's potentially tortious conduct, instead requiring only general foreseeability. 135 N.E.3d at 16. This decision indicates an overall inclination towards keeping the cause of negligent supervision open to a broader scope of potential plaintiffs.

bringing a "common law or statutory right to recover damages" against the employer for those injuries. *Id*. The prohibition of common law suits against an employer by an employee in exchange for no fault liability being imposed on the employer was a "*quid pro quo*" designed to mitigate "the prospect of large damage verdicts." *Meerbrey v. Marshal Field and Co., Inc.*, 564 N.E.2d 1222, 1225 (Ill. 1990).

Against this backdrop, there are Illinois decisions where the plaintiff has alleged a failure to train, but those claims only survive if the plaintiff alleges an intentional tort. For example, in *Wells v. IFR Engineering Co.*, the plaintiff alleged, among other things, that the employer "failed to train the decedent on how to safely use the chemicals in a closed and unventilated area[.]" 617 N.E.2d 204, 205 (Ill. App. Ct. 1993). However, because the Illinois workers compensation statute required that all claims for recklessness or negligence between an employee and an employer be resolved pursuant to that statute, the Court held that the plaintiff's claim could not survive unless it stated an intentional tort. *Id*. *See also Bercaw v. Domino's Pizza, Inc.*, 630 N.E.2d 166, 168 (Ill. App. Ct. 1994)(noting that in case involving delivery driver who was assaulted by a third party that the plaintiff had made various allegations against the employer, including failing to train in prescribed safety regulations, but finding that the plaintiff had failed to state a claim because the plaintiff did not allege that the defendant acted intentionally); *Daniels v. Venta Corporation*, No. 2-21-0244, 2022 WL 1115179, at *5 (Ill. App. Ct. Apr. 4, 2022)(holding that circuit court erred in dismissing claim because the plaintiff's complaint alleged that the defendant intentionally chose not to provide the plaintiff with

the information, instruction, and equipment necessary to ensure he could protect himself from asbestos). This is because there are certain exceptions to the exclusive remedy provisions of the Act, and one of those exceptions is where the injuries are not compensable under the Act. *See Collier v. Wagner Castings Co.*, 408 N.E.2d 198, 202 (Ill. 1980)

Clearly, the Workers Compensation Act serves to preempt any claims of failure to train sounding in negligence. Thus, the Court did not expect to find cases between an employer and employee where those claims survived. The lack of any such cases, however, does not mean there is no legal duty flowing from the employer to the employee regarding training. Though a negligence claim might be preempted, the duty underlying that claim still exists. Indeed, the Illinois Supreme Court recognized this when it interpreted the Joint Contribution Act in *Doyle v. Rhodes*, 461 N.E.2d 382 (Ill. 1984). In *Doyle*, the Illinois Supreme Court addressed the issue of whether a third-party defendant's statutory immunity under the Workers Compensation Act also immunized it from claims under the Joint Contribution Act. *Id.* at 384. Under the Joint Contribution Act, there is a right of contribution "where 2 or more persons are ***subject to liability in tort*** arising out of the same injury . . . ." 740 ILL. COMP. STAT. § 100/2(a) (emphasis added). In *Doyle*, the third-party defendants argued that it could not be subjected to a right of contribution because it was not "subject to liability in tort" due to the Workers Compensation Act. *Id.* at 386. The Court, however, rejected that contention, noting that liability in tort was "determined at the time of the injury out of which the right to

contribution arises, and not at the time the action is brought." *Id.* at 387 (quoting *Stephens v. McBride*, 455 N.E.2d 54 (Ill. 1983)). The Court reasoned that the exclusive remedy provisions of the Workers Compensation Act was in the nature of an affirmative defense which could be asserted by the employer against any action sounding in tort. *Id.* at 386. Thus, such a defense could be waived if not asserted by the employer in the trial court. *Id.* In such a situation, the plaintiff could recover a tort judgment against an employer for a work-related injury. *Id.* And, the Court envisioned situations where it could be advantageous for the employer not to assert the defense if the determination was made that the employee could not "prove negligence to a jury's satisfaction." *Id.* at 387. Therefore, the Court concluded that at the time of the employee's injury, the employer was subject to liability in tort to his employee, even though "that liability can be defeated depending on the response [the employer] chooses to make to his employee's claim in the event the employee decides to sue in tort." *Id. See also Sompo v. Japan Ins., Inc. v. Nippon Cargo Airlines Co., Ltd.*, 522 F.3d 776, 783 (7th Cir. 2008)(finding that liability in tort for purposes of the Joint Contribution act is construed broadly to include "potential" tort liability and such liability is determined at the time of the injury to the plaintiff)(quoting *Doyle*, 461 N.E.2d at 387).

As *Doyle* makes clear, under the Joint Contribution Act, an employer is ***potentially*** subject to liability in tort for actions sounding in negligence at the time of the employee's injury. It is only after the employer asserts the affirmative defense of the Workers Compensation Act that the claim is precluded. But, the Court here is tasked with

determining whether Supreme can be held liable in contribution under the Joint Contribution Act. Indeed, Supreme acknowledges that the Illinois Workers Compensation Act does not prohibit an employer's liability in contribution to a joint tortfeasor for negligently causing an employee's injury. (Doc. 113, p. 8, n. 1)(citing *Virginia Sur. Co., Inc. v. Northern Ins. Co. of New York*, 866 N.E.2d 149 (Ill. 2007)). Thus, in the Illinois cases cited above involving allegations of a failure to train sounding in negligence, even though such claims were precluded by the Workers Compensation Act, the employers were potentially liable for such claims at the time of the employees' injury for purposes of the Joint Contribution Act. Furthermore, by recognizing that an employee could bring a claim involving allegations of an intentional failure to train, those courts have implicitly recognized a duty on the part of an employer to train their employees.

Though there is no case in the employer-employee context finding a duty to train on the part of the employer, one Illinois court did discuss a duty to train in an analogous situation involving a master and a servant. For example, consider the relationship between a sports team's head coach and the head coach's subordinate coaches or between a coach and their players; this situation entails a superior's general duty to supervise or train his or her subordinates for the safety of such subordinates. *See Hills v. Bridgeview Little League Ass'n*, 745 N.E.2d 1166, 1180-1181 (Ill. 2000)(considering a head coach's liability for assistant coaches' brawl during a little league match). The aforementioned situation is analogous to that between an employer and an employee. *See, e.g.*, Douglas Damer, Larry L. Vam & Amy M. Dorsey, 4 PATTERN DISCOVERY TORT ACTIONS § 52:2(a)

(Jun. 2021)(stating that the relationship between a coach and his or her team is analogous to that between an employer and an employee for consideration of negligent training). In *Williams v. Board of Educ. of City of Chicago*, the plaintiff was a high school football player who sued the Board of Education after he became paralyzed when he conducted an unsafe "spearheading" maneuver during a game. 584 N.E.2d 257, 259 (Ill. App. Ct. 1991). At issue before the Court was whether the plaintiff's amended complaint related back to the original complaint so as to not be time barred under the Illinois Code of Civil Procedure. *Id.* at 260-261. The Court concluded that the amended complaint did relate back because the Board was previously placed on notice of the facts which formed the basis of the plaintiff's amended complaint, *i.e.*, "claims of inadequate weight training and instruction as to the dangers of spearing[.]" The Court further noted the following:

> The duty of adequate supervision of a scrimmage therefore includes the duty to exercise reasonable care in the selection of those who will participate in the scrimmage. That duty *may be breached* if those who supervise the scrimmage, such as the coaches, *field players who lack adequate physical training or adequate instruction in the rules of safe play*.

*Id.* at 262 (emphasis added). *See also* Maria N. Macconce, FOOTBALL HELMET INJURY LITIGATION, 130 AMJUR Trials 447, § 10 (2013, May 2022 update)(noting that the failure to train football players during practice constitutes negligent training). Thus, even though the existence of the duty was not directly at issue, in this master-servant relationship, the court recognized that a coach could be held liable for failing to ensure that his or her players received adequate training to avoid on-field injuries. The aforementioned case therefore illustrates that a master's duty to supervise does extend to providing a servant

with adequate training or instruction on the rules governing safe operation of the servant's job. As the employer-employee relationship is analogous in nature to a coach and his or her players, it is not a stretch to conclude that a similar duty exists between an employer and an employee.

Supreme alternatively argues that if any duty flows from it to Mr. Liss, that duty is to provide its employees with a reasonably safe workspace. (Doc. 113, p. 8). It does not include the more specific duty to provide training to one's employees. *Id.* Supreme further asserts that this general duty does not extend beyond the master's own workplace to include hazards about which the master does not and cannot have advanced knowledge. *Id.* at p. 8-9. Supreme relies on two sources as support: (i) *Iseberg v. Gross*, 879 N.E.2d 278 (Ill. 2007); and (ii) Restatement (Second) of Agency § 471. However, neither *Iseberg* nor § 471 are applicable to this case.

As an initial matter, *Iseberg* cannot support finding that Supreme's only relevant duty in this case was to warn Mr. Liss as to hazards on Supreme's own premises. The plaintiff in *Iseberg* was an attorney who worked as an agent and co-adventurer on a joint venture with the defendants; unfortunately, the joint venture was not successful, and the parties lost significant investments. 879 N.E.2d at 282-283. One of the joint venturers focused his ire on the plaintiff and discussed his plans to assault the plaintiff with the defendant. *Id.* at 283. The defendant failed to warn the plaintiff about the impending assault. *Id.* The trial court initially dismissed the plaintiff's complaint, and the appellate court upheld the dismissal, finding that there was no general affirmative duty for one to

protect another against a criminal attack by third-persons. *Id*. However, one appellate judge dissented in part, stating that the complaint established the elements necessary for the application of the principal and agent exception to the general rule. *Id*.  The Illinois Supreme Court considered the application of this exception on further appeal.

The plaintiff in *Iseberg* relied on Restatement (Second) of Agency § 471 to argue that defendants, as the principal, had an affirmative duty to warn plaintiff, as the agent, of the potential assault. 879 N.E.2d at 286. The Illinois Supreme Court noted that courts finding a duty to warn based on § 471 have generally treated the duty as an extension of "an employer's general obligation to provide a safe workplace for his employees." *Id*. The Court further indicated that this section applies to *agents*; the primary purpose for this section was to "permit the agent to make an informed decision about whether he wishes to continue to maintain the agency relationship and assume the risks that it entails." *Id*. at 286 n.5 (emphasis added). While it considered and appeared to approve of § 471, the Court declined to apply it to the case. *Id*. at 287-288. The Court reasoned that the risk of harm as alleged in the plaintiff's complaint did not "arise from the particular nature" of the plaintiff's alleged agency relationship with the defendants. *Id*. at 288. Simply put, the plaintiff was not injured while performing any tasks for the defendants. *Id*. at 287. As such, the duty to warn did not arise because the situation did not pertain to an "unreasonable risk of harm involved in the employment" as is required for § 471 to apply. RESTATEMENT (SECOND) OF AGENCY § 471.

Supreme appears to place great reliance on the "reasonably safe workspace" language in *Iseberg* to conclude that whatever duties are owed to Mr. Liss do not extend beyond Supreme's own premises. It is true that the plaintiff in *Iseberg* was injured at his home away from the work premises, which would appear to support Supreme's contentions. However, the Court's rationale for not applying § 471 was not due to where the injury took place, but rather because the plaintiff suffered no injuries while he was performing any tasks for the defendants. Thus, *Iseberg* does not provide a basis to limit any applicable duties that an employer may owe to its employees to its own premises.

Turning to § 471 itself, Supreme also relied on this section to argue that it owed no duty to Mr. Liss to warn him of dangers that were present on TMS's property. Section 471 notes that the duty to warn only arises for unreasonable risks involved in the employment that the principal should realize exists. *See* Restatement (Second) of Agency § 471. As such, Supreme reasons that it cannot be held liable to Mr. Liss because it had no way to know of the conditions on TMS's property. At the hearing on the motion for summary judgment, the Court expressed skepticism over whether § 471 was applicable because it did not appear to fit the facts of the instant case. Counsel for Supreme noted that this was the most analogous provision it could find. TMS also did not advance a competing restatement provision for the Court to analyze.

The Court, however, does not need to look any further than the commentaries to § 471 to find a more appropriate provision that squarely fits the facts of this case. The commentaries specifically reference other provisions of the Restatement, *i.e.*, Section 495

and 510, for "the duties of a master to a servant with respect to warning and instructions[.]" RESTATEMENT (SECOND) OF AGENCY § 471, cmt. c.[6] A servant is simply "an agent employed by a master" and whose service is controlled or subject to the right to control by the master. *Id.* (citing RESTATEMENT (SECOND) OF AGENCY § 2). *See also* RESTATEMENT (SECOND) OF AGENCY § 470 (stating that principals are subject to the same liability as an agent, except that "a master has nondelegable duties of care with respect to the working conditions of his servants"). As such, the terms "master-servant" and "employer-employee" have been used interchangeably because the relationship is "merely one type of principal-agent relationship." *Spiral Step Tool Co. v. Metal Removal Div.*, Civil Action No. 73 C 2731, 1974 WL 20182, at *1 (N.D. Ill. Jun. 14, 1974). *See also Moy v. County of Cook*, 640 N.E.2d 926, 927 (Ill. 1994)(stating that "[a]lthough the terms 'principal' and 'agent,' 'master' and servant,' and 'employer' and 'employee' may have separate connotations for purposes of contract authority, ***such distinctions are immaterial for tort purposes***") (emphasis added).

Section 510 actually outlines a master's duty to train their servants, in addition to the duty to maintain a reasonably safe workplace, stating that: the "master's duty . . . includes a duty that care be used to give such instructions to servants employed by him

---

[6]       Section 495 requires that an employer conduct business in the light of knowledge as to conditions likely to harm employees, where such employees are considered to have special knowledge of the business and subject matter. This section applies to discrete instances of unsafe conditions of which an employer has knowledge, but the employee may not even with such training, such as when a job requires interaction with dangerous gasses. *See* RESTATEMENT (SECOND) OF AGENCY § 495, cmt. a, Illustration 1. This section therefore presumes that the employees already have the basic requisite training to obtain special knowledge of the business and subject matter. It is therefore not applicable to this case, because the issue here is whether any such basic training occurred in the first place.

as . . . is necessary to prevent unreasonable risk to him and other servants during the progress of the work . . . ." RESTATEMENT (SECOND) OF AGENCY § 510. This includes the duty to instruct a servant as to safe methods of performing the work, as to the dangers of the work, as to specific risks known to the master but not the servant, and as to general dangers to which the servant will not be prepared to sufficiently anticipate. *Id.* at cmt. a. Moreover, the Restatement's explanation of the duty to warn and instruct also includes the responsibility to ensure that the servant fully understands the warning and instruction given to them.

The Illinois Supreme Court has already adopted § 471, and the commentaries to § 471 directs courts to § 510 when analyzing a master-servant relationship. This duty is analogous to the duty that TMS claims exists under Illinois law, *i.e.*, an employer's duty to adequately train its employees so that they are not at risk of injuring themselves or others. Section 510 is furthermore consistent with the analogous duty discussed previously involving a coach's responsibility to ensure that his or her players are instructed on the safe practice of their sport in football games. This relationship has been characterized as one between a master and a servant and is akin to the relationship between an employer and an employee. Finally, the Illinois Supreme Court has regularly adopted other provisions of the Restatements when considering various circumstances. *See, e.g.*, *Iseberg*, 879 N.E.2d at 286. *See also Hutchinson v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1023 (7th Cir. 2018)(citing *Jakubowski v. Alden-Bennett Constr. Co.*, 763 N.E.2d 790, 799 (Ill. App. Ct. 2002)); *Carney v. Union Pacific Railroad Co.*, 77 N.E.3d 1, 7 (Ill. 2016)(citing

generally *Larson v. Commonwealth Edison Co.*, 211 N.E.2d 247 (Ill. 1965)); *Gomien v. Wear-Ever Aluminum, Inc.*, 276 N.E.2d 336 (Ill. 1971)(adopting sections of the Restatement (Second) of Torts into the Illinois common law). Accordingly, the Court predicts that the Illinois Supreme Court would adopt § 510 and find that an employer does have a duty to adequately train its employees to do their job so that such employees will not be an unreasonable risk of injury to either themselves or others.

Supreme next argues that placing the burden of reasonable training on it under the facts of this case would be a gross violation of public policy. (Doc. 113, p. 13). While the Court will address whether applying this burden to Supreme in this particular instance violates public policy when contemplating the scope of the duty to train in this case, as an initial matter, the Court also clarifies that imposing a general duty on employers to reasonably train their own employees does not contravene public policy. To the contrary, the history of labor organizing in Illinois and in the United States strongly supports finding the existence of such a duty. *See* Lorraine Schmall, WORKPLACE SAFETY AND THE UNION'S DUTY AFTER LEUCK AND HECHLER, 28 U. KAN. L. REV. 561, 562 (1990)(detailing a long history of labor organization in support of workplace safety leading up to the introduction of workers' compensation statutes, with a focus on reducing the number, causes, and legal and economic impacts of workplace injuries). *See also* John Fabian Witt, TOWARD A NEW HISTORY OF AMERICAN ACCIDENT LAW: CLASSICAL TORT LAW AND THE COOPERATIVE FIRST-PARTY INSURANCE MOVEMENT, 114 HARV. L REV. 690, 835 (2001)(explaining that a key goal of the organized labor movement in the United

States was to shift the incentive to avoid workplace accidents from employees to employers). Finding that employers owe their employees a duty of reasonable training to avoid workplace injuries is consistent with that history. [7]

## II.    The Scope of the Employer's Duty to Reasonably Train its Employees

The question of whether employers owe their employees a duty of reasonable training does not answer the inquiry as to whether that duty is applicable under the specific facts of this case. Illinois courts have found that a "highly fact-specific" inquiry is necessary to determine whether that general duty extends to the circumstances of a particular case. *See, e.g., Stearns v. Ridge Ambulance Service, Inc.*, 32 N.E.3d 765, 769-770 (Ill. App. Ct. 2015)(considering the tests applicable to determining whether a duty exists under a specific set of facts and comparing *Mulloy v. American Eagle Airlines, Inc.*, 832 N.E.2d 205 (Ill. App. Ct. 2005), which concerned a motor-vehicle accident and in which a broader analysis of duty was sufficient, with *Lance v. Senior*, 224 N.E.2d 231 (Ill. 1967), in which a young boy with hemophilia was permitted to play with a needle and a more fact-specific inquiry into duty was necessary). This is particularly vital in negligent training cases, as the duty to properly train or supervise an employee "is a general one and the

---

[7]     Because of the Court's findings with respect to an employer's duty to train its employees for the benefit of such employees, the Court need not address whether the sections of the Restatement (Second) of Torts, Restatement (Second) of Agency, and OSHA, cited by TMS, are applicable analogies. *See* (Doc. 123, p. 12). However, it seems unlikely that they are. For example, Restatement (Second) of Torts § 314A concerns the duty to give aid, *see* cmt. d; § 414 concerns workplace injuries broadly, rather than a duty to provide training specifically; Restatement (Second) of Agency § 495 applies to a master's duty to maintain safe equipment and operations in light of general expertise in the industry, *see* cmt. a; and OSHA is inapplicable when a court is considering the existence, rather than the scope, of a duty. *See Sobczak v. Flaska*, 706 N.E.2d 990, 1000 (Ill. App. Ct. 1998).

extent of supervision required depends on many factors . . . ." *Dugar v. U.S. Bank National Association,* No. 21 CV 4052, 2021 WL 6063869, at *6 (N.D. Ill. Dec. 22, 2021). Accordingly, when considering an employer's duty to train its employees for the benefit of third parties, the Illinois Supreme Court has found that the application of the duty is "best analyzed under principles generally applicable to negligence cases." *Vancura*, 939 N.E.2d at 383 (applying general negligence principles to determine "whether and to what extent Kinko's had a duty to train its notary employees" under the Notary Public Act applicable in that case). When considering whether an employer owes an employee or others a duty to train them against a particular hazard either to themselves or to third parties, Illinois courts consider: (i) the reasonable foreseeability of the injury, (ii) the likelihood of that injury, (iii) the magnitude of the burden of guarding against the injury, and (iv) the consequences of placing that burden on the defendant. *See id.* at 348. This test also assists courts in determining whether public policy supports finding that the defendant bears the burden of a specific duty to train their employees under the particular facts of a case. *See Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092, 1097 (Ill. 2012).

Analysis of the four general negligence factors supports finding that Supreme owed Mr. Liss a duty to train him to wear protective gear and to avoid observable hazards on delivery sites. Supreme addresses all four of the negligence factors: (i) it was not reasonably foreseeable that TMS's property would contain a hazard of which Mr. Liss would not be aware, (Doc. 113, p. 9); (ii) the likelihood of injury is equally low, as Supreme could assume that Mr. Liss would appreciate the risks of the hazard, *id.* at p. 14;

(iii) the magnitude of guarding against this burden is significant, as Supreme would need to anticipate all conceivable hazards on someone else's property, *id.* at p. 15; and (iv) imposing this duty would insult construction workers, as it assumes they are incapable of walking across a wet lot without guidance from their employers. *Id.* However, Supreme's analysis assumes that the Court agrees with Supreme that (i) the duty to reasonably train employees is not owed to that employee, and, accordingly, (ii) the real concern before the Court is whether Supreme upheld its obligation to provide Mr. Liss with a reasonably safe workspace. In addition to assuming that the Court agrees with Supreme's earlier analysis, this framework also assumes that it is settled that Mr. Liss sustained his injury on uneven terrain, an assumption TMS vigorously contests.

During the hearing on the motion for summary judgment, Defendant TMS mentioned that its expert witness, Dr. Levitan-DiDomenico, testified that the placement of Plaintiff's injuries indicated that he first hit his unprotected head on the catwalk structure, which caused him to fall and hit his leg. Mr. Liss did not wear his hard hat when walking to and from TMS's main office, making this sequence of events plausible. (Doc. 123, Exh. A, 41:6-8). He also chose to walk under a horizontal and diagonal metal bar which forced him to duck. *Id.* at 39:11-23. These facts introduce a genuine dispute of material fact as to whether the cause of Mr. Liss's injury was his failure to wear a hard hat or the uneven terrain on TMS's property. As this question remains properly before a jury, and as the Court has determined that Supreme owed Mr. Liss a duty of reasonable training, the proper consideration currently before the Court is not whether Supreme

should have anticipated conditions on TMS's property of which Mr. Liss was apparently unaware, but whether Supreme owed Mr. Liss a specific duty to train him to take proper safety measures when making deliveries.

TMS argues that it is both reasonably foreseeable that Mr. Liss would encounter flooding hazards when making deliveries, and that Mr. Liss would encounter hazards which would endanger his head. (Doc. 123, p. 13-14). Accordingly, TMS asserts that Supreme was negligent in failing to train Mr. Liss to recognize hazards and to call Supreme when he encountered such hazards, and in failing to train Mr. Liss to consistently wear his hard hat. The Supreme Court of Illinois recognizes that head injuries are reasonably foreseeable on construction sites, notwithstanding any premises hazard, which makes such an injury more likely. For example, in *Deibert v. Bauer Bros. Const. Co., Inc.*, the plaintiff stepped out of a portable toilet into a large rut in the ground while looking up to watch for falling debris. 566 N.E.2d 239, 245 (Ill. 1990). In applying the distraction exception to the open and obvious doctrine, the Court noted that the plaintiff was forced to decide between two equally foreseeable hazards: the potential for a rut, and the potential for a head injury on a construction site. *Id. See also Bucheleres v. Chicago Park Dist.*, 665 N.E.2d 826, 834 (Ill. 1996)(citing cases and noting that a more obvious danger is more reasonably foreseeable and more easily warned against, though injury from such a danger is also less likely). It is readily foreseeable that proceeding under scaffolding would cause an injury. For example, co-owner of Supreme, Garland

Zimmerman, testified that the need to avoid walking under scaffolding is "common sense." (Doc. 123, Exh. E, 51:14-16).

Supreme has a stronger argument that the likelihood of injury from either the uneven terrain or as a derivative result of an initial head injury is low. Though Supreme does not explicitly argue that the risk of injury to Mr. Liss was due to an open and obvious danger, the characterization of the risk as "common sense" indicates that the risk is readily apparent to the average person. The more apparent a potential risk, the less likely it is that the risk will cause injury to a person because it is assumed that the person will notice and appreciate the risk. *See Bucheleres*, 665 N.E.2d at 833-834. However, this does not impact the remaining factors in the analysis: the magnitude of guarding against the burden and the consequences of doing so. *Id*. If both of these remaining factors weigh in favor of imposing a duty on the defendant, Illinois courts will do so, regardless of the relatively low likelihood of injury. *Id*.

Contrary to Supreme's assessment, the magnitude of training Mr. Liss explicitly to wear his hard hat and to appreciate potential hazards from a catwalk is low. The consequences of requiring Supreme to do so are also low. Mr. Garland testified that, despite regular training meetings, he did not instruct employees on avoiding hazardous structures like catwalks. (Doc. 123, Exh. E, 51:10-11)(stating "I don't instruct them. However they figure they can get into the job safely and easily" when asked whether he would instruct Mr. Liss to walk under a catwalk). Training at Supreme regularly consists of encouraging workers to use "common sense" without more explicit instruction; for

instance, there is no written protocol available to drivers describing what to do if a delivery is not possible. *Id*. at 64:14-19. Employers, however, are required to provide formal instruction, practical training and demonstrations, and an evaluation of an employee's performance in the workplace under OSHA. 29 C.F.R. § 1910.178(1)(2)(ii). Relying on an employee's "common sense" and experience thus is not a sufficient substitute for such instruction. *See Danis-Shook Joint Venture XXV v. Secretary of Labor*, 319 F.3d 805, 811 (6th Cir. 2003). Although OSHA cannot enlarge a common-law duty, and the question of whether Supreme violated any OSHA regulation is not before the Court, the regulations provide an example of the burden Supreme would face in implementing such training programs. Because Supreme is already required to provide formal and practical training greater than the reliance on common sense under OSHA, it would be of little burden to implement that same training to avoid common-law negligence as well.

Supreme argues that Mr. Liss injured himself on uneven terrain. However, because that is a genuine question of material fact, the Court cannot foreclose the possibility that Mr. Liss injured himself by hitting his unprotected head on a catwalk on TMS's property. The reasonable foreseeability that Mr. Liss would be injured due to a hazard such as a catwalk, and when walking on a construction site without a hard hat is high, while the magnitude and consequences of guarding against such a risk are low. Though the likelihood of injury is low, this factor alone does not indicate that public policy would weigh against imposing a duty of reasonable training on Supreme in this situation. As Supreme does not argue that it's training is sufficient to uphold this duty or

that the lack of training did not proximately cause Mr. Liss's injury, this finding is sufficient to foreclose summary judgment on this motion.

CONCLUSION

For the above-stated reasons, Defendant Supreme's motion for summary judgment (Doc. 113) is **DENIED**.

**IT IS SO ORDERED.**

**DATED:  June 7, 2022.**

Digitally signed by
Judge Sison 2
Date: 2022.06.07
09:52:13 -05'00'

_____
**GILBERT C. SISON**
**United States Magistrate Judge**